# Exhibit 46, Part 5 of 6

der er udbetalt udbytte, og for hvilke der er søgt refusion af udbytteskat. Om dette er sket ved benyttelse af et substitut for egenkapital eller på anden vis, er juridisk ligegyldigt, hvorfor SKAT baserer sin afgørelse på en fundamental misforståelse af de relevante økonomiske forhold ved at forudsætte, at ejerskab til aktier skal opnås via kapital, frem for likviditet der er fremskaffet på anden vis.

• • • • • •

I overensstemmelse med Skatterådets afgørelse i <u>SKM2010.26.SR</u> er det således pensionskassen, der som udlåner af aktierne til tredjemand tillige er berettiget til at modtage udbyttet, der udbetales af selskabet, på de aktier pensionskassen ejer.

Det er således ikke korrekt, at pensionskassen ikke har kunnet betale for de pågældende handler.

**1.2 Udbytterne samt de refunderede udbytteskatter er tilgået The Proper Pacific LLC 401K Plan**

<u>For det andet</u> bestrides det helt overordnet, at The Proper Pacific LLC 401K Plan - som hævdet af SKAT -ikke har modtaget de udbytter, som anførtes i The Proper Pacific LLC 401K Plans anmodninger om refusion af udbytteskat.

SKAT har ikke i den indklagede afgørelse nærmere begrundet dette synspunkt eller dokumenteret, at pensionskassen ikke har modtaget udbyttet eller refusionen.

Det bemærkes, at anmodningerne om refusion af udbytteskat ledsagedes af såkaldte Dividend Credit Advices (herefter DCA), der var udarbejdet af den eller de ansvarlige custodians. Heraf fremgik netop, at The Proper Pacific LLC 401K Plan havde modtaget nettoudbyttet vedrørende de aktier, der fremgik af anmodningerne.

Ifølge SKATs daværende hjemmeside var DCA'erne tilstrækkelig dokumentation for modtagelsen af udbytter.

Det skal fremhæves, at de omhandlede DCA'er var udstedt af regulerede finansielle virksomheder, der var autoriserede til at udstede sådanne bekræftelser. The Proper Pacific LLC 401K Plan kan med rette henvise til disse DCA'er, idet der ikke findes noget andet bevismateriale for modtagelse af et udbytte.

Endvidere skal det fremhæves, at SKAT - i det omfang SKAT har anfægtet DCA'ernes indhold - kunne have indhentet relevant dokumentation fra de andre professionelle aktører, der var involveret i gennemførelsen af de i sagen omhandlede transaktioner (dvs. professionelle aktører ansvarlige for tax-filings, share-brokerage, clearing, settlement, custody, safe-keeping samt kontoføring og administration). Dette har SKAT imidlertid forsømt.

Det bemærkes i den forbindelse, at samtlige de involverede professionelle aktører har været underlagt tilsyn af offentlige tilsynsmyndigheder, i den periode som sagen omhandler. Dertil kommer, at de involverede aktørers regnskaber og procedurer er blevet gennemgået og godkendt af uafhængige revisorer, i den periode som nærværende sag omhandler.

Særligt i relation til den eller de omhandlede custodians bemærkes, at SKAT har forsømt at anvende deres myndighed til at indhente relevante oplysninger og dokumentation med

hensyn til gennemførelsen af de omtvistede transaktioner fra de ansvarlige tilsynsmyndig-
heder. Dette er særligt relevant, henset til at The Proper Pacific LLC 401K Plan jo havde sine
konti hos en custodian, der var reguleret og kontrolleret af de engelske tilsynsmyndigheder.
Dette er af afgørende betydning, idet The Proper Pacific LLC 401K Plan - ligesom alle andre
kunder hos en custodian - selvsagt ikke har adgang til fortrolige oplysninger hos deres cu-
stodians.

**1.3 Manglende selvangivelse i USA**

<u>For det tredje</u> bestrides det helt overordnet, at The Proper Pacific LLC 401K Plans mang-
lende selvangivelse efter amerikansk skattelovgivning - som hævdet af SKAT - kan tillægges
betydning, ved vurderingen af om The Proper Pacific LLC 401K Plan var den retmæssige ejer
af de aktier, hvorfra der er udbetalt udbytte, og som efterfølgende er søgt refunderet.

Det bestrides således, at The Proper Pacific LLC 401K Plans manglende indsendelse af en
"Form 5500"-selvangivelse i USA kan komme The Proper Pacific LLC 401K Plan til skade.

En pensionskasse er ifølge den amerikanske skattelovgivning undtaget selvangivelsespligt,
hvis dens aktiver ikke overstiger grænseværdien på USD 250.000 på den sidste dag i regn-
skabsåret.

Det bemærkes, at pensionskassens aktiver i løbet af året således godt kan have oversteget
grænsen, når blot aktiverne på sidste regnskabsdag var mindre.

Der kan selvsagt være en lang række konkrete årsager til, at pensionskassens aktiver var
mindre end USD 250.000 på sidste regnskabsdag.

For eksempel vil de gennemførte aktietransaktioner typisk have været gennemført på dette
tidspunkt (køb og salg gennemført), med den virkning at aktierne ikke længere befandt sig i
depotet.

Herudover er der en række omkostninger forbundet med de gennemførte transaktioner,
som ligeledes medfører reduktion i pensionskassens aktiver.

Det er ligeledes muligt at foretage udlodninger fra pensionskassen, med den virkning at ak-
tiverne på regnskabsdagen var mindre end USD 250.000.

I nærværende sag oversteg The Proper Pacific LLC 401K Plans aktiver ved hvert af de
respektive års udgang ikke grænseværdien på USD  250.000.

• • • • • •

Det bestrides endvidere, at The Proper Pacific LLC 401K Plans manglende ind- sendelse af
en "Form 990-T"-selvangivelse i USA kan komme The Proper Pacific LLC 401K Plan til skade.

Indsendelse af "Form 990-T"-selvangivelsen skal ske, hvis en 401K-pensionsplan har lånefi-
nansieret indkomst.

Som anført ovenfor har The Proper Pacific LLC 401K Plan teknisk set ikke lånt nogen midler til at
betale for køb af danske aktier. The Proper Pacific LLC 401K Plan udlånte som anført sine aktier
til en tredjepart. Den kontante sikkerhed (cash-collateral), som blev stillet til afsikring af dette

udlån af aktier, gjorde det muligt for The Proper Pacific LLC 401K Plan at erlægge købsprisen for aktierne, idet tredjeparten (låntager) måtte stille sikkerhed (i form af kontanter) for aktielånet. Pensionskassen havde derved den fornødne likviditet til rådighed til at betale købsprisen for aktierne.

Likviditeten til erhvervelse af aktierne stammede på denne måde fra selve aktieudlånstransaktionen. The Proper Pacific LLC 401K Plan havde med andre ord ikke lånefinansieret indkomst, hvorfor The Proper Pacific LLC 401K Plan ikke var forpligtet til at indgive en "Form 990-T"-selvangivelse.

• • • • • •

Endelig bemærkes, at selv om pensionskassen fejlagtigt måtte have undladt at selvangive i USA, kan en eventuel manglende selvangivelse på ingen måde medføre, at pensionskassen ikke er retmæssig ejer af de aktier, hvoraf der er søgt om udbytterefusion.

Det bemærkes i den forbindelse, at pensionskassen i USA er gyldigt stiftet og såvel formelt som reelt har retsevne.

**1.4 Registreringer i Værdipapircentralen**

For det fjerde bestrides det helt overordnet, at den manglende registrering af aktierne hos VP Securities A/S kan tillægges betydning, ved vurderingen af hvorvidt The Proper Pacific LLC 401K Plan var den retmæssige (skatteretlige) ejer af de aktier, hvorfra der er udbetalt udbytte, og som efterfølgende er søgt refunderet udbytteskat for.

Det gøres i den forbindelse gældende, at det ikke på baggrund af registreringerne i VP Securities er muligt at fastslå, hvorvidt The Proper Pacific LLC 401K Plan var den retmæssige ejer af aktierne eller ej.

Dette vil således ikke være muligt i nærværende sag, hvor The Proper Pacific LLC 401K Plan som anført har lånt aktierne ud til en tredjepart. I sådanne tilfælde vil denne tredjepart i forhold til VP Securities vises som aktionær, uanset at pensionskassen forbliver den retmæssige (skattemæssige) ejer af aktierne. Tilsvarende gælder tilfælde, hvor den retmæssige ejer har sine danske aktier på en omnibus-konto, eller såfremt custodians selv anvender andre (sub-)custodians.

**1.5 Nystiftet pensionskasse med en deltager**

Helt overordnet bemærkes, at det forhold, hvorvidt den pågældende pensionskasse er nystiftet eller kun har en enkelt deltager, ikke har nogen betydning for, hvorvidt pensionskassen er berettiget til at modtage udbytterefusion.

Såfremt pensionskassen opfylder betingelserne i dobbeltbeskatningsoverenskomsten mellem Danmark og USA, jf. artikel 22, stk. 2, litra e, jf. artikel 10, stk. 3, litra c, er pensionskassen efter overenskomsten berettiget til at få refunderet udbytteskatten.

Af overenskomsten fremgår, at Danmark og USA selv definerer, hvad der konstituerer en pensionskasse, og at dette, jf. også SKATs afgørelse, forstås som

*"En juridisk person, der er organiseret efter lovgivningen i en kontraherende stat med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende, forudsat at mere end 50 % af denne persons begunstigede medlemmer er fysiske personer, som er hjemmehørende i en af de kontraherende stater".*

Da pensionskassen efter amerikansk ret er gyldigt stiftet og omfattet af overenskomsten, skal Danmark anerkende, at pensionskassen er berettiget til udbytterefusion. Det bemærkes i den forbindelse, at SKAT tilsyneladende <u>ikke</u> fra de amerikanske myndigheder har fået oplyst, at pensionskassen ikke er gyldigt stiftet mv., idet SKAT ikke har henvist hertil i afgørelsen.

Det fremgår endvidere af OECD's bemærkninger vedrørende de amerikanske dobbeltbeskatningsaftaler, at samtlige 401 (k)-pensionsplaner med en enkelt del tager antages at være omfattet af de amerikanske aftaler, hvilket ligeledes kan dokumenteres i dokumenter fra den amerikanske kongres i forbindelse med afstemningen om ratifikationen af den amerikanske dobbeltbeskatningsoverenskomst.

**2 SKATs afgørelse skal annulleres**

Endvidere gøres det helt overordnet gældende, at SKATs afgørelse af den 6. april 2018 skal annulleres, således at de tidligere afgørelser om refusion af udbytte- skatter står ved magt, samtidig med at det overlades til SKAT at foretage de nødvendige, fyldestgørende undersøgelser af sagen.

SKAT har ved afgørelse af den 6. april 2018, jf. bilag 1, foretaget en tilbagekaldelse af tidligere trufne afgørelser om refusion af udbytteskat.

Det skal i den forbindelse fremhæves, at SKATs tidligere afgørelser om refusion af udbytteskatter ubestrideligt var gyldige, hvilket også er lagt til grund af SKAT, idet en tilbagekaldelse af de tidligere afgørelser rent forvaltningsretligt forudsætter, at afgørelserne var gyldige.

De oprindelige afgørelser om refusion af udbytteskat blev truffet på baggrund af anmodninger, der <u>ubestridt</u> opfyldte de dagældende dokumentationskrav.

Det er først nu - flere år efter indgivelsen af refusionsanmodningerne - at SKAT stiller spørgsmålstegn ved validiteten af den dokumentation, som var vedlagt anmodningerne.

SKAT har imidlertid alene baseret sin efterfølgende opfattelse på *udokumenterede antagelser* om The Proper Pacific LLC 401K Plans manglende ejerskab og udlån af de omhandlede aktier. SKAT har således ikke ført noget egentligt bevis for på- standen om manglende ejerskab mv., og påstanden er således aldeles udokumenteret.

SKAT har helt forsømt at indhente relevante oplysninger hos de mange professionelle udenlandske aktører, der ubestridt har været impliceret i de omhandlede transaktioner. Tilsvarende har SKAT forsømt at indhente relevante oplysninger hos udenlandske kontrol- og tilsynsmyndigheder.

Forsømmelsen af at indhente relevante oplysninger skal ses i lyset af, at SKAT via sine kon-trolbeføjelser- i modsætning til The Proper Pacific LLC 401K Plan - har reel mulighed for at indhente de af SKAT efterspurgte oplysninger.

Bevistvivlen vedrørende de forhold, som SKAT har problematiseret i afgørelsen af den 6. april 2018, må således tilskrives SKATs manglende effektive undersøgelser, hvilket selvsagt ikke kan komme The Proper Pacific LLC 401K Plan til skade.

SKATs tilbagekaldelse er som anført alene baseret på antagelser opstået flere år efter afgø-relserne om refusion af udbytteskat. Dette er selvsagt særligt kritisabelt, når henses til sa-gens størrelse og meget alvorlige betydning for The Proper Pacific LLC 401K Plan. The Pro-per Pacific LLC 401K Plans muligheder for at modbevise SKATs påstande er samtidig blevet væsentligt forringet af det lange tidsforløb og det forhold, at SØIK endvidere har beslaglagt en stor del af sagens dokumenter.

På baggrund af ovennævnte gøres det helt overordnet gældende, at SKAT kunne og burde have foretaget en mere effektiv undersøgelse af de af SKAT problematiserede forhold, og at SKATs fortsatte undladelse heraf ikke kan komme The Proper Pacific LLC 401K Plan til skade.

Landsskatteretten skal derfor <u>annullere</u> SKATs afgørelse om tilbagekaldelse, således at de oprindelige, gyldige afgørelser om refusion af udbytteskat står ved magt, og således at SKAT får mulighed for at foretage en behørig oplysning af sagen. "

## Skattestyrelsens sammenfattende bemærkninger

Skattestyrelsen har i forbindelse med de afsluttende bemærkninger henvist til afsluttende og sammenfattende indlæg afgivet i 5 førersager i komplekset. Heraf fremgår bl.a. følgende:

"(…)

Trods fremlæggelse af flere tusinde siders bilag er der stadig ingen af pensionsplanerne, der kan do-kumentere, at de har betalt for aktier. De kan heller ikke dokumentere, at de har modtaget aktier, eller at de har modtaget nettoudbyttet fra de aktieposter, som de påstår at have ejet. Til gengæld ligger det fast, at de ikke havde nogen penge.

I sig selv er det utroværdigt, at pensionsplaner uden aktiver køber så ekstremt store aktieposter som påstået – ofte i milliardstørrelse. Det indtryk forstærkes betydeligt, når *ingen* af pensionsplanerne fremlægger deres egne bankkonti til dokumentation af pengestrømme til/fra pensionsplanernes egne (bank)konti, (…), men kun nogle interne posteringer hos en custodian uden underliggende bi-lagsmateriale. Det er konsekvent, at ingen af pensionsplanerne fremlægger kontoudtog, endsige gi-ver en forklaring på, *hvorfor* de ikke fremlægger egne bankkontoudtog.

Mere uddybende bemærker Skattestyrelsen følgende:

Indholdsfortegnelse

1.  INDLEDNING                                                          4
2.  SAGERNE I HOVEDTRÆK                                                 5
    2.1   Sagskompleks med svindel for 12,7 mia. kr.                     5
    2.2   De seks førersager                                            6

|  | 2.3 | Pensionsplanernes påståede set-up | 9 |
|  | 2.4 | Det påståede set-up ville aldrig kunne anvendes i virkeligheden | 11 |
| 3. | INGEN PENGE ELLER KREDITVÆRDIGHED, MEN AKTIER FOR MILLIARDER | | 12 |
|  | 3.1 | Pensionsplanerne havde ikke nogen penge og har ikke modtaget nettoudbytter | 13 |
|  | 3.2 | Pensionsplanerne har ikke haft adgang til ekstern finansiering | 14 |
|  | | 3.2.1   GMSLA'erne er ikke troværdige | 15 |
|  | | 3.2.2   Den påståede finansiering var ikke på plads på aftaletidspunktet | 16 |
|  | | 3.2.3   Aktielånsaftalerne er "indgået baglæns" | 17 |
|  | | 3.2.4   GMSLA'erne er ikke blevet overholdt | 18 |
|  | | 3.2.5   Stock Lending Rate fastsættes arbitrært, og den aftalte Rate anvendes ikke (nyt) | 20 |
| 4. | UREALISTISK SET-UP UDEN FORRETNINGSMÆSSIGT RATIONALE | | 21 |
|  | 4.1 | Der er handlet urealistisk store aktieposter | 22 |
|  | 4.2 | Pensionsplanernes fortjeneste svarer præcis til udbytterefusionen | 24 |
|  | 4.3 | Der er intet forretningsmæssigt rationale bag de påståede transaktioner (nyt) | 26 |
|  | 4.4 | Nulresultatet ved investeringerne er dybt usandsynligt | 27 |
|  | 4.5 | Nulresultatet nås alene ved hjælp af "regnefejl" (nyt) | 28 |
| 5. | FEJL OG MANGLER VISER, AT DER IKKE ER HANDLET AKTIER | | 30 |
|  | 5.1 | Der er ingen dokumentation for, at pensionsplanernes custodians ("Solo-gruppen") har besiddet aktier | 30 |
|  | 5.2 | Pensionsplanerne henviser til intern bogføring hos deres custodians ("Custody Statements" – bilag 10) | 32 |
|  | 5.3 | Efterfølgende udarbejdede oversigter over bogføringer beviser ingenting | 33 |
|  | 5.4 | Broker Confirmations (bilag 11) dokumenterer ikke ejerskab | 34 |
|  | | 5.4.1   Brokere gennemfører ikke handlen (nyt) | 34 |
|  | | 5.4.2   Der er flere uoverensstemmelser mellem de påståede aktiebesiddelser og handelsnotaerne (nyt) | 35 |
|  | | 5.4.3   Konkrete eksempler på fejl i handelsnotaer | 36 |
|  | 5.5 | Der er ikke dokumentation for gennemførte handler | 41 |
|  | 5.6 | Vilkår for settlement er ikke markedskonforme | 42 |
|  | 5.7 | Handlerne (og fortjenesten) | 44 |
|  | 5.8 | Det er udokumenteret, at nettoudbytte og refusion ædes op af omkostninger | 45 |
|  | 5.9 | Custody Agreement er ikke blevet overholdt | 45 |
| 6. | SYSTEMATIKKEN VISER, AT DET HAR VÆRET EN SKRIVEBORDSØVELSE | | 47 |
|  | 6.1 | Alle pensionsplaner køber samme dag og til samme pris (nyt) | 48 |
|  | 6.2 | Størrelsen på aktiebesiddelser er systematiseret | 49 |
|  | 6.3 | Pensionsplaner har næsten ens aktieporteføljer (nyt) | 51 |
|  | 6.4 | Alle pensionsplaner handler med de samme parter (nyt) | 52 |
|  | 6.5 | Salgstidspunkt er systematiseret (nyt) | 53 |
|  | 6.6 | Sanjay Shah kontrollerede pensionsplanernes custodians (Solo-gruppen) | 55 |
|  | 6.7 | Custodian: Sanjay Shahs "univers" | 56 |
|  | 6.8 | Credit Advices er nummereret fortløbende på tværs af Solo-gruppen | 57 |
|  | 6.9 | Credit Advices fra Solo-gruppen blev anvendt til forsøg på svindel i 2017 | 60 |
|  | 6.10 | Pensionsplanerne har fastholdt, at handlerne ikke blev styret centralt | 61 |
|  | 6.11 | To pensionsplaner har glemt at ansøge om refusion (nyt) | 62 |
| 7. | FORMALIA | | 64 |
|  | 7.1 | Bevisbyrde | 64 |
|  | 7.2 | Annullation eller tilbagekaldelse – ugyldige afgørelser kan tilbagekaldes | 66 |
| 8. | PENSIONSPLANERNES BETRAGTNINGER | | 68 |
|  | 8.1 | Pensionsplanernes pengemaskine | 68 |
|  | 8.2 | Én aktie kan have flere ejere | 68 |

| | | |
|---|---|---|
| 8.3 | Short-selling medfører, at der er flere aktier på markedet end udstedt af selskabet | 68 |
| 8.4 | 1 udbytteskat kan føre til 2 refusioner | 69 |
| 8.5 | Sagen handler om jura | 69 |
| 8.6 | Det er umuligt at svindle med aktiehandler | 70 |
| 8.7 | Skiftende forklaringer 1: Pensionsplanernes "afgørende" beviser ændrer karakter | 70 |
| 8.8 | Skiftende forklaringer 2: Uoverensstemmelser i forklaringer om sikkerhedsstillelse og udbetaling af refusion | 72 |
| 8.9 | Skiftende forklaringer 3: Pensionsplanernes konti | 72 |
| 8.10 | Skiftende forklaringer 4: Manglende bevismateriale | 73 |
| 8.11 | Manglende forbindelse til VP Securities og settlement ved netting | 73 |
| 8.12 | Aktielåntager vil stille sikkerhed på markedsværdien | 74 |
| 8.13 | Spekulation om, hvorvidt Pinsent Masons har rådgivet Solo Capital | 75 |

## 1.  INDLEDNING

Udover pensionsplanerne i de 6 førersager repræsenterer TVC Advokatfirma mere end 100 amerikanske pensionsplaner, som alle har deltaget i fuldstændig samme set-up og med samme kreds af aktører.

På baggrund af påstået ejerskab til danske aktier har pensionsplanerne hver især fået udbetalt mange millioner kr. i refusion af indeholdt udbytteskat – i de seks førersager fra 1,2 mio. kr. til 70,9 mio. kr.

Pensionsplanerne kan ikke dokumentere, at de har ejet de påståede aktier, og at de har modtaget (netto)udbytte herfra, (…). Og pensionsplanernes helt identiske historie er *urealistisk* på et konkret såvel som et generelt plan.

Der er tale om nystiftede pensionsplaner, som ikke havde nogen penge eller nogen kreditværdighed i øvrigt. Alligevel påstår de at have købt danske aktier for mange hundrede millioner kr. (og i mange tilfælde endda milliarder kr.). Pensionsplanerne påstår, at de har finansieret de påståede aktiekøb ved aftaler om aktieudlån og forwards, men det kan de ikke dokumentere. Bl.a. er der ikke dokumentation for pengestrømme, og det er derfor ikke muligt at se, hvor pengene til aktiekøbene skulle være kommet fra, eller hvor de ryger hen, (…).

Enhver, der køber aktier, vil naturligvis sikre sig selv dokumentation for at have ejet aktierne, men det har pensionsplanerne åbenbart ikke gjort.

Det er helt urealistisk, at *én* nystiftet pensionsplan uden penge og kreditværdighed har kunnet skaffe ekstern finansiering til at foretage så massive investeringer. Og det er endnu mere urealistisk, at det samme skulle kunne lade sig gøre for mere end *hundrede* nystiftede pensionsplaner uden penge og kreditværdighed.

Dertil kommer, at pensionsplanerne ikke kan dokumentere, hvor deres påståede massive gevinster er blevet af.

Den samlede fortjeneste ved hver aktiehandel (inkl. transaktioner ved aktieudlån og forwards) svarer *præcist* til den udbetalte refusion, og hele gevinsten tilfalder pensionsplanerne. Det illustrerer ganske klart, at set-up'et ifølge pensionsplanerne har det ene formål at opnå en uberettiget refusion, som kun pensionsplanerne selv får udbytte af. De andre aktører i set-up'et (aktiesælgere, aktiekøbere, aktielåntagere og forward-medkontrahenter) bidrager – ifølge pensionsplanernes historie – med aktier, penge og risikoafdækning, men får ikke del i gevinsten. Det er altså et set-up fuldstændig uden

forretningsmæssigt rationale for de øvrige aktører. Forretningsmæssige aftaler indgås for, at begge parter kan opnå fortjeneste ved aftalen. Her har andre aktører i meget betydelige aktiehandler altså deltaget uden at få andel i gevinsten i tusindvis af tilfælde.

Pensionsplanerne har fremlagt flere tusinde siders bilagsmateriale. Men ingen af dem har fremlagt sine egne kontoudtog. I det hele taget er sagskomplekset kendetegnet ved en total mangel på dokumentation for pengebetalinger og overførsler.

Bilagsmaterialet er både mangelfuldt og fejlbehæftet, hvilket – om end naturligt, når der er konstrueret et så omfangsrigt og fiktivt set up – i sig selv er mistillidsskabende, når der er tale om materiale, som angiveligt skulle dokumentere aktiehandler for mange milliarder kr.

Én ting kan dog også udledes af det samlede bilagsmateriale; der er tale om helt systematisk og centralt koordineret svindel med refusioner af indeholdt udbytteskat. Systematikken i forbindelse med de påståede aktiehandler viser ganske tydeligt, at der er tale om fiktive handler kamufleret ved rene skrivebordsmanøvrer.

Pensionsplanernes historie hænger ganske enkelt ikke sammen og har ikke hold i den virkelige verden. Pensionsplanernes egne forklaringer er da heller ikke konsekvente, men skifter alt efter, hvad der passer bedst ind i deres historie.

## 2.     SAGERNE I HOVEDTRÆK

De administrative sager angår spørgsmålet om, hvorvidt pensionsplanerne var berettigede til refusion af indeholdt udbytteskat. Sagerne angår <u>ikke</u> tilbagebetaling af udbetalte beløb. Spørgsmålene om tilbagebetaling af beløbene verserer ved de amerikanske retssager, som Skattestyrelsen har anlagt med bl.a. alle pensionsplaner repræsenteret af TVC Advokatfirma, herunder de seks førersager. Tilbagebetalingsspørgsmålet vil således blive afgjort ved de civile søgsmål.

### 2.1     Sagskompleks med svindel for 12,7 mia. kr.

Sagskomplekset omhandler systematisk svindel med refusion af indeholdt udbytteskat fra 2012 til 2015, hvilket har resulteret i, at den danske stat er blevet snydt for samlet ca. 12,7 milliarder kr.

Der er tale om bl.a. 277 amerikanske pensionsplaner, som har anmodet om – og fået udbetalt – refusion af indeholdt udbytteskat. Pensionsplanerne ejede imidlertid ikke de pågældende aktier og har derfor ikke modtaget (netto-)udbytte. De var derfor heller ikke berettiget til de omhandlede refusioner.

Pensionsplanerne mv. har i flere tilfælde tilsammen tilbagesøgt udbytteskat i en størrelsesorden, der ganske enkelt er umulig.

Hvis alle refusionsanmodningerne lægges til grund, vil de f.eks. omfatte mere end halvdelen af aktierne (A og B) i A.P. Møller – Mærsk A/S. Det kan *umuligt* være rigtigt, idet kendte, danske fonde i sig selv ejer over halvdelen af de samlede aktier. Dertil kommer aktier ejet af andre professionelle investorer.

Et andet eksempel på, at refusionsanmodningerne ikke kan lægges til grund, er aktiebesiddelser i Tryg A/S. I 2015 foretog Tryg udlodning og indeholdt i den forbindelse (korrekt) cirka 123 millioner kr. i udbytteskat. Efterfølgende er der med henvisning til ejerskab til aktier i Tryg A/S blevet anmodet om refusion af indeholdt udbytteskat på samlet ca. 151 millioner kr. Heraf har pensionsplanerne til-

bagesøgt samlet ca. 136 millioner kr. Der er altså ansøgt om – og udbetalt – langt mere i refusion, end der har været indeholdt. Det siger sig selv, at der aldrig kan være krav om refusion af mere, end der har været indeholdt. Det bemærkes, at det jo langt fra er alle aktionærer, der er berettiget til refusion.

Der er med andre ord utvivlsomt svindlet med refusionsanmodningernes oplysninger om ejerskab til danske aktier.

(…)

### 2.3    Pensionsplanernes påståede set-up

Pensionsplanerne har i deres 5 indlæg og på kontormøderne forklaret deres set-up. Alle pensionsplanerne har anvendt samme model og i vidt omfang handlet samme aktier på samme tidspunkter.

Som eksempel på det forklarede set-up kan anvendes den mindste af prøvesagerne – [pensionsplan A]. [Pensionsplan A] foretog ét påstået aktiekøb, nemlig 2.987.462 aktier i TDC A/S. Aktierne blev ifølge pensionsplanen erhvervet den 7. august 2014 for 153.406.173,70 kr.

Transaktionerne kan opsummeres som følger (…):

(…)

[Pensionsplan A] gør gældende (jf. (…)), at pensionsplanen den 7. august 2014 købte ca. 2,9 mio. aktier i TDC for ca. 153 mio. kr. [Pensionsplan A] foretog dette køb uden at have kapital og uden at have sikret finansiering på aftaletidspunktet.

Samme dag – den 7. august 2014 – fandt [Pensionsplan A] en medkontrahent (en forward counterparty), som var indstillet på at kurssikre en aktiepost på 2,9 mio. aktier i TDC til en kursværdi på ca. 153 mio. kr. Denne forward counterparty blev således lovet kursstigningerne på aktien, men skulle til gengæld dække eventuelle kursfald. Forward counterparty skulle nødvendigvis være *meget* solvent. Kursudsving på f.eks. 10 % (ca. 15,3 mio. kr. i dette tilfælde) er ikke unormale (…), og denne aftalepart skulle dermed kunne bære meget betydelige tab. I det konkrete tilfælde faldt aktiekursen for TDC i aftalens løbetid, og forward counterparty realiserede et tab på ca. 16 mio. kr. (…).

Fem dage senere – den 12. august 2014 – udlånte [Pensionsplan A] de 2,9 mio. aktier. Låntageren indvilgede i at stille en kontant sikkerhed, der svarede *netop* til aktiekursen den 7. august 2014 (dvs. på købstidspunktet), selvom aktiekursen – bl.a. pga. en udlodning af 1,5 kr. pr. aktie – naturligvis havde ændret sig siden.

Låntageren stillede 153 mio. kr. til rådighed i rede penge for lån af aktierne. Låntager krævede ikke sikkerhedsstillelsen reguleret i forhold til dagsværdien af aktierne, selvom låneaftalen (GMSLA'en) standardmæssigt gav mulighed herfor (…). Sikkerhedsstillelsen svarede til 51,35 kr. pr. aktie, selvom aktiekursen den 12. august 2014 varierede mellem 47,67 kr. og 48,28 kr. (…). Cirka 3 kr. pr. aktie – eller i alt 9 mio. kr. – var dermed overkurs på tidspunktet for sikkerhedsstillelsens udbetaling.

Dagen efter – den 13. august 2014 – skulle [Pensionsplan A] betale sælger for aktierne for at få disse. Og pensionsplanen skulle levere aktierne til aktielåntager for at få den kontante sikkerhedsstillelse. Sikkerhedsstillelsen fra aktielåntager matchede købesummen, så transaktionerne gik lige op og blev ifølge pensionsplanerne gennemført.

Samme dag modtog [Pensionsplan A] nettoudbyttet på ca. 3,2 mio. kr.

Den 5. november 2014 afhændede [Pensionsplan A] aktieposten for ca. 134 mio. kr. Forward-aftalen blev lukket til samme kurs, og aktielånet blev afviklet.

Den 12. november 2014 anmodede (... på vegne af [Pensionsplan A] om refusion af indeholdt udbytteskat. Anmodningen blev sendt til SKAT, att. Sven Nielsen. Vedlagt anmodningen var en udfyldt blanketansøgning, fuldmagt (Power of Attorney), Credit Advice udstedt af Old Park Lane og Form 6166 fra IRS.

Den 28. november 2014 fik pensionsplanen refunderet ca. 1,2 mio. kr. fra SKAT.

**2.4     Det påståede set-up ville aldrig kunne anvendes i virkeligheden**

Modellen hænger efter Skattestyrelsens vurdering ikke sammen. Det påståede set-up er simpelthen umuligt. Pensionsplanernes egen forklaring om, hvad der er sket, kan derfor ikke lægges til grund.

Som det fremgår, var [Pensionsplan A] afhængig af, at aftalerne flaskede sig fuldstændigt. Hvis ikke det skete, ville [Pensionsplan A] stå tilbage med risici, som pensionsplanen ubestridt ikke kunne bære.

[Pensionsplan A] skulle <u>for det første</u> finde en aktiesælger, der ville handle aktier for over 150 mio. kr. med en pensionsplan uden kapital og kreditværdighed og uden styr på finansiering på handelstidspunktet (aktierne blev jo først udlånt flere dage senere). Derudover skulle sælger være villig til på den ene side at give afkald på en eventuel kursgevinst opstået i perioden fra aftaleindgåelsen til settlement (idet en sådan kursstigning jo ville tilfalde pensionsplanen), mens sælger på den anden side skulle beholde risikoen for kursfald i samme periode, hvis pensionsplanen misligholdt købsaftalen (fordi pensionsplanen ikke havde nogen penge).

<u>For det andet</u> skulle [Pensionsplan A] samtidig finde en forward counterparty, der var i stand til at bære et meget betydeligt tab, idet et kursfald på f.eks. 10 % ville medføre et tab på 15,3 mio. kr. Denne forward counterparty skulle tro på, at aktiekurserne ville *stige*.

Derudover skulle [Pensionsplan A] <u>for det tredje</u> finde en aktielåntager, som havde 153 mio. kr. til rådighed i likvide midler. Denne aktielåntagers formål med aktielånet måtte nødvendigvis være shorting, hvis der skulle være et forretningsmæssigt rationale bag. Aktielåntageren skulle altså tro på, at aktiekurserne ville *falde*.

Tilmed skulle aktiesælger, forward medkontrahent og aktielåntager være indstillet på, at hele gevinsten – som præcist svarede til refusionen – gik til pensionsplanen.

Endelig var det nødvendigt, at custodian sikrede, at aktiekøbet og aktielånet blev gennemført samtidigt. Ellers kunne pensionsplanen jo hverken betale for aktierne eller udlåne dem.

Det er *helt usandsynligt*, at hele denne kabale skulle kunne gå op for bare én pensionsplan for én aktiehandel.

Pensionsplanerne repræsenteret af TVC Advokatfirma gør imidlertid gældende, at ikke bare én, men mere end 100 uafhængige pensionsplaner har benyttet netop denne samme fremgangsmåde for utallige million- og milliardhandler. I vidt omfang på de samme dage og med de samme aktier.

Det er umuligt, at det har kunnet lade sig gøre i den virkelige verden. Pensionsplanernes omfattende bilagsmateriale dokumenterer ikke de påståede aktiehandler – tværtimod, jf. afsnit 3 og 5, nedenfor. Når bilagsmaterialet er så utroværdigt, som tilfældet er, bestyrker det jo handlernes fiktive karakter. Pensionsplanerne har således heller ikke bevist, at det har forholdt sig på den helt usandsynlige måde, som de påstår.

Virkeligheden er, at pensionsplanernes historie alene er udtryk for bogføringsmæssige posteringer uden virkelige handler.

### 3.      INGEN PENGE ELLER KREDITVÆRDIGHED, MEN AKTIER FOR MILLIARDER

Det er ubestridt, at pensionsplanerne ikke selv havde penge til at finansiere de påståede massive opkøb af danske aktier. Aktierne kunne altså kun købes gennem ekstern finansiering.

Det er således et grundlæggende nødvendigt – men ikke tilstrækkeligt – moment i vurderingen af, om pensionsplanerne har løftet deres bevisbyrde for at have ejet de påståede aktier, om de har kunnet skaffe ekstern finansiering til køb af aktierne.

Ifølge TVC Advokatfirma havde de nystiftede pensionsplaner *"let"* adgang til finansiering af deres massive million- og milliardinvesteringer i danske aktier, (…).

Pensionsplanerne påstår med andre ord, at de kunne finansiere deres million- og milliardinvesteringer uden at skulle have én krone op af lommen og uden at skulle stille nogen form for sikkerhed.

Det passer jo ikke.

Det siger sig selv, at pensionsplanerne ikke kan finansiere købet af de påståede aktier uden at have hverken penge eller kreditværdighed.

Og når pensionsplanerne ikke har kunnet finansiere de påståede aktiekøb, kan pensionsplanerne heller ikke – i den virkelige verden – have købt aktierne.

### 3.1      Pensionsplanernes havde ikke nogen penge og har ikke modtaget nettoudbytter

Pensionsplanerne er "one-participant plans" (støttebilaget, afsnit 1.3), og det årlige indskud pr. deltager er således ifølge IRS' hjemmeside for 2016 begrænset til maksimalt $53.000 ($59.000 for deltagere, der er ældre end 55 år), (…). Der er ikke fremlagt dokumentation for, at der faktisk er foretaget sådanne indskud til pensionsplanen.

Pensionsplanerne var derudover *nystiftede*¸ da de påbegyndte deres påståede meget massive investeringer i danske aktier.

Ingen af pensionsplanerne har indsendt Form 5500 til IRS, og det kan derfor lægges til grund, at de hver især havde aktiver på maksimalt $250.000 ved afslutningen af hvert regnskabsår (*plan year*), jf. støttebilaget, afsnit 1.3.

Alligevel påstår pensionsplanerne at have ejet aktier i danske C20-selskaber for meget store millionbeløb og i nogle tilfælde endda milliardbeløb (DKK).

Det forhold, at pensionsplanerne ikke har indsendt Form 5500 til IRS, hvorfor det må lægges til grund, at de hver især alene havde aktiver for maksimalt $250.000 ved udgangen af deres regnskabsår (*plan*

*year*) understøtter ikke blot, at pensionsplanerne ikke havde et tilstrækkeligt kapitalgrundlag til at købe de massive påståede aktieposter, men *også*, at pensionsplanerne ikke har modtaget de påståede nettoudbytter.

I klageskrivelserne, s. 5, er det anført, at

> *"Det er ligeledes muligt at foretage udlodninger fra pensionskassen, med den virkning at aktiverne på regnskabsdagen var mindre end USD 250.000."*

På et møde den 13. december 2017 har IRS imidlertid oplyst SKAT, at hvis en pensionsplan udlodder midler, skal pensionsplanen indberette udlodningen til IRS på Form 1099-R (…) med angivelse af, hvor meget der er udbetalt og til hvem. Pensionsplanerne har ikke indleveret denne Form 1099-R til IRS.

Referat af SKATs møde med IRS den 13. december 2017 er fremlagt som (…).

Pensionsplanerne har heller ikke fremlagt dokumentation for udlodninger fra pensionsplanen. Grunden hertil er den simple, at pensionsplanerne ikke har modtaget de påståede nettoudbytter (og efterfølgende udloddet dem). Det skal understreges, at der er tale om pensionsplanernes eget dokumentationsmateriale, idet de påståede udlodninger skulle være sket fra dem selv. Alligevel fremlægger ingen af de over 100 pensionsplaner en sådan dokumentation.

Det anføres i TVC Advokatfirmas klageskrivelser, (…), at der kan være en lang række konkrete årsager til, at pensionsplanernes aktiver har oversteget grænseværdien på $250.000 (i forhold til pligten til at indsende Form 5500 til IRS) i løbet af året, mens aktiverne på sidste regnskabsdag var mindre. I *intet* tilfælde redegøres der dog for, hvad der konkret har fået de enkelte pensionsplaners aktiver til at falde til under grænseværdien. Som *mulige* årsager nævnes, at gennemførte aktietransaktioner var gennemført på dette tidspunkt, at omkostninger i forbindelse med transaktioner reducerede aktiverne, og – som citeret ovenfor – at der kan være foretaget udlodninger fra pensionsplanerne.

Der fremlægges imidlertid ingen dokumentation herfor.

Det er stærkt underligt, at en part opstiller nogle mulighed for, hvordan han kan have handlet *uden* at ville og kunne fortælle, hvad han *faktisk* har gjort. Dette understreger, at pensionsplaner søger og søger efter mulige forklaringer, der kan redde deres sag.

**3.2      Pensionsplanerne har ikke haft adgang til ekstern finansiering**

Pensionsplanerne gør gældende, at de har finansieret aktiekøbene ved at låne aktierne ud mod kontant sikkerhedsstillelse (…). Købsaftalen og låneaftalen er blevet gennemført (settled) samtidig (…), og pengene fra aktielåntager er blevet anvendt til at betale for aktierne.

Forklaringen holder ikke. Der er ikke nogen, der vil indgå million-transaktioner – hverken handler eller aktielån – med en part, der ikke selv har nogen penge overhovedet.

De fremlagte bilag dokumenterer da heller ikke finansiering. Der er ingen pengestrømme, og aftaledokumenterne er utroværdige. I øvrigt er aftalerne end ikke på papiret blevet overholdt af pensionsplanerne:

### 3.2.1    GMSLA'erne er ikke troværdige

Pensionsplanerne har som (...) fremlagt en række GMSLA'er. Pensionsplanerne er i de fleste tilfælde *ikke* angivet i GMSLA'erne som aftalepart, og der er ikke redegjort for, hvordan disse aftaler relaterer sig til de enkelte pensionsplaner.

Medkontrahenterne ifølge GMSLA'erne er i alle tilfælde selskaber hjemmehørende i notoriske skattelylande og på samme adresser på henholdsvis Cayman Islands og British Virgin Islands.

De fremlagte GMSLA'er er i mange tilfælde ikke underskrevet af (alle) aftaleparter, og der er ikke truffet aftale om f.eks. valuta.

Endvidere er GMSLA'erne udaterede, hvilket understøtter, at de blot er konstrueret til lejligheden.

GMSLA'erne dokumenterer med andre ord på ingen måde, at pensionsplanerne derved havde mulighed for at skaffe tilstrækkelig likviditet til at finansiere de påståede aktieinvesteringer, og denne påståede tilførsel af likviditet er heller ikke dokumenteret ved kontoudtog.

I brev af 26. oktober 2017 har IRS endvidere oplyst SKAT følgende om pensionskassernes muligheder for at finansiere aktiekøb med lånte midler (...):

> "[...] given the size or magnitude of the purported funds borrowed from a third party or GMSLA, these arrangements are <u>highly suspect</u>. A typical first-year, one-participant pension plan or one- participant plan in existence for two or even three years <u>would likely not have access to the millions of dollars required</u> to collateralize the GMSLA used in these transactions." (mine understregninger).

Det er med andre ord ikke rigtigt, når pensionsplanerne påstår, at de til trods for deres beskedne egenkapital havde mulighed for at finansiere de påståede massive aktieinvesteringer.

Ifølge pensionsplanerne muliggjorde GMSLA'erne finansiering af aktiekøb ved samtidigt aktieudlån til tredjemand mod kontant sikkerhedsstillelse. Levering af aktier til pensionsplanerne skete samtidig med, at betaling skete fra pensionsplanerne ("Delivery Versus Payment"), (...). Dette er ganske enkelt ikke en praktisk mulighed af den simple grund, at pensionsplanerne ubestridt ikke havde nogen penge. Og der er ikke nogen, der laver hverken GMSLA'er eller OTC-handler med en part, som hverken har penge eller kreditværdighed. Det siger sig selv.

Af samme grund ville en aftalepart heller ikke tillade pensionsplanerne først at betale for aktierne efter købsdatoen, fordi der ikke er nogen sikkerhed for, at pensionsplanerne ville kunne opfylde sådanne aftaler.

### 3.2.2    Den påståede finansiering var ikke på plads på aftaletidspunktet

Om aktieudlånene anfører pensionsplanerne i (...), at aktielåntagerne ved konkrete aftaler forpligtede sig *"til at stille sikkerhed i form af kontanter svarende til aktiernes markedspris, på datoen hvor pensionsplanerne indgik aftalen om køb af aktierne."*

Det er altså pensionsplanernes forklaring, at aktieudlånsaftalerne altid blev indgået til samme kurs som de påståede aktiekøb.

Det er en helt usandsynlig fremgangsmåde. Hvis aktiekursen *falder* i perioden fra det påståede aktie-køb til aktieudlånets etablering, vil aktielåntager naturligvis kun stille sikkerhed i overensstemmelse med den mindre kursværdi på aktieudlånstidspunktet. Derved vil pensionsplanerne ikke få den kon-tante sikkerhed, som er nødvendig for at betale for aktierne. Hvis aktiekursen omvendt *stiger*, vil pensionsplanerne naturligvis betinge sig sikkerhedsstillelse i overensstemmelse med denne kursstig-ning. Dette følger da også af "Marking-to-Market"-bestemmelsen i GMSLA'ens pkt. 5.4 (…).

I (…), anfører pensionsplanerne:

> *"Aktielånene blev desuden først etableret efter udbyttedatoen."*

I (…) uddybes dette:

> *"Aktierne blev betalt to henholdsvis tre dage efter købet ved at låne aktierne ud dagen efter udbyttedatoen og derved modtage en kontant sikkerhedsstillelse sva-rende til købsprisen for aktierne. De enkelte aktielån blev afviklet under rammeaf-talen GMSLA, der var indgået forud for aktiehandlen."*

(…)

Derudover giver det ikke mening, at pensionsplanerne – uden egenkapital – skulle have indgået af-taler om aktiekøb for mange millioner kr. (og i nogle tilfælde milliarder kr.), for først at forsøge at skaffe finansiering ved aktieudlån flere dage senere. Det er helt usandsynligt, at aktiesælger ville til-lade pensionsplanerne først at betale efter købsaftalens indgåelse ("Delivery Versus Payment", (…)), når pensionsplanerne på købstidspunktet ikke engang havde finansieringen på plads. Det er endvi-dere helt usandsynligt, at custodian ville indestå for en sådan *efterfølgende* finansiering.

### 3.2.3     Aktielånsaftalerne er "indgået baglæns"

Pensionsplanerne gør gældende, at de har finansieret aktiekøb gennem aktieudlån. Til belysning heraf har pensionsplanerne fremlagt bl.a. e-mails, som ifølge pensionsplanerne viser, hvordan afta-lerne om aktielån er blevet indgået.

Pensionsplanerne har kun fremlagt eksempler på disse e-mailkorrespondancer, (…). Pensionspla-nerne blev i (…) opfordret til at fremlægge *"al korrespondance om aktielån"*. Opfordringen er ikke besvaret.

(…)

### 3.2.4     GMSLA'erne er ikke blevet overholdt

I aktielånsaftalerne (GMSLA'erne) fremgår et vilkår om, at sikkerhedsstillelsen *dagligt* kan reguleres til markedskurs (…). Vilkåret kaldes "Marking-to-Market".

En sådan mulighed for daglig regulering af sikkerhedsstillelsen sikrer både aktielåntager og aktielån-giver mod for store risici. Så længe sikkerhedsstillelsen svarer til aktiernes kursværdi, har både ak-tielåntager og aktielångiver nemlig fuld sikkerhed. Hvis låntager ikke tilbageleverer aktierne, har lån-giver penge, der kan bruges til at foretage erstatningskøb. Hvis låntager ikke tilbagebetaler sikker-hedsstillelsen, kan låntager afhænde aktierne og opnå fyldestgørelse gennem provenuet. Når aktie-kursen ændrer sig, forsvinder denne balance. Hvis aktiekursen f.eks. stiger 10 %, har långiver ikke

længere fuld sikkerhed for tilbagelevering af aktierne. Omvendt har låntager ikke fuld sikkerhed for tilbagebetaling af sikkerhedsstillelsen (dvs. pengene), hvis aktiekursen falder.

Vilkåret om "Marking-to-Market" er dermed centralt for at fastholde balancen mellem parterne og for at minimere parternes risici. Vilkåret giver nemlig mulighed for en løbende justering af sikkerhedsstillelsen, hvormed begge parter hele tiden har (næsten) fuld sikkerhed. Uafhængige parter vil selvfølgelig håndhæve et sådant vilkår løbende for ikke at stå tilbage med et usikret tilgodehavende.

Et eksempel på vilkårets betydning er [Pensionsplan A's] køb af TDC-aktier (…). Aktierne blev ifølge pensionsplanerne købt til kurs 51,35 den 7. august 2014 (inkl. udbytte på 1,5 kr. pr. aktie). Umiddelbart efter oplevede TDC-aktien et meget markant kursfald (…). Den 12. august 2014 var kursen mellem 47,67 kr. og 48,28 kr. Den 3. november 2014 var kursen mellem 44,95 og 45,41 kr. (…).

Aktielåntageren havde stillet kontant sikkerhed på 153.406.173,70 kr. den 12. august 2014. Allerede på det tidspunkt udgjorde aktiernes kursværdi (med dagens højeste kurs, 48,28 kr.) kun 144.234.665,36 kr. Dermed havde aktielåntageren et usikret tilgodehavende på mere end 9 mio. kr., som pensionsplanen ubestridt ikke havde midler til at dække.

Da aktielånet blev afviklet den 5. november 2014, var kursen 45 kr. pr. aktie, og kursværdien var dermed 134.435.790 kr. (…). Det usikrede tilgodehavende var på det tidspunkt 18.970.383,70 kr.

Som eksemplet viser, havde aktielåntager et *meget betydeligt* usikret tilgodehavende som følge af kursudviklingen. "Marking-to-Market"-klausulen i GMSLA'en havde til formål at afværge sådanne risici ved at foreskrive en løbende regulering af sikkerhedsstillelsen. Det havde været *oplagt* i et tilfælde som dette i overensstemmelse med den påberåbte GMSLA – at regulere sikkerheden i nedadgående retning, hvormed aktielåntager ikke havde haft et usikret tilgodehavende.

Det skete imidlertid ikke. Som det fremgår af (…), er der nemlig ikke bogført nogen betalinger ud fra "Marking-to-Market"-klausulen på noget tidspunkt forud for den 5. november 2014, hvor hele aktielånsaftalen blev afviklet.

Det betyder, at aktielåntager tilsyneladende accepterede at have et usikret tilgodehavende på mange millioner kroner fra den 12. august 2014 til den 5. november 2014. Det var på trods af, at tilgodehavendet var hos en pensionsplan, der ubestridt ikke havde nogen midler.

Når en daglig regulering (Marking-to-Market, (…)) ikke blev foretaget i nogen tilfælde, må det være fordi, det ikke var nødvendigt – fordi der ikke var nogen aktier og dermed ikke nogen risici.

TVC Advokatfirma anfører i (…), at GMSLA'ens pkt. 5.4 ikke finder anvendelse;

> "Havde Skattestyrelsen læst bilag 1.3 til GMSLA, havde man set, at en sådan daglig regulering ikke var påkrævet, idet det ikke er pkt. 5.4, men derimod pkt. 5.5, der finder anvendelse."

TVC Advokatfirmas udsagn er ganske uforståeligt og må bero på en forkert læsning af GMSLA'erne. Udsagnet er i hvert fald forkert. Henvisningen til *"bilag 1.3 til GMSLA"* er formentlig en henvisning til GMSLA'ernes "Schedule", pkt. 1.3.

I "Schedule" til GMSLA'erne fremgår følgende af pkt. 1.3, (...):

| 1.3 | Basis of Margin Maintenance: | |
|---|---|---|
| | Paragraph 5.4 (aggregation) shall not apply* | ☐ |
| | Paragraph 5.4 (aggregation) applies unless the box is ticked. | |

Som det fremgår, finder pkt. 5.4 anvendelse, medmindre boksen er tjekket af – hvilket den ikke er. Bestemmelsen i pkt. 5.4 om daglig regulering af sikkerhedsstillelsen *fandt* derfor anvendelse.

### 3.2.5    Stock Lending Rate fastsættes arbitrært, og den aftalte Rate anvendes ikke (nyt)

Pensionsplanerne kan ikke forklare, hvilke forhold der har betydning for beregningen af den i custody statement (...) anførte stock lending fee, som angiveligt er blevet betalt i forbindelse med aktieudlånene.

I pensionsplanernes (...), anfører pensionsplanerne, at forholdet mellem aktielåntagerens og långiverens (dvs. pensionsplanen) "kapitalstyrke" har betydning ved forhandlaf af renten og aktielånsgebyret.

Det er ikke rigtigt, hvis pensionsplanerne ellers med deres udsagn mener, at gebyret fastsættes efter forhandlingsstyrken.

En gennemgang af de fremlagte custody statement (...) viser, at fastsættelsen af Stock Lending Rate ikke afhænger af, hvem der er aftalepart.

Som (...) fremlægges som eksempel en oversigt over pensionsplaner repræsenteret af TVC Advokatfirma, der i 2015 udlåner A.P. Møller Mærk A/S A-aktier, (...). Oversigten er udarbejdet med data fra pensionsplanernes fremlagte custody statements (...). Bilaget viser, at Stock Lending Rate er den samme for de pensionsplaner, der udlåner aktien i det samme antal dage, uanset hvem pensionsplanen udlåner aktien til.

Samme resultat ses ved <u>alle</u> transaktionerne for <u>alle</u> pensionsplanerne, der udlåner den samme aktie i samme periode.

Det er særdeles usandsynligt og fremstår konstrueret, at alle pensionsplaner indgår præcis den samme aftale med forskellige aftaleparter.

Det viser, at Stock Lending Rate *ikke* er fastsat ud fra parternes kapitalstyrke og ud fra en forhandling af renten. Derimod er Stock Lending Rate fastsat for at få transaktionerne til at gå i 0, jf. afsnit 4.5. Pensionsplanernes udsagn er altså objektivt forkert.

Dertil kommer en uoverensstemmelse ved [Pensionsplan B] udlån af 998.992 stk. Coloplast-aktier i 2014. [Pensionsplan B] aftalte i mailkorrespondance med aftaleparten (...) en "stock loan fee" på 36,47 basispoint, dvs. 0,3647 % (...). I henhold til custody statement (...) var Stock Lending Rate imidlertid 0,0173 %.

Det giver ikke mening, at der anvendes en anden Stock Lending Rate end den, der er aftalt mellem parterne. Det illustrerer, at parternes papiraftaler alene er lavet for syns skyld. Hvis der havde været

rigtige aktier og penge involveret, ville parterne selvfølgelig have reageret på, at låneomkostningerne afveg fra det aftalte.

## 4.      UREALISTISK SET-UP UDEN FORRETNINGSMÆSSIGT RATIONALE

Det er urealistisk, at pensionsplanernes påståede set-up skulle kunne finde sted i den virkelige verden. I dette afsnit ser Skattestyrelsen bort fra den helt karakteristiske, totale mangel på dokumentation, der præger alle pensionsplanernes sager.

Som beskrevet i afsnit 2.4, ovenfor, er der *alt* for mange parter involveret i transaktioner, der skal flaske sig på én helt bestemt måde. Det er *dybt* urealistisk, at det ville ske én eneste gang, hvis der var tale om rigtige aktier og penge mellem uafhængige parter. Pensionsplanerne gør imidlertid gældende, at det hele har flasket sig ved hver eneste aktiehandel for mere end 100 pensionsplaner. Det kan imidlertid kun lade sig gøre, hvis der ikke er penge eller aktier, og hvis parterne ikke er uafhængige.

Dertil kommer, at pensionsplanerne hver især har handlet aktieposter af en størrelse, som er helt ekstraordinær (afsnit 4.1, nedenfor). Selv hvis der bortses fra den manglende finansiering, er det tvivlsomt, om en enkelt pensionsplan ville kunne anskaffe sig så store aktieposter på én enkelt dag, eftersom handlerne hver især har et volumen, der er yderst unormalt på det danske aktiemarked. Det er indlysende, at *så mange* pensionsplaner ikke har kunnet købe *så store* aktieposter på samme dag. Det viser, at aktierne er fiktive.

Pensionsplanerne har derudover i *hvert enkelt* tilfælde angiveligt haft en arbitragegevinst, der er præcis lig med udbytterefusionen (når der bortses fra gebyrer til brokere mv.), jf. afsnit 4.2, nedenfor. Det er meget bemærkelsesværdigt, at tallene på den måde passer sammen – og det sker i *samtlige* pensionsplaners tilfælde for *samtlige* handler. Det betyder, at *alle* transaktionerne giver 0 som resultat, hvis der ses bort fra udbytterefusionen. Det ville jo ikke ske, hvis der foregik rigtige handler mellem uafhængige parter (afsnit 4.4, nedenfor).

En dybere analyse viser da også, at nulresultatet alene opnås, fordi en bestemt udgift (Stock Lending Fee) justeres til præcis den værdi, der gør, at det hele går i 0 (afsnit 4.5, nedenfor).

Endelig må det konstateres, at det under alle omstændigheder er utænkeligt, at de påståede medkontrahenter ville deltage i det set-up, pensionsplanerne har beskrevet, eftersom pensionsplanen oppebærer hele arbitragegevinsten uden at dele med de andre parter (afsnit 4.4).

En systematisk gennemgang af pensionsplanernes påståede setup og "dokumentation" viser således, at det er dybt urealistisk, at der skulle være foregået aktiehandler på den måde, som pensionsplanerne hævder og som bilagene ellers viser.

### 4.1      Der er handlet urealistisk store aktieposter

[Pensionsplan C] erhvervede angiveligt 6.267.033 B-aktier i Novo Nordisk A/S den 19. marts 2015. Aktierne blev købt fra brokeren (…) til i alt 2.142.698.582,7 kr., svarende til 341,90 kr. pr. aktie.

[Pensionsplan C] blev stiftet i september 2014, og pensionsplanen har ikke gennem Form 5500 oplyst om aktiver med samlet værdi på mere end $ 250.000 til de amerikanske skattemyndigheder (…). Det er dybt urealistisk, at en sådan pensionsplan uden aktiver af nævneværdig betydning skulle købe aktier for mere end 2,1 mia. kr. i et dansk børsnoteret selskab.

Derudover er det urealistisk, at det skulle være muligt at erhverve en så stor aktiepost på én dag. Det er meget sjældent, at så store aktieposter sættes til salg på én gang. Da dødsboet efter Mærsk Mc-Kinney Møller skulle sælge aktier for op til 3,9 mia. kr., skete det gennem accelereret bookbuildling – ikke på det frie marked (…).

Alligevel kunne den pågældende pensionsplans broker, (…), fremskaffe aktieposten med en kurs-værdi på cirka 2,1 mia. kr.

[Pensionsplan C] er langt fra den eneste pensionsplan, der påstår at have erhvervet Novo Nordisk-aktier for ca. 2 milliarder kr. den 19. marts 2015.

Ud af de over 100 pensionsplaner, der er repræsenteret af TVC Advokatfirma – og som har fremlagt custody statement (…) – har 76 pensionsplaner ifølge deres custody statements (…) købt aktier i Novo Nordisk A/S den 19. marts 2015. Pensionsplanerne har *hver* købt mellem 5,7 millioner aktier og 7,1 millioner aktier (svarende til Novo Nordisk-aktier for ca. 2 milliarder kr. for hver pensionsplan).

Samlet har disse 76 pensionsplaner erhvervet 482 mio. aktier i Novo Nordisk *samme dag*. Der var i alt 2.113 millioner B-aktier i selskabet, og pensionsplanerne repræsenteret af TVC Advokatfirma har dermed erhvervet mere end 22 % af Novo Nordisk-aktierne *på én dag*.

Det giver simpelthen ikke mening.

Dels har pensionsplanerne ikke haft råd til det. Og dels vil det ganske enkelt ikke være praktisk muligt at finde *sælgere* af så mange aktier på én dag.

Alle aktierne blev erhvervet til *samme* kurs, nemlig 341,9 kr. pr. aktie, hvilket var markedets lukkekurs den pågældende dato, hvor kursen havde varieret mellem 335 og 342 kr. (…). Næste dag åbnede aktien med kurs 341,7 kr.

Det er i sig selv påfaldende, at alle pensionsplanerne erhvervede Novo Nordisk-aktierne til *præcis samme kurs*. Derudover siger det sig selv, at det ikke er muligt at opkøbe så mange aktier i markedet på én dag, uden at det påvirker prisen voldsomt. En så massiv efterspørgsel ville selvfølgelig føre til en markant kursstigning. Når markedskursen har været upåvirket af så massive handler på én dag, skyldes det selvfølgelig, at handlerne *faktisk* ikke har fundet sted.

Novo Nordisk-aktien i 2015 er ikke det eneste sted, hvor der ifølge refusionsanmodningerne til SKAT skulle have fundet meget betydelige opkøb sted. Skattestyrelsen har foretaget en analyse af samtlige refusionsanmodninger omfattet af sagskomplekset (jf. støttebilaget, afsnit 5). Analysen viser, at de ukendte pensionsplaner, selskaber, mv. tilsammen – ifølge deres refusionsanmodninger – skulle have ejet nogle helt urealistisk store andele af danske børsnoterede selskaber omkring udbyttedatoen (…).

Eksempelvis fremhæves følgende ejerandele til pensionsplaner:

**På udlodningstidspunktet i 2014**

| | |
|---|---|
| A.P. Møller | 51,4 % |
| Novo Nordisk | 59,5 % |
| TDC (august-udlodningen) | 78,4 % |

**På udlodningstidspunktet i 2015**

| | |
|---|---|
| Carlsberg | 58,5 % |
| Danske Bank | 65,3 % |

|  |  |
|---|---|
| Novo Nordisk | 61,7 % |
| TDC (marts-udlodningen) | 79,7 % |

Det vil altså sige, at f.eks. 65,3 % af aktierne i Danske Bank skulle have været ejet af ukendte, udenlandske pensionsplaner mv. omkring udbyttedatoen i 2015. Det er selvfølgelig ikke rigtigt.

**4.2    Pensionsplanernes fortjeneste svarer præcis til udbytterefusionen**

Det fremgår af (…), som eksempel, at sælger og købers samlede arbitragegevinst – som svarer til refusionen – fordeles med 87,5 % til sælger og 12,5 % til køber (pensionsplanerne). Eksemplet hænger ikke sammen med de bilag, som pensionsplanerne har fremlagt.

Som eksempel kan fremhæves [Pensionsplan D's] køb af Danske Bank-aktier (…), der er repræsentativt. Heraf fremgår følgende transaktioner, der angår køb/salg af aktier, lån og forwards:

| 18. Mär 15 | Equity | Buy 3.519.967 Danske Bank A/S  @ 175,3 DKK | | -617.050.215,10 |
|---|---|---|---|---|
| 18. Mär 15 | Forward | Sell 3.519.967 Danske Bank A/S  @ 171,2147 DKK  EXPIRES 19.Jun 15 | | |
| 19. Mär 15 | Dividend | CASH DIVIDEND Danske Bank A/S  PD 23.Mär 15 | 14.132.667,50 | |
| 20. Mär 15 | Stock Loan | Lend 3.519.967 Danske Bank A/S  @ 175,3 DKK | 617.050.215,10 | |
| 22. Mai 15 | Dividend | Tax Reclaim Danske Bank A/S | 5.227.151,00 | |
| 02. Jun 15 | Equity | Sell 3.519.967 Danske Bank A/S  @ 198 DKK | 696.953.466,00 | |
| 02. Jun 15 | Forward | Buy 3.519.967 Danske Bank A/S  @ 197,9673 DKK  EXPIRES 19.Jun 15 | | -94.168.269,17 |
| 02. Jun 15 | Stock Loan | Recall 3.519.967 Danske Bank A/S  @ 198 DKK | | -696.953.466,00 |
| 02. Jun 15 | Stock Loan | Stockloan MTM Realized | 79.903.250,90 | |
| 02. Jun 15 | Stock Loan | Stocklending Fee | 132.350,77 | |

Når disse "pengestrømme" lægges sammen, fremkommer resultatet af aktiekøb, aktiesalg, aktielån og forward-aftale samt nettoudbytte og refusion for pensionsplanen. Resultatet af disse transaktioner er en fortjeneste for [Pensionsplan D] på 5.227.151,00 kr.

Det svarer helt nøjagtigt til refusionen ("Tax Reclaim Danske Bank A/S" i tabellens 5. linje, ovenfor).

Pensionsplanens fortjeneste er altså lig med udbytterefusionen. Dog betales enkelte mindre gebyrer til brokers (…), tax reclaim agent (…) og for brug af platformen (…).

Det betyder, at hvis ikke refusionen medregnes, går alle transaktionerne altså samlet i 0.

Og samme 0-resultat (før refusionen) genfindes for hver enkelt af de 6 førersager (…)

(…)

Og ud fra custody statements (…) kan samme resultat ses ved <u>alle</u> transaktioner for <u>alle</u> pensionsplanerne.

I <u>alle</u> tilfælde er det dermed pensionsplanen, der oppebærer hele arbitragegevinsten – som nøjagtigt svarer til udbytterefusionen. Også dette forhold dokumenterer i sig selv, at pensionsplanerne har påberåbt sig ret til udbytterefusion på et opdigtet grundlag.

**4.3    Der er intet forretningsmæssigt rationale bag de påståede transaktioner (nyt)**

Pensionsplanerne gør gældende, at de alle har anvendt investeringsstrategien "udbyttearbitrage" (...):

> *"Ved at købe aktien, modtage nettoudbyttet samt refusion af indeholdt udbytteskat og sælge aktien igen til en lavere pris (aktieprisen falder efter udbetaling af udbytte) kunne pensionsplanen realisere en gevinst. Det var denne gevinst, der var formålet med hele transaktionen."* (...)

> *"Udbyttearbitrage er en lavrisikoinvesteringsstrategi, der forårsages af, at et udbytte på grund af forskellige dobbeltbeskatningsoverenskomster ikke har den samme værdi for enhver investor. Investorer uden en dobbeltbeskatningsaftale vil søge at sælge deres aktier til markedet inden udbyttedatoen, mens investorer med gunstige betingelser i dobbeltbeskatningsoverenskomsterne vil søge at købe aktier inden udbyttedatoen. De forskellige ønsker i forhold til køb og salg fører umiddelbart til prisforskelle på de forskellige markeder (spot- og futuremarkedet) for samme aktie. Det er denne forskel, som udbyttearbitragen benytter med henblik på at realisere en gevinst."* (...)

Pensionsplanerne gør således gældende, at der kan opnås en gevinst ved handel af aktier omkring udbyttedatoen, fordi aktieudbyttet ikke har samme værdi for alle investorer, idet nogle investorer skal betale udbytteskat, mens andre ikke skal. Den påståede arbitragegevinst – som opnås ved handel på forskellige markeder og et komplekst set-up af transaktioner mellem *mange* parter – er dermed højst den udbytteskat, som kan spares.

Den <u>samlede gevinst</u> for *alle* deltagere i udbyttearbitrage kan derfor ikke være mere end udbytterefusionen (den sparede skat).

Skattestyrelsen bestrider helt overordnet, at udbyttearbitrage skulle være en anerkendt investeringsstrategi, som kan fungere som en ren pengemaskine. Der er ingen dokumentation for, at aktie- og spotmarkedet skulle opføre sig, som TVC Advokatfirma påstår.

Selv *hvis* udbyttearbitrage var en mulig investeringsstrategi, hænger pensionsplanernes dokumentation ikke sammen.

Den påståede investeringsstrategi kræver, at en lang række parter involveres:

| Part | Ydelse |
|------|--------|
| Sælger | Leverer aktierne |
| Pensionsplanen | ? |
| Køber | Aftager aktierne. |
| Aktielåntager | Leverer finansiering. |
| Forward-køber/-sælger | Afdækker kursrisici. |
| Custodian | Indestår for solvens og gennemførsel af transaktioner. |

Som det fremgår, byder hver part – bortset fra pensionsplanen – efter det oplyste ind med noget, der er nødvendigt, for at transaktionerne kan gennemføres med det ønskede resultat. Det siger derfor sig selv, at alle parter skal have en del af fortjenesten, før det giver mening for dem at indgå i arbitrageforretningen. Ellers er der intet forretningsmæssigt rationale for dem for at deltage i dette set-up, der naturligvis medfører en række risici, f.eks. medkontrahenters misligholdelse og medkontrahenters insolvens.

Som det fremgår i afsnit 4.2, ovenfor, giver arbitrageforretningen pensionsplanen et positivt resultat, der er <u>lig</u> med udbytterefusionen. Det er den samlede, maksimale gevinst for udbyttearbitrageforretningen. Og den oppebærer pensionsplanen *alene*.

Pensionsplanen deler dermed ikke arbitragevinsten med nogen. Det betyder, at *ingen* øvrige parter får nogen gevinst ud af at deltage i dette set-up – bortset fra de små fees, som de får for gennemførsel af transaktioner.

Ingen af de øvrige parter har dermed noget forretningsmæssigt incitament til at indgå i arbitrageforretningen. Det gælder for <u>samtlige</u> af de handler, som pensionsplanerne repræsenteret af TVC Advokatfirma påstår at have indgået og har fremlagt "dokumentation" for.

De øvrige parter ville derfor ikke have deltaget i dette set-up, hvis der var tale om rigtige handler. Også af den grund er det helt urealistisk, at handlerne skulle have fundet sted.

### 4.4    Nulresultatet ved investeringerne er dybt usandsynligt

Som anført i afsnit 4.2, ovenfor, er det påfaldende, at pensionsplanernes fortjeneste er helt lig med udbytterefusionen, når der tages højde for

- Aktiekøb og -salg
- Forward-aftaler
- Aktielån og låneomkostninger (Stock Lending Fee og Interest Rebate)
- Nettoudbytte

Alle disse transaktioner tilsammen giver helt præcis 0 kr. for <u>alle</u> påståede aktiehandler for <u>alle</u> pensionsplaner, der har fremlagt dokumentation.

Et sådant resultat kan ikke opnås i virkeligheden, men kun som bogføringsmæssige posteringer, der koordineres fra centralt hold.

Det er nemlig dybt usandsynligt, at gebyret i aktielånsaftalen skal svare netop til tabet/gevinsten ved forwardaftalen sammenlagt med kursudsvingene ved køb/salg i bare ét enkelt tilfælde. Og derfor er det selvfølgelig umuligt, at det konsekvent forholder sig sådan.

### 4.5    Nulresultatet nås alene ved hjælp af "regnefejl" (nyt)

En bestanddel i nulresultatet er låneomkostningerne, som angiveligt afregnes over for medkontrahenten til aktielånet. Låneomkostningerne består af Interest Rebate og Stock Lending Fee.

Stock Lending Fee *burde* beregnes ud fra en aftalt Stock Lending Rate, det lånte beløb og låneperiodens længde, dvs. efter følgende formel:

$$Stock\ Lending\ Fee = Stock\ Lending\ Rate * Beløb * \frac{Rentedage}{360\ rentebærende\ dage}$$

Der er imidlertid *ingen* tilfælde, hvor Stock Lending Fee er fastsat på denne måde. I stedet er Stock Lending Fee fastsat til netop dét beløb, der skal til, for at det samlede regnestykke giver 0. Stock Lending Fee er med andre ord beregnet som en variabel, der får regnestykket til at give 0.

Som eksempel kan fremhæves [Pensionsplan B's] udlån af 998.992 stk. Coloplast-aktier i 2014. Heraf fremgår følgende af custody statement …):

| Settlement Date | Return Date | Type | Underlying | Nominal | Start Price | Start Cash | End Price | End Cash |
|---|---|---|---|---|---|---|---|---|
| 09 December 2014 | 19 December 2014 | Lend | COLOB DC | 998,992 | 527,0000 | 526,468,784.00 | 501,5000 | -500,994,488.00 |

| Trade Date | Nominal | Cash | Return Date | No, of Days | Rate | Stock Lending Fee | Rate | Interest Rebate |
|---|---|---|---|---|---|---|---|---|
| 08 December 2014 | 998,992 | 526,468,784,00 | 19 December 2014 | 10 | -0,0173 | -2.525,23 | 0,7000 | -102,368,93 |

Her udlånes angiveligt 526.468.784 kr. i 10 dage til en aftalt Stock Lending Rate på 0,0173 %. Dermed *burde* Stock Lending Fee være:

$$Stock\ Lending\ Fee = Stock\ Lending\ Rate * Beløb * \frac{Rentedage}{360} = 0,0173\ \% * 526.468.784 * \frac{10}{360} = \textbf{2.529,97 kr.}$$

Som det fremgår af custody statement ovenfor, er Stock Lending Fee imidlertid blevet fastsat til 2.525,23 kr.

Det er en afvigelse på 4,74 kr., hvilket jo forekommer ubetydeligt i handler, der involverer mange hundrede millioner kroner. Afvigelsen er imidlertid af stor betydning for det samlede billede.

Afvigelsen kan nemlig findes ved alle pensionsplaners aktiehandler. Der er i alle tilfælde en "regne-fejl", som medfører, at transaktionerne (køb, salg, forward, lån, låneomkostninger og nettoudbytte) til sammen giver 0 kr.

"Fejlen" underbygger, at der *ikke* er tale om, at uafhængige parter har indgået aktiehandler og ak-tielånsaftaler. Derimod har *nogen* beregnet, hvordan transaktionerne skulle konstrueres, for at det samlede resultat ville blive 0.

Det understøttes i øvrigt af, at Stock Lending Rate tilsyneladende er aftalt til en anden sats end den, der fremgår af custody statement (afsnit 3.2.5, ovenfor)

Ved at "regne baglæns" er det muligt at beregne Stock Lending Rate ud fra Stock Lending Fee, låne-beløbet og antallet af rentedage. For [Pensionsplan B's] udlån af Coloplast-aktier (eksemplet ovenfor) giver det følgende "faktisk" Stock Lending Rate:

$$Stock\ Lending\ Rate = \frac{Stock\ Lending\ Fee}{Beløb * \frac{Rentedage}{360}} = \frac{2.525,23}{526.468.784 * \frac{10}{360}} = 0,01726755370172150\ \%$$

Stock Lending Fee stemmer dermed overens med en Stock Lending Rate, der *næsten* svarer til den Rate, der er angivet i Custody Statement (0,0173 %). Faktisk er Rate i Custody statement (formentlig) bare en afrunding af den Stock Lending Rate, der er blevet anvendt.

Det giver imidlertid *ingen* mening kommercielt. For pensionsplanerne og deres medkontrahenter, aktielåntagerne, har jo aftalt en Stock Lending Rate – og den er selvfølgelig ikke aftalt med 15 deci-maler. Det er ud fra dén Rate, at Stock Lending Fee burde være fastsat. Det er ikke den anden vej rundt.

Dermed er der tale om, at der ved udarbejdelsen af custody statement (…) er snydt på vægtskålen for at få transaktionerne til at gå i 0. Stock Lending Fee-beløbet er bare blevet fastsat til det beløb,

der skal bruges for, at regnestykket giver 0. Dette er efterfølgende søgt kamufleret ved at sætte Stock Lending Rate til noget, der *næsten* giver det rigtige resultat.

### 5.    FEJL OG MANGLER VISER, AT DER IKKE ER HANDLET AKTIER

### 5.1    Der er ingen dokumentation for, at pensionsplanernes custodians ("Solo-gruppen") har besiddet aktier

Alle pensionsplaner repræsenteret af TVC Advokatfirma, bortset fra én, har anvendt en eller flere af følgende 4 custodians: Old Park Lane, Solo Capital, Telesto og West Point.

(…)

De fire custodians – Old Park Lane, Solo Capital, Telesto og West Point – benævnes samlet "Solo-gruppen". De fire selskaber er blevet kontrolleret af Sanjay Shah (afsnit 6.6, nedenfor), der efterfor-skes som en af de formodede hovedbagmænd i udbyttesagen.

Solo-gruppen er kun kendt af Skattestyrelsen fra dette sagskompleks.

Som custodians har Solo Capital, Old Park Lane, Telesto og West Point attesteret ejerskab til danske aktier, og at der er blevet indeholdt udbytteskat ved udlodning. Det er sket ved udstedelse af Credit Advices, som ifølge pensionsplanerne bekræfter besiddelse af en given aktiepost, modtagelse af ud-bytte for den pågældende aktiepost, og at der er blevet indeholdt udbytteskat. På baggrund af de pågældende Credit Advices (som pensionsplanerne indsendte med refusionsanmodningerne) har SKAT udbetalt refusion af indeholdt udbytteskat til pensionsplanernes agenter.

Credit Advices udarbejdet af Solo-gruppen har ført til refusion af ca. 9 milliarder kr. ud af de i alt ca. 12,7 milliarder kr., der er omfattet af svindlen:

| Custodian | Refusionsbeløb |
|---|---|
| Solo Capital Partners LLP | 5.442.113.750 |
| Old Park Lane Capital PLC | 1.776.763.390 |
| Telesto Markets LLP | 925.443.359 kr. |
| West Point Derivatives Ltd | 880.884.044 kr. |
| *Hovedtotal* | *9.025.204.543* |

Solo-gruppen skal dermed have besiddet aktier i et helt ekstraordinært stort (og urealistisk) omfang på vegne af pensionsplaner, hvis kunderne/pensionsplanerne skal have været berettiget til refusion i dette omfang. Solo-gruppen har ifølge de udstedte Credit Advices samlet modtaget og afregnet 24,4 milliarder kroner i nettoudbytte til sine kunder.

Der er imidlertid *ingen* dokumentation for, at Solo-gruppen har besiddet de aktier, som pensionspla-nen påstår at have ejet, og som Solo-gruppen har attesteret ejerskab til:

- Ingen af de pågældende custodians (eller pensionsplanerne selv) er registreret i VP Securities, og det er ikke på anden vis dokumenteret, at Solo-gruppen faktisk har

besiddet aktieposter for pensionsplanerne, f.eks. ved at vise en kæde af sub-custo-dians, hvor der er tilknytning til et depot i VP Securities.

- Der er ikke fremlagt dokumentation for, at Solo-gruppen skulle have modtaget net-toudbytte for aktieposter på vegne af sine kunder (pensionsplanerne). Nettoud-byttet burde ellers udgøre 24,4 milliarder kroner.

- For en række pensionsplaner, der har anvendt Solo-gruppen som custodians, har Statsadvokaten for Særlig Økonomisk og International Kriminalitet (SØIK) i brev af 23. november 2017 oplyst SKAT, at SØIK ikke på baggrund af den på daværende tidspunkt gennemførte efterforskning kunne bekræfte, at 66 konkrete pensionspla-ner har modtaget aktieudbytte som følge af besiddelse af danske aktier. SØIK kunne heller ikke bekræfte, at pensionsplanerne har besiddet danske aktier, herunder ved henvendelse til VP Securities A/S (…). Erklæringen er blevet bekræftet den 12. juli 2019 (…).

- Der er ikke fremlagt dokumentation for pengestrømme til/fra Solo-gruppen som følge af de betydelige investeringer i danske aktier.

Der er således ingen penge- eller aktiespor, som på nogen måde dokumenterer, endsige sandsynlig-gør, at Solo-gruppen skulle have besiddet én eneste aktie i danske selskaber på vegne af pensions-planerne.

Alligevel har Solo-gruppen udstedt dokumenter (bl.a. Credit Advices), der har ført til refusion af over 9 mia. kr. fra den danske stat på baggrund af påståede aktiebesiddelser.

Solo-gruppens "univers" er fiktivt og konstrueret af Sanjay Shah, og dokumenter udstedt af Solo-gruppen er derfor uden nogen bevismæssig betydning.

**5.2     Pensionsplanerne henviser til intern bogføring hos deres custodians ("Custody State-ments" – (…))**

Pensionsplanerne har som (…) fremlagt en custody statement udarbejdet af deres respektive custo-dians. [Pensionsplan C] har dog kun fremlagt custody statement for én af flere anvendte Shah-kon-trollerede custodians, hvilket også er kendetegnende for en række øvrige pensionsplaner.

(…)

Under alle omstændigheder kan de pågældende custody statements (…) ikke dokumentere ejerskab til aktier, idet bilagene ikke viser bevægelser og saldi vedrørende pensionsplanernes aktiebeholdnin-ger og penge (dvs. de aktiver, som custodian skulle have i forvaring).

Af de fremlagte custody statements (…) fremgår således <u>for det første</u> ikke kontoudtog vedrørende pensionsplanernes *kontant*beholdninger, der viser bevægelser og daglige balancer, herunder indsæt-ning og hævning af pengebeløb, udgående og indgående beløb vedrørende køb og salg af aktier, modtagelse af indtægter (f.eks. udbytte, refusion og renter) og betaling af fees til f.eks. brokere. De fremlagte custody statements indeholder <u>for det andet</u> ikke kontoudtog vedrørende pensionspla-nernes *aktie*beholdninger, der for hver aktiepost viser navnet på aktieudstederen, antallet af aktier, stigning og fald i antallet af aktier (som følge af køb og salg af aktier) samt aktuel værdi af de pågæl-dende aktier (samt opgørelse af kursgevinst eller -tab).

Da de fremlagte custody statements mangler disse helt centrale oplysninger, er det vildledende over-hovedet at betegne dem som "custody statements".

Der er altså ikke med de fremlagte custody statements (…) – eller i øvrigt – fremlagt kontoudtog, der dokumenterer, at der faktisk er indsat penge på og trukket penge fra pensionsplanens konto, endsige at der faktisk er modtaget aktier på pensionsplanens aktiekonto.

I det hele taget er der ikke dokumentation for, at der er sket overførsel af aktier til – og penge fra - pensionsplanens konto.

Hvis penge og aktier ikke skifter hænder – hvilket vil fremgå af kontoudtog – er der ikke tale om en aktiehandel, men højest om svindel *kamufleret* som en aktiehandel.

Hvis penge og aktier ikke skifter hænder, vil der heller ikke være noget formål med at have en custo-dian (udover at kamuflere svindlen).

Det eneste "bevis" i denne custody statement for, at der skulle være aktier og betalinger, er, at den pågældende Shah-kontrollerede custodian "erklærer", at aktien er der, og "posterer" aktier/betalin-ger bogføringsmæssigt (internt). Ligesom Credit Advices fra disse Shah-kontrollerede custodians ikke er udtryk for nogen realitet, jf. afsnit 6.8-6.9, nedenfor, er deres interne bogføring det naturligvis heller ikke.

**5.3      Efterfølgende udarbejdede oversigter over bogføringer beviser ingenting**

Pensionsplanerne har fremlagt "oversigt over bogføringer" (…). Herom anføres i (…), at "*De enkelte bogføringer på pensionsplanens konto hos dens custodian fremgår af oversigten, der fremlægges som (…)*". Der er i fremlagt en sådan oversigt for hver af (…) sagerne.

(…)

De fremlagte oversigter over bogføringer (…) er ikke kontoudtog, men alene udklip fra udaterede Excel-ark, som ikke har noget autoritativt præg. Skattestyrelsen påpegede i (…) en række fejl ved disse oversigter:

- Transaktioner er posteret på handelsdatoen og ikke på leveringsdatoen.
- Oversigterne rummer ikke alle posteringer for en given periode.
- Posteringer, der ikke fremgår af custody statement, fremgår alligevel af oversigten. Der gælder f.eks. gebyrer til brokere og custodian samt udbetaling af  udbytterefu-sion.
- "*Stocklending Fee"* fremgår af oversigten, men svarer til "*Total Fees and Rebates"*

Oversigterne kan derfor ikke anvendes.

Pensionsplanerne har efterfølgende oplyst, at oversigterne blot er "*et resumé af begivenhederne, som er udarbejdet af [pensionsplanernes repræsentant] på basis af de optegnelser over handlerne, som pensionsplanerne havde til rådighed.*" (…). Det fremgår ikke, hvilke "optegnelser" der er tale om. Videre har pensionsplanerne anført, at "*De uoverensstemmelser, der er konstateret, er opstået ved de forenklinger, som er foretaget i oversigterne, der er udarbejdet af Schaffelhuber Müller & Kollegen S.à.r.l., for at forklare transaktionerne på en simpel måde for Skatteankestyrelsen.*" (…).

Sådanne oversigter udarbejdet efterfølgende til brug for klagesagen har ingen bevisværdi.

Det er i øvrigt påfaldende, at pensionsplanernes repræsentant i (…) har kunnet anføre oplysninger om f.eks. udbetaling af udbytterefusion til pensionsplanen og gebyrer, når sådanne oplysninger *ikke* fremgår af custody statement (…), men derimod efter sigende af en cash account, som pensionsplanerne ikke er i besiddelse af (…).

**5.4     Broker Confirmations (…) dokumenterer ikke ejerskab**

***5.4.1     Brokere gennemfører ikke handlen (nyt)***

I alle tilfælde har pensionsplanerne angiveligt anvendt en executing broker. Pensionsplanen gør gældende (…), at der er blevet afgivet en købsordre til custodian/clearing agent, der er en del af Solo-gruppen. Der er ikke fremlagt dokumentation for disse købsordrer. Når custodian har godkendt ordren, er ordren blevet placeret hos en executing broker.

Executing broker har angiveligt haft ansvaret for matching af ordren – dvs. at finde en køber/sælger til den givne aktiepost. Efter matching har brokeren udstedt en handelsnota (broker confirmation – (…)), hvor vilkårene for handlen fremgår.

Herefter har pensionsplanens custodian angiveligt sørget for clearing af handlen (…). Det vil sige, at det er en custodian fra Solo-gruppen, som har haft ansvaret for og kontrollen med, om handlen *faktisk* blev gennemført ved udveksling af aktier og penge.

De fremlagte handelsnotaer dokumenterer dermed ikke, at pensionsplanerne faktisk har købt aktier. En handelsnota er alene en bekræftelse af en aftale om aktiehandel med angivelse af centrale aftalevilkår. En handelsnota dokumenterer ikke, at aktiehandlen faktisk er blevet gennemført, allerede fordi brokeren ikke ved, om handlen er blevet gennemført i overensstemmelse med det aftalte.

Allerede af den grund kan materiale fra brokerne ikke bevise, at pensionsplanerne har besiddet aktier.

Pensionsplanerne tillægger handelsnotaerne ("broker confirmations") i (…) betydelig vægt. Det anføres i (…), at handelsnotaerne *"er den afgørende dokumentation for, at en et aktiekøb har fundet sted"*, og at handelsnotaerne er *"den afgørende dokumentation mod påstandene om svindel"*, (…).

Dette er forkert, eftersom handelsnotaerne ikke dokumenterer gennemførsel af handlen (udveksling af penge og aktier). I komplekset har brugen af brokere og fremlæggelse af handelsnotaer alene til formål at skjule, at der faktisk slet ikke er sket nogen aktiehandler.

***5.4.2     Der er flere uoverensstemmelser mellem de påståede aktiebesiddelser og handelsnotaerne (nyt)***

*Hvis* pensionsplanerne faktisk havde handlet med aktier, burde forløbet være som følger, når der anvendes en executing broker:

1. Pensionsplanen afgiver en ordre (f.eks. om køb) – evt. efter godkendelse fra custodian
2. Brokeren matcher pensionsplanen med en medkontrahent (f.eks. en sælger)
3. Brokeren laver en handelsnota (broker confirmation)

4.   Handlen gennemføres (settlement) i overensstemmelse med aftalen

Hvis det hele var foregået pænt og ordentligt, burde handlen blive gennemført (settlement) ud fra de vilkår, der er angivet i handelsnotaen (medmindre der sker en fejl ved gennemførslen). Med andre ord burde handelsnotaen (ved rigtige aktiehandler) være bestemmende for handlens vilkår.

*I disse sager* har pensionsplanerne dog fremlagt en lang række handelsnotaer, hvor aftalevilkårene ikke stemmer overens med den ordre, som pensionsplanerne angiveligt har afgivet ifølge custody statement (…). Der er tale om meget alvorlige fejl (se afsnit 5.4.3).

*Alligevel* er handlen blevet gennemført i overensstemmelse med pensionsplanens påståede – og udokumenterede – købsordre. Det svarer til, at man bestiller en togbillet til Aarhus, sætter sig på et tog til Malmø og alligevel bliver kørt til Aarhus.

Det giver *ingen* mening, at handlerne ikke er gennemført i overensstemmelse med handelsnotaerne. Det giver heller *ingen* mening, at oplysningerne i custody statement (…) ikke er i overensstemmelse med aftalevilkårene i handelsnotaerne (…).

Yderligere savner det mening, at pensionsplanerne ikke har reageret på betydelige fejl i  handelsnotaer, der bekræfter aktiehandler til betydelige millionbeløb.

Det fremgår da også af en række handelsnotaer, at pensionsplanerne er forpligtet til at tjekke oplysningerne. F.eks. fremgår følgende af en handelsnota fra (…):

> *"Please verify all details for accuracy, and immediately inform (…) of any errors. (…) cannot be held responsible for errors not brought to our attention immediately. The Purchaser and the Seller acknowledge receipt of this confirmation, that the terms contained herein and any and all actions and / or disputes arising therefrom are the sole and exclusive responsibility of the purchaser and the seller, and further agree to hold Brokers, and its agents and / or representatives harmless from any dispute and / or action that may arise as a consequence of the above transaction."*

Som det fremgår, fraskriver (…) sig ansvaret for alle fejl, der ikke straks reklameres over. Henset til handlernes størrelse er det klart, at pensionsplanerne selvfølgelig *ville* have kontrolleret handelsnotaerne nøje og have reageret på uoverensstemmelser, hvis det havde været rigtige aktier. Det gælder særligt, fordi pensionsplanerne ikke ville kunne bære et tab forårsaget af fejl i handelsnotaerne. Når pensionsplanerne ikke har reageret, skyldes det selvfølgelig, at der ikke er foregået aktiehandler, og at der derfor ikke er nogen risici forbundet med en forkert bekræftelse af aftalevilkårene.

Det giver ikke nogen mening, at brokerne kan begå sådanne fejl, når pensionsplanerne samtidig betegner brokerne som *"professionelle serviceydere"*, (…). Pensionsplanernes forsøg på at styrke brokernes troværdighed med henvisningen til, at brokerne har været igennem en *"særlig kontrolundersøgelse af det britiske finanstilsyn"*, (…), falder til jorden, når der henses til, hvor fundamentale fejlene er.

### 5.4.3    Konkrete eksempler på fejl i handelsnotaer

Der er mange tilfælde, hvor handelsnotaerne (…) ikke stemmer overens med oplysningerne i custody statements (…) og Credit Advices (…). Det indebærer, at den udokumenterede settlement, som pensionsplanerne påberåber sig med henvisning til custody statements (…), ikke passer med vilkårene i

handelsnotaerne (…). Pensionsplanerne har ikke fremlagt nogen dokumentation for, hvordan settlement skulle være sket korrekt, til trods for at handelsnotaerne var fejlbehæftede.

### 5.4.3.1    To forskellige handelsdatoer for samme transaktion

(…) viser et tilfælde, hvor der er anvendt to forskellige handelsdatoer ("Trade Dates"), hhv. den 5. marts 2015 og den 31. marts 2015, for samme påståede aktiehandel med 3.092.779 TDC-aktier med en værdi på ca. 167 mio. kr.

Bilaget består af en Credit Advice, et custody statement, en regning fra brokeren (…) og en handelsnota fra samme. Dokumenterne relaterer sig til [Pensionsplan C] og er allerede blevet fremlagt i sagen.

Det custody statement, der er fremlagt i sagen, findes på (…). Dokumentet er udarbejdet af [Pensionsplan C's] custodian, West Point (som er en Shah-custodian). Det fremgår heraf, at handelsdagen ("Trade Date" indrammet med rødt) er *den 5. marts 2015*, og at handlen med 3.092.779 TDC-aktier er et *køb* ("Buy" indrammet med rødt).

Den Credit Advice, der er fremlagt i sagen, findes på (…). Dokumentet er ligeledes udarbejdet af West Point. Det er dateret den 10. marts 2015 og fortæller, at [Pensionsplac C] ejede 3.092.779 TDC-aktier hen over ex-dagen den 6. marts 2015 ("Ex Date" indrammet med rødt). Credit Advicen understøttes altså af den i custody statementet angivne handelsdato.

Den handelsnota, der er fremlagt i sagen, findes på (…). Dokumentet er udarbejdet af brokeren, (…), der tilsyneladende har forestået handlen med TDC-aktierne. Det fremgår af handelsnotaen, at handelsdagen ("Trade Date" indrammet med rødt) er *den 31. marts 2015*, og at handlen med 3.092.779 TDC-aktier vedrører et *køb* ("BUY" indrammet med rødt).

Der er således uoverensstemmelse mellem handelsdatoerne for *samme* påståede aktiehandel.

Der er kun én af handelsdatoerne, som kan være rigtig, og hvis handelsnotaen skal tillægges en så *"afgørende"* betydning, som [Pensionsplan C] lægger op til, så må det være den 31. marts 2015. Det vil betyde, at [Pensionsplan C] ikke ejede 3.092.779 TDC-aktier over ex-dagen, og at den Credit Advice, der lå til grund for [Pensionsplan C's] refusionsanmodning, således ikke er rigtig.

Der er flere forhold, som kunne tyde på, at uoverensstemmelsen mellem custody statement og handelsnotaen skyldes en fejl begået af brokeren.

Først og fremmest fremgår handelsnotaens referencenummer ("TRADE CONFIRMATION REFERENCE: e184376" indrammet med rødt) også af regningen fra (…) af 31. marts 2015 (…). Her er handelsdatoen ("Trade Date" indrammet med rødt) angivet som *den 5. marts 2015* og altså ikke den 31. marts 2015 som angivet i handelsnotaen.

Herudover nævnes den 10. marts 2015 som *afviklingsdag* ("Settlement on 10 March 2015")  under "SETTLEMENT TERMS" i handelsnotaen (…). Denne afviklingsdag fremgår også af custody statement på (…) ("Settlement Date" indrammet med rødt), hvilket kunne tyde på, at fejlen alene omfattede *handelsdagen* angivet af brokeren.

Dette hænger dog ikke sammen med, at "SETTLEMENT TERMS" er angivet som "T+2" i handelsnotaen. Hvis handelsdagen var den 5. marts 2015 (som anført i custody statement), og afviklingsdagen var den 10. marts 2015, så ville handlen være blevet gennemført "T+3" og ikke som angivet "T+2".

Den 7. og 8. marts er således lørdag og søndag, mens resten af de mellemliggende dage er arbejds-dage, jf. nærmere om beregningen af leveringstiden i afsnit 5.6, nedenfor.

Forvirringen bliver endnu større, når der i handelsnotaen ovenover "SETTLEMENT TERMS" under "Settlement Date" står "T+1". Heller ikke denne afviklingsperiode er rigtig, hvis handelsdagen var den 5. marts 2015 som forudsat i custody statement.

TVC Advokatfirma anfører da også i (…), at det er *"mægleren, der har begået en fejl"*, og at det var *"et generelt problem, som (…) havde"*.

Det var altså ifølge pensionsplanerne et generelt problem, at handelsnotaer (for aktiehandler på mange hundrede millioner kr.) udarbejdet af brokeren (…) var fejlbehæftet. Det forekommer ganske useriøst af en professionel broker ved så store aktiehandler.

Dertil giver det ikke mening, at handlen er blevet gennemført i overensstemmelse, som oplyst i cu-stody statement, når der fremgår noget andet af den skriftlige aftalebekræftelse (handelsnotaen).

*5.4.3.2   Handelsnotaer forveksler køb og salg*

Der er flere eksempler på, at de påståede aktiehandler fremgår som *salg* under custody statement og brokerens faktura, men fremgår som "BUY" (*køb*) i handelsnotaen (…).

Der er f.eks. uoverensstemmelse mellem custody statement (…) og en handelsnota vedrørende en handel med Mærsk B-aktier (…). (…)

Det fremgår af custody statement, 3. linje, at der er blevet *solgt* ("Transaction Type: Sell") 7.896 Mærsk B-aktier til brokeren, (…) ("Counterparty") med handelsdag den 19. juni 2015 ("Trade Date") og afviklingsdag den 23. juni 2015 ("Settlement Date").

Det fremgår derimod af handelsnotaen, der er udarbejdet af (…), og som vedrører netop 7.896 Mærsk B-aktier, at aktierne er blevet *købt* ("YOU: BUY"). Handelsnotaen er adresseret til [Pensionsplan B], og "YOU: BUY" betyder således, at [Pensionsplan B] *køber* 7.896 Mærsk B-aktier.

Ifølge TVC Advokatfirma er dette *"ligeledes udtryk for en menneskelig fejltagelse"*, og pensionsplanen *"har ikke bemærket denne skrivefejl"*, (…), selvom det må siges at være en ret afgørende fejl.

Igen er det meget bemærkelsesværdigt, at [Pensionsplan B] angiveligt endte med at sælge aktier i overensstemmelse med intentionerne, selvom brokeren, som stod for matching mellem køber og sælger, ifølge handelsnotaen har opfattet [Pensionsplan B] som køber – og dermed må have matchet med en sælger, ikke en anden køber.

*5.4.3.3   Handelsnotaer tager ikke højde for helligdage (nyt)*

Et andet eksempel på broker-fejl findes ved settlement-vilkår omkring danske helligdage, særligt på-sken. Som eksempel fremlægges (…).
Settlement/levering af aktier henholdsvis penge er af afgørende betydning ved indgåelse af handler. Det er af betydning for, hvornår finansiering skal skaffes, og hvornår man opnår faktisk rådighed over aktieposten/købesummen.

Settlement angives typisk i handelsnotaer som "T + (antal dage)". Ved settlement "T + 2" skal aktier og betaling udveksles på dag nr. 2 regnet fra aftaledatoen. Når dagene tælles, er det kun hverdage, der skal tælles med. Det varierer fra land til land, hvilke dage der er hverdage.

Hverdage fastlægges ud fra markedet i det land, hvor aktien handles (dvs. Danmark, når det er danske aktier).

[Pensionsplan C] købte ifølge (…) 375.802 aktier i Vestas Wind i marts 2015 (…). Aftalen blev ifølge handelsnotaen indgået mandag den 30. marts 2015, og settlement skulle ske "T + 6", dvs. seks hverdage senere (…). I henhold til Custody statement skete levering tirsdag den 7. april 2015 (…).

Levering skete dermed ifølge den danske helligdagskalender tre hverdage efter aftaleindgåelsen, dvs. T+3:

| | | | Aktie-udstederen | Normal cyklus | **Danmark** | England | USA |
|---|---|---|---|---|---|---|---|
| Settlement, aktier | CUM | Mandag d. 30. marts 2015 | | Trade date (T) | Trade date (T) | Trade date (T) | Trade date (T) |
| | | Tirsdag d. 31. marts 2015 | Dividend Ex-date | T + 1 | T + 1 | T + 1 | T + 1 |
| | | Onsdag d. 1. april 2015 | Dividend Record Date | Normal Settle-ment (T + 2) | T + 2 | T + 2 | T + 2 |
| | EX | Torsdag d. 2. april 2015 | | Skærtorsdag | | T + 3 | T + 3 |
| | | Fredag d. 3. april 2015 | | Langfredag | | | |
| | | Lørdag d. 4. april 2015 | | | | | |
| | | Søndag d. 5. april 2015 | | | | | |
| | | Mandag d. 6. april 2015 | | 2. påskedag | | | T + 4 |
| | | Tirsdag d. 7. april 2015 | | | **T + 3** | T + 4 | T + 5 |

*Kalender* (spanning top header)

*De grå felter markerer weekend- og helligdage i de pågældende lande.*

Det er bemærkelsesværdigt, at levering skete T+3 (nemlig tirsdag den 7. april 2015), selvom der var aftalt levering T+6. Levering T+6 ville have indebåret levering fredag den 10. april 2015. Som tabellen viser, stemmer leveringen heller ikke overens med hverken den engelske eller amerikanske hellig-dagskalender.
Levering er altså *ikke* sket i overensstemmelse med det aftalte.

*5.4.3.4   Handelsnota angiver pris som"########"*

Der er også et eksempel på en handelsnota fra brokeren (…), hvor prisen på pensionsplanens salg af 7.884 Mærsk-aktier er angivet som " #########" (…). Prisen var 12.290 kr. pr. aktie, dvs. samlet 96.894.360 kr.

I så store handler tjekker de ansvarlige parter selvfølgelig, at det er de rigtige tal, herunder priser, som er på bekræftelsen. Det skriger til himlen og springer i øjnene, når købesummen er angivet som "#########".

TVC Advokatfirmas forklaring svækker pensionsplanernes sag. Det er – ifølge TVC Advokatfirma – *"tydeligvis en computerfejl"*, som om det gør noget i relation til, hvorvidt man ville opdage det.

TVC Advokatfirma har som (…) fremlagt en mail fra brokeren, (…) Capital London Ltd., hvoraf det fremgår, at fejlen skyldes, at kolonnen i det underliggende excel-ark ikke var stort nok til at indeholde prisen. Der er med mailen fremlagt en ny handelsnota (…). Det forøger mystikken gevaldigt. Underskriveren af mailen, (…), oplyser selv, at han nu er ansat i (…). Uanset at han ikke længere er ansat i (…), udsteder han alligevel en ny handelsnota på (…) brevpapir ved at rette i det relevante Excel-ark. Det forekommer meget besynderligt.

Det er derudover utroværdigt, når (…) i sin mail af 16. maj 2019 bekræfter, at den reviderede handelsnota *"accurately reflects"* omhandlede den aktiehandel, der skulle være foretaget den 22. juni 2015, dvs. 4 år tidligere. Troværdigheden svækkes yderligere af, at det ikke var Adrian Milne selv – men Patrick Milne – der er anført som broker på de "oprindelige" handelsnotaer.

*5.4.3.5   Fejlangivelse af afviklingsdagen*

Alle ovennævnte fejl og uoverensstemmelser er fundet i førersagerne. Hvis man begynder at gennemgå sagerne udenfor førersagerne, fremkommer nye fejl. Eksempelvis fremlægges en handelsnota fra brokeren (…) vedrørende en handel med Coloplast-aktier for [Pensionsplan E]. Her fremgår afviklingsdagen som 9. december 2012, hvilket ikke er i overensstemmelse med hverken custody statement (…) eller Credit Advice (…).

**5.5     Der er ikke dokumentation for gennemførte handler**

Det er ikke dokumenteret, at der for pensionsplanernes påståede aktiehandler er sket settlement, dvs. at aktiehandlerne er gennemført ved, at parternes ydelser (aktier og penge) er blevet udvekslet.

Ifølge pensionsplanerne er afvikling/settlement af en aktiehandel ikke en betingelse for at opnå ejerskab over aktierne, (…). Det er imidlertid åbenbart, at settlement er en forudsætning for, at der er gennemført en aktiehandel. Hvis sælger ikke besidder aktier (inkl. udbytte), som sælger er berettiget til at sælge, foreligger der vanhjemmel. Hvis der som følge heraf ikke sker settlement, vil aktier og penge ikke have skiftet hænder, og der vil i så fald ikke være tale om en (gennemført) aktiehandel. Køberen har jo aldrig erhvervet nogen aktiepost. Det samme gælder, hvis sælger *har* aktier, men handlen af den ene eller anden grund alligevel ikke bliver gennemført.

Der er *intet*, som viser, at der på noget tidspunkt har været aktier i et depot tilhørende pensionsplanernes custodian. Og derfor er det irrelevant, at custodian har "attesteret" pensionsplanernes ejerskab til aktier i Credit Advices, og at broker har bekræftet "handler" i broker confirmations (…). En Credit Advice er kun ord på papir. Og som anført i (…), dokumenterer en broker confirmation ikke, at aktiehandlen faktisk er blevet gennemført.

Langt de fleste af de pensionsplaner, som TVC Advokatfirma repræsenterer, har anmodet om udbyt-
terefusion for mere end ét påstået aktiekøb. Alle de påståede handler vedrører ekstremt store beløb.
Når pensionsplanerne påberåber, at afvikling/settlement ikke er nødvendig for at erhverve ejen-
domsretten, viser det bare, hvor svag pensionsplanernes sag er, når der slags argumenter bruges.
For i virkelighedens verden laver man ikke flere sådanne aftaler, uden at der bliver settlet. Og hvis
der ikke bliver settlet, vil der være et efterfølgende retsopgør, hvor den part, der taber penge på et
sådant manglende settlement, vil kræve erstatning af den anden part.

Der er således ingen dokumentation for, at pensionsplanerne (eller deres custodians) på noget tids-
punkt har haft, endsige modtaget, aktier. Det betyder, at der aldrig har været nogen aktiehandler. I
den sammenhæng er det irrelevant, om pensionsplanerne *tror*, der har været aktier.

**5.6    Vilkår for settlement er ikke markedskonforme**

Frem til den 6. oktober 2014 var standarden for aktiehandler i Danmark, at aktier blev leveret tre
dage efter aftaleindgåelsen (dvs. settlement T+3). Efter 6. oktober 2014 var standarden levering efter
to dage (dvs. T+2) (…). Ved beregningen af leveringstid medregnes kun hverdage – dvs. hverken we-
ekender eller helligdage medregnes.

Pensionsplanernes forklaring om afvikling af de påståede aktiehandler er ikke konsekvent.

I (…), oplyser pensionsplanerne, at afvikling sker to dage efter aftaleindgåelsen, dvs. T+2. I (…) er det
anført, at afvikling sker tre dage efter købet, dvs. T+3. Endelig anførte pensionsplanerne (…), at de
ved handlerne havde valgt at følge de danske regler for børshandler (…), hvilket pensionsplanerne i
mail af 24. april 2019 har præciseret til, at afviklingsdatoen både for OTC-handel og handel på børsen
lå to (tidligere tre) dage senere end handelsdatoen (dvs. T+2 og tidligere T+3).

Ifølge custody statements (…) har pensionsplanerne imidlertid konsekvent afveget fra markedsstan-
darden ved køb af aktier. Frem til 6. oktober 2014 er aktierne ifølge bilaget købt på vilkår T+4, og
efter 6. oktober 2014 er aktierne ifølge bilaget købt på vilkår T+3.

Dertil kommer, at pensionsplanerne ifølge broker confirmations i nogle tilfælde har settlet på helt
andre vilkår, f.eks. T+6 (…) eller T+1 (…).

Det af pensionsplanerne anførte stemmer således ikke overens med det fremlagte materiale. I alle
tilfælde har der ved levering været aftalt en dags længere leveringstid, end pensionsplanerne anfører
i deres indlæg, og længere, end hvad markedsstandarden  tilsagde.

Afvigelsen fra markedsvilkårene i custody statement (…) er bemærkelsesværdig, idet afvigelsen – selv
hvis der havde været aktiehandler og ikke blot bogføringsmæssige posteringer – i høj grad muliggør
svindel. Det skyldes "tidsplanen" ved udlodninger på det danske marked:

Når et selskab beslutter at foretage udlodning, fastsættes en *record date*. De, der er registreret som
depotindehaver på den pågældende dato, vil modtage udbyttet.

Når *record date* er fastsat, bliver *ex date* (*ex dividend-date*) fastlagt. Datoen fastlægges af handels-
platformen ud fra *record date* og markedsvilkårene for levering af aktier. *Ex date* er den første dag,
hvor aktierne handles uden udbytte, dvs. sælgeren får udbetalt udbyttet, selv om aktien er solgt.
Før den 6. oktober 2014 var markedsstandarden, at levering skete T+3. Det betød, at hvis man er-
hvervede aktier mandag den 11. august 2014, ville man få aktierne leveret (blive registreret som ejer)
torsdag den 14. august 2014. Aktier skulle derfor erhverves tre dage før *record date*, hvis man skulle

være registreret som ejer på *record date*. Ved handel to dage før *record date* ville man nemlig – ved almindelige vilkår for levering – ikke længere nå at modtage aktierne, inden selskabet fastlagde ejerkredsen med henblik på udbetaling af udbyttet – og dermed ville *sælgeren* få udbyttet. *Ex date* var derfor to dage før *record date*.

For at opnå ret til udbytte skulle man derfor erhverve aktier <u>senest</u> tre dage inden *record date*. Dermed ville man – ifølge markedsstandarden – modtage aktierne og være registreret som ejer på det tidspunkt, hvor det udloddende selskab fastlægger ejerkredsen, og man ville få udbyttet udbetalt til sig.

Den 6. oktober 2014 blev markedsstandarden ændret, således levering sker T + 2. Det betyder, at *ex date* blev dagen før *record date* – altså en dag tættere på *record date* pga. den forkortede leveringstid.

Ved pensionsplanernes *salg* af aktier har de ifølge deres custody statement (…) fulgt markedsstandarden, T+2 (efter 6. oktober 2014).

Ved pensionsplanernes *køb* af aktier har de imidlertid afveget fra markedsstandarden. Pensionsplanerne har ifølge custody statements (…) erhvervet aktierne på dagen før ex-daten (dvs. på sidste mulige dag, hvor aktierne kunne erhverves inkl. udbytte), men med "forsinket" levering. Levering skete T+3 (selvom markedsstandarden var T+2) og dermed <u>dagen efter *record date*</u>. Pensionsplanerne har derfor end ikke ifølge sine egne aftaler modtaget udbyttet direkte fra det udloddende selskab eller gennem egne sub-custodians. Det påståede udbytte er derimod blevet udbetalt til en sælger, der var depotindehaver på *record date*, men som havde pligt til at videreføre udlodningen, da aktien jo ifølge pensionsplanerne var blevet solgt inkl. udbytte (før *ex date*).

Pensionsplanerne gør dermed gældende, at de har været ejere, selvom de ifølge custody statements ikke har været registreret som ejere på *record date*, da de har handlet på vilkår, der afveg fra markedsstandarden. Det er et set-up, som i høj grad vil muliggøre svindel, da pensionsplanerne dermed – end ikke ifølge egne papirer – vil være registreret som ejere af aktien på *record date*, hvor virksomheden noterer ejerne og udbetaler udbyttet. For pensionsplanerne hævder, at de får aktierne leveret *senere* – og med ret til det udbytte, deres sælger modtager.

Den i strid med markedsstandarden forlængede leveringsperiode giver i øvrigt yderligere arbejde og risiko for tab. Hvis pensionsplanerne havde fulgt markedsstandarden, sådan som de fejlagtigt i deres indlæg påstår de gjorde, ville man undgå en pengeoverførsel af udbyttet fra sælgeren af aktierne til pensionsplanerne. Og pensionsplanere ville også undgå at løbe den risiko, at aktiesælgeren ikke overfører udbyttet til dem. I alle Shah-sagerne vælger man at løbe dette besvær og yderligere risiko uden, at man har givet nogen som helst legitim grund hertil.

**5.7    Handlerne (og fortjenesten)**

Pensionsplanerne har oplyst (…), at *"Fra 2015 og fremefter er handlerne foretaget ved brug af en algoritme-trader, hvor trusteen blot skulle godkende forslagene. Der forefindes derfor ikke dokumentation for indgåelse af disse handler."*, (…).

Denne forklaring er simpelthen for letkøbt. Selvfølgelig er der dokumentation for indgåelse af aktiekøb for flere milliarder kroner. Desuden findes der ikke nogen "algoritme-trader", som sørger for, at aktiekøb gennemføres efter fortløbende antal, eller som afhænger af, hvilken custodian pensionsplanerne er tilknyttet. Det giver simpelthen ikke nogen mening. Hvis der findes en algoritme, som pen-

sionsplanerne anvender, så må den alene være blevet anvendt til at sløre de påståede aktiehandlers manglende realitet.

**5.8    Det er udokumenteret, at nettoudbytte og refusion ædes op af omkostninger**

Pensionsplanerne har anført, at deres aktiver ved udgangen af året ikke overstige $ 250.000 på grund af de høje transaktionsomkostninger, der er forbundet med Div-Arb-investeringsmulighederne (dvs. udbyttearbitrage) (…).

Henset til størrelsen af de påståede aktieinvesteringer må der virkelig have været tale om meget betydelige omkostninger forbundet med transaktionerne.

Der er dog ikke fremlagt dokumentation, herunder kontoudtog og fakturaer, for at pensionsplanen har afholdt omkostninger, der kan have nedbragt pensionsplanernes aktiver – inklusiv refusion og påstået modtaget nettoudbytte på store millionbeløb – til højst 250.000 USD, (…). Omkostningerne er i øvrigt ikke specificerede, ligesom der ikke er fremlagt dokumentation for, hvem der er betalt omkostninger til, hvilke ydelser omkostningerne dækker, eller hvilke kontraktuelle vilkår omkostningerne er omfattet af.

Yderligere giver det ikke mening, at pensionsplanerne skulle indvilge i at deltage i udbyttearbitrage-investeringerne, hvis hele fortjenesten blev ædt op af omkostninger. *Selvfølgelig* havde pensionsplanerne haft en fortjeneste, hvis de faktisk havde deltaget i et komplekst aktiehandel-set-up.

Og så er der den lille, men ikke uvæsentlige, detalje, at alle pensionsplaner, som TVC Advokatfirma repræsenterer, har afvist at fremlægge egne bankkontoudtog, hvor man kan se bevægelser og saldi.

**5.9    Custody Agreement er ikke blevet overholdt**

Forholdet mellem den enkelte pensionsplan og dennes custodian fra Sologruppen har ifølge pensionsplanen været reguleret af en Custody agreement og/eller Terms and Conditions for Custody Services (…).

Det fremgår af punkt 5.1 i den fremlagte Custody Agreement (…), at pensionsplanerne ved indgåelsen af aftalen straks skulle overføre et beløb til pensionsplanernes konto hos sin custodian ("Minimum Cash Balance") til sikkerhed for pensionsplanernes forpligtelser.

Sikkerhedsstillelsen var som udgangspunkt 500.000 euro. (…). I nogle tilfælde er sikkerhedskravet dog lavere, (…), hvor der alene var krav om 20.000 euro.

Vilkåret om et minimumsbeløb hos custodian fremgår af alle Custody Agreements og/eller Terms and Conditions for Custody Services.

Sikkerhedsstillelsen er i alle tilfælde urealistisk lav i forhold til custodians indeståelse for pensionsplanernes transaktioner på milliardbeløb.

Dertil kommer, at *ingen* af pensionsplanerne har overholdt vilkåret, (…). På (…) bekræftede pensionsplanerne således, at *ingen* af dem havde overført et sådant beløb til sin custodian (…).

Kravet om kapital udgør en sikkerhed for custodian, som selvfølgelig skal være til stede, *inden* der handles. Sikkerheden er nødvendig, fordi der *er* risici forbundet med handler. Når der henses til, at pensionsplanerne ikke har nogen egenkapital, er kravet om minimumskapital endnu mere relevant.

Derfor har det klart formodningen imod sig, at der skulle være foretaget aktiehandler, før sikkerheds-stillelsen blev indbetalt.

Når pensionsplanerne direkte anfører, at vilkåret om minimumskapital hos custodian inden handler ikke er blevet opfyldt af nogen af planerne, viser det, at Custody Agreement ikke er blevet overholdt, men blot er indgået/underskrevet for syns skyld.

I (…) har pensionsplanerne anført, at der ikke gjaldt en klausul om minimumskapitalisering i tidlige depotaftaler, hvorfor *nogle af* pensionsplanerne havde realiseret gevinst nok til at efterkomme kra-vet uden indbetaling. Derigennem er vilkåret om minimumsbeløb ifølge pensionsplanerne blevet op-fyldt ved modregning.

Det er udokumenteret og har formodningen klart imod sig. Det er i strid med de fremlagte custody statements (…), hvor det fremgår på første side af hvert custody statement (…), at *"Opening Cash Balance"* for pensionsplanerne i alle år er 0 kr. Dertil kommer, at der ifølge custody statement ikke genereres noget overskud hos custodian ved transaktionerne, hvilket fremgår af *"Total Cash Ba-lance"* (…). Der fremgår således ikke nogen gevinster, som ville kunne anvendes til modregning. [Pen-sionsplan F] opnåede dog et overskud på 0,29 USD (…).

Det anførte strider jo også imod, at pensionsplanerne – godt nok udokumenteret som så mange an-dre af deres påstande – påstår, at deres gevinster er meget små pga. store omkostninger, jf. afsnit 5.8. De pensionsplaner, hvor kravet var 500.000 EUR, har et yderligere bevisproblem. Hvis de har så stor en formue, skal de indsende regnskab til de amerikanske skattemyndigheder, jf. støttebilaget, afsnit 1.3, hvilket jo gælder, når formuen er over 250.000 USD.

En tilsyneladende undtagelse til det manglende overskud er [Pensionsplan D], hvis konto hos Old Park Lane i 2014 blev krediteret cash payment/receipts for 927.100,27 kr. og debiteret 19.952,02 USD. Det er udokumenteret, hvad disse poster dækker over. Ved udgangen af 2014 var disse beløb tilsyneladende på kontoen hos Old Park Lane. Beløbene forsvinder dog fra 2014 til 2015, hvor [Pen-sionsplan D] anvendte en anden Shah-custodian, nemlig Solo Capital. Da det *både* er udokumenteret, hvor beløbet stammer fra, og hvor det blev af, kan det ikke tillægges nogen betydning. Dertil kommer, at indeståendet/gevinsten under alle omstændigheder fortsat er mindre end minimumsbeløbet på 500.000 euro hos Old Park Lane (…). Der ses således heller ikke her nogen gevinst, der giver mulighed for at bortse fra kravet om indbetaling.

Ifølge pensionsplanernes egen dokumentation, nemlig custody statements (…), oppebærer pensions-planerne således ikke nogen gevinst, der kan anvendes til at opfylde vilkåret om minimumsbeløb ved modregning. Kontoen starter nemlig i 0, og der genereres ifølge custody statement ikke nogen ge-vinst/noget overskud.

**6.     SYSTEMATIKKEN VISER, AT DET HAR VÆRET EN SKRIVEBORDSØVELSE**

Skattestyrelsen har foretaget en undersøgelse af de refusionsanmodninger og påståede aktiebesid-delser, der stammer fra pensionsplaner repræsenteret af TVC Advokatfirma, som har anvendt custo-dians fra Solo-gruppen, og som har fremlagt oplysninger om køb af aktier (broker confirmations eller custody statement). Undersøgelsens resultater angår <u>alle</u> de pensionsplaner, hvor TVC Advokatfirma har indgivet klager på vegne af pensionsplanerne i løbet af 2018 – dog ikke [Pensionsplan G], der har anvendt en anden custodian.
Det viser sig, at alle transaktionerne er systematiseret i et omfang, som kun giver mening, hvis der er tale om centralt orkestrerede transaktioner, der ikke involverer aktier eller penge. Så systematise-

rede transaktioner ville nemlig <u>aldrig</u> kunne finde sted i virkeligheden. Pensionsplanernes påståede aktieinvesteringer har nemlig været nøje afstemt.

Systematikken, der uddybes i de følgende afsnit, dækker blandt andet over, at:

- Alle aktieposter anvendt til refusion på en given aktie er købt samme dag og for samme kurs (afsnit 6.1, nedenfor).
- Aktieposterne er systematiseret, så der aldrig er to pensionsplaner, der ejer det samme antal af en given aktie. For A.P. Møller Mærsk-aktierne i 2015 ses det endda, at aktiebesiddelserne (med enkelte huller) er "fortløbende", så hver pensionsplan ejer én aktie mere end den foregående (afsnit 6.2, nedenfor).
- Selvom aktieposterne har betydelige størrelser, lykkes det i <u>alle</u> tilfælde at købe, ud-låne, kurssikre og sælge aktieposten samlet (afsnit 6.2, nedenfor).
- Pensionsplanernes investeringsprofiler ligner hinanden. Det er således de samme aktier, som hver af pensionsplanerne påstår at have ejet (afsnit 6.3, nedenfor).
- Ved de påståede handler i foråret 2014 har alle pensionsplaner angiveligt <u>købt</u> aktier fra samme broker, <u>solgt</u> aktier til samme broker, indgået <u>forward</u>-aftale med samme part og <u>udlånt</u> aktierne til samme part (afsnit 6.4, nedenfor).
- Pensionsplanerne afhænder angiveligt aktierne efter et fast mønster, der dog ændres over tid. F.eks. i 2014 sælger alle pensionsplanerne *enten* på én dag (f.eks. Coloplast-aktier i december) eller i løbet af en periode på fire dage (f.eks. Novozymes-aktier) (afsnit 6.5, nedenfor).
- Sanjay Shah, der er mistænkt som hovedbagmand i hele udbyttesagen, har kontrol-leret alle fire anvendte custodians, der har spillet en central rolle (afsnit 6.6 og 6.7, nedenfor).
- Credit Advices er nummereret fortløbende på tværs af custodians, der er uafhængige juridiske personer (afsnit 6.8, nedenfor). Også ved senere anmodninger om refusion (indsendt i 2017) ses samme nummersystem anvendt (afsnit 6.9, nedenfor).

På trods af alle disse ligheder – og det forhold at pensionsplanerne har valgt samme advokat og ind-giver enslydende skrifter i klagesagerne – fastholder pensionsplanerne, at de ikke har noget med hinanden at gøre (afsnit 6.10, nedenfor).

Systematikken viser, at der umuligt kan være tale om faktiske aktiehandler. Systematikken er kun mulig, fordi der er tale om en bogføringsøvelse orkestreret centralt og uden hold i virkeligheden – hverken gennem pengestrømme eller aktiebesiddelser.

Endelig er der to pensionsplaner, der tilsyneladende har glemt at søge refusion på ca. 29,5 mio. kr. for deres påståede aktiebesiddelser, hvilket kun kan ske, fordi der *faktisk* ikke er foretaget aktiehand-ler (afsnit 6.11, nedenfor).

### 6.1    Alle pensionsplaner køber samme dag og til samme pris (nyt)

I <u>alle</u> tilfælde har pensionsplanerne erhvervet deres aktier dagen før Ex-datoen, dvs. sidste dag hvor aktien kunne erhverves inkl. retten til udbytte.

*Derudover* har pensionsplanerne betalt *nøjagtig* samme kurs for aktierne (vistnok markedets lukke-kurs den givne dag). Det gælder dog tilsyneladende ikke Chr. Hansen Holding-aktier og Coloplast-aktier i 2013 samt [Pensionsplan H's] køb af Coloplast-aktier i december 2014 (i alt 15 handler ud af ca. 1.400 handler).

For eksempel har 76 pensionsplaner ifølge deres custody statements (…) købt aktier i Novo Nordisk A/S den 19. marts 2015. Pensionsplanerne har hver købt mellem 5,7 millioner aktier og 7,1 millioner aktier (svarende til en købesum på mellem 1,96 mia. kr. og 2,44 mia. kr.). Alle aktierne blev erhvervet til samme kurs, nemlig 341,9 kr. pr. aktie (se også afsnit 4.1 og 6.1, ovenfor).

Selvom alle pensionsplaner gør gældende, at de har anvendt samme investeringsstrategi, og selvom det ikke er usædvanligt at anvende lukkekursen til aktiehandler, er det påfaldende, at pensionsplanerne har haft så sammenfaldende handelsmønstre. Eksempelvis kræver det ganske meget arbejde at skaffe sig adgang til at købe aktieposter af så betydelig en størrelse for hver enkelt pensionsplan. Når man har en aftale med en eller flere sælgere, vil man ønske at lukke den så hurtigt som muligt for at fastholde sælgeren. Og der er et voldsomt arbejde med at lukke 76 aktiekøb med en værdi pr. styk på ca. 2 mia. kr.

### 6.2     Størrelsen på aktiebesiddelser er systematiseret

For pensionsplanerne, der har købt de samme aktier den samme dag og til samme pris, er også aktieposternes størrelse systematiseret. Der er således <u>ingen</u> tilfælde, hvor to pensionsplaner har købt det *samme* antal aktier.

(…) viser, hvordan de påståede besiddelser er systematiseret på tværs af pensionsplanerne. Bilaget indeholder en række oversigter over det antal aktier, som pensionsplanerne i henhold til deres indsendte Credit Advices skulle have ejet over udbyttedagen. Oversigterne baserer sig på <u>samtlige</u> Credit Advices (…), som Skattestyrelsen har modtaget fra pensionsplaner, der anvendte Solo-gruppen, og som Skattestyrelsen har udbetalt udbytterefusion på baggrund af. Udover pensionsplanerne repræsenteret af TVC Advokatfirma indgår der således også andre amerikanske samt malaysiske pensionsplaner, hvis navn er blevet anonymiseret i bilaget.

Oversigterne er blevet sorteret efter det antal aktier, som pensionsplanerne i henhold til deres indsendte Credit Advices hver især skulle have ejet over udbyttedagen. Antallet af aktier er stigende fra top til bund.

Alle oversigterne illustrerer, at antallet af aktier har en direkte sammenhæng med, hvem der er custodian for pensionsplanerne. Systemet fungerer således, at der er 3 intervaller, som antallet af aktier bogføres efter. Det mindste interval er styret af West Point og Telesto, det største interval er styret af Solo Capital, og intervallet i midten er styret af Old Park Lane.

Oversigten i (…) (Mærsk A-aktier), illustrerer eksempelvis, at West Point og Telesto styrer bogføringen i intervallet 7.717 – 8.193. Oversigten viser antallet af Mærsk A-aktier, som pensionsplanerne påstod at være i besiddelse af over udbyttedagen den 31. marts 2015 i henhold til deres Credit Advices. Blandt pensionsplanerne findes bl.a. [Pensionsplan F], [Pensionsplan C] og [Pensionsplan B], der alle er førersager. Deres trustees, som efter sigende *"afgiver samtlige ordrer til samtlige transaktioner"* (…), og som ikke havde *"nogen direkte eller indirekte forbindelse eller kendskab til alle de øvrige pensionsplaner"* (…), er henholdsvis (…), (…) og (…).

Som det fremgår (…) er der ingen overlap mellem antallet af aktier, som pensionsplanerne påstår at være i besiddelse af over udbyttedagen. I oversigten over Mærsk A-aktierne (…) og Mærsk B-aktierne (…) er antallet af aktier endda fortløbende med kun enkelte "huller". Den tredje pensionsplan i rækken påstår i sin Credit Advice at have ejet 7.840 Mærsk A-aktier, den næste pensionsplan påstår at have ejet 7.841 Mærsk A-aktier, den næste igen 7.842 Mærsk A-aktier og så fremdeles.

Det giver ikke nogen som helst mening, at pensionsplaner, der ikke har noget kendskab til hinanden – og som efter sigende skulle styre deres egne påståede aktiehandler – skulle handle i et sådant mønster. Det siger sig selv, at dette mønster ikke blot er et tilfælde.

Det fortløbende antal aktier var alene et røgslør, der havde til hensigt at skjule realiteterne for SKAT (nu Skattestyrelsen), nemlig at alle påståede køb af aktier er fiktive og alene udformet for uretmæssigt at opnå udbytterefusion.

_____

Det lykkes i *alle* tilfælde for pensionsplanerne at finde

- én sælger,
- én køber,
- én aktielåntager og
- én forward-aftalepart,

der vil handle disse helt abnormt store aktieposter til *netop* de beløb, som pensionsplanen har "ønsket". Det gælder disse meget betydelige aktieposter – og i alle tilfælde.

Det betyder, at pensionsplanerne på *intet* tidspunkt er fejlet med at finde medkontrahenter til de store transaktioner. Og det betyder, at pensionsplanen på *intet* tidspunkt er blevet nødt til at splitte transaktionen i to eller alene gennemføre transaktionen delvist.

Det kan ikke lade sig gøre for bare én pensionsplan. Det kan heller ikke lade sig gøre i så mange tilfælde.
Pensionsplanernes påstand er derfor virkelighedsfjern i anden potens.

**6.3    Pensionsplaner har næsten ens aktieporteføljer (nyt)**

Ifølge pensionsplanernes custody statements (…) havde de pensionsplaner, der handlede aktier i 2015, præcis den samme aktieportefølje og handlede med de samme 14 danske aktier i 2015.

Det drejer sig om 77 pensionsplaner ud af de over 100 pensionsplaner, som TVC Advokatfirma indgav klager på vegne af i 2018. Som eksempel vises her seks pensionsplaners investeringer i 2015, herunder førersagen [Pensionsplan C]:

| Navn ("pension plan") | [Pensions-plan C] | [Pensions-plan I] | [Pensions-plan J] | [Pensions-plan K] | [Pensions-plan L] | [Pensionsplan M] |
|---|---|---|---|---|---|---|
| *SANST j.nr.* | (…) | (…) | (…) | (…) | (…) | (…) |
| A.P. Møller Mærsk A/S - A | 7.880 | 7.865 | 7.849 | 7.851 | 7.892 | 7.871 |
| A.P. Møller Mærsk A/S - B | 7.884 | 7.871 | 7.864 | 8.069 | 7.893 | 8.079 |
| Carlsberg A/S - B | 18.0314 | 178.346 | 178.352 | 178.402 | 181.135 | 177.618 |
| Coloplast A/S - B | 292.365 | 294.517 | 295.956 | 293.038 | 295.514 | 295.238 |
| Danske Bank A/S | 3.026.108 | 3.399.185 | 3.080.069 | 3.332.339 | 3.293.014 | 2.978.112 |
| DSV A/S | 824.244 | 685.834 | 759.755 | 726.245 | 776.849 | 804.456 |

| | | | | | | |
|---|---|---|---|---|---|---|
| FLSmidth & Co A/S | 81.040 | 80.155 | 80.283 | 80.292 | 81.548 | 79.791 |
| GN Store Nord A/S | 588.285 | 552.691 | 626.259 | 588.941 | 581.185 | 591.435 |
| Novo Nordisk A/S - B | 6.267.033 | 5.887.844 | 6.671.570 | 6.274.023 | 6.191.398 | 6.300.588 |
| Novozymes A/S - B | 688.545 | 686.764 | 686.991 | 776.240 | 797.000 | 814.004 |
| Pandora A/S | 416.809 | 468.196 | 424.241 | 458.988 | 453.572 | 410.198 |
| TDC A/S | 3.092.779 | 3.296.713 | 2.766.412 | 2.886.717 | 2.957.050 | 3.205.055 |
| Tryg A/S | 34.618 | 34.976 | 34.540 | 34.742 | 35.067 | 34.793 |
| Vestas Wind Systems A/S | 375.802 | 374.281 | 373.968 | 376.685 | 374.009 | 378.845 |
| **Hovedtotal** | **15.883.706** | **15.955.238** | **15.994.109** | **16.022.572** | **16.033.126** | **16.086.083** |

(…)

For aktiehandler foretaget i 2014 kan det konstateres, at pensionsplanerne handlede blandt de samme 12 aktier. I 2013 handlede alle pensionsplanerne blandt de samme to aktier.

Også dette er særdeles besynderligt, hvis pensionsplanerne, som TVC Advokatfirma påstår, alle er uafhængige af hinanden. Tværtimod giver det god mening, når der er tale om en skrivebordsøvelse, der har til formål at formå den danske stat til at foretage uberettigede udbetalinger.

**6.4    Alle pensionsplaner handler med de samme parter (nyt)**

En gennemgang af pensionsplanernes custody statements (…) viser, at aktiehandler, der blev foretaget i foråret (februar til maj) 2014, blev indgået med præcis samme aftalepart. Dette gælder for alle transaktioner for samtlige pensionsplaner repræsenteret af TVC Advokatfirma, hvor der er indgivet klage i 2018 og fremlagt custody statement og/eller broker confirmations (…).

Som (…) fremlægges en oversigt, der illustrerer pensionsplanernes aftaleparter ved påståede køb af A.P. Møller Mærsk A/S A-aktier i 2014, herunder ét af pensionsplanerne fra førersagerne (markeret med rød i bilaget).

Som det fremgår, varetager brokeren (…) alle transaktioner, der vedrører køb af aktier. Videre fremgår det, at brokeren (…) varetager salget af aktier, at (…) er aftalepart til forwards, og at (…) er aftalepart til GMSLA'en. For en del af de påståede aktiehandler er der dog ikke oplysninger om pensionsplanernes aftaleparter på forwards og GMSLA'er.

Det er helt usandsynligt, at "uafhængige" pensionsplaner foretager aktiehandler for mange millioner kroner med præcis de samme aftaleparter. Også dette viser, at de fiktive aktiehandler er konstrueret fra centralt hold.

*Dertil* kommer, at det er helt usandsynligt, at de samme parter kan levere likviditet og risikoafdækning i det efterspurgte ekstremt store omfang. Det er i forvejen til fulde udokumenteret og usandsynligt, at aktielåntageren skulle kunne skaffe finansiering til bare én pensionsplans ekstraordinært store aktiekøb. Det er umuligt, at aktielåntageren skulle kunne skaffe finansiering til *mange* pensionsplaner på én gang.

Det samme gør sig gældende omkring forward-aftaleparten. Det er usandsynligt (og udokumenteret), at ét selskab (hjemhørende i skattely) skulle kunne kurssikre en lang række pensionsplaners handler for millioner af kroner.

### 6.5    Salgstidspunkt er systematiseret (nyt)

For aktiehandlerne i 2013 og 2014 anvendes *enten* samme salgsdato for alle handler af en specifik aktie på tværs af pensionsplanerne, *eller* også sælger alle pensionsplanerne deres aktieposter i løbet af fire dage

F.eks. påstår 20 pensionsplaner, herunder førersagen [Pensionsplan N], at de alle i perioden 16.-19. juni 2014 solgte deres Novozymes-aktier, der var blevet købt den 26. februar 2014 (…). Det er påfaldende, at 20 pensionsplaner, som påstår at være uafhængige af hinanden, hver for sig når frem til, at Novozymes-aktierne skulle "ejes" i næsten 4 måneder og så pludselig afhændes inden for ganske få dage.

Et andet eksempel er 23 pensionsplaner, der solgte Coloplast-aktier den 17. december 2014 (sammenstilling af data fra pensionsplanernes (…) – førersagerne er fremhævet):

| Shareholder (Pension Plan) | Antal aktier (Coloplast) | Salg (Handelsdato) |
|---|---|---|
| [Pensionsplan O] | 997.679 | 17. december 2014 |
| [Pensionsplan P] | 919.162 | 17. december 2014 |
| [Pensionsplan Q] | 1.063.104 | 17. december 2014 |
| [Pensionsplan B] | 998.992 | 17. december 2014 |
| [Pensionsplan E] | 1.016.175 | 17. december 2014 |
| [Pensionsplan R] | 928.526 | 17. december 2014 |
| [Pensionsplan S] | 950.518 | 17. december 2014 |
| [Pensionsplan T] | 1.002.630 | 17. december 2014 |
| [Pensionsplan U] | 1.074.214 | 17. december 2014 |
| [Pensionsplan V] | 1.020.078 | 17. december 2014 |
| [Pensionsplan D] | 1.046.892 | 17. december 2014 |
| [Pensionsplan W] | 997.586 | 17. december 2014 |
| [Pensionsplan X] | 1.015.159 | 17. december 2014 |
| [Pensionsplan Y] | 1.095.426 | 17. december 2014 |
| [Pensoinsplan Z] | 990.463 | 17. december 2014 |
| [Pensionsplan Æ] | 930.208 | 17. december 2014 |
| [Pensionsplan Ø] | 907.165 | 17. december 2014 |
| [Pensionsplan Å] | 933.555 | 17. december 2014 |
| [Pensionsplan AA] | 1.073.342 | 17. december 2014 |
| [Pensionsplan H] | 1.087.680 | 17. december 2014 |
| [Pensionsplan AB] | 931.267 | 17. december 2014 |
| [Pensionsplan AC] | 998.148 | 17. december 2014 |
| [Pensionsplan AD] | 975.440 | 17. december 2014 |

I alle disse tilfælde gør pensionsplanerne gældende, at de havde købt aktieposten den 4. december. Det er påfaldende, at 23 uafhængige pensionsplaner alle skulle beslutte sig for at "eje" aktieposten i *netop* 13 dage.

Eksemplerne viser, hvordan de påståede aktiebeholdninger er systematiseret på tværs af pensionsplanerne.

_____

I 2015 er der tilsyneladende anvendt en anden systematik for afvikling af "aktiebesiddelserne". Mønsteret ændrer sig, så pensionsplanerne i stedet for at sælge på samme dag eller i løbet af meget få dage begynder at afhænde deres aktier over en periode på cirka to måneder.

Imidlertid er det fortsat tydeligt, at handlerne er systematiseret fra centralt sted. Fordelingen af salgene tyder nærmere på, at handlernes størrelser søges maskeret.

Der er således en skarp opdeling mellem de fire custodians i Solo-gruppen. Der er på intet tidspunkt to custodians, der sælger samme aktier samme dag.

Dette kan illustreres med (…), der viser, at Mærsk A-aktier, der påstås købt den 31. marts 2015, angiveligt sælges på forskellige datoer afhængigt af, hvilken custodian der er tale om. F.eks. sælger Old Park Lane aktier den 2. juni 2015, mens Telesto sælger aktier den 3. juni 2015, og Solo Capital sælger aktier den 8. juni 2015.

Det er altså koordineret fra centralt hold, hvornår de Shah-kontrollerede custodians skal sælge aktierne, hvilket understøtter, at aktiehandlerne alene er en fiktiv konstruktion skabt med henblik på at opnå uberettigede refusioner af udbytteskat.

**6.6    Sanjay Shah kontrollerede pensionsplanernes custodians (Solo-gruppen)**

Pensionsplanerne repræsenteret af TVC Advokatfirma har alle – bortset fra én ([Pensionsplan G]) – anvendt en eller flere af fire custodians: Old Park Lane, Solo Capital, Telesto og West Point. Disse fire custodians udgør tilsammen Solo-gruppen.

Solo-gruppen er kun kendt af Skattestyrelsen fra dette sagskompleks.

De fire selskaber er alle i vidt omfang kontrolleret af Sanjay Shah, der efterforskes af det danske, engelske og tyske politi i forbindelse med udbyttesagen som en af de formodede hovedbagmænd, der har orkestreret svindlen.

Solo Capital Partners LLP, selskabsnummer OC367979, blev grundlagt i september 2011. Selskabet blev stiftet af Sanjay Shah og Solo Capital Limited. Solo Capital Partners LLP er aktuelt taget under konkursbehandling og behandles som under "Special Administration" i England på grund af den formodede kriminalitet begået i selskabet. Selskabet har tidligere været ejet af det luxembourgske selskab, Aesa SARL, der er ejet af Sanjay Shah, ligesom Sanjay Shah tidligere har været administrerende direktør for selskabet. En lang række af de Credit Advices, der er indsendt af Solo Capital, er underskrevet af Sanjay Shah personligt (…).

Old Park Lane Capital PLC var på udbetalingstidspunkterne ejet af en række aktionærer, hvoraf en af de største aktionærer er Aesa Holdings (UK) Limited, der efterfølgende har ændret navn til Solo Group Holdings Limited og er ejet af Aesa SARL, der ejes af Sanjay Shah.

Telesto Markets LLP var i 2015 ejet af Solo Group Holdings Limited, der som nævnt oven for er ejet af Aesa SARL, der som nævnt ejes af Sanjay Shah.

West Point Derivatives Ltd var i 2014 b.l.a. ejet af Hooloomooloo Holdings Limited, som ejes af Sanjay Shah.

Tidligere påstod pensionsplanerne, at de ikke havde noget kendskab til, om disse 4 custodians *"til-hørte samme gruppe af selskaber"*. Dette beroede på Skattestyrelsens *antagelse*, (...).

Senere har pensionsplanerne *radikalt* ændret deres forklaring om disse 4 custodians.

På (...) oplyste pensionsplanerne således som noget nyt, at *"Solo Capital var overordnet custodian i forhold til Old Park Lane, Telesto og West Point"*, og at alle pensionsplanernes penge indestod på Solo Capitals bankkonto, (...), og (...). Og i (...) omtaler pensionsplanerne konsekvent de 4 custodians som *"Solo-gruppen"*.

De fire custodians Old Park Lane, Solo Capital, Telesto og West Point udgør således tilsammen Solo-gruppen og har været kontrolleret af Sanjay Shah.

**6.7     Custodian: Sanjay Shahs "univers"**

De fire custodians i Solo-gruppen (Solo Capital, Old Park Lane, Telesto og West Point) har tilsammen produceret dokumentation, som er blevet anvendt til at få udbetalt over 9 milliarder kroner i udbyt-terefusion fra den danske stat. Dokumentationen dækker over påståede aktiebesiddelser til en kurs-værdi (på udlodningstidspunkterne på samlet ca. 1.354 mia. kr. De producerede dokumenter skal vise, at Solo-gruppen holdt meget betydelige aktieposter for sine kunder, dvs. pensionsplanerne, og at der for de pågældende aktieposter var blevet udbetalt udbytte og indeholdt udbytteskat, som pensionsplanerne derefter krævede refunderet fra SKAT.

Efterfølgende kontrol har imidlertid afdækket, at selvom Solo-gruppen har attesteret at holde aktier, hvoraf der er udbetalt bruttoudbytte på i alt 33,4 milliarder kroner, er der ingen objektiv dokumen-tation for – eller blot spor af – at Solo-gruppen skulle have besiddet én eneste aktie (afsnit 5.1, oven-for). Den eneste "dokumentation" for aktiebesiddelserne er de dokumenter, som Solo-gruppen selv har fremstillet.

En gennemgang af de dokumenter, som pensionsplanerne har fremlagt fra Solo-gruppen, forstærker da også indtrykket af, at Solo-gruppen ikke har besiddet aktier på vegne af pensionsplanerne, men derimod alene har fremstillet dokumentation med det ene formål at få udbetalt udbytterefusion:

Credit Advices er nummereret fortløbende på tværs af de 4 custodians, selvom der er tale om uaf-hængige juridiske personer (afsnit 6.8, nedenfor). Credit Advices, der passer ind *tidligt* i nummerræk-ken, er desuden blevet forsøgt anvendt til at opnå refusion *sent* i forløbet (i 2017) (afsnit 6.9, neden-for), hvilket illustrerer, at det er skuffedokumenter uden nogen realitet.

Påståede aktiebesiddelser er – som det fremgår af afsnit 6.1-6.5 – systematiseret på tværs af Solo-gruppen. Det er nøje afstemt, hvor store aktiebesiddelser der attesteres af hver custodian, hvilket kun kan have til formål at sløre systematikken og sammenhængen over for skattemyndighederne. I nogle tilfælde ses desuden, at størrelsen af pensionsplanernes aktiebesiddelser er "fortløbende"; dvs. at hver pensionsplan på listen ejer én aktie mere end den foregående.

<u>Aftalegrundlaget</u> mellem custodian og pensionsplan (Custody Agreement) er ikke blevet overholdt, idet pensionsplanerne ikke på noget tidspunkt har indbetalt den krævede Minimum Cash Balance (afsnit 5.9, ovenfor). Custodian har dermed ikke haft nogen sikkerhed, hvilket ville være uacceptabelt, hvis der faktisk blev handlet aktier (jf. også afsnit 3.2, ovenfor), idet custodian angiveligt skulle indestå for gennemførsel af transaktionerne.

<u>Custody statements</u> (…) viser ikke daglige bevægelser på hverken almindelige pengekonti eller på aktiedepoter (og -beholdninger) (afsnit 5.2, ovenfor). Uanset betegnelsen udgør de som (…) fremlagte bilag dermed ikke egentlige custody statements, og de dokumenterer ikke aktiebesiddelser.

<u>Oversigter over bogføringer</u> er udarbejdet efterfølgende af pensionsplanernes repræsentant til brug for denne sag (afsnit 5.3, ovenfor). De er fejlbehæftede og indeholder oplysninger, som ikke fremgår af sagens bilag. Oversigterne har derfor ingen bevisværdi.

Samlet set er fejlene og manglerne sammenholdt med systematikkerne i pensionsplanernes dokumenter fra Solo-gruppen klare indikatorer for, at pensionsplanerne på intet tidspunkt har ejet aktier, men at det derimod har været et samlet og komplekst svindelnummer.

**6.8    Credit Advices er nummereret fortløbende på tværs af Solo-gruppen**

I forbindelse med at SKAT har truffet afgørelser om dels tilbagekaldelse af tidligere afgørelser om refusion af indeholdt udbytteskat og dels afslag på nye refusionsanmodninger, har SKAT registreret alle Credit Advices indsendt med refusionsanmodningerne, herunder Credit Advices som er udstedt af Solo-gruppen. SKATs registrering af Credit Advices fra de omtalte fire custodians omfatter ca. 3.400 Credit Advices, der har dannet grundlag for refusionsanmodninger på samlet ca. 9 mia. kr.

SKATs registrering viser, at Credit Advices fra de fire Shah-kontrollerede custodians – som er juridisk uafhængige enheder – er nummereret af de respektive custodians selv, og at nummereringen er *fortløbende*. Registreringen viser også, at der ikke er nogen dubletter i Credit Advice ID-numrene fra disse fire custodians. Der er enkelte "huller" i nummereringen, dvs. Credit Advice ID-numre, som tilsyneladende ikke er benyttet.

Den fortløbende nummerering af udstedte Credit Advices fra Solo Capital, Old Park Lane, Telesto og West Point "hopper" mellem disse fire custodians. Det kan som eksempel illustreres med følgende uddrag fra SKATs registrering (…):

> Credit Advice ID 2533-2578: Telesto
> Credit Advice ID 2579-2619: West Point
> Credit Advice ID 2620-2659: Solo Capital
> Credit Advice ID 2660-2701: Old Park Lane
> Credit Advice ID 2702-2746: Solo Capital
> Credit Advice ID 2747-2788: Old Park Lane
> Credit Advice ID 2789-2830: Telesto
> Credit Advice ID 2831-2871: West Point

Som konkrete (anonymiserede) eksempler på den fortløbende nummerering kan nævnes følgende, (…):

<u>Eksempel 1:</u>

Sagsnr. 18-0004185                              Side 156/239

| Credit Advice ID 2788: Old Park Lane | 17. marts 2015 |
| Credit Advice ID 2789: Telesto | 17. marts 2015 |

Eksempel 2:

| Credit Advice ID 2904: Solo Capital | 23. marts 2015 |
| Credit Advice ID 2905: Old Park Lane | 23. marts 2015 |
| Credit Advice ID 2906: Solo Capital | 23. marts 2015 |

Eksempel 3:

| Credit Advice ID 2935: Solo Capital | 23. marts 2015 |
| Credit Advice ID 2936: Telesto | 23. marts 2015 |

Eksempel 4:

| Credit Advice ID 2955: Old Park Lane | 23. marts 2015 |
| Credit Advice ID 2956: Telesto | 23. marts 2015 |
| Credit Advice ID 2957: West Point | 23. marts 2015 |

Uanset om disse 4 custodians (til trods for, at de benyttede forskelligt brevpapir) skulle have benyttet samme back office, (…), giver det ikke nogen mening, at de i alt ca. 3.400 Credit Advices er fortløbende nummereret på tværs af selskaberne.

Og *hvis* de fire custodians har haft samme back office (…), giver det ikke mening, at de har anvendt et så forskelligt layout til deres Credit Advices:

(…)

Der er netop tale om fire juridisk uafhængige enheder. Den fortløbende nummerering giver ikke mening – heller ikke selvom det er inden for samme koncern. Og *hvis* der var tale om et legitimt set-up med koncernforbundne selskaber, giver forskellene i layout ikke mening.

Det understreger således, at opsætningen for så vidt angår udstedelsen af Credit Advices er orkestreret fra centralt hold. De udstedte Credit Advices er ikke udtryk for realiteter, men indgår alene som et element i den bevidste produktion af anmodninger om at få udbytterefusion uden at have ejerskab til aktier.

I en række tilfælde har pensionsplaner, der uberettiget har fået refunderet udbytteskat, og andre nystiftede pensionsplaner *efterfølgende* (dvs. efter at svindlen blev opdaget) indsendt yderligere refusionsanmodninger for flere hundrede millioner kr., som imidlertid blev afslået af SKAT med henvisning til manglende dokumentation for ejerskab til aktier og modtagelse af nettoudbytte. Også i forbindelse med disse efterfølgende anmodninger har pensionsplanerne henvist til Credit Advices fra Solo-gruppe

Mere centralt er det, at de indsendte Credit Advices passer ind i det fortløbende nummersystem (…), uanset at disse er indsendt senere.

Denne fortløbende nummerering af Credit Advices udstedt af de 4 Shah-custodians er en ganske markant illustration af den systematiske svindel med refusionerne.

**6.9     Credit Advices fra Solo-gruppen blev anvendt til forsøg på svindel i 2017**

Den 1. februar 2017 modtog SKAT via den nuværende IT-løsning 34 anmodninger om refusion af udbytteskat, som alle blev identificeret som mistænkelige af SKATs udbytteafdeling. Anmodningerne blev derfor oversendt til Særlig Kontrol.

De 34 anmodninger fra amerikanske pensionsplaner blev alle indgivet af agenten (...), der var ukendt for SKAT. Anmodningerne blev indgivet på vegne af 34 amerikanske pensionsplaner og lød på mellem 290.835 kr. og 1.479.587 kr. Der blev sammenlagt anmodet om refusion af mere end 25 mio. kr. Af de 34 pensionsplaner er de 29 navngivet efter (...).

En gennemgang af den vedlagte "dokumentation" viste, at de pågældende Credit Advices var udstedt af Telesto (8 stk.), West Point (8 stk.), Old Park Lane (9 stk.) og Solo Capital (9 stk.). Disse Credit Advices var nummereret således, at de passede ind i de "huller" i den fortløbende nummerering af Credit Advices, jf. ovenfor, men også sådan, at der fortsat ikke var nogen dubletværdier.

Det giver ingen mening, at nye (ukendte) pensionsplaner 1½ år senere indsender yderligere Credit Advices, som passer ind midt i kronologien af Credit Advice-numre. Det indikerer meget kraftigt, at der er tale om præfabrikerede "skuffe-dokumenter", der passer ind i et stort, overordnet system.

Endelig var det – grundet den nuværende elektroniske ansøgningsprocedure – muligt for SKAT at tjekke det "digitale fodspor" for de enkelte uploadede dokumenter, hvilket ikke var muligt med den tidligere fysiske ansøgningsprocedure (støttebilaget, afsnit 2). En gennemgang af de uploadede dokumenter vedrørende de 34 pensionsplaner viste, at Sanjay Shah var anført som forfatter på alle credit advices udstedt af både Solo Capital og Old Park Lane (i alt 18 dokumenter) (...).

SKAT, Særlig Kontrol, udsendte forslag til afgørelse i de *34* sager. Forslaget lød i alle tilfælde på, at anmodningen ville blive afslået, idet pensionsplanerne ikke havde dokumenteret ejerskab til aktierne og modtagelse af nettoudbytte. Forslagene blev sendt i kopi til agenten (...).

(...) indsendte i forlængelse heraf *35* skrivelser med indsigelser mod SKATs forslag til afgørelse. Der er med andre ord fremsendt indsigelser i en *ikke-eksisterende* sag, dvs. en sag, hvor der aldrig er fremsat nogen anmodning om refusion over for SKAT, og hvor SKAT derfor ikke har lavet noget forslag til afgørelse (...).

SKAT traf afgørelse om afvisning af anmodningerne den 1. juni 2018. Afgørelserne er blevet påklaget.

Når der – som det fremgår – fortsat anmodes om refusion efter samme metode og på samme grundlag som anvendt i nærværende sagskompleks, bliver det tydeligt, at den systematiske svindel med refusion af udbytteskatter ikke alene er historisk, men også af fremadrettet betydning.

### 6.10 Pensionsplanerne har fastholdt, at handlerne ikke blev styret centralt

Pensionsplanerne har igennem hele sagsforløbet fastholdt, at der ikke er tale om noget sagskompleks, og at pensionsplanerne har været fuldkommen uafhængige af hinanden.

Dette standpunkt fremgår f.eks. af (...):

> "Vores generelle svar på disse påstande er, at <u>den enkelte [pensionsplan] ikke har nogen direkte eller indirekte forbindelse eller kendskab til alle de øvrige pensionsplaner</u>, der tilsyneladende også har købt danske børsnoterede aktier under en tilsvarende investeringsstrategi. <u>[Pensionsplanen] har på intet tidspunkt haft kendskab til identiteten af alle de andre pensionsplaner med en lignende</u> *investerings-*

*strategi på samme eller andre handelsplatforme udført af samme eller andre mæg-lere, investeringsforvaltere mv.*"
(mine understregninger)

Videre har pensionsplanerne beskrevet, hvordan det var pensionsplanerne selv, der købte og solgte aktierne. TVC Advokatfirma har bemærket, at pensionsplanernes trustee *"havde en onlineadgang via Solos web-portal til at have indblik i og styre samtlige transaktioner på daglig basis"*, (…).

På (…) har pensionsplanerne også fremlagt en liste over tegningsberettigede ("Authorised Signatories of Trust"), (…), og en liste over personer, som var berettigede til at handle på vegne af pensionsplanerne ("Authorised Traders of Trust"), (…). Begge lister skulle efter sigende angå [Pensionsplan B], og den eneste person på listerne er (…) – [Pensionsplan B's] trustee.

Endelig har pensionsplanerne også fremlagt korrespondance mellem <u>(…),</u> der må tilhøre [Pensions-plan B], og brokeren (…) vedrørende aktiekøb, (…), ligesom pensionsplanerne også har bemærket, at custodian ikke var bemyndiget til at handle på vegne af pensionsplanerne, (…).

Pensionsplanernes beskrivelse af,

- *at* trustee'en skulle *"styre samtlige transaktioner på daglig basis"*, (…),
- *at* pensionsplanerne ikke havde *"nogen direkte eller indirekte forbindelse eller kendskab til alle de øvrige pensionsplaner"* eller *"kendskab til identiteten af alle de andre pensionsplaner med en lignende investeringsstrategi"*, (…), og
- *at* custodian ikke var bemyndiget til at foretage aktiehandler på vegne af pensionsplanerne, (…),

hænger på ingen måde sammen med pensionsplanernes *kollektive* og *koordinerede* investeringsstra-tegi, som de påståede aktiehandler illustrerer.

### 6.11    To pensionsplaner har glemt at ansøge om refusion (nyt)

To pensionsplaner, der er repræsenteret af TVC Advokatfirma, har tilsyneladende glemt at søge re-fusion af udbytteskat for deres påståede aktiebesiddelser.

Det drejer sig om [Pensionsplan Q], der ikke har søgt refusion for aktier erhvervet i 2015:

| Aktienavn | Antal aktier | Indeholdt udbytteskat |
|---|---|---|
| A.P. Møller Mærsk A/S - B | 8.094 | 4.307.383,98 kr. |
| Carlsberg A/S - B | 179.556 | 436.321,08 kr. |
| Coloplast A/S - B | 294.759 | 358.132,19 kr. |
| Danske Bank A/S | 3.578.514 | 5.314.093,29 kr. |
| DSV A/S | 823.723 | 355.848,23 kr. |
| FLSmidth & Co A/S | 80.747 | 196.215,21 kr. |
| GN Store Nord A/S | 630.605 | 153.237,02 kr. |
| Novo Nordisk A/S - B | 6.717.867 | 9.069.120,45 kr. |
| Novozymes A/S - B | 822.009 | 665.827,29 kr. |

| Pandora A/S | 492.896 | 1.197.737,28 kr. |
| TDC A/S (marts) | 3.090.704 | 834.490,08 kr. |
| Tryg A/S | 35.072 | 274.613,76 kr. |
| Vestas Wind Systems A/S | 378.092 | 398.130,88 kr. |
| A.P. Møller Mærsk A/S - A | 7.894 | 4.200.949,98 kr. |
| TDC A/S (august) | 1.092.245 | 294.906,15 kr. |
| **Sum** | | **28.057.006,87 kr.** |

Derudover drejer det sig om [Pensionsplan E], der ikke har søgt refusion for en i custody statement (…) medtaget aktiebesiddelse på 1.475.613 Coloplast-aktier erhvervet i 2015, hvor der ville være blevet indeholdt 1.792.869,80 kr.

Det giver ingen mening, at pensionsplanerne skulle kunne glemme at få udbetalt så betydelige beløb, som angiveligt skulle være anvendt til at dække betydelige omkostninger forbundet med dette set-up (afsnit 5.8, ovenfor), eller som pensionsplanerne under alle omstændigheder burde mene at have krav på, hvis de fastholder, at der har krav på de refusioner, som denne sag omhandler.

Det giver på den anden side god mening, at en enkelt pensionsplan eller en enkelt bogføringsmæssig postering kan forsvinde i mængden i et svindelnummer, der hos Solo-gruppen har været på cirka 9 milliarder kroner og omfattede langt over 100 pensionsplaner og mange tusinde påståede aktiehandler.

Pensionsplanerne hævder, de har meget små gevinster, da gevinsten ædes op af udokumenterede udgifter. Hvis det er rigtigt, så mangler de to pensionsplaner et betydeligt beløb og har dermed et betydeligt udestående, som ikke er blevet betalt. Det ville de påståede medkontrahenter opdage. Når de øjensynligt ikke har opdaget det, er det blot udtryk for, at det hele er papirmanøvrer – og ikke udtryk for reelle pengestrømme.

7.      FORMALIA

7.1      Bevisbyrde

Det er pensionsplanerne, der har anmodet om refusion af indeholdt udbytteskat, og det er dermed også pensionsplanerne, der har bevisbyrden for, at betingelserne for refusion af udbytteskat er opfyldt, jf. f.eks. UfR 2003.2312/3H. Dette bestrider pensionsplanerne da heller ikke, (…).

Det er irrelevant, om pensionsplanerne på ansøgningstidspunktet har fremlagt dokumenter, som – hvis de havde været korrekte – var tilstrækkelig dokumentation efter SKATs arbejdsgange i 2015, cf. (…). Det afgørende er, om Landsskatteretten på baggrund af sagens oplysninger finder, at pensionsplanerne har bevist, at de opfyldte betingelserne for refusion af udbytteskat.

Pensionsplanernes forklaring om transaktionerne, der skulle have givet ret til udbytterefusion, er usandsynlig, jf. afsnit 2.4, ovenfor, og bevisbyrden er derfor skærpet, jf. f.eks. UfR 1998.898 H.

Dertil kommer, at pensionsplanernes bilagsmateriale er fejlbehæftet og mangelfuld og deres forklaringer og anbringender usammenhængende og skiftende i en sådan grad, at bevisbyrden må skærpes *yderligere*, jf. afsnit 3-6, ovenfor, og afsnit 8, nedenfor, og f.eks. SKM2019.250.ØLR.
Pensionsplanerne gør omvendt gældende, at bevisbyrden har flyttet sig, således at Skatteforvaltningen er nærmest til at bære risikoen for bevistvivl som følge af den passerede tid og de trufne afgø-

relser om refusion. Pensionsplanerne gemmer sig i den sammenhæng i vidt omfang bag, at danske og engelske myndigheder har beslaglagt materiale fra deres custodians (…), og at Skattestyrelsen bør indhente materiale fra SØIK (…).

Skattestyrelsen bestrider, at bevisbyrden på den måde kan vendes, også når der henses til sagernes karakter. Pensionsplanerne har i perioden 2012-2015 anmodet om refusion på baggrund af meget store påståede aktiebesiddelser. Pensionsplanerne har således hver især foretaget investeringer for mange millioner kroner – og i mange tilfælde endda for flere milliarder kroner. Sagerne blev (i fører-sagerne) startet ved udsendelse af forslag til afgørelse den 23. og 24. marts 2017 og dermed få år efter udbetalingerne – og på tidspunkter, hvor bogføring fortsat burde være gemt efter både dansk og amerikansk ret.

TVC Advokatfirma repræsenterer mere end 100 pensionsplaner. Det kan simpelthen ikke passe, at alle disse pensionsplaner har været så letsindige, at de ikke selv har været i besiddelse af nogen form for fysisk eller elektronisk dokumentation for deres tidligere aktiebesiddelser (som udgjorde grund-laget for deres refusionsanmodninger).

Det er påfaldende, at pensionsplanerne ved 5 indlæg og over 4.000 siders bilagsmateriale har undladt at fremlægge relevant materiale, som *må* være i deres besiddelse, hvis der – som de påstår – er foregået aktiehandler:

- Pensionsplanerne har ikke fremlagt deres egne kontoudtog. Der er ikke fremlagt kontoudtog vedrørende hverken pensionsplanernes kontantbeholdninger eller aktiebeholdninger. Det siger sig selv, at pensionsplanerne er i besiddelse af dette materiale.

- Det er ikke dokumenteret, at pensionsplanerne har modtaget de påståede nettoudbytter eller udbytterefusion, (…).

- Der er ingen dokumentation for pengestrømme, herunder kontante sikkerhedsstillelser og betaling for aktier. Det er dermed heller ikke dokumenteret, at der er sket settlement, altså at de påståede aktiehandler faktisk er blevet gennemført.

- Ifølge pensionsplanernes egne oplysninger har de tjent millioner af kroner ved transaktio-nerne. Som eksempel herpå kan henvises til [Pensionsplan B] (…). I 19 tilfælde har [Pen-sionsplan B] ifølge eget udsagn handlet aktier og derved tjent et beløb, der "tilfældigvis" er næsten lige så stor som udbytterefusionen, (…). Pensionsplanerne har end ikke forsøgt at give Landsskatteretten et svar på, hvor deres meget store fortjenester er blevet af. Dette er et eksempel på, hvor virkelighedsfjerne pensionsplanernes forsøg på argumentation er. Når historien ikke hænger sammen, ja, så er det blot, fordi den er forkert.

- Der er kun fremlagt enkelte af de påberåbte GMSLA'er (…), og disse er udaterede, uden underskrift og ufuldstændige. Derudover er pensionsplanerne i de fleste tilfælde ikke afta-lepart.

- Der er ingen dokumentation for den påståede pantsætning af arbitragegevinsten (og pen-sionsplanernes yderligere midler) til GMSLA-medkontrahenterne og/eller custodian/Solo Capital, jf. TTC-klausulen.

Pensionsplanerne er i stedet fremkommet med en række skiftende forklaringer og en betydelig mængde dokumenter. Når pensionsplanernes forklaringer sammenholdes med de dokumenter, som pensionsplanerne har fremlagt under sagernes forberedelse for Skatteankestyrelsen, fremgår det ty-

deligt, at pensionsplanerne aldrig har ejet danske aktier. De foreliggende oplysninger peger derimod i den modsatte retning, jf. UfR 2003.2313/3 H. "Dokumentationen" er nemlig i et unaturligt stort omfang fejlbehæftet.

Der er ikke bevistvivl i sagen; der er nemlig ingen dokumentation for de påståede aktiehandler, og der er alt for mange fejl i det materiale, som pensionsplanerne har fremlagt for at underbygge deres "historie". Hvis den efter Landsskatterettens opfattelse foreligger bevistvivl, skyldes det alene, at pensionsplanerne har undladt at fremlægge dokumenter, der *må* være i deres besiddelse. Dette skal komme dem bevismæssigt til skade og er i modstrid med deres udsagn om, at de ville oplyse sagerne, (…).

**7.2       Annullation eller tilbagekaldelse – ugyldige afgørelser kan tilbagekaldes**

Pensionsplanerne har i (…) gjort gældende, at SKAT skulle have tilbagekaldt sine oprindelige, <u>gyldige</u> afgørelser om refusion af udbytteskat, (…), selvom der ikke er fremkommet <u>nye faktiske oplysninger</u> i sagerne siden afgørelserne om udbetaling, (…). Det anførte er udtryk for en misforståelse af både de faktiske og retlige omstændigheder.

Pensionsplanerne anfører nu korrekt i (…), at de <u>retlige omstændigheder</u> skal forstås således, at SKATs afgørelser om tilbagekaldelse er udtryk for en <u>annullation</u> af de oprindelige afgørelser som følge af, at disse var *ulovhjemlede* og derfor *ugyldige*.

Følgende fremgår således af afgørelserne til [Pensionsplan C], [Pensionsplan B] og [Pensionsplan F], (…):

> *"[Navn] har derfor ikke dokumenteret, at [navn] opfylder betingelserne for at få refunderet indeholdt af danske aktier, jf. artikel 10 i dobbeltbeskatningsove-renskomsten mellem Danmark og USA.*
>
> *(…)*
>
> *SKATs afgørelser om at refundere udbytteskat til [navn] hviler dermed på et urigtigt grundlag.*
>
> *SKAT tilbagekalder derfor de tidligere afgørelser om refusion af udbytteskatter."*

Tilsvarende formulering fremgår af Skattestyrelsens afgørelser til de øvrige førersager.

Som det fremgår, fastslås det i afgørelserne, at betingelserne for refusion ikke var opfyldt, og at afgørelserne om udbetaling er truffet på *urigtigt* grundlag. SKATs afgørelser er således *ikke* en tilbagekaldelse af en *gyldig* afgørelse. Det er derfor forkert, når pensionsplanerne skriver, at "*SKAT selv har lagt til grund, at de oprindelige afgørelser om udbetaling af refusion af udbytteskat var juridisk gyldige, da SKAT i modsat fald skulle have truffet afgørelse om at annullere disse tidligere afgørelser*", (…).

Det er irrelevant, om SKAT har benævnt afgørelsen "tilbagekaldelse" eller "annullation", (…). Pensionsplanerne kan ikke støtte ret på overskriften. Dertil kommer, at begreberne tilbagekaldelse og annullation ikke anvendes konsekvent. I SKM2011.501.HR fastslog Højesteret således, at SKAT kunne "*tilbagekalde*" (ikke annullere) en tilladelse, idet tilladelsen savnede hjemmel, dvs. pga. ugyldighed. Dommen illustrerer, hvordan begreberne (til en vis grad) anvendes synonymt.

Idet pensionsplanerne på intet tidspunkt har ejet de hævede aktier, endsige haft ret til udbyttet heraf, er SKATs oprindelige afgørelser om refusion af udbytteskat ugyldige, og SKAT var derfor såvel berettiget som forpligtet til at annullere afgørelserne. For ugyldige afgørelser er det *klare udgangspunkt*, at sådanne ikke kan opretholdes, jf. f.eks. SKM2011.501.HR. Det fremgår da også af Forvaltningsret Almindelige Emner, 6. udgave, kapitel 8, s. 517-518, hvortil pensionsplanerne henviser (…). De af pensionsplanerne anførte betragtninger om tilbagekaldelse er dermed uden betydning for nærværende sag.

<u>De faktiske omstændigheder</u> er gennemgået nærmere ovenfor og i (…). Som det fremgår heraf, har Skattestyrelsen en række oplysninger nu, der ikke forelå på udbetalingstidspunktet. Det er således ikke rigtigt, når pensionsplanerne skriver, at Skattestyrelsen i nærværende sag *"ikke ses at være kommet i besiddelse af reelt nye faktiske oplysninger i sagen"*, (…). Da SKAT udbetalte udbytterefusioner til pensionsplanernes agent, havde SKAT ikke kendskab til den omfattende svindel med refusionsanmodninger. SKAT havde heller ikke grundlag for at antage, at grundlaget for anmodningerne var uden realitet.

Betingelserne for annullation/tilbagekaldelse af de tidligere afgørelser er således opfyldt, idet afgørelserne er uhjemlede.

Selv hvis det kan bebrejdes SKAT, at der ikke blev foretaget en egentlig kontrol af hver enkelt refusionsanmodning, ændrer det ikke på, at pensionsplanerne ikke har fremlagt dokumentation for, at pensionsplanerne *faktisk* har ejet de påståede aktier. Skattestyrelsen er derfor heller ikke som følge heraf afskåret fra at tilbagekalde/annullere afgørelserne om refusion, jf. f.eks. UfR 2003.2312/3H og UfR 2007.3052 H.

Tilbage står nemlig, at der ikke er nogen dokumentation for, at pensionsplanerne faktisk har ejet de påståede aktier og modtaget det påståede nettoudbytte, hvorfor de ikke har været berettiget til de udbetalte refusioner.

## 8.     PENSIONSPLANERNES BETRAGTNINGER

### 8.1     Pensionsplanernes pengemaskine

Pensionsplanerne har i (…), anført, at

*"elimineringen af de økonomiske risici […] er en standardrutine for enhver DIV-Arb-transaktion"*

og, at

*"hver Div-Arb-transaktion er profitabel"*.

Ifølge pensionsplanerne har de altså uden at have nogen penge kunnet benytte en investeringsmodel, som er uden nogen form for økonomisk risiko, og som altid giver gevinst.

Pensionsplanerne anfører da også i (…), at *"Div-Arb er en pengemaskine"*.

En sådan (lovlig) pengemaskine eksisterer ikke.

### 8.2     Én aktie kan have flere ejere

Ifølge pensionsplanerne *"kan en aktie have mere end én ejer"*, (…).

Det er ikke rigtigt.

Det ville indebære, at det aktieudstedende selskab skulle udlodde udbytte til mere end 100 % aktionærer. Det er ikke tilfældet. En eventuel tvivl om, hvem der ejer en aktie, indebærer selvfølgelig ikke, at der er flere ejere af samme aktie på samme tidspunkt.

Hvis der kunne være flere ejere af samme aktie, ville det også betyde, at mere end 100 % aktionærer kunne møde og stemme på selskabets generalforsamling.

**8.3    Short-selling medfører, at der er flere aktier på markedet end udstedt af selskabet**

Pensionsplanerne påstår, at short-selling har som typisk konsekvens, at *" der er flere aktier til rådighed på markedet end der oprindeligt er udstedt."*, (…).

Det er ikke rigtigt.

Der kan ikke handles et større antal aktier end udstedt af selskabet – heller ikke ved short-selling. Kæden i short-selling kan opstilles således:

Ejer/aktielångiver → aktielåntager/short-seller → short-buyer

Short-selling skal være *dækket*. Aktielåntageren skal med andre ord have lånt aktien, inden han sælger den til short-buyer, og denne salgsaftale skal naturligvis ske med respekt af vilkårene i aktielåntagers låneaftale med aktielångiver – ellers foreligger der vanhjemmel. Man kan altså ikke (lovligt) duplikere hverken aktien eller retten til udbytterefusion ved short-selling.

**8.4    1 udbytteskat kan føre til 2 refusioner**

Pensionsplanerne hævder, at deres setup *"resulterer i to parallelle udbytterefusioner, selvom statskassen kun har modtaget en enkelt indbetaling af udbytteskat fra selskabet."*, (…).

Det er åbenlyst forkert.

Refusionerne er jo udtryk for *tilbagebetaling* af et beløb, som er blevet indeholdt. Betaling af 1 udbytteskat kan derfor ikke føre til 2 (retmæssige) refusioner. Det ville jo påføre statskassen enorme tab. En eventuel tvivl om, hvem der ejer en aktie og dermed er berettiget til udbytte og refusion, indebærer selvfølgelig ikke, at statskassen skal refundere mere udbytteskat, end der er blevet indeholdt. Staten skal jo ikke bære risikoen for (eller udgifterne ved), at der ved en handel forelå vanhjemmel.

**8.5    Sagen handler om jura**

Pensionsplanerne forsøger at pakke deres *"pengemaskine"* ind i en lang række juridiske betragtninger.

Ejerskab kan ikke opnås gennem juridiske betragtninger. Hvorvidt pensionsplanerne har erhvervet de påståede aktier, er tværtimod et spørgsmål om faktum. Og faktum er, at pensionsplanerne ikke kan fremlægge noget konkret bevis for at have ejet aktierne. Bemærkelsesværdigt er det især, at ingen af de mere end 100 pensionsplaner har fremlagt så meget som én side af deres egne kontoudtog.

Denne sag vedrører ikke afklaring af en juridisk gråzone for ejerskab af aktier. Sagen handler om faktum. Derfor er pensionsplanernes betragtninger om *bona fide*-ejerskab og *retmæssigt ejerskab* (beneficial ownership) ikke relevante.

Retten til refusion af indeholdt udbytteskat afhænger af, om man har ejet aktier og modtaget net-toudbytte heraf. Hvis der ikke er handlet nogen aktier, eller hvis der er tale om fiktive aktiehandler, har pensionsplanerne ikke ejet aktierne, og de er derfor heller ikke berettiget til refusion. Det siger sig selv. Og så er det uden betydning, om pensionsplanerne var i god tro. Ex tuto skal det bemærkes, at det er Skattestyrelsens opfattelse, at pensionsplanerne har været i ond tro.

Hvis der *ikke* blot var tale om fiktive aktiehandler, ville der foreligge håndfast og utvetydigt bevis for, at pensionsplanerne havde købt og ejet aktierne og modtaget nettoudbytterne herfra.

### 8.6     Det er umuligt at svindle med aktiehandler

Ifølge pensionsplanerne er aktiehandler underlagt så streng regulering, at fiktive aktiehandler slet ikke kan forekomme, (…). Det er også – ifølge pensionsplanerne – umuligt for en custodian at udstede dokumenter uden realitet.

Samtidig anerkender pensionsplanerne dog, at der er fejl i (…) (custody statement og broker confir-mations), hvilket ifølge pensionsplanerne *"lader […] til at bero på simple menneskelige inputfejl i com-puterne"*, (…). Derudover indeholder nogle af de skriftlige handelsnotaer fra (…) (broker) *"afvigelser fra de elektroniske instruktioner til afvikling af handlen"*, (…).

Disse fejl og afvigelser illustrerer det helt selvfølgelige, at det *er* muligt at svindle med aktiehandler, hvis man har viljen til det.

Som det fremgår af nærværende indlæg, er der da også flere steder tydelige fejl i det materiale, som pensionsplanerne har fremlagt.

### 8.7     Skiftende forklaringer 1: Pensionsplanernes "afgørende" beviser ændrer karakter

Pensionsplanerne har tidligere hævdet, at de fremlagte *Credit Advices* udstedt af de Shah-kontrolle-rede custodians var "legalt bevis" for, at pensionsplanerne har købt de påståede aktier, (…). Det er endda anført i (…) – i generelle vendinger – at der udover Credit Advices

> *"ikke findes noget andet bevismateriale for modtagelse af et udbytte."*

Det er simpelthen forkert, at pensionsplanerne – hvis de faktisk havde modtaget de påståede udbyt-ter – ikke skulle kunne fremlægge nogen form for objektiv dokumentation herfor.

Efterfølgende er det da også blevet pensionsplanernes opfattelse, at *handelsnotaerne* (…) er *"den afgørende dokumentation for, at aktiekøb har fundet sted"*, (…), idet fremlæggelse af en handelsnota er *"den eneste måde, hvorpå det kan dokumenteres, at man er juridisk ejer af aktier"*, (…).

Hverken Credit Advices eller handelsnotaer (…) dokumenterer ejerskab til aktier. Credit Advices er blot ord på papir, og handelsnotaer dokumenterer ikke, at handlerne faktisk er blevet gennemført. Hertil anfører pensionsplanerne i (…), at *"Denne påstand er materielt forkert. En broker confirmation er en handelsnota, der kun kan udstedes […] når en handel er gennemført."* (min understregning).

Omvendt anfører pensionsplanerne i (…), at *"handelsnotaen fra en "broker" [udgør] dokumentation for, at der foreligger en endelig og bindende aftale om aktiekøb. <u>For så vidt angår afvikling (settlement), så dokumenterer handelsnotaen fra mægleren (brokeren) ikke, at afvikling har fundet sted.</u>"* (min understregning).

Der er altså enighed om, at de fremlagte broker confirmations (…) <u>ikke</u> dokumenterer, at handlen er blevet gennemført.

Pensionsplanerne har også tidligere hævdet, at en custody statement har *"den samme indholdsmæssige værdi som dokumentation som et kontoudtog."*, (…). Pensionsplanerne har fastholdt, at de fremlagte custody statements (…) viste *daglige* kontobevægelser, (…).

De fremlagte custody statements (…) er dog alene årsopgørelser, som – uden underliggende kontoudtog – viser en række interne bogføringsmæssige posteringer hos custodian.

I (…) oplyses da også om de fremlagte custody statements (…), at de blot er *"kontoudskrifter produceret ved hvert års udgang og viser derfor kun et resumé af samtlige transaktioner. Hvert enkelt transaktion, værende sig køb, salg, forward hedge eller aktielån, blev løbende bogført i custodians systemer, og hver trustee kunne ved onlineadgang løbende se hver enkelt transaktion på kontoen."*

Det fremgår videre af pensionsplanernes bemærkninger, at *"trustee havde en onlineadgang via Solos web-portal til at have indblik i og styre samtlige transaktioner på daglig basis."*

Det er også i det lys påfaldende, at *ingen* af pensionsplanerne fremlægger kontoudtog af nogen art. Og det er bemærkelsesværdigt, at pensionsplanerne nu så radikalt ændrer forklaring om indholdet af (…), som pensionsplanerne i (…), omtalte som *"juridisk bevis for ejerskab af aktiepositioner"*.

### 8.8    Skiftende forklaringer 2: Uoverensstemmelser i forklaringer om sikkerhedsstillelse og udbetaling af refusion

Ifølge pensionsplanerne indebærer GMSLA'erne en *"pantsætning af alle aktiver (nuværende og fremtidige)"*, (…), oplyser pensionsplanerne, at det økonomiske resultat af de påståede aktietransaktioner og forwards blev *"givet i sikkerhed under GMSLA'en"*. Der er ikke fremlagt dokumentation for en sådan pantsætning af pensionsplanernes aktiver til GMSLA-medkontrahenterne.

Denne pantsætning hænger i øvrigt ikke sammen med, at pensionsplanerne i (…), har oplyst, at Div-Arb-resultatet (herunder nettoudbytte og refusion) blev pantsat til den respektive *custodian*. Ifølge (…), blev ejendomsretten til alle pensionsplanernes pengemidler overdraget til custodian til sikkerhed for betalingen af aktietransaktionerne i henhold til TTC-klausulen (pkt. 4.3 i Custody Agreement, (…)). Denne sikkerhedsstillelse er heller ikke dokumenteret.

Pensionsplanerne har i (…), ændret forklaring til, at ejendomsretten til pengemidlerne (herunder nettoudbytte og refusion) *altid* blev overdraget til *Solo Capital*. Dette er dog ikke i overensstemmelse med TTC-klausulen i den fremlagte Custody Agreement (…), som henviser til "Custodian". Det er – eller har i hvert fald hidtil været – ubestridt, at Solo Capital blot er én blandt 4 Shah-kontrollerede custodians benyttet af pensionsplanerne repræsenteret af TVC Advokatfirma. Det er åbenlyst, at disse oplysninger fra pensionsplanerne er modstridende.

Dertil kommer, at refusionerne ubestridt ikke er blevet udbetalt til hverken GMSLA-medkontrahenterne eller custodian (eller Solo Capital), men til pensionsplanernes agenter.

Hvis resultatet er pantsat, giver det ikke mening, at refusionerne er udbetalt til pensionsplanernes agenter i stedet for til panthaver.

### 8.9    Skiftende forklaringer 3: Pensionsplanernes konti

Pensionsplanerne har på kontormøderne oplyst, at alle deres penge indestod på Solo Capitals konto, (…), og at alle de påståede aktietransaktioner samt modtagelse af nettoudbytte og refusion skete over denne konto, (…). Dette er der ikke fremlagt dokumentation for. Det er også i strid med pensionsplanernes tidligere oplysning om, at pensionsplanerne ikke havde brug for separate konti ud over kontoen hos deres respektive custodian (som i langt fra alle tilfælde var Solo Capital), (…).

Hvis pensionsplanernes penge indestod på Solo Capitals konto, forekommer det også besynderligt, at der i vidt omfang er fremlagt custody statements – som pensionsplanerne selv sammenligner med kontoudtog, (…) – som er udarbejdet af West Point, Telesto og Old Park Lane.

Under alle omstændigheder har ingen af pensionsplanerne fremlagt kontoudtog overhovedet.

### 8.10    Skiftende forklaringer 4: Manglende bevismateriale

Det anføres i (…) – i generelle vendinger – at der udover Credit Advices

> "ikke findes noget andet bevismateriale for modtagelse af et udbytte."

Det er simpelthen forkert, at pensionsplanerne – hvis de faktisk havde modtaget de påståede udbytter – ikke skulle kunne fremlægge nogen form for objektiv dokumentation herfor, f.eks. i form af udbyttenota, kontoudtog, fonds-/depotoversigt eller lignende, jf. støttebilaget, afsnit 2.2, om de eksempler på dokumentation, der nu fremgår af SKATs hjemmeside.

### 8.11    Manglende forbindelse til VP Securities og settlement ved netting

Pensionsplanerne anfører mange steder i (…), at VP Securities ikke har et retvisende ejerregister (…), og at aktiehandler ikke nødvendigvis gennemføres ved levering af aktier mellem custodians, idet handler først afvikles ved overførsler af aktier internt (bogføringsmæssigt) hos hver enkelt custodian (…).

Sådanne anbringender kan ikke føre til, at pensionsplanerne skal have medhold i deres klage. Data fra VP Securities skal indgå i bevisvurderingen. Det er således relevant, om pensionsplanerne eller deres custodians har haft depoter i VP Securities – eller om de kan vise, gennem hvilke sub-custodians de efter sigende har ejet aktier.

Det er pensionsplanerne, som skal dokumentere, at de har ejet aktier i danske selskaber på udlodningstidspunktet, jf. afsnit 7.1, ovenfor. Hvis pensionsplanerne ikke kan bevise ejerskab, har de ikke ret til udbytterefusion.

Skattestyrelsen har gennem kontakt til VP Securities forsøgt at få bekræftet, om de af pensionsplanerne anførte custodians har haft aktiebeholdninger. Det kunne VP Securities ikke bekræfte. Formålet med Skattestyrelsens kontakt til VP Securities var at oplyse sagerne. Det ændrer ikke på, at pensionsplanerne har bevisbyrden for ejerskab.

Det samme gælder om netting-procedurer. Der er ingen beviser for, at pensionsplanernes custodians på noget tidspunkt har besiddet aktieposter i danske selskaber. Når de Shah-relaterede custodians (Solo Capital, Telesto, West Point og Old Park Lane) ikke har nogen aktier forud for levering, skal de

selvfølgelig modtage aktier ved gennemførsel af pensionsplanernes "handler". Det er op til pensions-
planerne at bevise, at der er sket en sådan levering af aktier. Den bevisbyrde kan selvfølgelig ikke
løftes ved at henvise til overordnede betragtninger om netting.

Pensionsplanerne gør tilsyneladende gældende, at det er *umuligt* at bevise ejerskab til danske ak-
tieposter. Det er selvfølgelig ikke rigtigt.

**8.12     Aktielåntager vil stille sikkerhed på markedsværdien**

Pensionsplanerne gør omkring de påståede sikkerhedsstillelser fra aktielåntager gældende, at

> *"Det er imidlertid kutyme inden for aktie-udlånsbranchen at værdiansætte sikker-
> heden, der skal stilles mark-to-market (dvs. på markedsbasis) uden noget
> "haircut". Hovedrisikoen for långiveren i en aktieudlånstransaktion er misghol-
> delse fra låntagers side. Det er derfor vigtigt, at værdien af sikkerheden (mindst)
> svarer til markedsprisen (mark-to-market)."* (…)

Det anførte stemmer ikke overens med, at sikkerhedsstillelsen *ikke* var markedsprisen på tidspunkt
for indgåelse af den konkrete aktieudlånsaftale, men derimod markedsprisen på tidspunktet for ind-
gåelse af købsaftalen, jf. afsnit 3.2.2, ovenfor.

I forlængelse heraf henviser pensionsplanerne til, at Nordnet forlanger *mere* end 100 % af markeds-
værdien i sikkerhedsstillelse.

Pensionsplanerne fordrejer imidlertid faktum.

Nordnet er en stor og etableret spiller på markedet, der ifølge årsrapporten for 2018 har aktiver til
en værdi af 92 mia. SEK, en bruttofortjeneste på 1,3 mia. SEK og en egenkapital på cirka 2 mia. SEK.

Udklippet fra Nordnet (…) viser, at en kapitalstærk part, Nordnet, forlanger mere end 100 % sikkerhed
ved shorting, således at Nordnet er sikker på at få de udlånte aktier hjem igen – og ellers er sikker-
hedsstillelsen høj nok til at foretage dækningskøb.

I modsætning til Nordnet har pensionsplanerne hverken egenkapital eller aktiver. Derfor er det selv-
følgelig medkontrahenten – nemlig aktielåntager, som skal være kapitalstærk og komme med et me-
get betydeligt millionbeløb – der vil være bekymret for, om denne får sine penge retur. Og derfor er
det *meget* usandsynligt, at låntageren vil indvilge i at stille sikkerhed på 100 %.

Eksemplet med Nordnet viser jo *netop*, at den kapitalstærke part vil kræve en "margin" i sikkerheds-
stillelsen i sin favør.

Pensionsplanernes påberåbelse af Nordnet-eksemplet illustrerer endnu engang, at pensionsplanerne
påberåber sig forhold og beviser, der er helt ved siden af deres situation. Og det understreger, hvor
dårlig en sag de har.


**8.13     Spekulation om, hvorvidt Pinsent Masons har rådgivet Solo Capital**

Pensionsplanerne henviser til, at Pinsent Masons har rådgivet Solo Gruppen i forbindelse med de gennemførte transaktioner (…). Det er imidlertid udokumenteret og fremgår ikke af den fremlagte faktura og mailkorrespondance (…), der ikke angår rådgivning af relevans for de for Skatteankestyrelsen verserende sager.

Dertil kommer, at rådgivning eller udtalelser fra Pinsent Masons selvfølgelig ikke har betydning for vurderingen af, om pensionsplanerne har ejet aktier. Det gælder, uanset om Pinsent Masons repræsenterer Skattestyrelsen i England.

Pensionsplanernes fremhævelse af dette forhold ligner alene et forsøg på at mudre billedet.

Det mest interessante ved pensionsplanernes fremlæggelse af (…) er, hvorfra pensionsplanerne har den del af (…), der vedrører rådgivning af Sanjay Shah og hans selskaber. Pensionsplanernes besiddelse af (…) i dets helhed tyder på, at pensionsplanerne har kontakt med Sanjay Shah."

**Skattestyrelsens støttebilag af 9. august 2019:**

"Skattestyrelsens støttebilag

Indholdsfortegnelse
1. AKTØRER                                                                                    2
    1.1    Custodian                                                          2
    1.2    Agenter                                                            3
    1.3    Amerikanske pensionsplaner                                         4
    1.4    Brokere                                                            6
2. REFUSIONSANSØGNINGER                                                                       7
    2.1    Perioden 2012-2015                                                 7
            2.1.1    Blanketten                                           8
            2.1.2    Credit Advice                                        8
            2.1.3    Form 6166                                            8
            2.1.4    Power of Attorney                                    9
    2.2    Ny ansøgningsproces fra 2017 og fremefter                          9
3. AFTALETYPER                                                                                9
    3.1    Global Master Securities Lending Agreement (GMSLA)                 9
    3.2    Forwards                                                           10
4. CIVILE RETSSKRIDT                                                                          11
            4.1.1    Tyskland: Arrest for ca. 2,2 milliarder kroner       11
            4.1.2    USA: Retssager for ca. 5,4 milliarder kr. anlagt – og ikke afvist       12
            4.1.3    Forlig: Tilbagebetaling af hhv. 10 mio. kr. og 1,6 mia. kr.       13
5. SKATS DATAANALYSE                                                                          13
            5.1.1    Grundlaget for SKATs analyse                         14
            5.1.2    Resultatet af analysen                               16
    (…)

1.  **AKTØRER**

Sagskomplekset vedrørende refusion af udbytteskat angår i alt 306 pensionsplaner og selskaber fra forskellige udenlandske jurisdiktioner, der via agenter *uberettiget* har anmodet SKAT (nu Skattestyrelsen) om refusion af udbytteskat på i alt ca. 12,7 milliarder kr. i perioden fra 2012 til og med 2015. SKAT har på grundlag af refusionsanmodningerne udbetalt de anmodede beløb i alt ca. 12,7 milliar-

der kr. i den tilsvarende periode. Udbetalingerne er sket til udenlandske bankkonti anvist af – og tilhørende – agenterne.

Af de i alt 306 pensionsplaner og selskaber, der har ansøgt SKAT om refusion af udbytteskat, er 277 pensionsplaner hjemmehørende i USA.

De forskellige centrale aktører og dokumenter kan illustreres som følger:



## 1.1    Custodian

Almindeligvis er en "custodian" (formueforvalter) et finansielt institut, der opbevarer kunders aktie-beholdninger og øvrige værdipapirer.

De i sagen indsendte Credit Advices, som alene udgør den påberåbte "dokumentation" for ejerskabet af aktierne og modtagelse af udbytte, er produceret af 12 forskellige internationale custodian-firmaer, der oplistes nedenfor.

Fordelingen af de anmodningsbeløb, som hver custodian har leveret påberåbt "dokumentation" (Credit Advices) til, kan opgøres således (i forhold til de 12,7 milliarder kr., som *uberettiget* er blevet udbetalt):

| Custodian | Total (DKK) |
|---|---|
| Solo Capital Partners LLP | 5.442.113.750 |
| Old Park Lane Capital PLC | 1.776.763.390 |
| (…) | 1.135.775.342 |
| Telesto Markets LLP | 925.443.359 |
| (…) | 920.721.387 |
| West Point Derivatives Ltd | 880.884.044 |
| (…) | 688.383.335 |
| (…) | 582.830.675 |
| (…) | 320.758.845 |
| (…) | 33.748.380 |

| | |
|---|---|
| (...) | 1.863.000 |
| (...) | 810.000 |
| Hovedtotal | 12.710.095.50 |

De involverede custodians har alle hjemsted i England bortset fra (...) og (...), der har hjemsted i henholdsvis (...) og (...).

**1.2 Agenter**

Alle de i sagen omhandlede 306 pensionsplaner og selskaber ansøgte om refusion af udbytteskat via en af SKAT reguleret blanketordning. De 306 enheder anvendte seks internationale eksterne rådgivningsfirmaer, såkaldte "agenter", der videreformidlede de anmodende enheders ansøgning om refusion af tilbageholdt udbytteskat til SKAT.

Fordelingen af refusionsanmodninger mellem de seks agenter har været som følger:

| Agent | Udbetalt (DKK) |
|---|---|
| (...) | 4.549.985.549 |
| (...) | 3.610.468.065 |
| (...) | 3.043.663.066 |
| (...) | 1.220.975.179 |
| (...) | 262.207.548 |
| (...) | 22.796.100 |
| Hovedtotal | 12.710.095.507 |

(...) har spillet den største rolle som agent i komplekset, idet agenten har været involveret i fremsættelse af anmodninger om refusion af udbytteskat for ca. 4,5 milliarder kr. ud af de svindlede 12,7 milliarder kr.

(...) har hjemsted i England, hvilket også er tilfældet for (...), (...) og (...). Agenterne (...) og (...) har hjemsted i henholdsvis (...) og (...).

Agenterne havde ikke alene til opgave at videreformidle materiale, men også at forestå selve den direkte kommunikation med SKAT, ligesom agenterne forestod fremsendelse af dokumentationen for refusionsanmodningerne.

Agenterne anviste i deres anmodninger til SKAT på vegne af de 306 pensionsplaner og selskaber de udenlandske bankkonti, som man ønskede refusionsbeløbene overført til. Alle de af agenterne anviste bankkonti var konti tilhørende agenterne, og SKAT udbetalte på baggrund af en gennemgang af anmodningerne alle beløb angående anmodningerne til de af agenterne anviste bankkonti.

**1.3 Amerikanske pensionsplaner**

Langt de fleste af de 277 amerikanske pensionsplaner har ifølge det for SKAT oplyste været "401 (k) plans". Betegnelsen henviser til, at pensionsplanerne har været oprettet i henhold til betingelserne i Section 401 (a) i US Internal Revenue Code ("IRC").

En 401(k) plan etableres af en arbejdsgiver til fordel for dennes medarbejdere. Det er en forudsætning for oprettelse af en pensionsplan, at arbejdsgiveren har et Employer Identification Number (ENI), som tildeles de amerikanske skattemyndigheder, IRS. Videre er det en betingelse for oprettelse af 401 (k) planer, at der er et formelt vedtaget *plan document*, og at der er en separat aftale med en trustee. Det pågældende *plan document* skal regulere vilkårene for pensionsplanen, herunder overholdelse af IRC og – hvis den finder anvendelse– the Employee Retirement Income Security Act ("ERISA"), samt anden gældende lovgivning. Aftalen med trustee'en skal regulere, hvordan pensionsplanens midler skal investeres og bestyres.

Indbetalinger til 401 (k) planer kan foretages af både arbejdstagere og arbejdsgiveren i henhold til pensionsplanens *plan document* og de grænser, der sættes af IRC. Når der bortses fra undtagelser om periodisering af bidrag ved årsskifter, kan indbetalingerne til en 401 (k) plan for hver deltager (både arbejdsgiver og arbejdstagere) ikke overstige det laveste af 1) en beløbsgrænse, der periodisk justeres for inflation ($53.000 i 2016 eller $59.000 for deltagere, der en 55 år eller ældre) og 2) 100 % af deltagerens kompensation fra arbejdsgiveren det pågældende år. Beløbsgrænsen er lavere for visse typer 401 (k) planer.

Generelt kan 401 (k) planer alene foretage udbetalinger som udlodning til deltagerne eller som dækning af tilladte udgifter for pensionsplanen. Udlodning til deltagerne kan kun ske under visse omstændigheder, f.eks. ved ophør af ansættelsesforhold, økonomisk hardship, død, invalidering, alder (59½ år) eller ophør af pensionsplanen uden succession. Sådanne udlodninger skal indberettes til IRS på Form 1099-R. Det bemærkes, at der kan være behov for andre formularer, hvis udlodningen sker til en person, der ikke er bosiddende i USA.

Bidrag til 401 (k) planer skal opbevares i en særskilt fond, der bestyres af en eller flere trustees, der - med visse undtagelser – har ekskl. ret til at bestyre pensionsformuen, herunder til at foretage investering af midlerne.

I nærværende sagskompleks har de omfattede trustees fungeret som bestyrere af pensionsplanerne på et overordnet niveau. Trustee'en har underskrevet fuldmagter på vegne af pensionsplanen *og* på vegne af den arbejdsgiver, der har oprettet planen. Der er omkring 70 forskellige trustees involveret i sagskomplekset. Langt de fleste er bosiddende i USA. Ud af de i alt 70 trustees repræsenterer 4 trustees samlet set 156 af de 277 amerikanske pensionsplaner.

Langt de fleste af de i sagen involverede 401 (k) planer er af typen "One-participant plans", hvilket også fremgår af SKATs afgørelser om tilbagekaldelse, hvor dette er tilfældet. "One-participant plans" er pensionsplaner for virksomhedsejere, der ikke har ansatte i den tilknyttede erhvervsvirksomhed (bortset fra eventuelt ejerens ægtefælle). Disse pensionsplaner består således, som ordlyden indikerer, udelukkende af ejeren (og eventuelt dennes ægtefælle). Pensionsplanen er i øvrigt undergivet samme regler og krav som øvrige 401 (k) plans, dog ikke ERISA.

"One-participant plans" er ikke forpligtede til at indsende regnskabsoplysninger (Form 5500) til de amerikanske myndigheder, når de har aktiver for højst $250.000 ved udgangen af pensionsplanens indkomstår (*plan year*).

Hvis "One-participant plans" har aktiver for over $250.000, har de pligt til at indsende regnskabsoplysninger (Form 5500) til de amerikanske myndigheder. Denne forpligtelse opfyldes normalt ved indsendelse af Form 5500-EZ, men kan i visse tilfælde i stedet opfyldes ved brug af Form 5500-SF.

Ud af de 277 pensionsplaner i sagskomplekset har langt den overvejende del heraf ikke indsendt Form 5500. Det må lægges til grund, at de øvrige pensionsplaner ikke har haft aktiver for mere end $250.000 ved udgangen af deres regnskabsår (*plan year*).

401 (k) planer indebærer en række skatteretlige fordele i USA. Således har arbejdsgiveren fradragsret for indbetalinger til pensionsplanen, arbejdstageren er skattefritaget for indbetalinger til pensionsplanen, og pensionsplanens midler/indkomst er fritaget fra indkomstbeskatning. Derudover er 401(k)-planerne i dobbeltbeskatningsoverenskomster med USA tillagt nogle skattefordele, herunder ret til refusion af udbytteskat fra udenlandske aktier. Når der i andre lande anmodes om disse fordele, skal pensionsplanen bevise, at den er hjemmehørende i USA.

### 1.4 Brokere

Almindeligvis er en broker en mægler, dvs. en mellemmand mellem investorer, der vil købe og sælge værdipapirer. Brokeren betales typisk et gebyr for sin rolle.

Brokeren sørger for matching af køber og sælger og dermed indgåelse af købsaftalen (executing broker) og/eller for gennemførsel af handlen (clearing broker), dvs. udveksling af parternes ydelser.

Pensionsplanerne repræsenteret af TVC Advokatfirma har angiveligt anvendt deres custodian til clearing (gennemførsel) af handlerne (…). De har dermed alene anvendt executing brokers.

Det betyder, at brokeren har haft ansvaret for at finde en køber/sælger. Efter matching har brokeren udstedt en handelsnota (broker confirmation – (…)), hvor vilkårene for handlen fremgår.

Disse handelsnotaer er imidlertid fejlbehæftede i et omfang, som i sig selv gør, at de ikke har nogen bevisværdi i den relation, at to parter har fundet hinanden i en aktiehandel (sammenfattende indlæg, afsnit 5.4). Anvendelsen af executing brokers er derfor højest et led i Sanjay Shahs cover-up af svindlen.

Dertil kommer, at executing brokers ikke forestår gennemførsel af handlerne (clearing), og at de derfor ikke har nogen viden om, hvorvidt parterne faktisk udveksler ydelser – og hvorvidt parterne faktisk har haft de aktieposter, som angiveligt købes/sælges.

### REFUSIONSANSØGNINGER

### 2.1     Perioden 2012-2015

Fra 2012 til 2015 har pensionsplanerne med henvisning til dobbeltbeskatningsoverenskomster mellem Danmark og det land, hvori de enkelte pensionsplaner var hjemmehørende, anmodet SKAT om refusion af indeholdt udbytteskat.

Refusionsanmodningerne blev indgivet af en række internationale agentvirksomheder via blanketordningen. Agenterne handlede på pensionsplanernes vegne.

Anmodningerne var vedlagt følgende:

1. Blanket 6.003 ENG – Claim to Relief from Danish Dividend Tax (afsnit 2.1.1, nedenfor),

2.  Attest udarbejdet af en custodian i form af eksempelvis en "Credit Advice" for ejer-skabet til de pågældende aktier og modtagelse af udbytte af aktierne (afsnit 2.1.2, nedenfor).

3.  Form 6166 fra IRS (for så vidt angår de 277 amerikanske pensionsplaner) (afsnit 2.1.3, nedenfor) og

4.  Fuldmagt fra pensionsplanen (afsnit 2.1.4, nedenfor),

På baggrund af pensionsplanernes anmodninger udbetalte SKAT de ansøgte beløb til agenternes op-lyste konti, såfremt de rette dokumenter var vedlagt. SKAT foretog ikke nogen egentlig sagsbehand-ling i forbindelse med udbetalingerne.

I de sager, hvor Skattestyrelsen (tidligere SKAT) i 2018 har truffet afgørelse om at tilbagekalde de tidligere afgørelser om at refundere indeholdt udbytteskat, er det Skattestyrelsens opfattelse, at de indsendte dokumenter er uden realitet, og at refusion er blevet ubetalt med urette.

### 2.1.1  Blanketten

Af anmodningsblanketterne fremgår bl.a., hvilket beløb agenten – på pensionsplanens vegne – søger refunderet, og at beløbet skal udbetales til agentens bankkonto. Endvidere erklærer agenten, at pen-sionsplanen er "beneficial owner" af de pågældende aktier.

Anmodninger indsendt i de konkrete førersager omtales nedenfor i afsnit 6.

### 2.1.2  Credit Advice

Som eneste "dokumentation" for pensionsplanernes krav på refusion af indeholdt udbytteskat var anmodningerne vedlagt Credit Advices udstedt af forskellige custodians (formueforvaltere). Disse Credit Advices er udstedt og indsendt som "dokumentation" for, at pensionsplanerne har ejet aktier i danske C20-selskaber, at pensionsplanerne har modtaget udbytter fra disse selskaber, og at der er indeholdt udbytteskat i de modtagne udbytter.

Alle Credit Advices udstedt af Solo-gruppen er forsynet med et ID-nummer.

Disse Credit Advices viser – tilsyneladende – hvilke danske aktier pensionsplanerne var ejere af, hvilke udbytter der var blevet udloddet til pensionsplanerne, og hvilke udbytteskatter der var blevet inde-holdt i forbindelse med udlodningerne.

I de sager, hvor Skattestyrelsen (tidligere SKAT) i 2018 har truffet afgørelse om at tilbagekalde de tidligere afgørelser om at refundere indeholdt udbytteskat, er det imidlertid Skattestyrelsens opfat-telse, at de indsendte Credit Advices er uden realitet.

### 2.1.3  Form 6166

Form 6166 (Certificatation of US Tax Residency) er et certifikat, som udstedes af United States Trea-sury Department som dokumentation for, at et individ eller en virksomhed i amerikansk, skattemæs-sig henseende har hjemsted i USA. Certifikatet udstedes af Treasury Department på baggrund af pen-sionsplanens indsendelse af Form 8802 (Application for United States Residency Certification).

Oplysningerne i Form 8802 afgives under ansvar og efterprøves ikke af Treasury Department ved udstedelsen af Form 6166. Alle de i sagen omhandlede 277 amerikanske 401 (k) pensionsplaner har i deres anmodninger vedlagt Form 6166.

Form 6166-certifikatet bekræfter, at en juridisk person har domicil i USA i henhold til amerikansk skatteret. Det bemærkes, at certifikatet ikke dokumenterer, hvorvidt de øvrige betingelser for at modtage refusion af indeholdt udbytteskat fra udenlandske aktier er opfyldt i henhold til en dobbeltbeskatningsoverenskomst, herunder om ansøgeren reelt er ejer af de aktier, der ansøges om tilbagebetaling på baggrund af.

For at opfylde kravene til at modtage certifikatet skal pensionsplanen indsende en kopi af den underskrevne Form 5500 eller et IRS determination letter eller en erklæring (afgivet under strafansvar) om, hvorfor pensionsplanen ikke er forpligtet til at indgive Form 5500, og hvorfor pensionsplanen ikke har et IRS determination letter.

### 2.1.4     Power of Attorney

Den indsendte Power of Attorney giver agenten fuldmagt til på pensionsplanens vegne bl.a. at ansøge om refusion af indeholdt udbytteskat og modtage refunderede beløb fra SKAT.

### 2.2     Ny ansøgningsproces fra 2017 og fremefter

I starten af 2017 idriftsatte SKAT en ny IT-løsning for indberetning af anmodninger om refusion af udbytteskat. IT-løsningen fungerer som "TastSelv", hvor refusionsanmodningen uploades med tilhørende dokumentation.

Af SKATs hjemmeside fremgår, at det bl.a. er en betingelse for at få udbytterefusion, at der er indeholdt dansk udbytteskat af det udbytte, der søges om refusion for ("betingelse 3"), og at aktionæren er den retmæssige ejer af aktierne på tidspunktet for vedtagelsen af udbyttet ("betingelse 4"), (…).

Som dokumentation for opfyldelse af betingelse 3 og 4 kan ifølge SKATs hjemmeside f.eks. fremlægges udbyttenota eller meddelelse fra depotbanken om modtaget udbytte, kontoudtog, depotoversigt med bl.a. oversigt over aktiebeholdningen på tidspunktet for vedtagelsen af udbyttet og købsbilag, (…).

### 3.     AFTALETYPER

### 3.1     Global Master Securities Lending Agreement (GMSLA)

En GMSLA er en standard for låneaftaler udarbejdet af ISLA (The International Securities Lending Association). Standardaftalen giver mulighed for at indgå aftaler om udlån af værdipapirer, f.eks. aktier, på tværs af landegrænser.

GMSLA rummer en række standardvilkår, og derudover er der forskellige oplysninger, som parterne skal udfylde konkret.

GMSLA'en er dermed en *rammeaftale*. Det betyder, at GMSLA'en sætter rammerne i form af vilkår for aktieudlånet. GMSLA'en har imidlertid ikke betydning, medmindre parterne *faktisk* indgår aktielånsaftaler, som i så fald vil være omfattet af GMSLA'ens vilkår.

Pensionsplanerne har fremlagt en række GMSLA'er som (…) i de respektive sager. De fremlagte GMSLA'er er i mange tilfælde ikke underskrevet af (alle) aftaleparter.

### 3.2     Forwards

En forward er en terminskontrakt. Det kan være en bindende aftale om fremtidig levering af en valuta eller vare til en på forhånd aftalt dato og pris. Forwardaftalen udgør dermed en kurssikring frem mod det tidspunkt, hvor den fremtidige levering skal finde sted, idet aftaleparterne på forhånd ved, hvilken pris varen/valutaen vil blive handlet for.

Forwardaftalen *behøver* ikke være bundet op på fysisk levering af aktivet, men kan også afregnes ved *differenceafregning*. Det vil sige, at parterne ved forward-kontraktens udløb – i stedet for at levere valuta/aktiver (f.eks. en aktiepost) – afregner differencen mellem markedsprisen og den i forwarden aftalte pris.

Ved differenceafregning er det ikke nødvendigt for parterne faktisk at besidde det aktiv, som forwardkontrakten er bundet til, da aktivet ikke skal leveres, men alene anvendes til at fastslå en betalingsforpligtelse.

Eksempel
A og B indgår en forward den 1. august 2019. Aftalen lyder på, at A den 1. september 2019 vil erhverve B's Novo Nordisk-aktier, der pr. 1. august har en kursværdi på 1 mio. kr., til 1,01 mio. kr.

Den 1. september 2019 skal aftalen afregnes. Aktiepostens markedsværdi forudsættes for eksemplets skyld at være steget til 1,2 mio. kr.

Afregningen kan herefter *enten* ske ved, at A køber aktieposten fra B for 1,01 mio. kr. *Eller* også kan afregningen ske ved differenceafregning:

Parterne havde aftalt at handle aktieposten til 1,01 mio. kr., men aktieposten har en værdi på 1,2 mio. kr. (markedsprisen, også kaldet spotprisen). Aktieposten er dermed 190.000 kr. mere værd end parternes aftalte pris. B skal i så fald betale A 190.000 kr., hvilket udgør forskellen på den aftalte pris og markedsprisen på udløbsdatoen.

### 4.     CIVILE RETSSKRIDT

Skattestyrelsen har foretaget en række civilretlige skridt i sagen i flere forskellige jurisdiktioner, herunder i USA, Tyskland og England. Dette sker med henblik på at inddrive statens økonomiske tab på over 12,7 milliarder kroner, der uberettiget er blevet udbetalt til de af agenterne anviste konti. Skattestyrelsen har således rejst såvel tilbagesøgnings- og erstatningskrav over for en række forskellige aktører i sagen for at få fastslået deres respektive betalingsforpligtigelser.

Herunder er alle de pensionsplaner, der er repræsenteret af TVC Advokatfirma, blevet sagsøgt i USA med krav om betaling.

Der er endnu ikke truffet nogen endelige realitetsafgørelser i sagskomplekset.

Der er dog en række tilfælde, hvor udenlandske domstole har taget stilling til (dele af) sagskomplekset, og hvor afgørelserne ikke er underlagt tavshedspligt:

### 4.1.1   Tyskland: Arrest for ca. 2,2 milliarder kroner

I juni 2018 blev der gennemført civilretlige beslaglæggelser og arrester i forskellige jurisdiktioner, herunder i Tyskland. I forbindelse med arresterne har SKAT beskrevet og ført bevis for den formodede svindel i sagskomplekset.

For at få medhold i en arrestbegæring i Tyskland skal tre betingelser være opfyldt:

5.  der skal være et retligt grundlag for kravet mod ejerne,
6.  det skal være overvejende sandsynligt, at de pågældende aktiver reelt tilhører midler udbetalt af SKAT, og
7.  der skal være risiko for, at aktiverne flyttes eller taber deres værdi til skade for SKAT, såfremt arrest ikke gennemføres.

Skattestyrelsen har gennemført arrest i Tyskland for ca. 2,2 milliarder kr.

### 4.1.2    USA: Retssager for ca. 5,4 milliarder kr. anlagt – og ikke afvist

I USA har SKAT antaget et amerikansk advokatfirma til at rådgive om muligheden for at forfølge SKATs tilbagesøgnings- og erstatningskrav i USA mod de involverede amerikanske pensionsplaner. Der er ved en række amerikanske domstole, primært i New York, i perioden frem mod den 15. juni 2018 anlagt i alt 155 retssager mod pensionsplaner, ledelsesmedlemmer og trustees for disse pensionsplaner og i enkelte tilfælde tredjeparter med tilknytning til pensionsplanerne og ansøgningerne. Samlet set er der anlagt retssager for ca. 5,4 milliarder kr.

Herunder er alle pensionsplaner repræsenteret af TVC Advokatfirma blevet stævnet.

Første retsmøde i en række af de anlagte retssager blev gennemført den 26. juni 2018 i New York.

Pensionsplanerne fremsatte over for retten i Southern District of New York en begæring om afvisning af sagerne. Pensionsplanerne henviste herved bl.a. til, at retten ikke har jurisdiktion, idet Skattestyrelsens krav – ifølge pensionsplanerne – er omfattet af common law-doktrinen "the revenue rule", som indebærer, at amerikanske domstole ikke har jurisdiktion over sager, der direkte eller indirekte søger håndhævelse af fremmede landes skattelovgivning. Reglen indebærer med andre ord, at fremmede landes skattemyndigheder ikke kan indbringe krav, som direkte eller indirekte kan karakteriseres som skattekrav, for de amerikanske domstole.

Retten afviste den 9. januar 2019 pensionsplanernes begæring om afvisning i deres helhed (…). Det fremgår bl.a. af rettens kendelse (…), at

> "*If plaintiff can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied.*"

Retten lægger herved bl.a. vægt på, at Skattestyrelsen i sin stævning har gjort gældende, at der er tale om svindel ("*commercial fraud*") (…), samt at stillingtagen til sagen ikke kræver en for- tolkning af begrebet "*beneficial ownership*" i dansk skattelovgivning. Skattestyrelsen har således – uden at sondre mellem faktisk og retmæssigt ejerskab – påstået, at pensionsplanerne ikke har ejet aktierne, og pensionsplaner har ikke fremlagt dokumentation for det modsatte (…).

### 4.1.3    Forlig: Tilbagebetaling af hhv. 10 mio. kr. og 1,6 mia. kr.

Skattestyrelsen har i sagskomplekset indgået to forlig med i alt 63 amerikanske pensionsplaner og dertil knyttede personer og selskaber:

I efteråret 2018 indgik Skattestyrelsen forlig med 2 amerikanske pensionsplaner. De to pensionsplaner havde tidligere indgivet klager til Skatteankestyrelsen og var under klagesagerne repræsenteret af TVC Advokatfirma. Da sagerne blev forligt i efteråret 2018, blev klagerne tilbagekaldt. Forligene indebar, at de to pensionsplaner tilbagebetalte de refunderede beløb, jf. Skatteministeriets pressemeddelelse af 1. november 2018 (…) og pressemeddelelse af 29. maj 2019 (…).

I maj 2019 indgik Skattestyrelsen en ny forligsaftale. Den nye forligsaftale blev indgået med 61 amerikanske pensionsplaner og en række dertil knyttede personer og selskaber. De 61 pensionsplaner havde i perioden 2012-2015 fået udbetalt cirka 2,9 milliarder kroner. Heraf havde pensionsplanerne selv fået udbetalt cirka 1,6 milliarder kroner. Forliget lød på, at pensionsplanerne og de dertil knyttede personer og selskaber skulle tilbagebetale cirka 1,6 milliarder kroner. Restbeløbet forfølger Skattestyrelsen fortsat hos andre ansvarlige parter (…).

Det kan således konstateres, at 63 amerikanske pensionsplaner ind til videre har indgået forlig i sagskomplekset, og at forligene omfatter mere end en femtedel af den samlede, formodede svindel.

## 5.    SKATS DATAANALYSE

SKAT har gennemgået de indgivne refusionsanmodninger og sammenholdt disse med de danske C20-selskabers udlodninger, aktiekapital, mv. På den baggrund har SKAT foretaget en samlet analyse af, om refusionsanmodningerne samlet set *kan* være korrekte.

Analysen resulterede i to delkonklusioner, der gennemgås nærmere i det følgende:

> Der er refunderet for meget i forhold til, hvad der er indeholdt
> I nogle tilfælde er der refunderet *større beløb,* end der er indeholdt af udbytteskat. Det dokumenterer, at (en del af) refusionsanmodningerne er svindel, idet refusionen ikke kan overstige det indeholdte beløb.

> Refusionsanmodningerne bygger på usandsynligt store investeringer i og ejerandele af danske selskaber

> Det er *helt usandsynligt*, at meget betydelige andele af danske C20-virksomheder skulle være ejet af ukendte pensionsplaner mv., der ofte alene har én ejer, og som højst har et meget beskedent kapitalgrundlag.

Analysens delkonklusioner viser, at der er svindlet i betydeligt omfang.

### 5.1.1    Grundlaget for SKATs analyse

SKAT har analyseret en række udlodninger fra udvalgte danske selskaber, hvor pensionsplanerne mv. efterfølgende har ansøgt om refusion af påstået indeholdt udbytteskat. SKATs analyse har været koncentreret om de udlodninger, hvor der er tilgået størst provenu til pensionsplanerne mv., og hvor SØIK har indhentet materiale fra VP Securities. Analysen har dermed omfattet cirka 12,4 mia. kr. ud af den samlede svindel på 12,7 mia. kr.

### 5.1.1.1    Det retlige grundlag

Når selskaber udlodder udbytte, har de som udgangspunkt pligt til at indeholde 27 % udbytteskat ved alt udbytte. Indeholdelse kan dog ske med f.eks. 0 % eller 15 % i stedet afhængigt af omstændighederne og oplysninger om udbyttemodtageren, jf. kildeskattelovens §§ 65-67 A.

Indeholdelse med andre satser end 27 % er udtryk for, at skatteyderen er omfattet af en undtagelsesbestemmelse, jf. f.eks. kildeskattelovens § 65, stk. 11, og kildeskattebekendtgørelsens § 31, stk. 1, nr. 2. I sådanne tilfælde vil der ikke (retmæssigt) kunne anmodes om refusion af udbytteskat i henhold til dobbeltbeskatningsoverenskomster, idet udbyttemodtageren ikke opfylder undtagelsesbestemmelsernes krav, hvis denne er skatteretlig udlænding. Det er altså kun, når der er indeholdt 27 % udbytteskat, at der kan anmodes om refusion.

Herudover skal anmodningerne støttes på en dobbeltbeskatningsoverenskomst. Det er derfor et krav, at den, der fremsætter anmodningen, ikke er hjemmehørende i Danmark, idet personen i et sådant tilfælde ikke vil være omfattet af en dobbeltbeskatningsoverenskomst.

Der kan således alene (retmæssigt) søges om refusion af udbytteskat, hvis indeholdelse er sket med satsen 27 % over for en (skattemæssig) udlænding.

### 5.1.1.2    De faktiske oplysninger

For danske børsnoterede selskaber sørger VP Securities for at registrere, hvilken beskatning der skal ske over for hver af de registrerede ejere, når der udloddes udbytte. Videre forestår VP Securities selve udlodningen. Herefter oplyser VP Securities selskabet om udlodningerne, bl.a. sådan at selskabet kan opfylde sin oplysningsforpligtelse over for SKAT.

Selskaber har nemlig pligt til at oplyse til SKAT, hvad der er udloddet i alt, og hvad der er indeholdt i udbytteskat med hver af de givne procentsatser (blandt andet 15 % og 27 %). På denne baggrund har SKAT kendskab til (…):

> Udloddet beløb
> Indeholdt udbytteskat – både samlet og fordelt på de respektive procentsatser

SKAT har desuden oplysninger om alle refusionsanmodningerne, idet disse har været stilet til SKAT (…). Oplysningerne har været registreret i IT-systemet 3S for så vidt angår ansøgninger fra blanketordningen.

Da SKAT fik kendskab til, at der kunne være svindlet med refusionsanmodninger vedrørende udbytteskat, lavede SKAT manuelt en opgørelse af, hvad der samlet er anmodet om refusion af for hver udlodning. Herudover opgjorde SKAT manuelt, hvor meget netop pensionsplanerne mv. har anmodet om refusion af pr. udlodning. Samlet har SKAT dermed på nuværende tidspunkt kendskab til:

> Samlede refusionsanmodninger for hver udlodning (…)
> Refusionsanmodningerne fra pensionsplanerne mv. for hver udlodning (…)

Herudover har SKAT modtaget en række supplerende oplysninger fra VP Securities, som SØIK har indhentet. Det er oplysninger, der er udtrukket direkte fra VP Securities' registre vedrørende en række specifikke udlodninger. Heraf fremgår bl.a. det samlede antal aktier (i hver aktieklasse) i omløb på udlodningstidspunktet og navn og adresse på hver enkelt registreret ejer på udlodningstidspunktet.

Oplysningerne om ejerskab registreret i VP Securities er ikke fuldstændige. En betydelig del af aktierne i børsnoterede selskaber er registreret som ejet af f.eks. banker, der har ét fælles depot for deres kunder (kaldet et omnibusdepot). Her står banken registreret som ejer hos VP Securities, selvom det er en kunde, der faktisk ejer aktiebeholdningen. Omnibusdepoter er registreret med depotindehaverens (typisk bankens) nationalitet/adresse – uden viden om den underliggende ejers nationalitet. Hertil kommer, at det *kan* være, at adresser registreret i VP Securities ikke er blevet opdateret ved aktieejerens flytning.

SKAT har anvendt adresseoplysningerne fra VP Securities til at fastlægge, om ejeren (skatteretligt) er udlænding (...). Henset til, at en meget betydelig andel af danske C20-aktier opbevares i omnibusdepoter, *kan* andelen af udenlandske aktionærer være anderledes end det, der fremgår af VP Securities' registreringer. Opgørelsen giver dog alligevel en indikation af, hvor stor en andel af aktierne, der har været ejet af personer, som er hjemmehørende i andre lande end Danmark.

På baggrund af selskabernes indberetninger og de indhentede data fra VP Securities har SKAT opnået kendskab til (...):

> Samlet antal aktier i omløb på udbyttedatoen
> Andel af aktierne, der er registreret som ejet af udlændinge på udbyttedatoen

Endelig har SKAT indsamlet en række offentligt tilgængelige informationer om blandt andet aktiekurser og udbytte pr. aktie.

### 5.1.2    Resultatet af analysen

#### 5.1.2.1    Der er refunderet for meget i forhold til, hvad der er indeholdt

SKAT har overordnet sammenholdt refusionsanmodningerne med den indeholdte udbytteskat for de udlodninger i perioden 2012-2015 fra danske C20-selskaber, hvor der har været mest omfattende svindel med refusionsanmodninger (...). Det er dermed ikke samtlige udlodninger, der har været omfattet af analysen, men derimod en række udvalgte udlodninger.

Analysen har vist, at 76,9 % af det indeholdte beløb på tværs af de analyserede udlodninger er blevet udbetalt som udbytterefusion.

Hvis der kigges på de enkelte udlodninger hver for sig, fremgår det, at der i 11 tilfælde er *refunderet mere, end der er indeholdt* (...), og at svindlen har udgjort en meget stor del af refusionsanmodningerne. I tre tilfælde har *pensionsplanerne mv. alene* fået refunderet mere end det indeholdte beløb.

Når der er refunderet mere, end der er indeholdt, siger der sig selv, at nogle af refusionsanmodningerne har været uberettigede. Der kan ikke være krav på at få "refunderet" noget, der aldrig har været indeholdt.

----------

SKAT har herefter foretaget en endnu mere dybdegående analyse (...). Som gennemgået er der alene mulighed for at få udbytterefusion, hvis der er indeholdt udbytteskat med satsen 27 %, *og* udbyttemodtageren er (skatteretlig) udlænding.

Analysen viser, at 91,7 % af det udbytte, der er indeholdt med satsen 27 %, er blevet refunderet. Når der tages højde for, *at* det ikke er alle aktier med en udbytteskattesats på 27 %, der er ejet af udlæn-

dinge, _at_ det er langt fra alle udlændinge, der overhovedet er berettigede til refusion, og _at_ mange udlændinge maksimalt vil være berettigede til delvis refusion, er det tydeligt, at (en del af) refusions-anmodningerne har været uretmæssige.

Dette ses særligt for de enkelte udlodninger hver for sig. Der er i 14 tilfælde _refunderet mere end den udbytteskat_, der efter VP Securities' registreringer er indeholdt med _satsen 27 %_ (…). Det _kan ikke_ lade sig gøre (retmæssigt).

Videre er der i 23 tilfælde _refunderet mere end den udbytteskat_, der efter VP Securities' registreringer er indeholdt _fra udlændinge med satsen 27 %_ (…).

_5.1.2.2   Refusionsanmodningerne er udtryk for usandsynlige investeringer og ejerandele_

SKAT har videre sammenholdt refusionsanmodningernes oplysninger om antal aktier på  udbytte-tidspunktet med de officielle aktiekurser den pågældende dato (…). På den måde har det været muligt at beregne den samlede investering for pensionsplanerne mv. i hvert enkelt C20-selskab på ud-byttetidspunktet.

Som det fremgår, har den samlede investering for pensionsplanerne mv. været på cirka 910 mia. kr. i løbet af marts 2015.

Henset til de forskellige datoer for udlodning i de forskellige selskaber har investeringerne dog ikke nødvendigvis været samtidige, selvom de er inden for samme måned. Som eksempel har investerin-gerne netop den 19. marts 2015 udgjort kr. 445 mia. i Novo Nordisk (B) og kr. 13,2 mia. i GN Store Nord, i alt kr. 458,2 mia.

Endelig har SKAT sammenholdt refusionsanmodningernes oplysninger om antal aktier med selska-bernes samlede aktiekapital (…). Herudfra er det beregnet, hvor stor en andel af selskabernes sam-lede aktiekapital, som pensionsplanerne mv. samlet skulle have ejet. Dette er blevet sammenholdt med, hvor stor en andel af selskabets aktier der har været tilgængelige for sådanne investeringer.

Som det fremgår, skulle pensionsplanerne mv. blandt andet have ejet 51,4 % af A.P. Møller-aktierne i 2014, 59,5 % af Novo Nordisk B-aktierne i 2014 og 66,9 % af FL Smidth & Co.-aktierne i 2015.

Overordnet set er det _helt usandsynligt_, at aktionærer/aktører, der er ukendte på det danske marked, skulle have foretaget _så store_ investeringer og besidde så betydelige andele af aktiekapitalen. Tallene understøtter dermed, at en stor andel af refusionsanmodningerne nødvendigvis må være uretmæs-sige.

Særligt i forhold til A.P. Møller-aktierne bemærkes det, at fire kendte, danske storaktionærer tilsam-men ejede 52,82 % af aktiekapitalen i 2014 (…), og det var dermed _umuligt_, at pensionsplanerne mv. skulle eje 51,4 %.

(…)"

**Klagerens sammenfattende indlæg**

Af klagerens sammenfattende og afsluttende indlæg fremgår følgende:

"Skatteankestyrelsen har som bekendt ved forslag til afgørelse den 3. juli 2019 i de seks førersager indstillet, at Skattestyrelsens afgørelser af henholdsvis den 6. april 2018 og den 4. maj 2018 stadfæstes.

Idet formålet med førersagerne er at danne grundlag for de øvrige sager repræsenteret af TVC og SMK, må det som udgangspunkt lægges til grund, at Skatteankestyrelsen vil argumentere på samme vis i denne sag.

Heroverfor fastholder pensionsplanen helt overordnet, at Skattestyrelsen ikke er berettiget til at annullere de oprindelige afgørelser om udbetaling af udbytterefusion.

Pensionsplanen fastholder således helt overordnet, at pensionsplanen var berettigede til at modtage de i sagerne omhandle udbytterefusioner, herunder at pensionsplanen ejede de i sagerne omhandlede aktier og udbyttebeløb.

Skatteankestyrelsens forslag til afgørelse af den 3. juli 2019 i seks førersager samt Skattestyrelsens sammenfattende indlæg af den 9. august 2019 giver pensionsplanen anledning til at fremkomme med nærværende sammenfattende indlæg.

Det er kendetegnende for nærværende sag, at pensionsplanen har fremlagt et meget omfattende bilagsmateriale, der dokumenterer og understøtter de omtvistede transaktioner og pensionsplanernes ejerskab til omtvistede aktier og udbyttebeløb.

Det er endvidere kendetegnende for sagen, at Skattestyrelsen bygger sine syns- punkter på antagelser opstået flere år efter, at SKAT traf afgørelse om de omtvistede refusioner af udbytteskat, samt at den bevistvivl, som Skattestyrelsen har søgt at opstille, i vidt omfang må tilskrives Skattestyrelsens egen, mangelfulde oplysning af sagen.

... ...

Pensionsplanen fastholder som anført, at den var både civilretligt og skatteretligt ejer af de i sagen omhandlede aktier, ligesom pensionsplanen havde retskrav på at modtage de i sagen omhandlede udbyttebeløb, med den effekt at pensionsplanen havde retskrav på at modtage refusion af indeholdt udbytteskat.

Det fastholdes således, at der ikke nu efterfølgende er grundlag for at tilbagekalde eller annullere SKATs oprindelige afgørelse om refusion af indeholdt udbytteskat.

Vi vil i nærværende sammenfattende indlæg fremkomme med vores bemærkninger til Skatteankestyrelsens forslag til afgørelse af den 3. juli 2019 i førersagerne. Endvidere vil vi i nærværende indlæg imødegå de synspunkter, som Skattestyrelsen har gjort gældende i styrelsens sammenfattende indlæg af den 9. august 2019 i førersagerne.

Af overskuelighedsmæssige årsager har vi endvidere valgt at indarbejde det tidligere anførte i nærværende indlæg, således at nærværende indlæg tjener som et sammenfattende indlæg.

I indlæggets 1. del vi foretage en detaljeret beskrivelse af den investeringsstrategi, som pensionsplanen fulgte samt de i den forbindelse foretagne dispositioner.

Vi vil i den forbindelse redegøre for, hvorfor pensionsplanen både civilretlig og skatteretligt ejede af de omtvistede aktier og udbyttebeløb.

I indlæggets 2. del vil vi fremkomme med vores bemærkninger til Skattestyrelsens synspunkter i sagen, navnlig Skattestyrelsens synspunkter i relation til dokumentationen for og indholdet af de omtvistede transaktioner.

Endvidere vil vi i den forbindelse fremkomme med vores bemærkninger til de af Skattestyrelsen opstillede dokumentationskrav, samt Skattestyrelsens egen manglende sagsoplysning.

I indlæggets 3. del vil vi fremkomme med vores bemærkninger til Skatteankestyrelsens forslag til afgørelse af den 3. juli 2019 i førersagerne, herunder det af Skatteankestyrelsen anførte i relation til dokumentationen for de omhandlede transaktioner og realiteten heraf.

1. INTRODUKTION ................................................................................................................ **8**

DEL 1: PENSIONSPLANEN VAR SKATTEMÆSSIGT RETMÆSSIG EJER AF AKTIER OG UDBYTTER

2 BESKRIVELSE AF FINANSIELLE TRANSAKTIONER OG RELEVANTE EKSTERNE AKTØRER    **9**

2.1 Om pensionsplanen, som erhvervede danske aktier ............................................. 9
2.1.1    Dispositioner på vegne af pensionsplanen .......................................... 11
2.2 De anvendte finansielle instrumenter .........................................................................
12
2.2.1    Aktiekøb/-salg .......................................................................................... 13
2.2.2    Forwards  14
2.2.3    Aktieudlån ................................................................................................. 14
2.3 De involverede eksterne aktører ................................................................................
16
2.3.1    Brokere    16
2.3.2    Aktielåntagere og deres mellemmænd (Stock Loan Intermediaries) ............ 18
2.3.3    Forward counterparties og intermediaries ........................................................ 19
2.3.4    Custodians og clearing-agenter ........................................................................ 20
2.3.5    Tax agents .......................................................................................................... 23
2.3.6    Introducing brokere ............................................................................................ 24
2.3.7    Arrangers  24
2.3.8    Sammenfattende bemærkninger om de involverede eksterne aktører ..................... 24
2.4 Pensionsplanens forretningsmodel og transaktioner ......................................... 25
2.4.1    Introduktion til udbyttearbitrage ...................................................................... 25
2.4.2    Transaktioner .................................................................................................... 27
2.4.2.1  Onboarding  27
2.4.2.2  Køb af aktier og salg af forward ..................................................................... 27
2.4.2.2.1 Fremgangsmåden ved aktiekøb og salg af forward ....................................... 27
2.4.2.2.2 Pensionsplanens og aktiesælgers forretningsmæssige begrundelse
                   for aktiekøb/-salg. .......................................................................................... 29
2.4.2.2.3 Pensionsplanens og forwardkøberens forretningsmæssige begrundelse
                   for salg/køb af forward ................................................................................... 31
2.4.2.3  Aktieudlån og finansiering af aktiekøb ............................................................. 32
2.4.2.3.1 Fremgangsmåden ved aktieudlån .................................................................. 32
2.4.2.3.2 Pensionsplanens og aktielåntagers forretningsmæssige begrundelse
                   for aktieudlån .................................................................................................. 33
2.4.2.3.3 Øvrige bemærkninger til finansiering af aktiekøb ......................................... 34
2.4.2.4  Afvikling af transaktionerne (settlement) ....................................................... 35
2.4.2.6  Positionerne lukkes .......................................................................................... 38
2.4.2.7  Gevinsten realiseres ........................................................................................ 38
2.4.2.8  Sammenfattende bemærkninger om forretningsmodellen og

|  | transaktionerne ................................................ | 39 |
| 2.4.2.9 | Eksempler på transaktioner ved udbyttearbitrage ....................... | 43 |
| **3.** | **PENSIONSPLANEN BLEV DEN CIVILRETLIGT OG SKATTEMÆSSIGT RETMÆSSIGE** | |
|  | **EJER AF AKTIERNE** | **46** |
|  | 3.1 Pensionsplanen blev den civilretlige ejer af aktierne ................. | 46 |
|  | 3.2 Handel med store aktieposter – shortselling ..................... | 48 |
| 3.2.1 | Introduktion til short selling ........................................... | 49 |
| 3.2.2 | Short selling skaber flere aktier, indtil handlerne bliver afviklet (settlement) ......... | 52 |
| 3.2.2.1 | Skattestyrelsens synspunkter vedrørende "short buyer" .................... | 55 |
| 3.2.2.2 | Konsekvensen af flere aktier som følge af short selling (indtil settlement) ......... | 57 |
| 3.2.2.2.1 | Manglende kildebeskatning af kompensationsbetaling ..................... | 58 |
| 3.2.2.3 | Skattemæssigt retmæssigt ejerskab ved aktieudlån – dobbelt ejerskab | |
|  | ud over settlement ........................................ | 60 |
| 3.2.2.3.1 | Retspraksis vedrørende skattemæssigt retmæssigt ejerskab ved | |
|  | aktieudlån ................................................ | 61 |
| 3.2.2.3.2 | SKAT om skattemæssigt retmæssigt ejerskab ved aktieudlån ............... | 63 |
| 3.2.2.3.3 | Skatteministeriet om skattemæssigt retmæssigt ejerskab ved | |
|  | aktieudlån ................................................ | 64 |
| 3.2.2.3.3.1 | Aktieudlån uden videresalg til tredjemand ............................ | 64 |
| 3.2.2.3.3.2 | Aktieudlån med videresalg til tredjemand ............................ | 65 |
| 3.2.2.3.3.3 | Bemærkninger til Skatteministeriets opfattelse ........................ | 65 |
| 3.2.2.3.3.4 | Faglitteraturen om skattemæssigt retmæssigt ejerskab ved | |
|  | aktieudlån ................................................ | 66 |
| 3.2.2.4 | Konklusion: Short selling har ingen indflydelse | |
|  | på pensionsplanens skattemæssig retmæssige ejerskab ................. | 71 |
| **4.** | **JURIDISKE FORHOLD VEDRØRENDE UDBYTTESKAT** ...................... | **72** |
| 4.1 | Udbytteskat indeholdes i henhold til kildeskattelovens regler ............. | 73 |
| 4.2 | Kildeskattebekendtgørelsens regler om fritagelse for indeholdelsespligt......... | 73 |
| 4.3 | Begrænset skattepligt af udbytte............................... | 74 |
| 4.4 | Bestemmelse af den rigtige procentsats........................... | 74 |
| 4.5 | Kompensationsbetalinger ..................................... | 74 |
| **5.** | **DOKUMENTATION FOR SKATTEMÆSSIGT RETSMÆSSIGT EJERSKAB** ................... | |
|  | ........................................................ | **75** |
| 5.1 | Den i praksis foreliggende dokumentation for et skattemæssigt retsmæssigt | |
|  | ejerskab ................................................ | 76 |
| 5.1.1 | Broker confirmations (handelsnotaer) .............................. | 76 |
| 5.1.2 | Custody statements og DCA.................................... | 78 |
| 5.2 | Dokumentation for pensionsplanens skattemæssigt retmæssige ejerskab 79 | |
|  | **KONKLUSION PÅ FØRSTE DEL**................................... | **82** |
|  | **DEL 2: SKATTESTYRELSENS SYNSPUNKTER BEROR PÅ ET UDOKUMENTERET** | |
|  | **OG FORKERT GRUNDLAG – IKKE GRUNDLAG FOR TILBAGEKALDELSE** .................. | **82** |
|  | **6. SKATTTESTYRELSENS MANGLENDE SAGSOPLYSNING** ..................... | **82** |
|  | **7. FREMLAGT OG MANGLENDE DOKUMENTATION** ........................ | **84** |
| 7.1 | Skattestyrelsens udokumenterede påstand om falsk dokumentation .............. | 84 |
| 7.1.1 | Fejl i dokumentation fra brokere................................. | 85 |
| 7.1.1.1 | Forskellige handelsdatoer på broker confirmations og custody | |
|  | statements ............................................... | 85 |
| 7.1.1.2 | Handelsnotaer forveksler køb og salg ............................. | 87 |
| 7.1.1.3 | Handelsnota angiver pris som "#####" ............................ | 87 |
| 7.1.1.4 | Handelsnotaer tager ikke højde for helligdage ......................... | 88 |

7.1.1.5   Fejl i andre handelsnotaer ................................................................... 89
7.1.2     Fejl i dokumentation fra custodian – custody statement og kontoudtog ............... 89
7.1.3     Overholdelse af GMSLA ....................................................................... 91
7.1.4     Stock lending rate .............................................................................. 92
      7.2  Manglende dokumentation .................................................................. 92
7.2.1     Købekontrakten over aktierne .............................................................. 93
7.2.2     Pengestrøm og kontoudtog................................................................... 93
7.2.2.1   Pengestrøm  93
7.2.2.2   Strøm af aktier .................................................................................. 94
7.2.3     TTC-klausulen .................................................................................... 94
7.2.4     Enkelte kontoåbningsdokumenter og transaktionsdokumenter ........................... 95
7.2.5     Dokumentation i 2014 og 2015 ............................................................... 95
      7.3  Ansvaret for manglende dokumentation................................................... 96
      **8. FOR MEGET UDBETALT UDBYTTESKAT** ..................................................... **97**
      8.1  Summen af alle refusioner .................................................................... 97
      8.2  Summen af refusioner pr. udloddende selskab ........................................... 99
      8.3  Fejlfunktioner ved administration af udbytteskat ........................................ 100
      **9. PENSIONSPLANENS FINANSIELLE TRANSAKTIONER** .................................... **102**
      9.1  Finansiering af aktiekøb ...................................................................... 102
      9.2  Muligheden for at gennemføre de omhandlede finansielle
           transaktioner .................................................................................... 104
      9.3  Registreringer i VP Securities er uden betydning....................................... 108
9.3.1     Betydningen af en registrering ved VP Securities ....................................... 108
9.3.2     Dokumentation for at Solo-gruppen har besiddet aktier ................................ 109
9.3.3     Skrivelser fra SØIK og VP Securities ..................................................... 110
      9.4  Pensionsplanen modtog udbytte ........................................................... 112
      9.5  Der var indeholdt kildeskat af pensionsplanens udbytteudbetaling.................... 113
      9.6  Pensionsplanen modtog refusionen ........................................................ 115
      9.7  Sikkerhed i henhold til custody agreement .............................................. 116
      9.8  "Fiktive transaktioner" ........................................................................ 117
9.8.1     Definition "fiktiv transaktion" .............................................................. 118
9.8.1.1   Fiktiv Handel 118
9.8.1.1.1 Køb af short sellere ............................................................................ 118
9.8.1.1.2 Levering af aktierne købt af short sellere ................................................ 119
9.8.1.1.3 Modtagelse af udbytte (market claim) .................................................... 119
9.8.1.2   Fiktive aftaler .................................................................................... 119
9.8.2     Handel organiseret af Solo .................................................................. 120
9.8.3     Fiktive aktier – short selling ................................................................ 122
      9.9  Skattestyrelsens fejlagtige antagelser om processen ................................... 123
      9.10 Aktiekøb blev gennemført .................................................................... 124
      9.11 Længere settlement-periode end VP Securities ........................................... 126
      9.12 Ikke blot en skrivebordsøvelse .............................................................. 128
9.12.1    Alle pensionsplaner køber til samme dag og til samme pris............................ 128
9.12.2    Størrelsen på aktiebesiddelserne .......................................................... 130
9.12.3    Næsten ens aktieporteføljer ................................................................. 131
9.12.4    Alle pensionsplanerne har handlet med de samme parter .............................. 132
9.12.5    Samme salgstidspunkt ........................................................................ 132
9.12.6    Sanjay Shah kontrollerede pensionsplanernes custodians (Solo-gruppen)............ 133
9.12.7    Shahs "Univers" ................................................................................ 134
9.12.8    Fortløbende nummerering af Credit Advices på tværs af Solo- gruppen,
           som også blev anvendt i 2017................................................................ 135

| | | |
|---|---|---|
| 9.12.9 | Pensionsplanerne er ikke styret centralt | 136 |
| 9.12.10 | Ikke-indleverede ansøgninger om refusion | 137 |
| 9.13 | En udbytteskat kan føre til to refusioner | 138 |
| 9.15 | Det er umuligt at svindle med aktiehandler | 141 |
| 9.16 | Pensionsplanerne skifter ikke forklaring | 142 |
| 9.16.1 | Broker confirmations og custody statements | 142 |
| 9.16.2 | Sikkerhedsstillelse | 143 |
| 9.16.3 | Pensionsplanernes konti | 144 |
| 9.16.4 | Dokumentation for modtagelse af udbytte | 144 |
| 9.17 | Pinsent Masons | 145 |
| **10.** | **BEVISBYRDE OG FORMALITET** | **146** |
| | **KONKLUSION PÅ ANDEN DEL** | **149** |
| | **DEL 3: SKATTEANKESTYRELSENS INDSTILLING I FØRERSAGERNE – DE GENNEMFØRTE HANDLER HAVDE REALITET** | **150** |
| **11.** | **ANERKENDELSE AF GENNEMFØRELSEN AF AKTIEHANDLERNE.** | **150** |
| **12.** | **SKATTEANKESTYRELSENS TILSIDESÆTTELSE AF SKATTEMÆSSIGE EJERSKAB I FØRERSAGERNE** | **151** |
| 12.1 | Kendskab til transaktionsdokumenterne | 151 |
| 12.2 | Dokumentation | 151 |
| 12.2.1 | Dokumentation for ejerskab af aktierne | 152 |
| 12.2.2 | Dokumentation for modtagelse af udbyttet | 153 |
| 12.2.3 | Dokumentation for modtagelse af udbytterefusion | 155 |
| 12.3 | Ikke grundlag for at anfægte realiteten | 155 |
| 12.3.1 | Civilretten styrer vurderingen af det skatteretlige ejerskab | 156 |
| 12.3.2 | Generelt om realitetsgrundsætningen | 156 |
| 12.3.3 | Realitetsgrundsætningen i retspraksis | 160 |
| 12.3.4 | Realitetsgrundsætningen i den juridiske litteratur | 180 |
| 12.3.5 | Realitetsgrundsætningen anvendt på pensionsplanernes sager | 182 |
| 12.3.5.1 | Dokumentation for forbindelsen til pensionsplanens økonomi | 183 |
| 12.3.5.2 | Realitetsgrundsætningen – aftaler med uafhængige parter på markedsvilkår | 184 |
| 12.3.5.3 | Realitetsgrundsætningen – handler reelt gennemført på pensionsplanernes vegne, herunder råderet | 184 |
| 12.3.5.4 | Overførsler fra custodian | 184 |
| 12.3.5.4.1 | | |
| 12.3.5.4.2 | Custodians handlinger på pensionsplanernes vegne | 188 |
| 12.4 | I øvrigt ikke grundlag for at tilsidesætte pensionsplanens skattemæssige ejerskab | 188 |
| 12.4.1 | Øvrig dokumentation | 189 |
| | **Endelig konklusion** | **190** |
| | Textmarke nicht definiert. | |
| | **Bilag** | **191** |
| | **Sagens videre forløb** | **194** |

## 1 INTRODUKTION

I denne sag foreligger der ikke megen enighed mellem Skattestyrelsen og klageren – med en enkelt undtagelse: sagens genstand.

Som Skattestyrelsen ganske rigtig fremhæver i det sammenfattende indlæg af den 9. august 2019 i førersagerne, afsnit 2, side 5, angår alle disse sager spørgsmålet om, hvorvidt pensionsplanerne var berettigede til refusion af indeholdt udbytteskat.

Sagerne drejer sig dermed ikke i deres egentlige kerne om formaliteter (tilbagekaldelse eller annulla-tion) eller om aktiehandel og de involverede aktører i en aktiehandel.

Sagerne drejer sig i modsætning til Skattestyrelsens påstand ikke om finansiering af aktietransaktioner eller om fejl i dokumentationen.

Sagerne drejer sig i virkeligheden om spørgsmålet om, hvordan man bliver retmæssig ejer af en dansk dematerialiseret aktie, om hvorvidt pensionsplanerne virkelig har modtaget et udbytte, om short sling, der medfører, at der er flere danske aktier i omløb end udstedt af de danske selskaber, og om mangler ved den danske skattelovgivning, der medfører, at der indbetales for lidt i udbytteskat.

Alle disse spørgsmål udløses af investeringsstrategien udbyttearbitrage, der i 2012 for alvor fandt sin vej til det danske marked.

**DEL 1: PENSIONSPLANEN VAR SKATTEMÆSSIG RETMÆSSIG EJER AF AKTIER OG UDBYTTER**

Det fastholdes, at pensionsplanen var civilretligt og skattemæssigt retmæssig ejer af de i sagen om-handlede aktier samt civilretligt og skattemæssigt retmæssig ejer af de i sagen omhandlede udbyttebe-løb.

Aktierne blev erhvervet ved gennemførelsen af udbyttearbitrage.

**2 BESKRIVELSE AF FINANSIELLE TRANSAKTIONER OG RE- LEVANTE EKSTERNE AKTØRER**

Det skal indledningsvist fremhæves, at de transaktioner, der ligger til grund for de omtvistede udbyt-terefusioner, er meget komplekse.

De underliggende transaktioner er så komplekse, at der efter vores opfattelse består en reel risiko for, at nærværende sagskompleks afgøres på forkert grundlag som følge af misforståelser angående de in-volverede aktører, transaktionerne og selve investeringsstrategien, udbyttearbitrage.

Derfor vil vi i det følgende redegøre tilbundsgående for de anvendte finansielle instrumenter, de impli-cerede aktører, de underliggende transaktioner og den anvendte investeringsstrategi.

Nedenfor – i afsnit 2.1 – redegøres der således for den implicerede pensionsplan, der ejede de om-handlede aktieposter og udbyttebeløb.

I den forbindelse redegøres der for traderen, der foretog de omhandlede aktietransaktionerne på pen-sionsplanens vegne.

De omhandlede aktietransaktioner er som anført anvendt som led i gennemførelsen af den investe-ringsstrategi, der er almindeligt kendt som udbyttearbitrage.

I afsnit 2.2 redegøres for de anvendte finansielle instrumenter, der blev anvendt som led i gennemfø-relsen af udbyttearbitragen.

Gennemførelsen af den omhandlede investeringsstrategi har forudsat involvering og bistand af et stort antal aktører. Vi har i afsnit 2.3 redegjort for de enkelte grupper af involverede aktører, herunder deres rolle og forretningsmæssige ræson for involveringen i transaktionerne.

I afsnit 2.4 har vi endvidere redegjort for den omhandlede investeringsstrategi, og vi har i den forbindelse redegjort nærmere for de enkelte skridt i gennemførelsen af investeringsstrategien.

**2.1 Om pensionsplanen, som erhvervede danske aktier**

I nærværende sag er de omhandlede aktietransaktioner alle blevet gennemført af en amerikansk "enkeltmands"-pensionsplan, en såkaldt Solo 401K-pensionsplan.

Det er som anført pensionsplanen, der har ejet de omhandlede aktieposter og ud- bytterefusioner.

Pensionsplanen har karakter af en ordning, der er skattebegunstiget i USA, derved at pensionsplanens indkomst først beskattes, når den udloddes til den/de begunstigede. Formålet med pensionsplanen er at generere indkomst/gevinst gennem investeringer og akkumulere disse, indtil de kan udloddes til den/de begunstigede. På den måde kan reglerne for de skattebegunstigede pensionsplaner sammenlignes med de danske regler for ratepensioner, der tillige først beskattes ved udbetalingen.

Solo 401K-pensionsplaner stiftes af enkeltmandsvirksomheder, der enten drives i selskabsform (LLC) eller i personligt regi. De begunstigede er de erhvervsdrivende selv og/eller deres ægtefæller. De begunstigede (deltagerne) kaldes også "plan participants".

Der findes virksomheder, som eksempelvis den amerikanske virksomhed Broad Financial, der er specialiseret i at yde assistance ved stiftelsen af pensionsplaner, herunder **401K**-pensionsplaner og **Solo 401K**-pensionsplaner.

Ved stiftelsen af pensionsplanerne anvendes typisk standardiserede formularer. Disse formularer er standardiserede, således at samme formularer kan anvendes både ved stiftelsen af små Solo 401K-pensionsplaner og ved stiftelsen af store pensionsplaner med mange deltagere. Af denne grund er der eksempelvis i formularerne henvist til administrative "Committees" udnævnt af arbejdsgiverens bestyrelse, uanset at en sådan "Committee" ikke findes i en Solo 401K-pensionsplan, idet sådanne små pensionsplaner forvaltes af en trustee, som virksomhedsejeren udpeger ved stiftelsen af pensionsplanen og den bagvedliggende trust.

Bidragene til en 401K-pensionsplan opbevares i en (til lejligheden oprettet) trust, der har til formål at akkumulere, forvalte og investere disse bidrag til fordel for planens deltagere og begunstigede personer. Etableringen af en trust separerer pensionsplanens formue fra virksomhedsejerens egen formue. Trusten forvalter formuen ved handlinger foretaget af den tegningsberettigede trustee eller anden befuldmægtiget.

The Texas Rocco LLC 401K Plan er en (relativt) nystiftet enkeltmandspensions- plan (Solo 401K-pensionsplan) forvaltet af en trust og dennes trustee.

De involverede aktører omkring selve pensionsplanen kan skitseres, som følger:



Etableringen sker således, ved at en LLC (arbejdsgiveren = enkeltmandsvirksom- heden) stifter en trust (jf. fx JEB5 Investment Trust) og 401k-pensionsplanen (The Texas Rocco LLC 401K Plan). Solo 401K-pensionsplanen er den juridiske ejer af formuen, og trustens trustee er den tegningsberettigede forvalter heraf.

**2.1.1 Dispositioner på vegne af pensionsplanen**

Den omhandlede pensionsplan er som anført en selvstændige juridisk person.

Den kan udelukkende handle gennem sin trustee i den korresponderende trust eller en af trusteen be- fuldmægtiget person. Den såkaldte trader, var således enten trusteen selv eller befuldmægtiget, pro- fessionel formueforvalter.

I størstedelen af de sager hvor SMK og TVC Advokatfirma er repræsentanter (TVC-sagerne), var det de pågældende trustees selv, der afgav ordrerne til at købe og sælge aktierne og indgik forward hedgen samt aktielånene under GMSLA'erne. Alle evner og al viden, som de pågældende trustees har og be- nytter til fordel for pensionsplanerne, skal tilregnes de pågældende pensionsplaner.

Eftersom traderen skal være i stand til at identificere de aktier, hvor prisen på derivatet (futuren eller forwarden) er ude af balance med spotprisen, og samtidig være i stand til at fremskaffe den nødven- dige finansiering gennem et aktieudlån, er en betydelig grad af specialistviden og forretningsmæssige relationer nødvendige for at gennemføre udbyttearbitragehandler.

**2.2 De anvendte finansielle instrumenter**

Vi vil i det følgende redegøre for finansielle instrumenter, som pensionsplanen anvendte til realiseringen af investeringsstrategien.

Helt overordnet er der anvendt tre typer finansielle transaktioner: et køb (og salg) af aktier, en forward og et aktielån.

Som anført købte pensionsplanen danske aktier på udbyttedatoen, holdt dem i en periode (gennemsnitligt 45 dage) og solgte dem herefter igen. Den grundlæggende motivation for at købe aktierne på netop dette tidspunkt var af skattemæssig art: Pensionsplanen var berettiget til refusion i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og USA. Pensionsplanen kunne dermed i modsætning til andre med en mindre gunstig skattestatus modtage bruttoudbyttet – og ikke kun nettoudbyttet.

For at afdække risikoen for kursfald indgik pensionsplanen samtidig en forward hedge.

Finansieringen af aktiekøbene skete ved et aktieudlån, efter aktierne blev købt, men før aktierne skulle betales.

Disse tre transaktioner kan umiddelbart godt ligne en "kabale, der skal gå op", således som Skattestyrelsen udtrykker det (jf. Skattestyrelsens sammenfattende ind- læg i førersagerne af den 9. august 2019, side 12). De er dog ikke andet end udtryk for godt forberedte, finansielle, strukturerede transaktioner. Finansindustrien adskiller sig herved ikke fra enhver anden industri: Alt skal forberedes på forhånd, for at slutresultatet falder på plads. Helt ligesom bilfabrikken skal have hundredvis af enkeltdele fremme ved samlebåndet på det rette tidspunkt, for at slutresultatet er en funktionsdygtig bil, skal også finanstransaktioner, der består af mange led, forberedes i forvejen. Ligesom bilfabrikken indgår rammeaftaler med underleverandører for levering af enkeltdele, indgår pensionsplanen rammeaftaler med mel- lemmænd i aktieudlån (Stock Loan Intermediaries), der kan fremskaffe den nødvendige finansiering, samt aftaler med brokere, der kan skaffe aktierne og forwardkontrakter, og clearing-agenter/custodians, der i sidste ende indestår for, at de indgåede aftaler også vil blive afviklet.

Disse forberedende aftaler kaldes i finansindustrien "pre-trade" eller on-boarding.

**2.2.1 Aktiekøb/-salg**

Udbyttearbitrage-investeringsstrategien forudsatte, at pensionsplanen købte de aktier, de omhandlede udbytter er betalt på.

Det er i den forbindelse vigtigt at fremhæve, at de omhandlede aktier blev handlet gennem OTC-transaktioner.

Aktier købes og sælges ikke kun gennem børsen. Aktietransaktioner over store voluminer gennemføres typisk uden for børsen ved såkaldte OTC-transaktioner (OTC = Over The Counter – over disken). Dette forhindrer store kurssving, som handlen med store aktieposter ville udløse ved de offentlige børser.

Et OTC-marked er et decentraliseret virtuelt marked uden en fysisk lokation. Handel foregår mellem markedsdeltagere via internettet, telefon, e-mail og lignende kommunikationssystemer (messaging systems). På OTC-markeder er handel mellem to parter anonym ligesom på børser. Det betyder, at man kun kan se, hvor meget blev handlet til hvilken pris, men ikke hvem der har købt eller solgt nøjagtigt hvor meget. Det er de handlende, der styrer OTC-markedet, og det er dem, der sætter kursen, de er vil-

lige til at købe og sælge for. For at handle på et OTC-marked har man brug for en børsmægler (broker). Brokeren kan gennemføre en såkaldt ejermatchinghandel. Brokeren optræder så selv som sælger til sin kunde. Brokeren køber aktien fra markedet (fra en anden broker eller en anden kunde). Hvorfra brokeren skaffer sig aktien, som han sælger OTC, kan kunden ikke vide. I mange tilfælde kan end ikke brokeren identificere, hvor den enkelte aktie, som han sælger, stammer fra, da brokeren køber mange aktieposter fra mange forskellige kilder. Hos brokeren blandes alle de købte aktier.

De af pensionsplanen gennemførte aktiehandler blev indgået OTC med dennes brokere som ejermatchinghandler.

Ejermatchinghandler er som defineret i kapitalmarkedslovens § 71, stk. 3, en udførelse af kundeordrer over egenbeholdningen. Brokeren – der netop ikke er operatøren af et reguleret marked – træder ind i handlen og agerer som sælger til pensionsplanen, der ønsker at købe aktierne. Brokeren skaffer sig aktierne fra markedet.

Fristen til afvikling af OTC-handler kan afvige fra den "markedskonforme" settlementfrist. Det væsentligste ved OTC-handler er netop, at de ikke er standardiserede som ved børsen. OTC-handler er skræddersyede.

Fælles for børshandler og OTC-handler er, at det er strakshandler (spotmarkeder). De foregår her og nu. Ejerskabet til aktierne overdrages med øjeblikkelig virkning. Vil man først købe aktien på et senere bestemt tidspunkt, men til en nu aftalt pris, indgår man en terminskontrakt (som en forward).

### 2.2.2 Forwards

En forward er en skræddersyet terminskontrakt mellem to parter til at købe eller sælge et aktiv til en bestemt pris på et bestemt tidspunkt (en fremtidig dato). En forward afsluttes enten ved fysisk levering af aktivet eller ved differenceafregning, hvor parterne ved kontraktens udløb udligner forskellen mellem den aftalte forwardpris og spotprisen (dvs. den aktuelle markedspris) på udløbstidspunktet.

Indgåelsen af en forwardkontrakt er ikke at betragte som afståelse af aktierne, når/hvis forwardkontrakten er omfattet af kursgevinstloven.

Det følger af kursgevinstlovens § 33, stk. 1, sidste punktum, at det overdragne aktiv anses for erhvervet eller afstået på afviklingsdagen og til markedsværdien på afviklingsdagen, hvis kontrakten afvikles ved levering.

En forwardkontrakt falder ind under kursgevinstloven, hvis en af de følgende betingelser *ikke* er opfyldt:

- Kontrakten kan kun opfyldes ved levering af aktierne (altså ikke ved differenceafregning)
- Kontrakten kan ikke overdrages
- Der er ikke indgået nogen modgående kontrakt.

Ved spørgsmålet om, hvorvidt kontrakten kun kan opfyldes ved levering, eller om differenceafregning er mulig, kommer det an på, om kontrakten rent faktisk blev afviklet ved differenceafregning (jf. forarbejderne til kursgevinstloven, bemærkninger til lov nr. 439 af den 10. juni 1997, punkt n). Er dette rent faktisk sket, kommer det ikke an på, om det var forudset i kontrakten.

### 2.2.3 Aktieudlån

Et aktieudlån er, som navnet antyder, en aftale om udlån af aktier. De udlånte aktier vil som altoverve-jende hovedregel være børsnoterede aktier, hvilket gør aktierne let omsættelige. De lånte aktier vil altså være at betegne som en "genusvare".

Et traditionelt aktielån er defineret ved en aftale mellem en kontrahent, långiver (A), og en medkontra-hent, låntager (B), hvor A mod et vederlag (gebyr/fee) og eventuelt en sikkerhed udlåner aktier optaget på et reguleret marked til B. Ved overdragelsen af de udlånte aktier overgår ejendomsretten til B, såle-des at B efterfølgende fuldt kan disponere over aktierne. Dette bevirker, at B har ret til at afgive stemme ved generalforsamling, retten til at modtage udbytteudlodning samt at sælge aktierne.

Samtidigt med udlånet accepterer B at aflevere samme antal aktier tilbage til A på senere aftalt tids-punkt. Ved lånet af aktierne vil det oftest blive aftalt, at A vil/skal blive kompenseret for de til aktierne i udlånsperioden udloddede udbytter.

Figur 2.4 illustrerer et aktielån



Skattemæssig kvalifikation og behandling af REPO og aktielån – Kandidatafhandling den 17. juli 2013 af Nils Panum Thisted

Skattemæssig kvalifikation og behandling af REPO og aktielån – Kandidatafhandling den 17. juli 2013 af Nils Panum Thisted

Stiller B sikkerhed til A i form at kontante pengemidler, vil denne kontante sikkerhedsstillelse være for-bundet med en forpligtelse for A til at betale renter til B. Værdien af sikkerhedsstillelsen for et aktielån ligger typisk over den aktuelle markeds- pris for aktierne.

Aktieudlån adskiller sig herved grundlæggende fra en repotransaktion (repurchase agreement) eller kontrakter om lån med håndpant i aktier. Repotransaktioner og lån med håndpant i aktier ligner til for-veksling aktieudlån, der foretages mod kontant sikkerhedsstillelse. I alle tilfælde overdrages der aktier fra en person til en anden mod betalingen af en sum penge, og i begge tilfælde er parterne forpligtet til at levere aktierne henholdsvis pengene tilbage.

På hvilken side der foretages et såkaldt "hair-cut", er dog forskelligt ved aktieudlån og ved repo'er/lån med håndpant i aktier. Skattestyrelsen lader i det sammenfattende indlæg i føreresagerne af den 9. august 2019 i afsnit 8.12 til at overse dette faktum.

Det skal i den forbindelse fremhæves, at et aktieudlån sker i aktielåntagers interesse. Det er derfor aktielåntager, der skal yde en højere sikkerhedsstillelse end den aktuelle markedspris. Aktielåntagere er typisk short sellere. Repo'er og lån mod håndpant i aktier sker derimod i aktieindehaverens interesse. Aktieindehaveren anmoder kapitalgiveren om et lån og stiller sine aktier i sikkerhed for lånet.

Transaktionerne kan være meget svære at adskille fra hinanden, dog hjælper indicier, som (1) hvem stiller anmodningen, og (2) overstiger værdien af aktierne beløbet, der betales.

Anmoder modtageren af pengene om et lån, og stiller han aktier, hvis værdi overstiger det beløb, han modtager, til sikkerhed herfor, er der tale om en repo eller et lån med håndpant i aktier. Der foretages et "hair-cut", på værdien af den sikkerhed han stiller for at låne pengene.

Anmoder derimod modtageren af aktierne om et lån, og giver han en kontant sikkerhed, hvis værdi overstiger den aktuelle markedsværdi af aktierne, er der tale om et aktieudlån. Her er det aktieindehaveren, der beskyttes, mod risikoen for at aktielåntager ikke leverer aktierne tilbage (som han jo netop gerne ville låne), og derfor skal aktielåntager stille et højere beløb i kontant sikkerhed end den aktuelle markedsværdi af aktierne.

For yderligere forklaringer vedrørende aktielån og repo'er henvises til Katja Joo Dyppel, Beskatning af aktielån og repo'er, SR.2013.0053, jf.bilag 2c, samt Nils Panum Thisted, Skattemæssig kvalifikation og behandling af REPO og aktielån, som her fremlægges som <u>bilag 75</u>.

**2.3 De involverede eksterne aktører**

For at kunne realisere de mange strukturerede finansielle transaktioner er det nødvendigt at et antal finansielle virksomheder deltager. Der er her tale om fondsmæglere ("brokere"), custodians og clearing-virksomheder samt aktielåntagere og deres mellemmænd, forward intermediaries, og endelig de så-kaldte introducing brokers og "Arrangers".

Som det fremgår af redegørelsen nedenfor, var der et meget stort antal aktører involveret i gennemførelsen af de omhandlede transaktioner, der hver især rådede over særlig indsigt og/eller særlige kontakter, eller som blev påført ikke uvæsentlige risici i forbindelse med gennemførelsen af de omhandlede transaktioner.

**2.3.1 Brokere**

Samtlige ordrer til køb og salg af aktier blev af trustee'en/traderen indgivet til en professionel, autoriseret og kontrolleret broker i London.

Brokerens opgave er at matche en købsordre med en salgsordre. Ved denne matchning opstår den juridisk bindende aftale om køb af aktier, der efter dansk lovgivning umiddelbart fører til overgang af det civilretlige ejerskab til køber.

Brokerens primære opgave er at placere ordren på markedet, idet han i sit netværk af brokere og ved børsen søger at finde en (eller flere) salgsordrer, der passer til den købsordre, han har modtaget fra sin klient. Brokeren betegner selv opgaven som at "skaffe likviditet" til en ordre. Han mener dermed ikke, at han skal finde likvide midler til at betale for et bestemt antal aktier, som hans kunde gerne vil købe.

Den likviditet, som brokeren skal fremskaffe til sin kunde, består i tilstrækkelige aktier til at kunne matche kundens købsordre med salgsordre.

Brokerne, som pensionsplanen handlede med, indgik i reglen aktiehandlerne som ejermatchinghandler. Brokeren, der arbejdede for sælger, købte dermed selv aktierne af sælger og solgte dem videre til en anden broker, der agerede for den ultimative køber (pensionsplanen). Pensionsplanen købte med andre ord dermed aktierne af sin egen broker, ikke af den ultimative sælger.

Når brokeren skaffer sig aktierne fra markedet, kan han gøre dette ved at købe aktier af flere forskellige kilder. Samtlige aktier, som brokeren har købt, indgår i en stor pulje, hvor der ikke længere kan skelnes, hvilken "konkret aktie" der kom fra hvilken kilde. Dematerialiserede aktier er kun antal på depotkonti, der adskiller sig lige så lidt fra hinanden som pengemidler.

Strømmen af aktier til brokerne ind til en stor pulje kan illustreres, som følger:



"Den aktie" – af ubestemmelig herkomst – som pensionsplanen efterfølgende fik leveret til sin depotkonti hos sin custodian, var heller ikke nødvendigvis den selv samme aktie, som dens køb blev matchet med ved brokeren. Det er i og for sig også irrelevant, da dematerialiserede aktier er genusvarer: Pensionsplanen skal bare have leveret en aktie, af samme klasse og fra samme selskab som den har købt.

Skattemæssigt gør det kun en forskel, hvis man vil undersøge, om den aktie, som pensionsplanen købte og fik leveret, stammede fra en short seller eller en long owner. Vil man behandle disse aktier forskelligt (skattemæssigt betragtet), støder man på det problem, at pensionsplanen kan have købt en aktie, der stammer fra en long owner (der allerede har aktien i sit depot på salgstidspunktet) hos sin broker, men når leveringen sker, modtager pensionsplanen en aktie, der stammer fra en short seller – eller omvendt. Og ingen er i stand til at skelne disse aktier fra hinanden, i kredsløbet af aktier der kon-

stant blandes sammen i puljer. Ville man betragte aktier fra short sellere som koldt vand og aktier fra long ownere som varmt vand, er det, der opstår hos såvel brokerne som hos custodians, lunkent vand, som man ikke kan skille ad igen.

Brokerens honorar afhænger af, om han kan skaffe sin kunde det ønskede antal aktier.

Derfor er pensionsplanens betaling af brokernes honorarer dokumentation for, at pensionsplanens ordrer til køb eller salg af aktier blev matchet med tilsvarende ordrer, som brokerne skaffede fra markedet.

De brokere, som traderne for pensionsplanen placerede ordrerne til køb- og salg af danske aktier hos, var finansielle virksomheder, der var uafhængige af Solo- gruppen. Brokeren Novus blev ganske vist købt af Sanjay Shah, dog skete det først, efter pensionsplanerne var ophørt med at benytte Novus som broker. Det var kun i 2013 – altså før Sanjay Shah overtog Novus – at Novus var broker for pensionsplaner, der benyttede sig af Solo-gruppen som clearer og custodian.

### 2.3.2 Aktielåntagere og deres mellemmænd (Stock Loan Intermediaries)

Pensionsplanen, der var kunde i Solo-gruppen, anvendte et begrænset antal professionelle mellemmænd (Stock Loan Intermediaries) som modparter i forbindelse med aktieudlån. Inden pensionsplanen startede sin forretningsaktivitet, indgik den rammeaftaler om aktieudlån (såkaldte GMSLA'er) med mellemmænd (Stock Loan Intermediaries). I en GMSLA fastsættes kun de generelle vilkår for lånene.

At ikke alle pensionsplaner har gemt kopier af de underskrevne GMSLA'er er af den simple grund, at det drejer sig om standardaftaler, der er identiske for samt- lige pensionsplaner.

Hvert enkelt konkrete aktieudlån blev indgået ved de e-mails, som trustee'en udvekslede med mellemmanden i aktielån, efter at købsordren til aktierne var placeret og matchet ved brokeren. Det er først disse e-mails, der indeholder de for indgåelsen af en retligt bindende aftale om aktieudlån nødvendige konkrete informationer: Hvilke og hvor mange aktier lånes ud, beløbet for den kontante sikkerhedsstillelse samt gebyrets og rentens størrelse samt aktieudlånets løbetid.

Pensionsplanen og dens trustee kendte og kender stadig ikke de ultimative låntagere af aktierne, idet aktielånsmellemmændene var imellem dem. Pensionsplanen kender derfor heller ikke de endelige aktielåntageres motivation for at låne aktierne.

Inden pensionsplanen købte en given aktiepost, forhørte pensionsplanen sig telefonisk hos mellemmændene om, hvor mange aktier mellemmændene havde brug for at låne, dvs. kunne formidle til en endelig låntager. Dette med henblik på at sikre, at pensionsplanen kun købte et antal aktier, som pensionsplanen efterfølgende kunne låne ud. De i sagerne fremlagte e-mails fra mellemmanden til pensionsplaner, hvori pensionsplaner spørges til, om de har et givent antal aktier, er således sendt, efter at pensionsplanerne allerede havde været i kontakt med mellemmanden.

Der er således ikke tale om, at aftalerne om aktielån er "indgået baglæns", således som det hævdes af Skattestyrelsen.

Der er heller ingen "brikker der skal falde på plads", eller en "kabale, der skal gå op" for at kunne finansiere aktiekøbet, sådan som Skattestyrelsen påstår. Skattestyrelsens påstande hviler på manglende kendskab til praktikken i udbyttearbitrage.

### 2.3.3 Forward counterparties og intermediaries

Pensionsplanen har ikke haft kendskab til de ultimative forwardmodparters identitet, idet forwardkontrakterne er handlet gennem mellemmænd. Mellemmændene træder derved (ligesom ved en ejermatchinghandel) selv ind i kontrakten og er selv umiddelbar forward counterpart til pensionsplanen.

Den ultimative forward counterparts motivation kan pensionsplanen derfor heller ikke kende.

Pensionsplanen har ikke lovet køberen af forwarden (hverken intermediarien eller den ultimative forward counterpart) noget som helst således som påstået af Skattestyrelsen i det sammenfattende indlæg i førersagerne af den 9. august 2019, afsnit 2.3 (side 10). Mindst af alt har pensionsplanen lovet modparten til forwarden en kursstigning. Den ultimative modpart til forwarden har simpelthen en modsat- rettet interesse i forhold til pensionsplanen: Han ønsker at eje aktien på en bestemt dato efter generalforsamlingsdatoen. Om det er, fordi den ultimative modpart af egen motivation forventer en kursstigning, eller fordi modparten af (skattemæssige årsager) simpelthen ikke ønsker at eje aktien på udbyttedatoen, men vil sikre sig købet af aktien til en bestemt pris på en senere dato, kan pensionsplanen som uafhængig part ikke udtale sig om.

Et vigtigt aspekt i nærværende sag er, at de købte aktier aldrig blev leveret under forward hedgen, idet pensionsplanen altid differenceafregnede mellemværendet med forwardmodparterne, dvs. udlignede forskellen mellem den aftalte forwardpris og spotprisen (markedsprisen) på tidspunktet for udløbet af forwardkontrakten. Derved undgik pensionsplanen, at forwardkontrakterne i skattemæssig henseende kunne anses for en afståelse af de erhvervede aktier.

Det var væsentligt for såvel pensionsplanen som også de ultimative modparter til forwardkontrakterne, at forwardkontrakten ville være omfattet af kursgevinstloven, således at indgåelsen af forwarden IKKE er at betragte som afståelse af aktierne. Som det fremgår af forarbejderne til kursgevinstloven (bemærkningerne til lov nr. 439 af den 10. juni 1997, punkt n) kommer det for spørgsmålet om, hvorvidt en kontrakt kun kan opfyldes ved levering, eller om differenceafregning er mulig, an på, om kontrakten rent faktisk er blev afviklet ved differenceafregning. Er dette rent faktisk sket, kommer det ikke an på, om det var forudset i kontrakten.

### 2.3.4 Custodians og clearing-agenter

Custodians og clearing-agenterne har en dobbeltrolle. På den ene side har custodian til opgave at opbevare pensionsplanernes værdipapirer (aktier). Denne rolle kan custodian først opfylde, når aktierne er overført fra sælgers custodian til købers custodian. Det sker ved settlementprocessen (afvikling). Ved afviklingen af aktiehandlen skal købsprisen betales mod levering af aktier (payment versus delivery). Der skal med andre ord udveksles penge og værdipapirer mellem de involverede custodians. Dette kan enten ske på brutto- eller på nettobasis.

Sker afviklingen på bruttobasis, udveksles den konkrete aktiepost, der blev solgt fra den ene custodian til den anden mod overførslen af den konkrete købesum.

Afvikling på bruttobasis kan illustreres, som følger:



Sker afviklingen på nettobasis, modregnes først alle aktietransaktioner i den pågældende afviklingsperiode (hvilket ikke nødvendigvis er en hel dag) mellem de pågældende custodians, inden nettobalancen overdrages mellem sælgers og købers custodian.

Afvikling på nettobasis kan illustreres, som følger:



Ved clearingen opgøres forpligtelserne, der skal udveksles. Sker clearingen under anvendelse af net-
ting, om- og modregnes flere overførselsordrer mellem de involverede custodians til en nettofordring,
således at kun nettoforpligtelsen overdrages mellem de to custodians (jf. kapitalmarkedslovens § 3,
stk. 1, nr. 29).

Har køber og sælger samme custodian, afvikles aktietransaktionen internt jf. CSD- direktivets artikel 9
(afviklingsinternalisatorer), således at ingen aktier sendes fra custodian til custodian. Clearingen og af-
viklingen af transaktionerne er ikke desto mindre reel – og i tiltagende omfang nøje reguleret af EU.

Custodians og clearing-agenterne bliver principielt først aktive, efter at den endelige og bindende af-
tale om overdragelse af ejerskab til aktierne er indgået.

Idet clearing-agenten dog indestår for opfyldelsen af en indgået aftale om køb og salg af aktier – som
garant for betaling af købssummen og levering af aktierne – skal brokeren og traderen begge informere
clearing-agenten om hensigten om at indgå en aktiehandel, som først matches når clearing-agenten
har givet tilsagn om, at de kontraktuelle forpligtelser vil blive opfyldt.

Som følge af denne risiko, som clearing-agenten overtager ved afviklingen af handler indgået af en pen-
sionsplan uden tilstrækkelig egenkapital til at betale for de købte aktier, og nødvendigheden af at
skaffe en aktielåntager til det specifikke antal aktier, som pensionsplanen køber, forlanger clearing-
agenten et betragteligt honorar. Et honorar, som clearing-agenten enten forlanger udbetalt til sig selv
eller (af skattemæssige årsager) til en forbunden virksomhed.

På grund af den høje risiko for at skulle indestå for betalingen af købesummer i så betragtelig størrel-
sesorden som i de omtalte aktiehandler, var honoraret, som Solo-gruppen forlangte for sine tjeneste-
delser som custodian og clearing-agent også ganske væsentligt. Honorarer i en størrelsesorden, om-
kring 70-80 pct. af gevinsten, er normale inden for branchen og blev også betalt af pensionsplanerne.

Disse honorarer blev trukket fra pensionsplanernes cash-konto hos deres custodian. Idet pengene un-
der TTC-klausulen allerede befandt sig på Solo Capitals konto, viste betalingen af honoraret sig kun ved
en bogføring på pensionsplanernes cash-konto hos deres egen custodian. TTC-klausulen i Custody
Agreements var en sikkerhed for Solo-gruppen, for det tilfælde at clearing-agenten/custodian måtte
træde til og betale købssummen i en given aktietransaktion.

### 2.3.5 Tax agents

Anmodningerne om refusion blev indsendt af en professionel tax agent på vegne af pensionsplanen.
Den engagerede tax agent havde til opgave at verificere, at samtlige forudsætninger for at få udbetalt
refusion fra Danmark var opfyldt og behørigt dokumenteret.

Den pågældende tax agent modtog honorar for sine ydelser.

Eftersom den engagerede tax agent ikke kun var ansvarlig for anmodningen om refusion, men også for
overvågningen heraf, skulle refusionen udbetales fra SKAT til tax agenten. Tax agenten informerede
pensionsplanen om modtagelsen af den respektive refusion og overførte samtlige refusionsbeløb til
Solo Capitals kontant-konto, jf. bilag 76, som her fremlægges. Dette skete med frigørende virkning for
den pågældende tax agent, idet pensionsplanen havde sin konto hos Solo Capital gruppen. I Solo-grup-
pen blev modtagelsen af hvert refusionsbeløb bogført på hver pensionsplans konto.

Solo Capital var berettiget til at modtage refusionsbeløbene, som tilkom pensionsplanen, idet pen-
sionsplanen havde overdraget ejendomsretten til alle sine kontante midler til sikkerhed til sin custo-

dian. Denne overdragelse til sikkerhed af kontante midler skete under TTC-klausulen i Custody Agreement.

Overdragelse af ejendomsretten til refusionsbeløbet står ikke i modstrid med GMSLA'en som påstået af Skattestyrelsen i styrelsens sammenfattende indlæg i førersagerne af den 9. august 2019, idet GMSLA'en kun pantsætter de aktiver, der tilhører pensionsplanen. De kontante midler tilhører kun pensionsplanen i "et logisk sekund", hvorefter de i henhold til TTC-klausulen umiddelbart overdrages til custodianens ejerskab.

Samtlige pengemidler, der tilkom pensionsplanerne, blev dog bogført på separate konti hos Solo-gruppen, således at de enkelte pensionsplaners midler til enhver tid kunne identificeres og fritages fra sikkerhedsstillelsen. Dette skete i øvrigt på bag- grund af rådgivning modtaget fra advokatfirmaet Pinsent Masons, der som bekendt er Skattestyrelsens eget advokatfirma i England.

Såfremt pensionsplanen ikke havde noget udestående med sin custodian, dvs. hvis custodian ikke havde måttet betale en aktiehandel på vegne af pensionsplanen, kunne pensionsplanen på ethvert tidspunkt opsige kontrakten med sin custodian og forlange såvel pengemidler som også aktiedepoter overført til en anden custodian/bank. Den pågældende custodian havde på intet tidspunkt nogen rettigheder til aktiedepoterne, og overdragelsen af ejendomsretten til pengemidlerne skete kun til sikkerhed.

### 2.3.6  Introducing brokere

Eftersom det ikke er let at finde alle de her beskrevne finansielle virksomheder, der er villige til at acceptere en nystiftet enkeltmandspensionsplan som kunde til at investere i store danske aktieposter uden selv at råde over tilstrækkelig egenkapital, er såkaldte introducing brokere nødvendige. En introducing broker introducerer kunder til de forskellige finansielle virksomheder mod honorar.

### 2.3.7  Arrangers

Endelig havde pensionsplanen brug for en såkaldt arranger. En arranger er en agent med eksklusiv adgang til bestemte netværk, firmaer eller forretningskoncepter (immaterielle rettigheder). Også en arranger fakturerer pensionsplanen for sine tjenesteydelser.

### 2.3.8  Sammenfattende bemærkninger om de involverede eksterne aktører

Aflønningen af det store antal medvirkende finansielle virksomheder, der rådede over særlig viden og særlige kontakter, eller som overtog visse finansielle risici i forbindelse med gennemførelsen af aktietransaktionerne, efterlod pensionsplanen med en mindre del af det samlede provenu ved den omhandlede udbyttearbitrage. Dette svarer til markedspraksis og er intet tegn på, at de diverse aktører ikke skulle være uafhængige af hinanden, eller at pensionsplanen blot skulle have ageret som "stråmand" for andre involverede parter, sådan som Skattestyrelsen lader til at ville antyde.

Pensionsplanen var ikke undergivet Sanjay Shahs kontrol og kunne på ethvert tidspunkt også skifte til en anden finansiel virksomhed. Dette dokumenteres netop også, ved at en del pensionsplaner først var klienter hos Solo Capital og efterfølgende hos North Channel Bank. Pensionsplanen kender ikke de konkrete navne på de pensionsplaner, der skiftede clearer og custodian, men ved, at det skete.

Skattestyrelsen er i en bedre position til at kunne navngive de pensionsplaner, der har indgivet anmodninger om refusion på basis af et DCA udstedt af Solo Capital og senere af North Channel Bank.
### 2.4 Pensionsplanens forretningsmodel og transaktioner

### 2.4.1 Introduktion til udbyttearbitrage

Pensionsplanen anvendte den investeringsstrategi, der kaldes udbyttearbitrage. Udbyttearbitrage er helt grundlæggende en investering i aktier omkring udbyttedatoen.

Forretningsmodellen er mulig som følge af det forhold, at ikke alle aktionærer har samme skattestatus. Nogle betaler mere i udbytteskat end andre. Enkelte er – ligesom pensionsplanen – helt fritaget for at betale udbytteskat. Aktionærer der er (helt eller delvist) fritaget for at betale udbytteskat, modtager således en højere indkomst fra udbytteudlodningen end andre aktionærer, der er mindre gunstigt stillet.

Aktionærer der ikke har adgang til en dobbeltbeskatningsoverenskomst, ved med sikkerhed, at de på udbyttedatoen mister 27 pct. af udbyttet. Disse 27 pct. mister en amerikansk pensionsplan ikke. Aktionærer, der skattemæssigt set ikke står så godt som pensionsplanen, vil derfor gerne sælge aktierne hen over udbyttedatoen. Dette gør de i reglen ved at sælge aktierne kort før eller på selve udbyttedatoen til den aktuelle markedspris (som stadig indeholder hele bruttoudbyttet) og købe aktier tilbage fra markedet ved at købe en forwardkontrakt.

Dagen efter udbyttedatoen falder aktierne i pris, idet selskabet jo har mistet værdi pga. udlodningen af udbyttet. Teoretisk set skulle aktierne dagen efter udbyttedatoen – også kaldet ex-datoen, idet det er den første dag hvor, aktierne handles udenret til udbytte – falde med samme beløb som bruttoudbyttet. Det er jo den værdi, som selskabet mister i kroner og ører ved selve udlodningen.

I praksis falder prisen dog stort set aldrig med nøjagtig samme beløb som brutto- udbyttet. Allerede dette faktum tilskynder spekulationer i prisudviklingen omkring udbyttedatoen og dermed en øget handelsaktivitet på netop dette tidspunkt.

Spekulationsforretningen bliver til en arbitrageinvestering ved den parallelle investering i en forward-kontrakt.

Arbitrage er et økonomisk fagudtryk for handel med ensartede varer (og tjenesteydelser) på adskilte markeder. Handlens formål er at udnytte synlige prisforskelle på forskellige markeder. Handles den samme vare på to forskellige markeder til en forskellig pris, opstår arbitragemuligheden: Den samme vare købes og sælges samtidig på forskellige markeder, og arbitragøren kan umiddelbart se, hvilken gevinst han vil realisere.

De forskellige "markeder", der herved er tale om, kan ikke kun være forskellige børser. En og samme aktie handles ikke nødvendigvis til helt samme pris på samtlige børser. De forskellige markeder, som en arbitragør kan rette sig mod, kan også være selve aktiemarkedet og derivatmarkedet som fx forward-markedet. Prisen på en aktie, der straks købes på det såkaldte "spotmarked," er ikke den samme som prisen for samme aktie, der handles over en forwardkontrakt.

Prisen for en aktie, der handles over en forwardkontrakt, afviger allerede pga. rentefaktoren fra selve købsprisen for aktien: Hvis man over en forwardkontrakt aftaler at købe en aktie på et bestemt tidspunkt i fremtiden til en bestemt pris, vil selve forrentningen af købsprisen blive medregnet i prisen på forwardkontrakten og derved afvige fra aktieprisen på spotmarkedet.

Prisen på forwardkontrakten kan dog også afvige fra spotprisen af mange andre grunde. En årsag, til at forwardprisen kommer ud af balance med forwardprisen – sådan som den skulle ligge hvis kun forrentningen af købsprisen ville blive indkalkuleret – kan være efterspørgsel fra "tidligere aktionærer" der in-

den udbyttedatoen sælger deres aktier til markedet for at undgå tabet af de 27 pct. udbytteskat. Da den oprindelige aktionær uden dobbeltbeskatningsoverenskomst ved, at han ved udlodningen af udbyttet mister de 27 pct. af udbytteskatten, har udbyttet og dermed selve aktien en mindre værdi for ham, end for en pensionsplan der har ret til refusion. Denne subjektive værdiforskel, der forårsages af, at nogle aktionærer diskrimineres i forhold til andre, bringer markedet i bevægelse. Værditabet, der sker på ex-datoen, er mindre for skattebegunstigede pensionsplaner end for andre aktionærer. Pensionsplanen kan derfor sælge aktierne igen til de tidligere ejere under en forwardaftale til en højere pris, end forwardprisen skulle være, da køberen af forwarden stadig vil stå finansielt bedre, end hvis han havde beholdt aktien, modtaget et nettoudbytte og lidt en værditab på sin aktie på ex-datoen i en størrelsesorden af bruttoudbyttet.

Pensionsplanen lider et umiddelbart "tab" på ex-datoen, da aktien også i hans besiddelse mister i værdi. Bruttoudbyttet trækkes fra aktiens markedsværdi. Dette tab udlignes i pensionsplanens tilfælde dog fuldt ud ved modtagelsen af nettoudbyttet og refusionen. Tilbage bliver for pensionsplanen gevinsten, som denne kan realisere af arbitragetransaktionen: købet af aktien på spotmarkedet og salget af akten på derivatmarkedet (forwardkontrakten).

Selvom gevinsten, som pensionsplanen realiserede, udgjorde samme værdi som refusionen af udbytteskatten, bestod selve gevinsten dog ikke i refusionen som påstået af Skattestyrelsen. Den realiserede gevinst stammede fra selve arbitrageforretningen. Denne kunne pensionsplanen ikke risikere at miste ved markedsbevægelser og var derfor nødt til at lukke samtlige positioner, når arbitragegevinsten var faldet til refusionsbeløbet.

At udbyttearbitrage er en fuldkommen legitim investerignsstrategi, fremgår af den som <u>bilag 77</u> fremlangte brochure fra det engelske finanstilsyn FCA fra juni 2017.

**2.4.2 Transaktioner**

I det følgende beskrives forretningsgangen ved udbyttearbitrage i praksis, idet hvert enkelt trin belyses nærmere.

**2.4.2.1    Onboarding**

Forud for iværksættelsen af pensionsplanens handelsaktivitet har pensionsplanen været igennem udførlige kontoåbningsprocedurer hos samtlige af de implicerede finansielle virksomheder, herunder broker (fondsmægler), mellemmændene til forwardkontrakterne og aktielånene samt clearing- og settlement-agenten og custodian.

Det nødvendige aftalegrundlag skulle være på plads, førend pensionsplanen kunne gennemføre handelsaktiviteten, herunder rammeaftalerne med aktielåns-mellemmændene (GMSLA-aftaler). Herved sikredes, at der pr. e-mail og med kort varsel kunne indgås en konkret aftale om udlån af et konkret antal aktier på en helt konkret dato.

**2.4.2.2    Køb af aktier og salg af forward**

**2.4.2.2.1 Fremgangsmåden ved aktiekøb og salg af forward**

Første trin i selve udbyttearbitrage-transaktionerne har bestået i at placere en købsordre til fondsmægleren. Når pensionsplanens trustee (eller den af trustee autoriserede trader) har identificeret en bestemt aktie, hvor prisen på derivatet (future/forward) er ude af balance med prisen for selve aktien på spotmarkedet, forhører trustee'en sig telefonisk hos sin aktielånsmellemmand, om der på markedet er

en interesse for at låne aktier i det pågældende selskab. Giver aktielånsmellemmanden udtryk for, at der eksisterer generel forespørgsel på markedet efter at låne en bestemt aktie, placerer pensionsplanens trustee en ordre om at købe et bestemt antal aktier hos broker (fondsmægler = execution broker).

Brokeren kontakter herefter sit netværk for at identificere en (eller flere) passende salgsordrer på markedet. Handlerne sker ikke nødvendigvis ved børsen. Store mængder aktier, som dem der er nødvendige, for at udbyttearbitrage kan betale sig (idet prisforskellen mellem spotmarkedet og derivatmarkedet er så minimal), handles generelt OTC, dvs. udenom børsen. Dette med henblik på at forhindre risikoen for (illegal) markedsmanipulation. Der henvises til det anførte ovenfor under afsnit 2.2.1 .

Identificerer brokeren en eller flere passende salgsordrer i sit netværk af brokere, meddeler han dette til pensionsplanens trader, som anmodes om at indhente tilsagn fra clearing-agenten om, at denne vil indestå for, at afvikling vil ske. Parallelt hermed anmodes sælgers clearing-agent om at indestå for, at afviklingen vil ske. Således indestår købers clearing-agent for, at købesummen betales, og sælgerens clearing-agent indestår for, for at aktierne leveres. Modtager clearing- agenterne disse meldinger omkring udbyttedatoen, og kan de se, at afviklingsdatoen ligger efter "record day", markeres transaktionen i computersystemerne (som "cum ex- trade"), så de respektive custodians er opmærksomme på, at der opstår en såkaldt "market claim", når udbyttet udbetales.

"Record day" er datoen, hvor selskabet (VP Securities) verificerer, hvem der er registreret som ejere af de danske aktier. Udbyttet vil af VP Securities sendes, til den der på "record day" står registreret som ejer af en aktie. Er en aktiehandel ikke afviklet på record day endnu, vil VP Securities umiddelbart sende udbyttet til den forkerte modtager, nemlig sælgeren. Har sælger eksempelvis sit depot i Nordea, og køberen sit depot i Danske Bank, vil VP Securities sende udbyttet til Nordea. Nordea kan dog se, at aktierne efter record day er overført til Danske Bank. Nordea er derfor under den såkaldte "market claim-proces" forpligtet til at sende udbyttet videre til Danske Bank, hvor den retmæssige ejer af aktien har sit depot.

Under market claim-processen er de respektive custodians således forpligtede til at debitere nettoudbyttet, som sælger i første omgang har modtaget, fordi han stadig stod registreret som ejer på "record day" og overføre dette nettoudbytte til køberen af aktien.

Finder brokeren ikke en passende salgsordre på markedet, kan købsordren ikke efterkommes, og pensionsplanen bliver ikke ejer af danske aktier. Eksempler på købsordrer, der ikke blev matchet, fremlægges som bilag 78. Desværre har ikke alle pensionsplaner gemt kopier af de købsordrer, der ikke blev matchet, da de jo ikke havde nogen juridiske eller finansielle konsekvenser.

Idet pensionsplanen kun vil købe aktierne, hvis den samtidig kan sælge det samme antal aktier via en forward, sender pensionsplanens trader parallelt med ordren til køb af aktier også en ordre til salg af samme antal aktier via en forward- kontrakt.

Disse to ordrer – køb af aktier og salg af en forward – sendes ikke nødvendigvis til den samme broker. Kan brokeren identificere en anden broker (i sit netværk), som har en klient, der ønsker at købe aktierne over en forward, meddeler pensionsplanens broker dette til pensionsplanen, som igen opfordres til at indhente tilsagn fra clearing-agenten om at ville indestå for afviklingen.

Pensionsplanen anmoder herefter sin clearing-agent om tilsagn til at afvikle aktiekøbet og forwardsalget. Giver clearing-agenten tilsagn, meddeles dette til pensionsplanen og brokerne, som så matches handlerne. Alt dette sker indenfor få sekunder/minutter over elektroniske kommunikationssystemer.

Brokerne gennemfører handlerne som såkaldte ejermatchinghandler. Det betyder, at det er de respektive brokere, der indtræder som part i købsaftalen. Der er ikke nogen direkte kontakt mellem pensionsplanen og de ultimative sælgere af aktierne. Sælgeren af aktierne er og forbliver derfor ukendt for pensionsplanen. Der er ingen kontraktuel forbindelse mellem dem.

Idet en broker samtidig indgår flere ejermatchinghandler med forskellige brokere over aktier udstedt af samme selskab, er det ikke muligt efterfølgende at identificere den oprindelige ejer af de aktier, pensionsplanen købte. Hos brokeren blandes alle aktierne således sammen i en pulje, hvor det efterfølgende ikke længere er muligt at spore en bestemt aktie tilbage til en bestemt oprindelig sælger.

I det øjeblik hvor brokerne matcher handlerne, bliver pensionsplanen ejer af aktierne. Indenfor tre sekunder efter at ordrerne er blevet matchet, sendes der automatisk en såkaldt "trade report" til børsen i London (LSE), og afviklingen af hand- len sættes samtidig i gang ved de afviklingsinstruktioner der automatisk sendes til clearing-agenten. Ud over denne "trade report", der er rettet mod offentligheden, sendes der ligeledes en såkaldt "transaction report" til det engelske finanstilsyn, FCA (via LSE's Unavista MIFIR Reporting Portal – jf. Sanjay Shahs processkrift til High Court i London, afsnit 56.9). Denne "transaction report" anvendes i tilsynsmyndighedernes kontrol og overvågning af aktietransaktionerne. Begge rapporter sendes elektronisk og fuldt automatisk fra handelssystemerne (computerne), hvor aktiehandlerne blev matchet.

Efter matchingen af købs- og salgsordre begynder fristen for afviklingen af handlen at løbe. Handler, der skulle afvikles gennem Solo-gruppens selskaber, blev, som mange andre OTC-handler, afviklet med en dags længere frist, end VP Securities (som den nationale CSD) afvikler handler. Clearing-agenter har (også i henhold til FCA's regler) pligt til at sørge for, at risikoen en "fail" undgås – dvs. at en handel ikke kan afvikles – og hertil anvendes en længere afviklingsperiode, især når der er tale om så store aktieposter som de i nærværende sag omtalte. Indtil 2015 blev aktiehandlerne således afviklet, fire dage efter ordrerne blev matchet (T+4), og fra og med 2015 blev aktiehandlerne afviklet, tre dage efter matchingen (T+3).

**2.4.2.2.2 Pensionsplanens og aktiesælgers forretningsmæssige begrundelse for aktiekøb/-salg**

Hovedaktørerne i en udbyttearbitragetransaktion er naturligvis køber og sælger af aktierne. Disse har modsatrettede interesser: Mens sælgeren ikke ønsker at eje aktierne på retserhvervelsestidspunktet for udbyttet (udbyttedatoen), har køberne netop interesse i at være den retmæssig ejer af aktierne på denne dato.

Den ultimative sælgers motivationer for ikke at ville eje aktierne på udbyttedatoen kan som anført være mange. Som følge af manglende ret til refusion efter den dobbeltbeskatningsaftale, som sælger er underlagt, kan sælger have en interesse i om muligt at sælge aktien til en pris, der indeholder 100 pct. af værdien af bruttoudbyttet. Han vil derved økonomisk være stillet, som om han var underlagt en dobbeltbeskatningsoverenskomst, der gav ret til refusion af hele udbytteskatten. Sælgeren kan også have et ønske om at blive beskattet af en aktieavance – frem for at blive beskattet af aktieudbyttet. I denne situation vil sælgerens søge at sælge aktien (inklusive udbytte) til en højere pris end aktiernes tilbagekøbspris efter udbyttedatoen (dvs. eksklusive udbytte).

Endvidere kan der naturligvis være tale om spekulanter, der spekulerer i, at markedsprisen for en aktie ikke falder svarende til udbyttets værdi. Sådanne spekulanter kan også optræde som sælgere af aktier inden udbyttedatoen. Der findes selvsagt også mange andre realøkonomiske incitamenter til salg af aktier inden udbyttedatoen. Pensionsplanen kan ikke vide, hvad der har været en given ultimativ sælgers incitament til at sælge inden udbyttedagen. Det bemærkes dog, at der notorisk kan være mange forskellige incitamenter hertil.

Pensionsplanen købte aktierne med henblik på at realisere en gevinst ved at købe aktierne på spotmarkedet og sælge aktierne gennem en forward eller en future.

Pensionsplanens trustee / trader kan samtidig se både prisen på spotmarkedet og prisen på forward-/futuremarkedet og derved øjeblikkelig regne sig frem til, hvilken gevinst der kan realiseres ved at købe aktierne på spotmarkedet og sælge dem gennem en forward eller en future. Forudsætningen for at denne gevinst også realiseres i virkeligheden, er blot, (1) at refusionen af udbytteskatten udbetales, og (2) at pensionsplanen kan bære omkostningerne i forbindelse med aktieudlånet, der finansierer købsprisen af aktierne.

Pensionsplanens kalkulation af investeringens rentabilitet er baseret på den forudsætning, at pensionsplanen ikke mister udbytteskatten på ex-datoen, men har krav på at modtage refusion. I modsat fald ville pensionsplanen være lige så dårligt stillet som en sælger, der ikke har adgang til udbytterefusion. Uden refusion har pensionsplanen betalt for meget for aktierne inden ex-datoen.

Pensionsplanens erhvervelse af de i sagen omhandlede aktieposter har været finansieret af de kontante sikkerhedsstillelser fra aktielåntagere. Mens aktielåntagere skal betale et gebyr for aktielånet, skal pensionsplanen betale renter for den kontante sikkerhedsstillelse. Gebyr og rentesats er variable størrelser, der til stadighed genforhandles mellem parterne afhængig af de aktuelle markedsbetingelser. Dette medfører for pensionsplanen en usikkerhed med hensyn til finansieringsomkostningerne, som kan tvinge pensionsplanen til at sælge aktierne inden udløbsdatoen for forwarden eller foranledige pensionsplanen til at forlænge aktielånet og hedgen ud over den oprindelige løbetid.

For det tilfælde at SKAT ikke har villet udbetale den refusion, som pensionsplanen har haft retskrav på, har pensionsplanen ikke haft tilstrækkelig egenkapital til umiddelbart at overleve dette tab af udbytterefusion, der svarede til 27 pct. af ud- byttet. For at imødegå denne risiko har pensionsplanen generelt været nødt til at sælge aktierne på spotmarkedet og kalde aktielånet tilbage, når finansieringsomkostningerne i forbindelse med transaktionen nåede til et beløb svarende til en hidtidige gevinst uden udbytteskatten. Pensionsplanen ville da stadig nå til nulre- sultat, hvis SKAT ikke skulle udbetale refusionen. Dette er således også årsagen til, at gevinsten, der realiseres ved transaktionerne, svarer til samme beløb som udbytteskatten. Refusionen af udbytteskatten er dog kun tilbagebetaling af det beløb, som pensionsplanen mistede, da pensionsplanen havde købt aktien dagen før ex-datoen for en pris inklusive bruttoudbytte, men kun modtog et nettoudbytte fra det danske selskab under afviklingen af market claim-processen.

**2.4.2.2.3 Pensionsplanens og forwardkøberens forretningsmæssige begrun- delse for salg/køb af forward**

Den forretningsmæssige begrundelse for at indgå en forward er i bund og grund at afdække en risikoposition: Har man en aktiepost, kan man afdække risikoen for kurssvingninger ved at sælge en forwardkontrakt. Heri aftales at sælge aktierne på et bestemt tidspunkt i fremtiden til en bestemt pris.

Også køberen af forwardkontrakten sikrer sig mod kurssvingninger ved at købe aktierne under en forwardaftale: Han ved, til hvilken pris han kan købe aktierne i fremtiden. Dette kan være et væsentligt argument for en short seller eller for en aktionær, der sælger sine aktier inden udbyttedatoen for at undgå udbytteskatten.

Hvilken konkret motivation modparterne til forwardkontrakterne har haft, kan pen- sionsplanen ikke udtale sig om, da den ikke havde nogen direkte kontakt til dem. Der var altid en mellemmand imellem pensionsplanen selv og den ultimative forwardmodpart.

Den ultimative modpart til en forward hedge kan have haft utallige grunde til at indgå en aftale med pensionsplanen.

Således kan den ultimative køber af en forward håbe på, at aktieprisen hurtigt sti- ger igen, efter den dato hvor aktien ikke længere bliver handlet med ret til udbytte (ex dividend-datoen). Empiriske undersøgelser viser således, at aktieprisen på ex- dividend datoen ikke altid falder med nøjagtig samme værdi som bruttoudbyttet, samt at aktiekursen stiger hurtigere end normalt efter ex-dividend datoen.

Den ultimative modpart til en forward kan også være en udlænding, der inden udbyttedatoen sælger sin aktie for ikke at miste udbytteskatten, som han ikke er refusionsberettiget til. Han kan ønske at sikre sig retten til at igen købe en tilsvarende post aktier i selskabet fra markedet til en bestemt pris. Han kan ved en høj prisansættelse af forwarden give arbitrageuren et incitament til at købe aktierne inden udbyttedatoen og sælge aktier efter udbyttedatoen. Modparten til forwarden kan derved bringe prisen for forwarden ud af balance med spotmarkedet.

**2.4.2.3 Aktieudlån og finansiering af aktiekøb**

**2.4.2.3.1 Fremgangsmåden ved aktieudlån**

Pensionsplanen finansierer købet af aktierne ved at låne aktierne ud og betale aktiesælger med den kontante sikkerhedsstillelse modtaget fra aktielåntager.

Ex dividend-datoen, der er den første dag, hvor aktierne handles uden krav på udbytte, indtræder mellem handelsdatoen og udlånsdatoen og afviklingsdatoen. Uanset at aktiernes værdi således er lavere på udlånsdatoen end på handelsdatoen, stiller aktielåntager en kontant sikkerhed svarende til købsprisen på handelsdatoen. Dette er helt almindelig markedspraksis, idet aktielångiver i reglen altid forlanger mere i sikkerhed for aktielånet end den aktuelle markedsværdi af aktierne, jf. afsnit 8.1 i dette indlæg. Dette adskiller netop et aktielån fra et lån mod håndpant i aktier. Her er det aktiernes værdi, der overstiger lånets værdi.

Ved aktielån er det dog aktieudlåner, der beskyttes, mod risikoen for at aktielåntager – som i mange tilfælde netop er en short seller – ikke kan levere de lånte aktier tilbage. Derfor overstiger den kontante sikkerhedsstillelse den aktuelle markedsværdi af aktierne.

Som anført ovenfor har pensionsplanen allerede forud for købet af de omhandlede aktier indgået en GMSLA-rammeaftale med aktielånsmellemmanden, der indeholder de generelle betingelser for aktieudlånet. Pensionsplanen og aktielånsmellemmanden aftaler herefter de konkrete vilkår om hvilke aktier, antallet af aktier, låne- gebyret, rentesats osv. Disse aftaler indgås via e-mail. Når aktielånsmellemmanden og pensionsplanen er enige om lånebetingelserne, meddeles aktielånet til clearing-agenten og custodian. Disse kontrollerer, at den fra aktielångiver modtagne besked om aktieudlån svarer til den fra aktielånsmellemmanden modtagne besked. Er dette tilfældet, bekræftes aktielånet.

Idet pensionsplanen anvender den kontante sikkerhedsstillelse fra aktielåntager til at betale købsprisen for aktierne, skal aktielånet afvikles samme dag hos clearing-agenten og custodian som selve aktiekøbet. Uden betaling af købsprisen leveres aktierne ikke til pensionsplanens depotkonto hos custodian.

Afviklingen af aktiekøbet sker parallelt med afviklingen af aktieudlånet. Aktierne registreres dermed tre henholdsvis fire dage efter købet af aktierne, først på pensionsplanens depotkonto og derefter på aktielånetagerens depotkonto. Denne registrering på pensionsplanens konto er af afgørende betydning for, at pensionsplanens market claim afvikles korrekt, og at pensionsplanen modtager udbyttet, der i første omgang var sendt forkert af sted af VP Securities til sælgerens konto.

Selvom samtlige betingelser aftales pr. E-mail, når selve aktielånet indgås, betyder det ikke, at betingelserne for aktielånet er fastlåst. Da aktielånene ikke havde en fast løbetid (se: "*term: open*") var de åbne for konstante genforhandlinger, dvs. at pensionsplanen på ethvert tidspunkt kunne forlange et andet gebyr, og at aktie- låntageren på ethvert tidspunkt kunne forlange en anden rente ved at true med straks at opsige lånet. Havde pensionsplanen interesse i at lade aktielånet løbe videre, ville denne acceptere de ændrede betingelser. Tilsvarende forholdt det sig for aktielåntageren.

Som eksempel på disse e-mails, ved hvilke aktielånsbetingelserne blev løbende ændres, fremlægges <u>bilag 79</u>.

Den af Skattestyrelsen i det sammenfattende indlæg af den 9. august 2019 i førersagerne, afsnit 4.5, side 28, anførte formel er derfor ganske rigtig, men den kan ikke anvendes til at nå frem til det nøjagtige beløb, som den samlede Stock Lending Fee udgjorde. Uden at kende den til enhver tid gældende nøjagtige rentesats, der fandt anvendelse hver enkelt dag, er det ikke muligt at regne baglæns, sådan som Skattestyrelsen forsøger på side 29. Den af Skattestyrelsen påståede "regnefejl" kan ikke konstateres.

Da Skattestyrelsen anvender den forkerte rentesats på samtlige beregninger af samtlige aktielån for alle pensionsplanerne, kommer styrelsen naturligvis også til samme "regnefejl" i alle sagerne. Når Styrelsen når den konklusion, at der forelig- ger en fejl i alle sagerne, burde Styrelsen nærmere komme til den konklusion, at der må være en fejl i styrelsens fremgangsmåde og tage variable rentesatser i betragtning for de forskellige dage.

At Skattestyrelsen ikke kan få styrelsens egne beregninger til at stemme, er ikke et tegn på svindel, men et tegn på at styrelsen ikke ved, hvordan aktielånsbranchen fungerer i realiteten.

### 2.4.2.3.2 Pensionsplanens og aktielåntagers forretningsmæssige begrundelse for aktieudlån

Pensionsplanen har til betaling af de købte aktier brug for kontante midler. Disse fremskaffes ved at låne aktierne ud og modtage en kontant sikkerhedsstillese for aktierne, der svarer til købsprisen. Finansindustrien taler herved om såkaldte "cash-neutral-transactions".

Aktielåntageren kan have mange bevæggrunde for at ville låne aktierne.

Det er således <u>ikke</u> korrekt, når Skattestyrelsen påstår, at aktielåntageren alene har haft short selling som formål.

Aktielåntageren kan således have brug for de lånte aktier til hedging. Aktielåntageren kan også være en bank, der ønsker af komme af med store likvide pengemidler for at have et andet, mere værdifuldt aktiv i regnskabet end kontante pengemidler. En aktielåntager kan ligeledes være et investeringsselskab, der skal respektere en bestemt allokering af sine aktiver (risikospredning) og derfor har brug for flere aktier i sit depot på regnskabsdatoen.

Den Europæiske Centralbank henviser på sin internetside (<u>https://www.ecb.eu- ropa.eu/explainers/tell-me-more/html/securities_lending.de.html</u>) også udtrykkeligt til, at der eksisterer mange årsager til at låne en aktie: Hvis man kun midlertidigt har brug for en aktie i en enkelt dag eller enkelte uger, så er det ofte billigere, hurtigere og mindre risikabelt at låne aktierne i stedet for at købe dem. Mange forskellige strategier, der bruges på de finansielle markeder, beror på aktielån. De lånte aktier kan bruges til handel (løbe en risiko for at realisere en gevinst), arbitrage (realisere en risikofri gevinst fra prisforskelle) eller hedgingformål (nedsætte risiko). Hvis aktier af en hvilken som helst grund leveres sent, kan aktielån være en mulighed for at fremskaffe de manglende aktier til tiden.

Det bør i dette sammenhæng bemærkes, at verdens største nationalbanker selv agerer som låntager af værdipapirer som middel til at realisere deres pengepolitik. Herved kan nationalbanker pumpe yderligere likviditet ind i markedet med henblik på at øge pengemængden og derigennem øge inflationen. Således er det også alment kendt, at den schweiziske og japanske nationalbank er registrerede som verdens største ejere af børsnoterede aktier – om disse nu er købt eller lånt.

Størrelsen af den globale aktieudlånsindustri udgør USD 10 billioner, hvorfor det selvsagt er umuligt at redegøre for alle de mulige bevæggrunde, som en aktielåntager kan have.

Aktielåntageren vil derfor ikke nødvendigvis have den forventning, at aktieprisen vil falde, således som Skattestyrelsen påstår i indlægget.

Aktielåntageren og pensionsplanen har modsatrettede interesser: Mens pensionsplanen har aktier og har brug for kontante pengemidler, har aktielåntageren – der råder over kontante pengemidler – brug for aktierne. Begge parter i et aktieudlån tager betaling for deres ydelser: Aktielåntager forlanger renter på den kontante sikkerhedsstillelse, som han skal stille, og pensionsplanen forlanger et gebyr for at låne aktierne ud. Hvem, der herved realiserer et tab, og hvem, der realiserer en gevinst, afhænger af de aktuelle markedsbetingelser og de involverede parters forhandlingsevner.

### 2.4.2.3.3 Øvrige bemærkninger til finansiering af aktiekøb

Pensionsplaner, der ikke har tilstrækkelig egenkapital til selv at betale for aktierne, handler, under det der er kendt som "margin trading" eller gearing. Herved kan handles et enormt antal aktier (eller andre aktiver) uden at anvende egenkapital. Alt, hvad investoren har brug for, er en prime broker, der forsyner investoren med den nødvendige kapital.

Arbitragetransaktioner (ikke blot dem, der foretages omkring udbyttedatoen) kan finansernes uden egenkapital, når gevinsten ved at købe en aktie på spotmarkedet og samtidig sælge derivativet på forwardmarkedet straks kan determineres. I reglen er prisforskellen mellem spot- og forwardmarked minimal. Der skal derfor et enormt handelsvolumen til for at skabe nok gevinst, til at strategien giver nok af- kast til at betale samtlige tjenesteydelser i denne forbindelse.

Prime brokere, der i nærværende sager var custodians, og clearing-agenterne behøver ikke nødvendigvis selv direkte at finansiere investoren i form af en kredit.
Prime brokeren kan også blot agere som garant for, at betalingen af aktierne vil ske. Skaffer pensionsplanen sig de nødvendige finansielle midler til at betale for aktierne ved at låne disse ud mod en kontant sikkerhedsstillelse, begrænser prime brokerens rolle sig til at være garant.

### 2.4.2.4 Afvikling af transaktionerne (settlement)

Selve afviklingen af aktiekøbene blev indtil 2015 gennemført fire dage og fra 2015 tre dage efter de omhandlede køb af aktier og salg af forwards. Aktiekøbene afvikledes ved clearing og afregning (settlement). Det var clearing-agentens opgave at beregne, hvilken sum penge der i alt skulle fra købers custodian til brokeren (og derfra videre til den ultimative sælger), og hvor mange aktier der i alt skulle fra custodians depotkonto til pensionsplanens depotkonto.

Disse afregninger kan ske på brutto- eller nettobasis. Det betyder, at hver eneste handel enten kan betales separat, og hver eneste antal aktier overdrages separat til pensionsplanens custodian (bruttoafvikling). Alternativt kan samtlige købs- og salgssummer, der skal udredes mellem brokerens (= sælgerens) custodian og køberens custodian, modregnes hinanden, og samtlige tilgange og salg af aktiepo-

ster nettes (modregnes), således at der kun overføres en enkelt nettosum penge, og der kun overdrages en samlet nettopost af aktier mellem købers og sælgers custodian (nettoafvikling efter netting).

Anvendes der netting under clearing- og settlementproceduren, kan en aktie aldrig spores fra den ultimative sælger, til den pensionsplan der købte aktien. Efter netting af alle køb og salg vil pensionsplanen med høj sandsynlighed netop ikke modtage en aktie, der på et tidspunkt lå i brokerens eller den ultimative sælgers depot, men en aktie, der tidligere lå i depotet for en anden kunde hos samme custodian. Dette er netop formålet med netting: Der overdrages færre aktier mellem diverse custodians.

Skulle pensionsplanen på dagen for afviklingen af handlen endnu ikke have modtaget den kontante sikkerhedsstillelse for aktieudlånet, hæfter clearing-agenten over for brokeren (sælgeren) for betalingen af købsprisen. Efter købs- og salgsordre er matchet, kan afviklingen af handlen ikke længere stoppes. Clearing-agenten har pligt til selv at betale aktierne, hvis køber ikke har tilstrækkelige midler.

Det bemærkes, at clearing-agenten i ingen af de af pensionsplanen gennemførte handler har måttet udrede købsprisen, indtil et aktielån var på plads.

Pensionsplanen fik samme dag <u>afviklet</u> aktiekøbet, forwarden og aktieudlånet. Pensionsplanen registreredes herved fire henholdsvis tre dage efter købet som ejer af aktierne. Pensionsplanen var således i en periode af fire henholdsvis tre dage ejer af aktierne, uden at dette var registreret hos custodian. Registreringen hos custodian skete først, når pensionsplanen betalte for aktierne og fik dem leveret til sin depotkonto. Dette betød, at den oprindelige ejer i de første fire henholdsvis tre dage efter købsaftalens indgåelse stadig var registreret som ejer af aktierne, selvom vedkommende ikke længere var den retmæssige ejer af aktierne.

Efter at pensionsplanen havde været retmæssig ejer af aktierne i flere dage, lånte pensionsplanen aktierne ud, således at købesummen kunne erlægges. Aktielåntager blev fra dette tidspunkt registreret som den nye civilretlige ejer.

Registreringen af ejerskabet af aktierne er under dansk lovgivning dog ikke nogen forudsætning for at erhverve ejerskab. Registreringen er kun deklaratorisk og tjener sikringen af rettighederne som ejer mod tredjemand. På dette punkt adskiller dansk lovgivning sig fundamentalt fra tysk lovgivning. Det er derfor så fatalt for Skattestyrelsen at basere hele styrelsens argumentation i sagen på tysk retspraksis.

Skattestyrelsen tillægger registreringen af ejerskabet hos custodian en betydning for ejerskabet, som denne ikke har. Pensionsplanens ejerskab starter ikke først ved registreringen af købet hos custodian, hvorfor der heller ikke er tale om et "gennemgangs-ejerskab" af aktierne for få minutter, indtil først pensionsplanen registreres som ejer, og aktielåntager dernæst umiddelbart efter registreres som civilretlig ejer under aktieudlånet. Pensionsplanen var ejer af aktierne allerede fra matchingen af købsordren.

**2.4.2.5 Transaktionernes løbetid**

Som anført ovenfor blev de købte aktier aldrig leveret under forward hedgen, idet pensionsplanen altid differenceafregnede mellemværendet med forwardmodparterne.

Pensionsplanen holdt aldrig aktierne i netop samme periode som forward kontraktens løbetid. Gennemsnitligt gik der 90 dage mellem pensionsplanens køb og salg af aktierne. Denne løbetid blev opnået ved enten (1) at forlænge forwardkontrakterne (såkaldt "roll-over"), (2) ved at købe en anden forward fra markedet med samme afviklingsdato som den oprindeligt solgte forwardkontrakt eller (3) ved en tidligere differenceafregning af den solgte forwardkontrakt. At forwardens løbetid generelt ikke blev

overholdt, er dokumentation for, at det drejer sig om ægte transaktioner, idet de er underlagt marke-dernes bevægelser.

Skattestyrelsens påstand om, at pensionsplanen skulle have handlet aktierne så hurtig efter hinanden, at det ikke var muligt at identificere den retmæssige ejer, er således tydeligvis ikke korrekt. Når der går 90 dage mellem køb og salg af aktierne, giver det ingen mening at tale om "looping" af aktierne.

Den af Skattestyrelsen fremførte påstand om "looping" lader til at være en påstand, der helt ukritisk er overtaget fra de tyske "cum ex-sager". Dette, til trods for at Skattestyrelsen og Skatteministeriet begge er af den overbevisning, at (1) cum ex-trading ikke er mulig i Danmark, og at (2) ingen af pensionsplanerne angiveligt slet ikke skulle have købt nogen danske aktier. Ønsker Skattestyrelsen virkelig at støtte sig til den tyske argumentation, må Skattestyrelsen først indrømme, at (1) dette drejer sig om en cum ex-sag, og (2) alle pensionsplanerne virkelig købte og solgte danske aktier. Tyskerne har, i alle de mange år de har kæmpet for at ændre lovgivningen for at forhindre cum ex-trading, aldrig påstået, at der slet ingen handel fandt sted. Tyskerne indrømmer desuden, at der eksisterede en mangelfuld lov-givning.

Pensionsplanen var i stand til at lade 90 dage gå, inden de solgte aktierne igen, fordi finansieringen var sikret ved et aktieudlån. Så længe pensionsplanen realiserede et positivt resultat ved aktieudlånet (dvs. så længe aktieudlånsgebyret oversteg renterne på den kontante sikkerhedsstillelse), eller pensionspla-nen i det mindste ikke realiserede et tab, der oversteg arbitragegevinsten, kunne pensionsplanen holde på aktierne og lade aktielånet løbe videre.

I de tilfælde hvor gebyret for aktieudlånet oversteg renterne, som pensionsplanen skulle betale for den kontante sikkerhedsstillelse, og pensionsplanen således realiserede en gevinst på at opretholde aktie-udlånet, var det enten modtagelsen af re- fusionen eller udviklingen af priserne på aktiemarkederne, der bevirkede, at pensionsplanen lukkede samtlige positioner. Da forwardkontrakten var solgt, til en pris der var ude af balance med det aktuelle aktiemarked, kunne den normale prisudvikling af såvel ak-tiemarkedet som også forwardmarkedet bevirke, at pensionsplanen ville realisere de hidtidige gevin-ster og ikke løbe yderligere risici.

Den kalkulerede gevinst, som pensionsplanerne skulle realisere, lå på samme niveau som udbytteskat-ten, og når den var nået, var den målsatte gevinst realiseret, og positionerne lukket.

**2.4.2.6    Positionerne lukkes**

Som alle pensionsordninger har en solo 401K-pensionsplan som mål at generere et overskud og under alle omstændigheder undgå at realisere tab.

Udbyttearbitrage er her en oplagt investeringsform, idet traderen ved en nøje overvågning af investe-ringen kan lukke positionerne i tide til at undgå at realisere et tab.

Pensionsplanen ved, i det øjeblik hvor aktierne købes, og forward kontrakten sælges, hvilken gevinst der kan realiseres (købs- og salgspriser er begge kendte). De eneste usikkerhedsfaktorer, som transak-tionen er forbundet med, er, (1) om og hvornår refusionen udbetales, og (2) omkostningerne forbun-det med aktieudlånet og dermed med finansieringen af aktiekøbet.

Pensionsplanen ved, at salgsprisen på forwarden ligger under købsprisen for aktierne. Det er også gan-ske normalt, da udbyttet forfalder mellem aktiernes købsdato og forwardkontraktens udløbsdato. Hvis salgsprisen på forwarden plus bruttoudbyttet ligger over aktiernes købspris (på spotmarkedet), kan

pensionsplanen regne med at realisere en gevinst. Fra denne gevinst er pensionsplanen kun nødt til at trække omkostningerne for aktieudlånet fra.

Betingelserne for aktieudlånet (= renterne på den kontante sikkerhedsstillelse og gebyret for aktielånet) er konstant genstand for genforhandlinger, idet både aktie- långiver og aktielåntager på ethvert tidspunkt kan opsige aktielånet. Det betyder i praksis, at de aktuelle markedsbetingelser for aktieudlån konstant har direkte indflydelse på omkostningerne for transaktionen. Stiger omkostningerne for aktie- udlånet, således at pensionsplanen ikke længere kan realisere en gevinst, hvis refusion ikke modtages, er pensionsplanen nødt til at lukke samtlige positioner: sige aktieudlånet op, sælge aktierne og købe en forward/forwarden.

Aktielånet kan siges op med dags varsel.

Forwardkontrakten kan enten købes tilbage, eller pensionsplanen kan indgå en tilsvarende forward-kontrakt over køb af samme antal aktier, som den tidligere har solgt, med samme afviklingsdato som det oprindelige salg.

Salget af aktierne sker helt efter samme procedure som købet af aktierne beskrevet ovenfor. Nu er pensionsplanen blot sælger ikke køber.

### 2.4.2.7    Gevinsten realiseres

Pensionsplanen starter hele transaktionen med et likviditetsmæssigt tab: Pensionsplanen har købt ak-tierne for deres fulde værdi – inklusive bruttoudbyttet – og den næste dag (på ex-datoen) handles ak-tierne til en lavere værdi. Teoretisk set skulle denne lavere værdi svare til bruttoudbyttet. Markederne reagerer dog anderledes end teorien. Sommetider falder aktieprisen mere, sommetider mindre end bruttoudbyttet.

Faktum er dog, at markedsprisen af de af pensionsplanen købte aktier allerede dagen efter købet fal-der. Dette "tab" udlignes af to betalinger: nettoudbyttet og refusionen. Det betyder, at tabet på den meget likvide aktieværdi erstattes af to mindre likvide aktivposter: kravet på nettoudbyttet og refu-sionskravet. Mens nettoudbyttet i reglen modtages få dage efter aktiekøbet, varer det flere måneder, inden refusionen bliver modtaget.

Bogholderimæssigt realiserede pensionsplanen heller ikke noget tab dagen efter købet, på trods af at markedspriserne for aktierne faldt, for pensionsplanen solgte samtidig en forward. Summen af værdien for forwarden, nettoudbyttet og udbytterefusionen var altid mindst den samme som købsprisen af ak-tierne. Formålet med en forward-hedge er jo netop at udligne det tab der sker på værdien af aktierne ved en tilsvarende stigning i værdien af hedgen.

Gevinsten, som pensionsplanen realiserer, stammer således ikke fra refusionen. Refusionen inddækker kun tabet på aktieværdien. Gevinsten stammer derimod enten fra et overskud realiseret under aktie-udlånet (hvis gebyret for aktieudlånet oversteg renterne, der skule betales på den kontante sikkerheds-stillelse), fra salget af aktierne eller fra differenceafregningen af forwardkontrakten.

Grunden til, at det regnskabsmæssigt giver indtryk af, at pensionsplanens gevinst var refusionen (jf. Skattestyrelsens sammenfattende indlæg i førersagerne af den
9. august 2019, afsnit 4.2, side 24), er den, at pensionsplanen principielt lukkede sine positioner, når den gevinst, som pensionsplanen kunne realisere under aktieudlånet, aktiesalget og/eller forwardkon-trakten udgjorde samme værdi som refusion. Ville pensionsplanen lade investeringen løbe videre,

kunne pensionsplanen risikere at realisere et tab: Nemlig i tilfælde af at refusionen ikke ville blive ud-
betalt.

### 2.4.2.8 Sammenfattende bemærkninger om forretningsmodellen og trans- aktionerne

I nærværende sag købte pensionsplanen de danske aktier inden udbyttets ex- dato, dvs. inden udbyt-
tet blev trukket fra aktien. Den blev ejer af aktierne og udbyttet på baggrund af en endelig og bindende
aftale om køb af aktierne.

Denne aftale blev indgået, ved at pensionsplanens købsordre elektronisk blev matchet med en salgsor-
dre ved en mægler. Pensionsplanen betalte 100 pct. af den aktuelle markedspris, inden udbyttet blev
trukket fra aktiens værdi. Købsprisen var således inklusive 100 pct. af bruttoudbyttet.

Da pensionsplanen havde adgang til en dobbeltbeskatningsoverenskomst, der giver den ret til refusion
af udbytteskatten, havde aktierne også denne værdi for pensionsplanen, selvom de umiddelbart kun
modtog nettoudbyttet på sin konto hos sin custodian.

Aktierne blev betalt tre henholdsvis fire dage efter købet ved at låne aktierne ud efter udbyttedatoen
og derved modtage en kontant sikkerhedsstillelse svarende til købsprisen for aktierne. De enkelte ak-
tielån blev trukket under GMSLA'en, der var indgået forud for aktiehandlen som en rammeaftale. De-
taljerne for hvert enkelt aktielån blev fastlagt ved e-mailkorrespondance. E-mailkorrespondancen frem-
lægges som bilag 80.

Den økonomiske risiko forbundet med transaktionen blev styret ved hjælp af en forward hedge (i 2012
anvendtes futures til samme formål). Samme dag som aktierne blev købt, blev der indgået en forward
hedge over salget af aktierne på et senere tidspunkt til en fastlagt pris. Aktierne blev dog i ingen af sa-
gerne leveret under forward hedgen. Forward hedgen blev altid differenceafregnet. Derved var risi-
koen for at miste ejerskabet til aktierne ved indgåelsen af hedgen udelukket.

Til illustration af forløbet af transaktionerne i den af pensionsplanen gennemførte udbyttearbitrage
henvises til tidslinjen nedenfor. Tidslinjen illustrerer endvidere, at pensionsplanen umuligt kan have
solgt de "samme" aktier under en forwardkontrakt, som de lige havde købt samme dag, selv hvis der
ses bort fra det faktum, at forwarden generelt blev afviklet ved differenceafregning, og at der aldrig
blev leveret aktier under forwardkontrakten.



Det var forskellen mellem prisen for aktien på spotmarkedet og prisen for aktien på forwardmarkedet, der fik pensionsplanen til at købe aktierne umiddelbart før udbetalingen af udbytte. Pensionsplanens trader kunne se, at salgsprisen på forward- markedet ikke lå lige så langt under prisen på spotmarke- det, som bruttoudbyttet matematisk ville medføre.  Dette kan som anført bland andet skyldes, at de sæl- gere, der ønsker at købe aktierne tilbage efter udbyttedatoen, tilbyder mere end normalt for ak- tierne, da udbyttet af deres aktier beskattes med 27 %, hvorfor disse sælgere kan tilbyde en højere pris for forwarden end andre købere. Grunden hertil er en øget efterspørgsel fra markedet på at købe ak- tier efter udbyttedatoen (fx fra dem der har solgt aktierne inden udbyttedatoen).

Ved at købe aktien, modtage nettoudbyttet samt refusion af indeholdt udbytteskat og sælge aktien igen til en lavere pris (aktieprisen falder efter udbetaling af ud- bytte) kunne pensionsplanen realisere en gevinst. Det var denne gevinst, der var formålet med hele transaktionen – og det, som skabte det økonomiske overskud. Hensigten med transaktionerne var således ikke blot at opnå refusion af udbyt- teskat fra de danske skattemyndigheder, sådan som det påstås af Skattestyrelsen. Tværtimod bevir- kede den efterfølgende refusion af indeholdt udbytteskat blot, at dispositionen var skattemæssigt neutral for pensionsplanen.

Udbyttearbitrage er således intet andet end en normal arbitrageforretning. Det eneste specielle ved udbyttearbitrage er, at den gennemføres omkring datoen for udlodningen af udbyttet. Det er netop det faktum, at selskabet har til hensigt at ud- lodde et udbytte, der bringer markederne (spot- og forwardmarkedet) ud af balance.

Udenlandske investorer, der ikke er berettigede til udbytterefusion, søger at sælge deres aktier, inden udbyttet udloddes, for at købe dem tilbage fra markederne efter udlodningen. (Danske) aktionærer, der hellere vil realisere et resultat, der er skattepligtigt i henhold til aktieavancebeskatningsreglerne, end at modtage et aktieudbytte, søger ligeledes at sælge deres aktier til markedet inden udlodningen af udbyttet. Disse aktionærer vil eventuelt også købe aktier tilbage fra markedet efter udbyttedatoen. Og endelig er der rene spekulanter, der mener, at aktieprisen ikke falder, med netop det beløb der ud- betales i udbytte, som bringer aktier på marke- det lige inden udbyttedatoen. Alle disse grupper af in- vestorer forårsager bevægelser på markedet lige omkring udbyttedatoen. Disse bevægelser er ikke identiske på spot- og forwardmarkedet. Prisen på spotmarkedet for en og samme aktie kan udvikle sig anderledes end prisen på forwardmarkedet. Derved opstår muligheden for en arbitrageforretning.

Den eneste grund til, at udyttearbitrage kaldes udbyttearbitrage, er, at denne arbitrageforretning fore- tages, netop når udlodningen af udbyttet bringer specielt store bevægelser ind i markedet.

Lignende arbitrageforretninger foretages hele året rundt, idet spot- og futuremarkedet ikke kun afviger fra hinanden omkring udbyttedatoen.

Skattestyrelsen interesserer sig dog kun for udbyttearbitrage, fordi denne foretages omkring udlod- ningsdatoen for udbyttet og derved udløser en udbytteindkomst for arbitrageuren med deraf følgende retskrav på refusion af indeholdt udbytteskat i henhold til de gældende regler herom.

Efter pensionsplanen allerede i sit 2. indlæg udførligt havde beskrevet udbyttearbitragen for Skattesty- relsen, var det Skattestyrelsen selv, der i styrelsens 2. indlæg af den 18. januar 2019 for første gang be- tegnede udbyttearbitrage som en "pengemaskine". Dette begreb er ikke pensionsplanernes, således som Skattestyrelsen igen påstår det i styrelsens sammenfattende indlæg i førersagerne af den 8. au- gust 2019, afsnit 8.1.

Utroligt nok bliver Skattestyrelsen gennem samtlige indlæg ved med at benægte eksistensen af udbyt- tearbitrage (senest i det sammenfattende indlæg i førersagerne af den 9. august 2019, afsnit 4.3, side

26). Dette, til trods for den megen omtale denne investeringsstrategi har fået under betegnelsen "cum ex" ikke kun i dansk, men også i international presse, og den grundige undersøgelse foretaget af ESMA på foranledning af Europamentet, jf. Europaparlamentets forslag til beslutning om en fælles løsning fra november 2018, som her fremlægges som <u>bilag 81</u>. Da Skattestyrelsen den 9. august 2019 fremsendte sit sammenfattende indlæg i førersagerne, forelå ESMAs rapport om udbyttearbitrage allerede. Det hjælper derfor ikke Skattestyrelsens sag at benægte realiteterne.

Det vidner også kun om naivitet at tro, at det udelukkende er pensionsplanerne, der realiserer en gevinst ved udbyttearbitragen. Det er dog kun synligt for pensionsplanerne, hvilken gevinst de selv realiserede ved forretningen. Det er jo deres forretning. Pensionsplanerne kan umuligt redegøre for uafhængige tredjeparters forretningsmodeller og profit.

Pensionsplanerne skal naturligvis ikke dele deres gevinst med modparterne til aktielånet og forwarden. Det ville jo have betydet et illegalt samarbejde mellem disse uafhængige markedsdeltagere. Aktielåntager og forwardmodparten har forretningsmæssige interesser, der er modsat dem, som pensionsplanerne har. De samarbejder naturligvis ikke og deler ingen gevinst.

Efter så mange siders beskrivelser af udbyttearbitrage gennem de tidligere indlæg er det også ufatteligt, at Skattestyrelsen stadig ikke kan eller vil forstå pensionsplanernes rolle. Skattestyrelsen opremser i styrelsens indlæg af den 9. august 2019, afsnit 4.3, side 27, de forskellige aktører uden at forstå pensionsplanens rolle.

Således anføres partnerne, som følger:

| **Part** | **Ydelse** |
|---|---|
| Sælger | Leverer aktierne |
| Pensionsplanen | ? |
| Køber | Aftager aktierne. |
| Aktielåntager | Leverer finansiering. |
| Forward-køber/-sælger | Afdækker kursrisici. |
| Custodian | Indestår for solvens og gennemførsel af transaktioner. |

Hertil bemærker Skattestyrelsen:

> *"Som det fremgår, byder hver part – bortset fra pensionsplanen – efter det oplyste ind med noget, der er nødvendigt, for at transaktionerne kan gennemføres med det ønskede resultat. Det siger derfor sig selv, at alle parter skal have en del af for- tjenesten, før det giver mening for dem at indgå i arbitragefor- retningen. Ellers er der intet forretningsmæssigt rationale for dem for at deltage i dette set-up, der naturligvis medfører en række risici, f.eks. medkontrahenters misligholdelse og med- kontrahenters insolvens."*

Hvad Skattestyrelsen nægter at acceptere, er, at pensionsplanen er køberen af aktierne. Der er ingen grund til spørgsmålstegnet ud for pensionsplanen. Pensionsplanen er køberen af aktierne, da pensionsplanen netop råder over en gunstig skattestatus, som den anvender til at realisere sin gevinst.

De andre parters forretning er ikke udbyttearbitrage. Der er derfor heller ingen grund til, at de skulle have del i pensionsplanens udbyttearbitragegevinst. Det giver absolut ingen mening, at køberen og sælgeren at aktier eller køberen og sæl- gerne af en forwardkontrakt skulle dele gevinsten, der blev re- aliseret ved transaktionerne. Det gør købere og sælgere aldrig.

**2.4.2.9 Eksempler på transaktioner ved udbyttearbitrage**

Til illustration af økonomien i de af pensionsplanens gennemførte udbyttearbitrageforretninger gen- nemgås i det følgende en transaktion gennemført af pensionsplanen. Det drejer sig om købet af en post aktier i TDC A/S i 2015).

En gennemgang af alle pensionsplanens transaktioner ville vise, at pensionsplanen sommetider realise- rede en gevinst på køb og salg af aktierne ligesom i enhver anden investering i spekulationsøjemed. Sommetider blev gevinsten derimod realiseret på forward hedgen. Her virkede hedgen netop efter hensigten: modvirke tabene på selve aktietransaktionen. At gevinsten opstod på så forskellig vis, er netop dokumentation for realiteten af transaktionerne, og for at de på ingen måde var centralt organi- seret eller styret.

Appendix 1 viser ligeledes en oversigt over samtlige aktietransaktioner, som pensionsplanen gennem- førte. Det fremgår heraf, hvordan det varierer, hvor gevinsten realiseres: på aktiehandlen eller forward hedgen. Dette er typisk for udbyttearbitragetransaktioner.

En udbyttearbitragetransaktion kan opdeles i tre transaktioner: en aktiehandel, en forwardkontrakt og et aktieudlån.

Køb/salg af aktier og forwardkontrakten:

Pensionsplanen afgav den 5. marts 2015 en købsordre på 2.358.808 TDC A/S aktier til en pris på kr. 54,00 pr. aktie, i alt kr.  127.375.632,00. Betaling, levering af aktier og registrering var fastsat til at ske den 10. marts 2015. Idet købet indgås, samme dato som udlodningen af udbyttet besluttes, markeres handlen i clearing- systemet som en såkaldt "cum ex trade". Dette markerer over for de involverede custodians, at der efter afviklingen af aktiehandlen skal realiseres en market claim. Dette sikrer, at der ikke er to personer, der begge modtager udbyttet, modtager en DCA og derved kan anmode om refu- sion.

Pensionsplanen indgik – ligeledes den 5. marts 2015 – en forwardkontrakt (en finansiel kontrakt) ved- rørende salg af 2.358.808 TDC A/S aktier til en pris på kr. 53,00 pr. aktie til afvikling den 19. juni 2015.

Pensionsplanen indgik den 2. juni 2015 en ny forwardkontrakt med samme afviklingsdag, nemlig den 19. juni 2015 vedrørende køb af 2.358.808 TDC A/S aktier til en pris på kr. 49,68 pr. aktie. Den lukkede derfor den åbne position og havde en samlet gevinst på forwarden på kr. 3,56 pr. aktie.

Den 2. juni 2015 solgte pensionsplanen aktierne med valutadato den 4. juni 2015 til en pris på kr. 49,69 pr. aktie, i alt kr. 117.209.169,52. Pensionsplanen havde således et nettotab på kr. -4,31 pr. aktie, i alt kr. -10.166.462,48.

Aktiehandlerne og forwardkontrakterne gav tilsammen et samlet tab på kr. 0,75 pr. aktie, i alt et tab på kr. 1.774.059,50.

Aktieudlånet

Den 9. marts 2015 afgav pensionsplanen en ordre til afvikling den 10. marts 2015 om at udlåne 2.358.808 TDC A/S aktier mod kontant sikkerhedsstillelse af kr. 54,00 pr. aktie, i alt kr. 127.375.632,00. Pensionsplanen modtog således kr. 127.375.632,00 som sikkerhed for at få aktierne tilbage.

Aktieudlånet blev den 2. juni 2015 sagt op med valutadato den 4. juni 2015. Dette havde den konsekvens, at aktierne skulle leveres tilbage. Aktierne havde da en markedsværdi på kr. 49,69 pr. aktie, i alt kr. 117.209.169,52.

Dette beløb samt det samlede beløb af den løbende regulering af værdiansættelsen, MTM, som udgjorde kr. -10.166.462,48 skulle tilbagebetales til aktielåntager, i alt kr. 127.375.632,00.

Dermed var aktielåntageren sikret at modtage det fulde beløb, som han havde stillet i kontant sikkerhed for aktielånet.

Herudover skulle pensionsplanen betale rente på aktieudlånet på kr. -213.000,36 samt modtage gebyr for aktieudlånet på kr. 265.130,02, i alt betale netto kr. 52.129,66.

Udbytte og refusionsbetalingen

Interimudbyttet var blevet vedtaget den 5. marts 2015.

Aktierne blev handlet uden udbytte fra den 6. marts 2015 (ex-dato).

Pay day, dvs. dagen hvor udbyttet udbetales, var den 10. marts 2015.

Pensionsplanen modtog nettoudbyttet i form af en market claim, idet sælger af aktierne stadig var registreret som ejer af aktierne på record day. Pensionsplanene var på record day (den 9. marts 2015) endnu ikke registreret som ejer af aktien, da afviklingen af købet først skete den 10. marts 2015. Record day er i Danmark dagen før pay day. VP Securities udbetalte derfor umiddelbart udbyttet til den tidligere ejer, der stadig var registreret som ejer af aktien hos VP Securities, den 9. marts 2015. I henhold til den såkaldte "market claim proces" er sælgerens custodian forpligtet til at debitere udbyttet fra sælger og kreditere udbyttet hos køber (el- ler sende udbyttet videre til købers custodian, så han kan kreditere købers konto). Det er således køberen af aktierne, der modtager udbyttet og er refusionsberettiget.

Bruttoudbyttet betalt af TDC A/S var kr. 1,00, i alt kr. 2.358.808,00 for pensionsplanens aktier.

Heraf udgjorde nettoudbyttet kr. 1.721.929,84 og udbytteskatten kr. 636.878,16.

Betalingen af disse to beløb til pensionsplanen udlignede blot tabet, som pensionsplanen havde på ex-datoen, da aktierne på denne dato mistede det tilsvarende beløb i værdi. Refusionen var således ikke drivkraften til investeringerne i de danske aktier. Grunden til at investere i de danske aktier var prisforskellen på spot- og forwardmarkedet, der var udløst af udlodningen af et udbytte.

**3 PENSIONSPLANEN BLEV DEN CIVILRETLIGT OG SKATTEMÆSSIGT RETMÆSSIGE EJER AF AKTIERNE**

**3.1 Pensionsplanen blev den civilretlige ejer af aktierne**

Som udgangspunkt gælder principielt, at skatteretten styres af civilretten. Dette gælder tillige i forhold til spørgsmålet om opnåelse af ejendomsret til aktier.

Det er et grundlæggende obligationsretligt princip i dansk ret, at ejerskab til et givent aktiv opnås, når der er indgået en endelig og bindende aftale mellem parterne, som er juridisk gyldig. Dette princip gælder også for erhvervelse af aktier.

Ejerskabet erhverves, uanset om køberen måtte misligholde forpligtelsen til at betale købesummen. Af samme grund findes der regler om, at sælger efterfølgende kan hæve salget, hvis der ikke sker betaling af den aftalte købesum, medmindre der alene mangler at blive betalt et uvæsentligt beløb. Disse regler om efterfølgende ophævelse af et salg, hvis ikke køber betaler købesummen, illustrerer med al tydelighed, at betaling af købesummen ikke er en forudsætning for ejendomsrettens overgang. I givet fald ville det ikke være nødvendigt med regler om efterfølgende ophævelse af handlen, i de tilfælde hvor køber ikke betaler den aftalte købesum.

Da betalingen af købesummen ikke er en betingelse for at erhverve ejerskab, leveres aktier (i afviklingsprocessen kaldet settlement), først når betalingen sker (i henhold til princippet "Payment versus Delivery" – DvP).

Konsekvensen heraf er, at:

- Settlement af en aktiehandel, som sker hos clearing- og settlement- agenten, er ikke en forudsætning for at erhverve ejerskab af en aktie.
- Dokumentation af en pengestrøm fra køber til sælger er ikke dokumentation for, at en køber har erhvervet ejerskab til en dansk aktie.
- Dokumentation for overdragelse af en aktie fra sælgers til købers depot er ikke dokumentation for, at en køber har erhvervet ejerskab til en dansk aktie.
- Køberen af en aktie er ejer, allerede inden aktien registreres i hans depot.
- Sælges en aktie, så kort inden udbyttedatoen at aktien endnu ikke er registreret i køberens depot, bliver udbyttet udbetalt til den forkerte via VP Securities og de underliggende subcustodians. Det er med baggrund heri, at købelovens § 19, stk. 1, erklærer køberen af en aktie berettiget til modtagelsen af udbyttet (og dermed til refusion).

I overensstemmelse hermed fastholder bemærkningerne til aktieavancebeskatningslovens § 23 (L78 af den 16. november 2005, jf. bilag 12) således også:

> "Det afgørende for fastlæggelse af afståelsestidspunktet er, hvornår der foreligger en endelig og bindende aftale om afståelsen. For aktier, der er handlet på børsen, vil det være børsnotaens dato (handelsdatoen) der lægges til grund.
>
> Derudover kan fastlæggelsen af erhvervelsestidspunktet have en betydning, f.eks i forbindelse med ny lovgivning. Også her er det afgørende, hvornår der foreligger en endelig og bindende aftale om erhvervelsen. For aktier, der er handlet på børsen, vil det være børsnotaens dato (handelsdatoen), der lægges til grund".

Tilsvarende er anført i Den juridiske vejledning, afsnit C.B.2.1.6.1.

Handelsdatoen for en børsnoteret aktie er således det tidspunkt, hvor køds- og salgsordre "matches". Denne matching af køds- og salgsordre – der sker ved et automatiseret "hand shake" på moderne automatiserede handelsfaciliteter – betegnes som "gennemførelsen af handlen".

Også Skatterådet lader ingen tvivl om, at det civilretlige ejerskab erhverves på handelsdatoen, som netop ikke er afviklingsdatoen, idet det i afgørelsen af den 20. marts 2007 (SKM2008.831.SR) fastholdes, at handelsdatoen ligger efter afgivelsen af en ordre på køb af aktier, men før afviklingen af transaktionen:

> "En bestilling kan ikke sidestilles med et køb […]
>
> […] det er handelsdatoen, der skal lægges til grund ved fastsættelsen tidspunktet, for køb eller salg af aktier. Valørdatoen er således ikke afgørende. […] Det gælder, uanset at valørdatoen først er den 4.1.2006 og uanset at aktierne derfor ikke var med i spørgerens depot pr 31.12.2005)"

Det er dermed på den ene side klart, at en købsordre ikke er nok til at blive ejer af en aktie. På den anden side er det på samme måde klart, at købet endnu ikke behøver at være afviklet ved bogføring på køberens depotkonto. Betaling af aktierne er derfor heller ikke nødvendig for at blive ejer af aktierne, idet købsprisen for aktierne først skal betales ved levering (delivery versus payment), jf. værdipapirhandelslovens § 72/kapitalmarkedslovens § 188, dvs. ved bogføring af aktierne på køberens depotkonto.

Pensionsplanen har i den foreliggende sag afgivet en købsordre til sine brokere om køb af aktier. Disse ordrer blev matchet med salgsordrer, der kom fra andre brokere. Denne matching er selve købsaftalen, der er endelig og bindende. Betalingen og registreringen af aktierne, der bekræfter, at aftalen var endelig og bindende, skete tre til fire dage senere.

Det kan ved sagens afgørelse således lægges til grund, at pensionsplanen var civilretlige ejere af de i sagerne omhandlede aktier.

Af dette civilretlige ejerskab følger ligeledes skattemæssigt retmæssigt ejerskab, såfremt der ikke foreligger en af de af retspraksis udviklede undtagelser.

Retspraksis har især i forbindelse med aktielån fastholdt, at aktielåntager bliver den civilretlige ejer af aktien, men ikke den skatteretligt retmæssige ejer af aktien. Aktielångiver fortsætter med at være den skattemæssigt retmæssige ejer af aktien, helt indtil aktien sælges af aktielåntager til en tredjemand.

På udbyttedatoen havde pensionsplanen ikke lånt aktierne ud. Udlånet skete først tre til fire dage senere. Om aktielåntager efterfølgende lånte aktierne ud, beholdt dem eller solgte dem videre til en tredjemand, kan pensionsplanen ikke vide. Pensionsplanen blev derfor ved med at være den skattemæssigt retmæssige ejer af aktierne, selvom der tre-fire dage senere fulgte et aktieudlån.

At forwardkontrakten blev indgået, samme dag som aktierne blev købt, medfører ligeledes ikke, at pensionsplanen mistede det skattemæssigt retmæssige ejerskab til aktierne.

**3.2 Handel med store aktieposter – shortselling**

Skattestyrelsen mener i det sammenfattende indlæg til førersagerne af den 9. august 2019, afsnit 4.1, side 22-24, at der er handlet urealistisk store aktieposter, og at pensionsplanerne af den grund umuligt kan have været ejere af de omtalte aktier. Styrelsen mener, at det skulle være umuligt at erhverve så

store aktieposter på en enkelt dag. Som eksempel herfor angiver styrelsen et salg af aktier for kr. 3,9 mia., som blev solgt gennem accelereret bookbuilding – ikke på det fri marked.

Styrelsen bemærker således ganske rigtigt, at store aktieposter netop ikke handles på børsen. Til store aktieposter søges alternative markeder OTC.

Ville Skattestyrelsen foretage en lignende analyse af alle handler foretaget fx af Danske Bank, Deutsche Bank, Citibank eller Blackrock, ville skattestyrelsen nå frem til lignende store handler med aktier. Der handles hver dag af alle store aktører på markedet ufatteligt store aktieposter.

Da det ganske rigtigt kan være svært at skaffe store aktieposter, er det evident, at der blandt de aktier, som pensionsplanerne købte, logisk nok må have været en del aktier solgt af short sellere. Hvilke og hvor mange aktier der kom fra long ownere eller short sellere, er umuligt at sige. Men det gælder for enhver køber af aktier. Ingen kan vide, hvem han køber en aktie af. Hverken ved børshandler eller ved OTC-handler.

### 3.2.1 Introduktion til short selling

Short selling er ikke lovreguleret i Danmark med undtagelse af reglerne om forbud mod udækket short selling og enkelte flagningsregler.

Ifølge notat af den 10. april 2018 fra Finanstilsynet vedrørende short selling i Danmark, der fremlægges som bilag 82, betyder short selling i henhold til Finanstilsynets egen definition, , salg af en aktie, som sælger ikke ejer på salgstidspunktet, i modsætning til en almindelig værdipapirhandel, hvor sælgeren ejer det værdipapir, som sælges.

Det er internationalt anerkendt, at en short seller betragtes som dækket, hvis han blot har en ramme-aftale om aktielån på plads, på det tidspunkt hvor han sælger de aktier, han ikke ejer. En sådan ramme-aftale er en GMSLA. Den, der ønsker at sælge aktier, han ikke ejer, skal ved en rammeaftale om ak-tielån blot sikre sig at kunne levere aktierne på leveringstidspunktet. I short selling-branchen tales her-ved også om en "lokaliseringsaftale": Short selleren skal være i stand til at lokalisere de aktier, som dækker hans salg, så han kan levere på afregningstidspunktet. For at udtrykke det med Finanstilsynets ord, jf. bilag 82, side 2, så skal en short seller

> *"altså før salget have været i stand til at låne papiret eller på tilsvarende vis sikret sig at kunne få overført ejerskab til papiret."*

"At være i stand" til at låne er netop ikke det samme som allerede at have lånt. Derfor taler Finanstilsy-net om, at short selleren blot skal sikre sig, at han kan overføre ejerskab.

Short selleren skal med andre ord ikke indgå en **konkret** aftale om lån af et bestemt antal aktier, inden salget foretages, sådan som Skattestyrelsen postulerer i indlægget af den 9. august 2019, idet en sådan aftale ville gøre "short selleren" til den civilretlige ejer af aktien. Han ville dermed slet ikke være short seller længere, men en "long owner seller." Short selling kan derfor (legalt) kun forekomme i form af salg under rammeaftaler om aktielån (medmindre der er tale om short selling foretaget af såkaldte "market makere" – banker autoriseret til at foretage udækket short selling).

Idet en short seller blot skal være dækket i form af indgåelse af en rammeaftale om aktielån, har short selling den konsekvens, at en short seller øger antallet af aktier i handel, og dermed antallet af aktier som indgås endelige og bindende aftaler om køb af. Alle køberne af disse aktier bliver i henhold til ob-ligationsrettens almindelige regler ejere af de erhvervede aktier.

Finanstilsynet fremhæver således også i bilag 82, side 6:

> *"Tilsvarende gør short selling det muligt for market makere at tilbyde deres kunder (detailkunder såvel som institutionelle kunder) at købe et værdipapir, selvom om **market makeren ikke kan skaffe papiret** fra sin egenbeholdning eller via markedet **på tidspunktet for kundens ordre**."* (vores fremhævning)

Short sellere kan i praksis sælge et ubegrænset antal aktier, så længe de blot har lokaliseringsaftaler om aktielån (GMSLA'er), der gør det muligt for dem at levere de solgte aktier. Således var værdien af korte positioner i danske børsnoterede aktier i starten af 2018 ca. kr. 25 mia. svarende til ca. 1 pct. af den samlede værdi af det danske noterede aktiemarked. Og disse tal omfatter kun korte positioner, der hver især har været indberetningspligtige. Har de ultimative sælgere af aktierne, som blev solgt til pensionsplanerne, delvist været short sellere, behøver de ikke nødvendigvis at dukke op i disse statistikker, hvis hver short sellers nettoposition ikke oversteg 0,2 pct. af den af selskabet udstedte aktiekapital.

**Figur 3: Værdien af korte nettopositioner i danske børsnoterede aktier er seksdoblet siden 2013**

Note: Figuren viser markedsværdien i danske kroner af udestående korte nettopositioner over 0,2 pct. af den udstedte aktiekapital i danske børsnoterede aktier fordelt på udstederselskabets sektor samt den relative størrelse ift. det samlede marked. Sektorfordelingen er bestemt ud fra GICS-koder.

Kilde: Finanstilsynet.

Ingen kan skelne mellem aktier solgt af en short seller og aktier solgt af en reel aktieejer (long owner). Det tilgængelige antal aktier i handel stiger dermed ved short selling (midlertidigt) til et antal over 100 pct. af de udstedte aktier. Det er først ved afviklingen (settlement) af aktiehandlerne, at dette overskydende antal aktier i handel bringes tilbage til det reelle antal aktier udstedt af selskabet. Den samlede mængde af demterialiserede aktier vil altid være korrekt på afviklingstidspunktet, når short selleren skal levere de solgte aktier, idet han trækker aktier under aktielånet eller foretager et inddækningskøb på markedet.

Det er således muligt, at der handles flere danske aktier på markedet, end det an- tal der oprindeligt blev udstedt af selskaberne. Short selling har netop den typiske – og tillige **ofte af central-banker og finanstilsyn ønskede (jf. Finanstilsynets rapport on short selling, jf. bilag 82, side 5-6)** – konsekvens, at der er flere aktier til rådighed på markedet, end der oprindeligt er udstedt.

Overdragelsen af *ejerskab* er i henhold til dansk lovgivning fuldstændigt adskilt fra afviklingen af en aktiehandel. Det er tilmed irrelevant for spørgsmålet om ejerskab, om (1) en aktiehandel afvikles "fy-sisk" (ved en "de-registrering" af sælger og en "registrering" af køber ved VP Securities eller et andet depotinstitut), eller om handlen (2) afvikles ved brug af netting (med den konsekvens, at der eventu-elt slet ikke sendes en nettorapport til VP Securities – hvis nettoresultatet er 0).

### 3.2.2 Short selling skaber flere aktier, indtil handlerne bliver afviklet (settlement)

Når en short seller sælger aktier under en rammeaftale om aktielån (GMSLA), skaber han enten flere aktier, end selskabet har udstedt, eller udtrykt anderledes opstår der dobbelt ejerskab til en og samme aktie: Aktielångiveren, der endnu ikke har lånt aktien ud under en konkret aftale om aktielån (men kun har indgået en rammeaftale om et potentielt udlån) er stadig civilretlig ejer af aktien. Samti-dig erhverver køberen civilretligt ejerskab af en aktie ved den endelige og bindende aftale med short selleren.

Det er først ved afviklingen af handlerne (der i reglen sker, to dage efter handlen er indgået ved en endelig og bindende aftale), at antallet af ejere bringes tilbage til antallet af aktier, der er udstedt af selskabet, da der ikke kan registreres mere end én ejer af samme aktie. Det er dette faktum, vi har forsøgt at skitsere med følgende illustration.

Illustrationen viser en kunstig verden hvor et selskab kun at udstedt en enkelt aktie. Dermed kan eje-ren kun sælge en enkelt aktie.

Illustrationen viser dog 3 short sellers, der bringer det samlede antal af aktier i omløb op til 4 aktier, selv om der kun kan leveres en enkelt aktie. Handlet bliver alligevel 4 aktier.

I den her illustrerede situation er der flere aktier der bliver genstand for en endelig og bindende aftale om køb af aktier, og der er således fire købere der bliver ejere af aktierne selv om der kun er en der kan få aktien leveret. Der opstår således en temporær "inflation" af aktier, som Unidroit udtrykker det, på handelsdatoen som igen forsvinder på afviklingsdatoen.





Det er således kun indtil afviklingen af aktiehandlerne, at der eksisterer flere ejere af danske aktier, end svarende til det antal aktier selskaberne har udstedt. Da der ikke "fysisk" kan leveres flere aktier, end selskabet har udstedt, må det dobbelte midlertidige ejerskab skabt af short selleren ophøre, når aktierne skal leveres ved elektroniske bogføringer (posteringer/registreringer) hos den eller de involverede custodians. Om afvikling under anvendelse af netting kan føre til en forlængelse af det dobbelte ejerskab ud over tidspunktet for afviklingen, behøves ikke diskuteres her, da pensionsplanen lånte aktierne ud, på det tidspunkt hvor aktiekøbene skulle afvikles for at kunne betale købsprisen. Pensionsplanens civilretlige ejerskab ophørte derfor også med afviklingen af aktiekøbet, i henhold til den aktieudlånsaftale de indgik pr. e-mail. På udbyttedatoen havde pensionsplanen dog civilretligt ejerskab til aktierne, hvorfor den også var rette indkomstmodtager af udbyttet, med den konsekvens at den havde retskrav på at modtage refusion af indeholdt udbytteskat i henhold til dagældende regler herom.

Hvilke aktier, der har mere end én civilretlig ejer, kan ikke identificeres, idet short sellere agerer under en eller flere rammeaftaler om aktieudlån. Rammeaftalerne (GMSLA'er) om aktielån indgås ofte mellem (long owner-)aktionærer og mellemmænd for aktielån (stock loan intermediaries) på den ene side og short sellere og stock loan intermediaries på den anden side. Aktionæren, der låner sin aktie ud, kender derfor ikke nødvendigvis short selleren. Aktielångiver, der stiller sin aktie til rådighed for et potentielt eller konkret udlån, kender heller ikke den ultimative aktielåntager og dennes motivation og ved langt mindre, om den ultimative låntager overhovedet er en short seller.

Short selleren trækker kun på rammeaftalen (GMSLA) – ofte blot ved e-mails, der fastholder de konkrete betingelser for det konkrete aktielån – hvis og når han skal levere aktierne under clearing- og settlement-processen. Hvis short selleren køber aktier fra markedet igen, inden han skal levere de aktier, han oprindeligt solgte, og han aftaler en kortere leveringstid for aktiekøbet end for aktiesalget

(ved OTC-for- retninger kan leveringsfristen aftales frit), behøver short selleren aldrig at trække nogen aktier under GMSLA. Han har ikke desto mindre overdraget ejerskab til ak- tier til en køber.

På aktieleveringsdagen udligner short selleren således det overstigende antal af aktier i forhold til an- tallet af udstedte aktier (free float bringes tilbage til normalen), idet han foretager et dækningskøb, så ingen "opdager", at short seller har solgt aktier, han ikke ejede. Lykkedes det ikke short seller at lave et sådant dækningskøb, ville det være åbenlyst, at der havde været flere ejere af aktier end svarende til det udstedte antal. Han må derfor trække på GMSLA, hvilket bringer aktielångivers ejerskab til ophør. Dette ændrer dog ikke på, at der *juridisk har været to ejere i en periode*. Hvem, der fortsætter med at være ejeren, afgøres efter de tingsretlige regler, herunder reglerne om iagttagelse af sikringsakter og vindikation/ekstinktion. Det er netop i *denne* forbindelse, at leveringen af aktien spiller en rolle under dansk lovgivning. Den, der har aktien registreret i sit depot, har en sikret retsposition som ejer. Indtil leveringen er ejerskabet, som køberen erhverver, ikke beskyttet mod ekstinktion. Køberen har ikke de- sto mindre erhvervet ejerskab til aktien.

Sagt med andre ord betyder dette, at short selleren i perioden mellem salget af aktierne, han ikke ejede, og dækningskøbet (eller lånet af aktierne under en konkret låneaftale) overdrog ejerskab af ak- tier ved en simpel købekontrakt til en køber, der ikke kan vide, at sælgeren er en short seller. Herved skaber short selleren de facto flere ejere af danske aktier, end selskabet har udstedt. Dette kan kun for- hindres, hvis selve overdragelsen af ejerskab af aktier kræver levering af aktierne.

Et sådan krav eksisterer dog ikke i dansk lovgivning. I dansk lovgivning er levering af aktierne, der sker under settlement-processen, og som fører til registrering af ejerskabet hos købers custodian, blot de- klaratorisk.

Herved adskiller dansk lovgivning sig ganske væsentlig fra fx tysk lovgiv- ning. I henhold til tysk lovgiv- ning er leveringen af aktien fra sælgers depot til købers depot nødvendig, for at køber bliver ejer. Da dette ikke er nødvendigt i dansk lovgivning, har Danmark – også i henhold til den tyske prof. dr. Chri- stoph Spengel fra Universitetet i Mannheim – gjort det utroligt let for short sellere at skabe flere aktio- nærer end svarende til antallet af danske aktier udstedt af selskaberne.

Professoren mener, at Danmark i udbyttesagen lider under et juridisk problem, som lovgivning og rets- praksis selv har skabt.

Det er helt åbenlyst, at Skattestyrelsen forsøger at støtte sig til tyske regler og retspraksis omkring er- hvervelse af ejerskab af aktier for at løse problemerne, der opstår ved short selling. Skattestyrelsen for- søger at gøre dette helt uden retsgrundlag. Der er ingen regler i Danmark, der fordrer levering af ak- tierne for at erhverve ejerskab, tværtimod.

### 3.2.2.1 Skattestyrelsens synspunkter vedrørende "short buyer"

I sit sammenfattende indlæg af den 9. august 2019 præsenterer Skattestyrelsen i afsnit 8.3, side 69, en kæde, der skulle gengive short selling:

*Ejer/aktielångiver à Aktielåntager/short seller à "Short buyer"*

Denne kæde gengiver ganske rigtigt, hvordan en aktie leveres. Den gengiver dog ikke, hvordan ejerska- bet overdrages.

Skattestyrelsen lader ved præsentationen af denne kæde til at ville introducere den (nye og fiktive) fi- gur "short buyer". En "short buyer" findes i realiteten ikke. Introduktionen af dematerialiserede aktier

og den anonyme måde, disse handles på, har gjort det umuligt at følge en bestemt aktie fra en bestemt sælger til en bestemt køber. Aktier eksisterer kun som tal i computere, og når disse tal under afviklingsprocessen kan modregnes hinanden (kaldet "netting"), så hver finansiel virksomhed kun overdrager nettosummen af alle køb og salg foretaget af hans kunder til den næste finansielle virksomhed, er det udelukket at forfølge en bestemt aktie fra sælger til køber. Der findes ikke en "short buyer" svarende til en short seller.

En short seller er kun en short seller, hvis han <u>ikke</u> er den civilretlige ejer af aktien. Den civilretlige ejer af aktien er long seller. I det øjeblik short selleren indgår et <u>konkret aktielån</u> med ejeren af aktien, bliver aktielåntageren den civilretlige ejer af aktien. Det betyder med andre ord, at short selleren kun er "short", så længe han enten (1) er udækket (hvilket er tilladt for en såkaldt "market maker"), eller (2) "kun" er dækket ved en GMSLA, men endnu ikke har trukket (= lånt) et konkret antal aktier under en GMSLA. Når aktierne trækkes ved et konkret aktielån under GMSLA'en, bliver short selleren til long owner. Short selling er derfor kun muligt, så længe der "kun" eksisterer en GMSLA, der endnu ikke er trukket aktier under. Når en short seller trækker aktier under en GMSLA, trækker han aktier, som selskabet har udstedt. Eksistensen af GMSLA'en dækker short selleren og gør hans salg legalt (idet han dermed ikke er "udækket"), men samtidig medfører denne short selling, at der handles med flere aktier, end der er udstedt af selskabet. Der er flere aktier på markedet til handel end udstedt af selskabet.

Havde Skattestyrelsen ret i sin argumentation, ville short selling udelukkende eksistere i form af udækket short selling (foretaget af market makers).

Grunden til at short selleren kan overdrage ejerskab til noget, han ikke selv har (civilretligt og retmæssigt ejerskab), er, at shortselleren kan **legitimere** overdragelsen af ejerskabet til aktierne ved at kunne udelukke risikoen for en "fail" af handlen, dvs. at handlen ikke afvikles. En fail kan short selleren udelukke ved at (1) være i besiddelse af en GMSLA, der tillader ham at låne aktier til leveringen, og (2) have en clearing agent og custodian, der – i nødstilfælde – er forpligtet til at indestå for, at aktierne leveres under afviklingen af handlen. Short sellerens van- hjemmel til aktierne, der stadig ejes af aktielånegiver på salgstidspunktet, medfører ikke, at køberen, der handler i god tro på sælgers ejerskab, ikke erhverver ejerskab. Aktielångivers ejerskab til aktierne ekstingveres derimod af køberen, der handler i god tro. Denne ekstinktion retfærdiggøres af, at aktielånegiver selv har udsat sig for den risiko, at aktielåntager disponerer over aktierne ved at indgå en GMSLA.

Hvordan køberen handler i god tro på short sellerens ret til at overdrage legitime- ret ejerskab til aktier, han først låner senere, kan illustreres, som følger:



Den korrekte kæde til illustration af overdragelsen af ejerskab skulle følgelig se ud, som følger:

*Ejer/aktielångiver à Køber, der erhverver i god tro*

Kunne en sælger, der ikke selv er ejer, ikke overdrage ejerskab, ville reglerne omkring erhvervelse af ejerskab i god tro (vindikation/ekstinktion) slet ikke eksistere. Idet det dobbelte ejerskab af aktierne ophører – eller sagt med andre ord: idet antallet af aktier, der ejes, bringes tilbage til antallet af aktier, der er udstedt af selskabet – når aktierne leveres og registreres på køberens depotkonto, fører short selling ikke til problemer vedrørende ekstinktion. Når short selleren indgår en aftale om lån af et **bestemt antal aktier** under en GMSLA, bliver han ejer af disse aktier og leverer dem til sin køber af aktierne.

At antallet af aktier i handel øges ved short selling, er netop en af de af Finanstilsynet ønskede virkninger af short selling. Der kan således henvises til både Finanstilsynets publikation omkring short selling (jf. bilag 82) samt ESMAs rapport om udbyttearbitrage, jf. bilag 83. ESMA gør det helt tydeligt, at et retskrav på refusion bør afhænge af modtagelsen af et nettoudbytte og ikke af ejerskabet af en aktie, idet short selling netop har den konsekvens, at der handles med flere aktier, end der er udstedt af selskaberne. Når handlen i sig selv er nok til at erhverve ejerskab, har short selling fatale konsekvenser for skattesystemet. ESMA lægger ingen skjul på, at en DCA (dividend credit advice) er det korrekte dokument, som et retskrav på refusion skal dokumenteres med, men at denne DCA ikke skal afhænge af ejerskabet af aktien, men af modtagelsen af udbyttet.

Skattestyrelsen lader til at basere hele sin teori om, at der ikke skulle være "realitet" i de gennemførte aktiehandler, på det faktum at aktiehandlerne skulle være foretaget som short selling. Herved overser Skattestyrelsen, at også short selling er reelle aktiehandler, og at leveringskæden ikke er identisk med

kæden til overdragelse af ejerskab, da leveringskæden først finder sted, flere dage efter ejerskabet er overdraget. Skattestyrelsen overser konsekvent, at der kan handles ubegrænset mange aktier, og at kun antallet af aktier, der kan leveres, er begrænset af antallet af aktier udstedt af selskaberne

**3.2.2.2 Konsekvensen af flere aktier som følge af short selling (indtil settlement)**

At short sellere i perioden mellem købsaftalen og leveringen af aktier kan skabe flere ejere af aktier end svarende til antallet af udstedte aktier, fører udelukkende til problemer, hvis og når short selling sker omkring udbyttedatoen. Købekontrakten gør da en person udbytteberettiget, selv om han ikke er registreret som ejer endnu, jf. købelovens § 19, stk. 1: Køb af aktier omfatter det udbytte, som ikke var forfaldent, på det tidspunkt hvor købet sluttedes.

Dette har den konsekvens, at køberen skal krediteres nettoudbyttet på udbyttets betalingsdato, uanset hvornår registreringen af aktierne sker på hans depot. Ligger betalingsdatoen på en tidligere dato end registreringsdatoen af aktien hos custodian, skal sælgeren af aktien betale nettoudbyttet til køberen (short selleren betaler en kompensationsbetaling under "market claim-processen" til køber). På denne kompensationsbetaling er der i dansk skatteret ingen kildeskat, selvom det i virkeligheden drejer sig om betalingen af udbytte til aktiens civilretlige ejer. Da køberen af aktien er ejer på udbyttedatoen og modtager nettoudbyttet på betalingsdatoen, er han også berettiget til refusion.

Ligger betalingsdatoen for udbyttet efter registreringsdatoen af aktiesalget udført af en short seller, er det aktielångiver, der i henhold til GMSLA'en er berettiget til kompensationsbetalingen. Aktiekøberen modtager i dette tilfælde udbyttet direkte fra selskabet (hvor der også indbetales udbytteskat), men aktieudlåneren modtager kompensationsbetalingen fra short selleren, som Danmark ikke opkræver kildeskat af, på trods af at den økonomisk og skatteretligt betragtes som et udbytte.

Det midlertidige dobbelte ejerskab af aktien mellem salg og levering af aktien har dog kun konsekvenser for udbetalingen af udbytte og beskatningen heraf.

Idet det kumulative juridiske ejerskab ender, når aktierne skal leveres, vil altid kun én aktionær pr. aktie være stemmeberettiget ved generalforsamlingen, idet stemmeberettigelsen fordrer, at registreringen af aktien eftervises ved en udskrift fra den respektive custodian.

Skattestyrelsens påstand i styrelsens sammenfattende indlæg i førersagerne af den 9. august 2019 om, at

> *"Hvis der kunne være flere ejere af samme aktie, ville det også betyde, at mere*
> *end 100 % aktionærer kunne møde og stemme på selskabets generalforsamling."*

er naturligvis ikke korrekt.

**3.2.2.2.1 Manglende kildebeskatning af kompensationsbetaling**

Skatteministeriet og Skattestyrelsen har, som fremgår af den i 2015 udstedte Early Warning, helt klart identificeret, at et af hovedproblemerne i udbytteskattesagerne er short selling.

Så længe der ikke opkræves udbytteskat af kompensationsbetalingen, som en short seller skal betale, til den der køber aktien på generalforsamlingsdatoen (retserhvervelsestidspunktet for udbyttet og dermed med retskrav på refusion), men som først bliver registreret som ejer efter record day, vil der mangle en indbetaling af udbytteskat. Da køberen af aktien (eller nogen som helst anden person) ikke kan se forskel på en aktie købt af en short seller og en aktie købt af en long owner, er short selleren,

der sælger på generalforsamlingsdatoen, nødt til at betale en kompensationsbetaling ind i kæden af custodians og endelig ned til køberen svarende til nettoudbyttet på aktierne. Alle købere af aktier, også dem der køber det overskydende antal aktier, der er i omløb, modtager et nettoudbytte og en DCA og er refusionsberettigede som ejere af aktierne og modtagere af et nettoudbytte.

Da ingen andre end short selleren selv og dennes umiddelbare custodian ved, kan se eller kan konstatere, at en betaling i virkeligheden ikke kommer fra selskabet selv, men fra en short seller, er det nødvendigt at beskatte kompensationsbetalingen. Allerede ved den første subcustodian i kæden af custodians blandes alle nettoudbytter fra selskabet selv uigenkaldeligt med kompensationsbetalingerne fra short sellere. Ingen i kæden af custodians er i stand til at bekræfte over for køberen af aktien, om det beløb, han får krediteret på sin konto (nettoudbyttets sum), i virkeligheden stammer fra en short seller eller fra selskabet.

Dette afspejles også i det faktum, at hverken køberen af en aktie – eller noget andet menneske – kan sige, om den aktie, han har købt og får leveret, stammer fra en short seller eller fra en long owner. Det er meget muligt, at netop den "aktie", som køberen får registreret på sin depotkonto pga. netting i afviklingsprocessen, før var registreret hos en helt anden kunde som samme custodian. Køberen modtager jo ikke netop den specifikke aktie, som "hans" sælger har solgt ham, men en hvilken som helst aktie fra samme selskab, da aktier er genusvarer.

Ved kontormødet blev fremlagt følgende skitse, der viser dette problem i grafisk form:



Det fremgår af skitsen, at såvel aktier som også betalingen af udbyttet fra selskabet selv (vist med sorte pile) blandes med aktier/kompensationsbetalinger, der stammer fra en short seller (vist med røde pile). Mens short selleren udelukkende kan opfylde sin forpligtelse til levering af aktier, med aktier der er udstedt af selskabet, kan "udbyttet", som køberen modtager, lige så godt være en kompensationsbetaling fra en short seller. Idet kravet på betaling af udbyttet allerede opstår med købet af aktierne, er short selleren nødt til at skabe et "udbytte" – udover, hvad selskabet har betalt. Dette udbytte fra short selleren kaldes kompensations- betaling.

I Tyskland erkendte man problemerne omkring kompensationsbetalingerne allerede i 1999 (ved en kendelse fra BFH) og indførte i 2007 en kildebeskatning på kompensationsbetalingerne. I 2012 blev kildebeskatningsreglerne igen ændret, da det stod klart, at man ligeledes var nødt til at ændre skyldneren, der er pligtig til at foretage indeholdelse og indberetning af kildeskat på udbytte. Danmark har derimod til dato intet gjort for at rette op på denne mangel. I Danmark holder man stadig fast ved kildeskattelovens § 65, ifølge hvilken det er det udloddende selskab, der har pligt til at indeholde og indberette udbytteskatten, og en beskatning af kompensationsbetalingen fra short selleren sker slet ikke.

### 3.2.2.3 Skattemæssig retmæssig ejerskab ved aktieudlån – dobbelt ejer- skab ud over settlement

Ud over problemerne der skabes ved at en køber, der handler i god tro, kan erhverve ejerskab til aktier, der stadig ejes af en aktielångiver, medfører den praktiske håndtering af aktieudlån samt retspraksis omkring aktieudlån og retmæssig ejerskab yderlige problemer vedrørende identifikationen af den skattemæssig retmæssige ejer og dermed en risiko for dobbelt refusion, idet der evt. udbetales re- fusion til en aktielångiver, der ikke længere er at betragte som den skattemæssig retmæssige ejer af aktierne.

### 3.2.2.3.1 Retspraksis vedrørende skattemæssig retmæssig ejerskab ved aktieudlån

Ved aktieudlån registreres aktielåntageren ved VP Securities som den nye ejer af aktien. Denne civilretlige kategorisering af aktielånet, som kommer til udtryk hos VP Securities, stemmer dog ikke overens med de *skatteretlige* kategoriseringer af aktielån.

Ud fra skatteretlige betragtninger af aktielån bliver ejendomsretten *ikke* overdraget fra långiver til låntager (jf. SKM2010.266.SR). Der sker således *ikke* en afståelse, ved aktielån som er indgået i henhold til den danske standardiserede aktielånsordning, Morgan Stanley & Co International Limited – Overseas Securities Lender's Agreement eller Overseas Securities Lenders Association, Global Master Securities Lending Agreement (GMSLA).

Långiver beholder som udgangspunkt alle sine rettigheder mv. hidrørende fra aktierne. Låntager har dog visse dispositionsbeføjelser over aktierne, idet låneaftalen som udgangspunkt blot kræver tilbagelevering på et bestemt tidspunkt i fremtiden. Indtil dette tidspunkt oprinder, kan låntager disponere fuldt ud over aktierne, herunder afstå dem til tredjemand. Låntager skal dog betale et beløb til långiver, der svarer til udbyttet udbetalt af selskabet under aktielånets varighed (kompensationsbetaling). Låntager skal ved låneperiodens afslutning tilbagelevere aktier af samme mængde og art. Derved stilles långiver således, som om aktierne havde været i hans besiddelse under hele låneperioden. Han betragtes derfor ud fra en helhedsopfattelse af aktielånearrangementet fortsat som den *skatteretlige ejer* af aktierne. Dette resultat når både SKAT, skatteeksperter og Landsskatteretten.

Idet aktieudlåneren ikke mister det skatteretlige ejerskab af aktierne ved udlån, og han i overensstemmelse hermed i henhold til GMSLA'en også er berettiget til at modtage udbyttet, er aktieudlåner også berettiget til udbytterefusion.

Idet salg af dematerialiserede aktier foregår anonymt (via mæglere), og der vel er alle tjenesteydere, der deltager i en overdragelsestransaktion, sker en sammenblanding af alle aktier, der overdrages mellem alle deres kunder, kan en køber af en aktie ikke vide, om han *køber og modtager* en aktie, der stammer fra en long owner (der har aktien i sit depot), eller om han køber aktien af en short seller, der kun har kunnet låne aktien.

Dette er i og for sig i 364 dage om året heller ikke relevant. Det er kun, i det øjeblik hvor selskabet ud-lodder et udbytte, at det bliver et problem, når skattemyndighederne, retspraksis og litteraturen er-klærer aktielångiveren for den skattemæssige ejer af aktien.

Når køber ikke kan vide, om sælger er en short seller, der kun låner aktien, må køber nødvendigvis ved køb af aktien ikke kun blive civilretlig ejer af aktien, men også skattemæssig ejer. Idet køberen af aktien vil blive registreret hos VP Securities eller enhver anden subcustodian, vil køberen også modtage et nettoudbytte og være refusionsberettiget.

Ved siden af aktieudlåneren, der har modtaget en kompensationsbetaling fra aktielåntageren og er skattepligtig heraf, som om han havde modtaget udbyttet direkte, er der den nye ejer af aktien, der li-geledes modtager et udbytte, er skattepligtig heraf og er refusionsberettiget.

Retspraksis omkring aktielån har således skabt to skattemæssige ejere af samme aktie på udlodnings-tidspunktet.



Idet short selling skal være dækket i form af et aktielån, fører alle de af retspraksis, skatteeksperter (Katja Dyppel Joo, jf. bilag 2c) og SKAT Jura og Store Selskaber (jf. Early Warning 2015 fremlagt som bi-lag 4a) anerkendte problemer omkring aktielån til de omtalte problemer i forbindelse med short sel-ling.

### 3.2.2.3.2 SKAT om skattemæssigt retmæssigt ejerskab ved aktieudlån

Som SKAT Store Selskaber den 27. marts 2015 skrev til SKAT Jura i Early Warning, registrerer VP Securi-ties som udgangspunkt den juridiske ejer. Ved aktielån registreres låntager som ejer, hvorved udlåner ikke længere er registreret som ejer. Herefter anføres det, at der ved aktielån skattemæssigt skal hen-ses til, hvem der er retmæssig ejer/beneficial owner, jf. SKM2010.266.SR. Af afgørelsen fremgår, at en *aftale om lån af aktier ikke skatteretligt kan kvalificeres som afståelse*. En långiver anses skattemæssigt for retmæssig ejer af aktierne. Udbytte, der udloddes i låneperioden, anses for at tilfalde långiver, og långiver skal derfor beskattes heraf.

I forbindelse med short selling har dette den konsekvens, at aktielångiveren fortsat anses for at mod-tage et udbytte, han beskattes heraf, og følgelig må han være refusionsberettiget, hvis han i øvrigt op-fylder betingelserne herfor.

Samtidig erhverver en køber, der handler i god tro, og ikke ved, at han køber af en short seller, ejerskab til aktierne, ligesom han modtager udbyttet og er skattepligtig heraf, med den konsekvens at han tillige er berettiget til refusion af indeholdt udbytteskat i henhold til gældende regler herom.

SKAT Juras Early Warning af den 7. juli 2015 til Skatteministeriet tager som udgangspunkt afsæt i Early Warning fra SKAT Store Selskaber. Også SKAT Juras Early Warning fremfører indledningsvis, at låntager registreres civilretligt som ejer af de lånte aktier, men at aktierne i overensstemmelse med TfS 1999, 408 ikke anses for afstået. Skattemæssigt anses långiver således fortsat som ejer af de udlånte aktier. I SKM2010.266.SR tilsluttede Skatterådet sig SKATs indstilling om, at det er långiver, der efter de indgåede dobbeltbeskatningsaftaler er beneficial owner af udbytte på de lånte aktier, *når disse ikke er videresolgt* af låntager.

Problemet, der herved opstår, er, at aktielångiveren principielt ikke kan vide, hvorfor låntager indgår et aktielån, og han kan langt mindre vide, om låntager sælger aktierne videre. Aktielångiver må dermed med afsæt i SKM2010.266.SR gå ud fra, at han trods udlån af aktierne fortsat er den retmæssige modtager af udbyttet, skattepligtig heraf og refusionsberettiget. Samtidig bliver køberen af aktierne retmæssig ejer af aktierne, udbyttet heraf og således ligeledes refusionsberettiget.

Skattemæssigt set, medfører SKM2010.266.SR således et dobbelt skattemæssigt ejerskab af de samme aktier. Dette naturligvis kun, så længe aktielånet består.

SKAT Jura angiver med rette i Early Warning, at den skattemæssige behandling af aktielån i Danmark afviger fra den skattemæssige behandling af aktielån i resten af verden. Denne forskel giver anledning til problemer, når danske långivere eller låntagere indgår aktielån med udenlandske långivere eller låntagere.

**3.2.2.3.3 Skatteministeriet om skattemæssigt retmæssigt ejerskab ved aktie- udlån**

Skatteministeriet skelner i sit svar på Early Warning i forbindelse med aktielån af den 23. september 2015 mellem to forskellige situationer, når det drejer sig om aktielån: (1) aktielån uden videresalg til tredjemand og (2) aktielån med videresalg til tredjemand.

**3.2.2.3.3.1 Aktieudlån uden videresalg til tredjemand**

Dette beskriver Skatteministeriet, som følger:

> *"I en aktielåneaftale mellem långiver og låntager vil långiver, desuagtet udlånet af aktierne til låntager, stadig skattemæssigt være den retmæssige ejer ("beneficial owner") af aktiern og dermed også af udbyttet"*

Skatteministeriet støtter sig herved på SKM2010.266.SR, ifølge hvilken udbytte på udlånte aktier skal beskattes hos långiver. Er der tale om en udenlandsk långiver, vil denne også være berettiget til at søge refusion af den overskydende indeholdte udbytteskat (jf. bilag 4a, notat af den 23. september 2015, side 6)

Når Skatteministeriet i samme notat skriver, "*at der i dansk skatteret ikke er hjemmel til, at andre end den part, der efter dansk ret skattemæssig anses som modtager af pengene fra et selskab, kan få godskrevet eller tilbagebetalt kildeskatter på udbytte*", skal dette ses, i sammenhæng med at der her kun er tale om tilfælde af aktielån uden videresalg til tredjemand.

Skatteministeriet lader ingen tvivl om gældende ret, når de udlånte aktier ikke sælges til tredjemand:

*"Det er lånetager, der modtager udbyttet på aktierne. Lånetager vil som regel kompensere långiver for udbyttet vis en såkaldt udbyttekompensation. Overføres bruttoudbyttet fra lånetager til långiver som udbyttekompensation, vil udbyttekompensationen generelt have en så direkte tilknytning til de udloddede udbytte, at udbyttekompensationen beskattes som ud- bytte hos långiver (jf SKM2009.65.SR). Tilsvarende er lånetager ikke skattepligtig af udbyttet, idet lånetager de facto blot modtager udbyttet på långivers vegne. Udlodningen af udbyttet har således som udgangspunkt ingen skattemæssige konsekvenser for lånetager."*

Hvad Skatteministeriet her overser, er det faktum, at låntager slet ikke modtager et bruttoudbytte, som denne kan give videre til långiver. Da låntager kun modtager et nettoudbytte, kan det også kun være dette beløb, som låntager skal give videre til långiver. Refusion af udbytteskatten må långiver anmode om hos skattemyndig- hederne på baggrund af sit skattemæssige ejerskab af aktierne. Et sådant ejer- skab er relativt problematisk at dokumentere, da der ikke findes noget register for aktieudlån. Det er kun låntager, der kan dokumentere sit civilretlige ejerskab med en udskrift fra sin custodian.

**3.2.2.3.3.3**   Aktieudlån med videresalg til tredjemand

*"Ved lånetagers videresalg til tredjemand anses aktierne ikke for afstået af lånegiver, for så vidt angår avanceopgørelsen. Dette skal ses i sammenhæng med, at det i låneaftalen mellem långiver og lånetager er aftalt, at lånetager skal tilbagelevere aktierne, idet der fortsat er tale om et lån. Da aktierne imidlertid er en genusvare, er salget så at sige irrelevant for långiver i avancehenseende. Der sker således ikke afståelsesbeskatning af lånegiver.*

*Med tredjemands erhvervelse af aktierne fra lånetager bliver tredjemand imidlertid retmæssig ejer af aktierne og dermed også af udbyttet. (jf. SKM2010.266.SR). Udbyttet beskattes så- ledes hos tredjemand. Det er dermed tredjemand der er berettiget til at modtage en eventuel refusion af indeholdt udbytteskat.*

*I de tilfælde hvor lånetager fortsat skal kompensere långiver for udbytte, som lånetager pga. salget til tredjemand ikke har modtaget, kvalificeres udgiften til udbyttekompensation som et tab omfattet af statsskatteloven."*

Som følge af at aktierne er solgt af låntager til tredjemand, er Skatteministeriet af den opfattelse, at långiver ikke længere anses som aktuel aktionær, at kompensationsbetalingen ikke længere er at anse som et udbytte, og at aktielåntager ikke længere er refusionsberettiget. Refusionsberettiget er den tredjemand, der har erhvervet aktierne fra aktielåntager.

**3.2.2.3.3.3**   Bemærkninger til Skatteministeriets opfattelse

Skatteministeriet overser to grundlæggende aspekter:

1   Aktielångiver kan ikke vide, om og hvornår en aktielåntager sælger aktierne, da de ikke nødvendigvis har nogen umiddelbar kontakt med hinanden. Aktielån formidles af mellemmænd, såkaldte "stock loan intermediaries".
2   Aktielångiver modtager kun nettoudbyttet fra aktielåntageren (dette helt i henhold til de internationale standardaftaler om aktielån GMSLA).

At lade aktielångivers retsstilling afhænge af omstændigheder, han ikke kan kende til og ingen indflydelse har på, vil resultere i retsusikkerhed, der vil ødelægge det danske marked for aktieudlån. Når en aktielångiver i praksis hverken kan vide, om en aktielåntager sælger aktierne (og i givet fald hvornår),

eller om det beløb, han modtager, berettiger ham til refusion eller ej, selvom han kun modtager et beløb svarende til nettoudbyttet, kan hans retsstilling umuligt ændres ved aktielåntagers ensidige dispositioner. Det ville stride imod ethvert retsstatsligt princip.

Skatteministeriets position er i tilfælde af videresalg af aktierne til tredjemand juridisk ikke holdbar. Når retspraksis i henhold til SKM2010.266.SR fastholder, at aktielångiver fortsat er den skattemæssige ejer af aktien, må dette nødvendigvis gælde, uanset om aktielåntager sælger aktierne videre til tredjemand eller ej.

Den tværministerielle arbejdsgruppe oprettet i 2015 under Skatteministeriet lader også til at erkende problemet, idet det såvel i publikationen "SKAT ud af krisen",jf. bilag 4b, som også i statusnotatet af den 26. juni 2016,side 6, jf. bilag 5a, tilkendegives, at der *i Danmark* ikke findes et sæt regler, der sikrer, at det er muligt at identificere de skattemæssigt retmæssige aktieejere.

### 3.2.2.3.4 Faglitteraturen om skattemæssig retmæssig ejerskab ved aktieudlån

I faglitteraturen har specielt Katja Joo Dyppel beskæftiget sig med konsekvenserne af aktieudlån, jf. bilag 2a, i sin artikel *"Beskatning af aktielån og repo'er"* fra 2013.

Hun fastholder, at aktier, som overføres ved indgåelse af aktielån, generelt ikke anses for afstået i <u>skatteretlig</u> henseende, hvorfor udlånet at aktier ikke medfører afståelsesbeskatning.

Hun konstaterer ligeledes korrekt, at selskaberne udbetaler udbyttet til låntageren af aktierne, såfremt aktierne er overdraget til låntagers værdipapirdepot, eller til tredjemand, hvis aktierne er overdraget til dennes værdipapirdepot. I henhold til standardlåneaftalerne er aktielångiver dog berettiget til eventuelt udloddet udbytte i låneperioden, hvorfor låntager skal kompensere långiver for udbyttet.

For at en betaling kan anses som et udbytte i skatteretlig henseende, er det en betingelse, at betalingen kan anses som en udlodning, og at modtageren heraf er aktionær i det udloddende selskab. Dette følger af ligningslovens § 16 A, hvorefter der ved udbytte forstås *"alt, hvad der af selskabet udloddes til aktuelle aktionærer"*. Afgørende er således, om långiver eller låntager er aktionær på tidspunktet for udlodningen.

Katja Joo Dyppel foretager herefter en grundig analyse af retspraksis, der ser ud, som følger:

I TfS 2001, 146 tog Ligningsrådet stilling til den skatteretlige kvalifikation af udbyt- ter betalt under et aktielån. Herefter skulle det kompenserede udbytte beskattes som almindelig indkomst hos långiver, uanset om låntager fortsat besad aktierne eller havde afstået disse. I det omfang låntager modtog udbytte fra selskabet, skulle dette udbytte udbyttebeskattes. Såfremt det i skatteretlig henseende forudsættes, at de udlånte aktier ikke er afstået til låntager, og långivers aktionærposition således ikke er ophørt, er denne **afgørelse svær at forklare**. Efter ligningslovens § 16 A forudsætter udbyttebeskatningen tilstedeværelsen af en aktionærposition, og tilsvarende gælder i forhold til statsskattelovens § 4 E. Det følger således heraf, at der ikke foreligger et udbytte, medmindre udbetalingerne sker til en aktionær. Det synes rimeligt at forudsætte, at en aktionær i aktieavancebeskatningslovens forstand tillige er aktionær i ligningslovens § 16 A's forstand, og eftersom der ikke foreligger en afståelse/erhvervelse efter aktieavancebeskatningsloven, synes praksis vanskelig at begrunde.

Konsekvensen af Ligningsrådets afgørelse offentliggjort i TfS 2001, 146 fremgår af TfS 2001, 760, hvor der tages stilling til, om kompenseret udbytte fra et aktielån indgår i investeringsforeningers minimumsudlodning. For investeringsforeninger, som udlåner aktier, indgår de udlånte aktier stadig i investeringsforeningens aktiebeholdning, men ifølge Ligningsrådet skulle modtagne refusioner af udbytte

og andet vederlag ikke indgå i minimumsudlodningen. Argumentet var, at der i minimumsudlodningen alene indgår renter, indtjente udbytter efter ligningslovens § 16 A og gevinster på finansielle kontrakter efter kursgevinstlovens §§ 29-33, jf. ligningslovens § 16 A. Eftersom det overdragne udbytte fra låntager til långiver var skattepligtigt som almindelig indkomst, anså Ligningsrådet ikke dette beløb for at kunne omfattes af minimumsudlodningen i ligningslovens § 16 C.

Senere i TfS 2002, 755 tog Ligningsrådet bl.a. stilling til den skatteretlige behandling af låntagers fradragsret for betaling af vederlag for udlånet samt kompenserende udbytter til långiver. Med henvisning til TfS 2001,146, hvorefter vederlag og kompensation for udbytte kvalificeres hos långiver, uafhængig af om aktierne er solgt videre af låntager eller ej, anføres det, at tilsvarende betragtninger gør sig gældende for låntager. I denne forbindelse bemærker Ligningsrådet, at aktiernes **eventuelle videresalg derfor er irrelevant** for låntagers mulighed for at kunne fradrage vederlag og kompensation for udbytte i den skattepligtige indkomst.

I relation til den skatteretlige behandling af udbytter og kompenserende udbytter på de udlånte aktier ændrede Landsskatteretten det af Ligningsrådet afgivne svar i TfS 2002, 755 i en kendelse offentliggjort i TfS 2004, 152. Ifølge Landsskatteretten afhænger den skatteretlige behandling af, hvordan låntager disponerer over de lånte aktier i låneperioden, og der tages stilling hertil i tre scenarier:

1    Låntager har videresolgt aktierne og modtager ikke udbytte, men skal kompensere långiver for udbytte. Det løbende vederlag og det beløb, der betales til långiver som kompensation for udbyttet, har en sådan direkte forbindelse til aftalen om aktielån, at udgiften skal indgå ved opgørelsen af låntagers gevinst eller tab ved salg og køb efter reglerne i statsskattelovens § 4, litra f.

2    Låntager videresælger ikke aktierne og modtager ikke udbytte og har derfor ingen gevinst konstateret, men skal stadig betale et vederlag for at låne aktierne. Udgifterne til vederlaget udgør derfor hans tab ved aftalen, og dette tab er efter statsskattelovens § 4 F ikke fradragsberettiget ved opgørelsen af den skattepligtige indkomst, men alene i eventuelle andre gevinster ved tilsvarende aftaler i samme år.

3    Låntager har ikke videresolgt aktierne, men har modtaget udbytte, som han skal kompensere långiver for. Da låntager ikke er blevet ejer af aktierne i kraft af låneaftale eller på anden måde, er han ikke skattepligtig af udbyttet, der tilfalder långiver i henhold til GMSLA'en.

Af Landsskatterettens kendelse kan det udledes, at den skatteretlige behandling af **låntagers** udgift til vederlag og kompenserende udbytte afhænger af, hvordan **låntager** disponerer over aktierne i perioden. Heraf følger, at, i det omfang låntager alene kompenserer långiver for det udbytte, som låntager selv har modtaget, skal låntager ikke beskattes af det modtagne udbytte, således at udlodningen ingen skattemæssige konsekvenser har for låntager. Argumentet er, at låntager ikke er blevet ejer af aktierne og alene oppebærer udbytte på långivers vegne.

I de tilfælde hvor låntager skal kompensere for udbytte, som han ikke har modtaget, hvad enten aktierne er videresolgt eller ej, kvalificeres udgiften som et tab omfattet af væddemålsbestemmelsen i statsskattelovens § 4 F. Dette betyder, at årets tab alene kan modregnes i årets gevinster på tilsvarende aftaler.

I TfS 2009, 283 tages bl.a. stilling til, hvordan **långiver** beskattes af kompenserende udbytte. Med henvisning til Landsskatterettens kendelse anfører Skatterådet, at **betalinger, som modtages for manglende udbytte** på udlånte aktier, er skattepligtige som **udbytte** hos långiver, såfremt udbyttet tilfalder långiver.

For at det kompenserende udbytte beskattes som udbytte hos långiver, må det dog være en betingelse, at der rent faktisk kompenseres for et udloddet udbytte. Er der således ikke udloddet udbytte, men skal låntager alligevel betale et vederlag, kan dette næppe kvalificeres som et udbytte, da betin-

gelsen om, at der er foretaget en udlodning i overensstemmelse med ligningslovens § 16 A, ikke er op-fyldt. I et sådant tilfælde er indkomsten formentlig skattepligtig efter statsskattelovens § 4.

I Skatterådets afgørelse i TfS 2009, 283 henvises til situation 3 i Landsskatterettens kendelse, som ved-rører det tilfælde, hvor låntager ikke har videresolgt aktierne, men har modtaget udbytte, som långiver skal kompenseres for. Der er således ikke taget stilling til beskatning af **långiver**, i den situation hvor låntager har solgt de lånte aktier og fortsat er forpligtet til at kompensere långiver for manglende ud-bytte.

Katja Joo Dyppel illustrerer situationen, som følger:



Figur 4. Betalingsstrøm ved kompenserende udbytte ved videresalg

Forskelligt fra det tilfælde, hvor låntager ikke sælger de lånte aktier, er, at tredjemand (også) bliver ejer af aktierne, **hvorfor der foreligger dobbelt ejerskab**, såfremt låntagers salg af aktierne ikke bevirker, at långiver anses for at have opgivet sin aktionærposition.

Konsekvensen af at långiver fortsat anses for at være aktionær, kan være, at långiver fortsat udbytte-beskattes efter ligningslovens § 16 A af kompenserende udbytte modtaget af låntager, uanset at lånta-ger kompenserer långiveren for udloddet udbytte, uden at låntager selv har modtaget dette. Samtidig vil tredjemand ligeledes blive udbyttebeskattet af det udloddede udbytte, som denne modtager fra det udloddende selskab, jf. ligningslovens § 16 A. Dette **dobbelte ejerskab** kan således resultere i den uhensigtsmæssige konsekvens, at der opstår en situation, hvor der **udbyttebeskattes et større beløb, end der faktisk udloddes**.

Katja Joo Dyppel anfører i sin artikel fra 2013, at man alternativt kan argumentere for, at selvom långi-ver ikke anses for at have afstået sine aktier ved indgåelse af aktielånet, resulterer låntagers salg i, at långiver ikke længere er aktuel aktionær af specifikke aktier, men alene har retten til i fremtiden at modtage samme mængde aktier udstedt af samme selskab og med samme rettigheder som de ud-lånte. Dette resulterer i, at långiver ikke længere anses for aktuel aktionær og således ikke længere kan modtage udbytte efter ligningslovens § 16 A, hvorfor udbytte i stedet beskattes efter statsskatte-lovens § 4. Katja Joo Dyppel bekræfter, at det er **uhensigtsmæssigt, at låntagers handling er afgørende for egen og lån- givers beskatning af kompenserende udbytte.** Hun mener dog, at det kan være kor-rekt, eftersom det synes vanskeligt at se, hvordan långiver fortsat kan anses for at være aktuel aktio-nær efter ligningslovens § 16 A, når aktierne er solgt til tredjemand.

Katja Joo Dyppels alternative argumentation har følgende konsekvens: Såfremt låntager (af aktierne) skal kompensere långiver for udbytte udloddet i udlånsperioden, afhænger den skatteretlige behand-ling af, om låntager har (videre)solgt aktierne til tredjemand eller ej. Er aktierne ikke solgt til tredje-mand, anses långiver for at være aktuel aktionær og udbyttebeskattes således efter ligningslovens § 16 A, uden at udlodningen har skattemæssige konsekvenser for låntager. Er aktierne derimod solgt til

tredjemand, kan långiver efter Katja Joo Dyppels mening formentlig ikke anses som aktuel aktionær, hvorfor det kompenserende udbytte beskattes efter statsskattelovens § 4, mens låntager alene har fradrag for det kompenserende udbytte efter væddemålsbestemmelsen i statsskattelovens § 4, litra f.

Ved denne alternative argumentation overser Katja Joo Dyppel, at långiver i **praksis** slet ikke kan vide, hvad låntager gør med aktierne. De fleste aktielån formidles af mellemmænd (stock loan intermediaries), der forhindrer enhver direkte kontakt med den oprindelige aktieudlåner og den endelige låntager. Stock loan intermediary er den kontraktuelle modpart til aktieudlåneren, og stock loan intermediary kan enten låne aktien direkte ud til en anden klient eller låne aktien ud til en anden stock loan intermediary. Om og hvornår en aktie sælges videre til en tredjemand, er i praksis fuldkommen uklart for den oprindelige aktieudlåner. I praksis fungerer den alternative model præsenteret af Katja Joo Dyppel derfor ikke.

De praktiske konsekvenser for en aktieudlåner ville være, at han aldrig kan vide, om han stadig er skattemæssig ejer af aktierne eller ej, hvordan han skal beskattes af kompensationsbetalingen, og om han er refusionsberettiget. Det betyder for aktieudlåneren en så betydelig risiko, at han i praksis aldrig vil være parat til at låne sine aktier ud, da han konstant vil risikere at overtræde skattelovgivningen på grund af handlinger foretaget af en aktielåntager, som han ikke kender.

På et lille nationalt marked hvor aktielångiver og låntager kender hinanden, kan Katja Joo Dyppels alternative betragtningsmodel måske fungere. På de internationale aktiemarkeder er denne model dømt til at fejle.

**3.2.2.4 Konklusion: Short selling har ingen indflydelse på pensionsplanens skattemæssig retmæssige ejerskab**

Det er uden betydning for pensionsplanens ret til refusion, om en person, der lånte aktierne af den stock loan intermediary, som pensionsplanen lånte deres aktier til, solgte aktierne igen, idet pensionsplanen først lånte aktierne ud efter retserhvervelsestidspunktet for udbyttet. Pensionsplanens skattemæssigt retmæssige ejerskab kan derfor ikke berøres af et videresalg til en tredjepart.

Retserhvervelsestidspunktet for udbyttet og dermed for retskravet på refusion er tidspunktet for deklarering af udbyttet, jf. den juridiske vejledning, afsnit C.B.3.1 (Det skattemæssige udbyttebegreb). Deklarering af udbytte til sædvanligvis ske på selskabets ordinære eller ekstraordinære generalforsamling. Skattemæssigt forstås ved udbytte således alt, hvad der af et selskab udloddes til aktuelle aktionærer (jf. ligningslovens § 16 A, stk. 2, nr. 1).

Pensionsplanen købte senest på generalforsamlingsdagen de danske aktier. Den blev den civilretlige og dermed også den skattemæssige ejer af aktierne samme dag, idet aftalen om køb af aktier er tilstrækkelig til overdragelse af ejendomsretten.

Udbyttet blev af selskabet (VP Securities) udbetalt til den tidligere ejer af aktierne, idet denne stadig var registreret som ejer af aktierne på den såkaldte record day. Selskabet kan med frigørende virkning over for den aktuelle civilretlige og skatteretlige ejer af en aktie udbetale udbyttet, til den der er registreret som ejer på record day (jf. værdipapirhandelsloven § 71, stk. 2), selvom denne person ikke (længere) er den retmæssige modtager af udbyttet.

Udbyttet, der er udbetalt til sælgeren, skal debiteres dennes konto og krediteres pensionsplanens konto. Dette sker gennem de involverede custodians, der skal afvikle denne "market claim", som køberens krav på overførsel af udbyttet kaldes. Sælger har ingen indflydelse på denne videresendelse af udbyttet til den berettigede (køberen).

Købte pensionsplanen aktien af en long owner seller, debiteres denne sælger det udbytte, som han modtog på grund af sin registrering på record day fra selskabet. Beløbet krediteres pensionsplanens konto, så snart denne registreres som ny ejer af aktien ved sin custodian. Det er først på det tidspunkt, at det i kæden af custodians bliver synligt, hvem den egentlige berettigede til udbyttet var: pensionsplanen, der var ejer af aktien på udbyttedatoen, på trods af at han stadig ikke var registreret som sådan.

Købte pensionsplanen derimod aktien af en short seller – hvilket pensionsplanen ikke kan vide – er det short selleren, der skal kompensere pensionsplanen for det udbytte, der tilfalder pensionsplanen som retmæssig ejer af aktien på udbyttedatoen. Det egentlige udbytte udbetales af selskabet via VP Securities til den aktionær, som short selleren efter udbyttedatoen inddækker sit salg hos på leveringsdatoen (settlement day). Kompensationsbetalingen fra short selleren kan i praksis ikke skelnes fra selve udbyttet, der oprindeligt kom fra selskabet, da begge dele blandes sammen i pengestrømmen, der fører ned gennem de forskellige custodians. Det forholder sig i praksis ikke således, at køberen af en aktie ved, hvem sælgeren er – heller ikke ved OTC-handler. Køberen kan derfor umuligt vide, om den "market claim", der krediteres på hans konto, når aktiekøbet afvikles, og aktierne registreres i hans depot hos hans custodian, i virkeligheden stammer fra en long owner seller eller en short seller.

Hvis pensionsplanen købte af en short seller, var den aktionær, der <u>senere</u> lånte aktien til short selleren for at afvikle handlen, stadig retmæssig ejer af aktien på udbyttetidspunktet. Samtidig blev pensionsplanen ejer af aktien ved købekontrakten med short selleren.

Det på udbyttedatoen erhvervede retmæssige ejerskab af aktien og dermed kravet på udbetaling af udbyttet og refusion mister pensionsplanen civilretligt først, når aktien lånes ud til en tredjemand. Dette udlån foretages mellem generalforsamlingsdatoen og afviklingsdatoen for aktiekøbet. Om pensionsplanen også skatteretligt mistede ejerskabet til aktien og dermed kravet på udbyttet, da aktierne blev lånt ud, er uden betydning for pensionsplanens ret til udbyttet og refusionen, der opstod, inden aktien blev lånt ud.

Pensionsplanen var på det afgørende tidspunkt, generalforsamlingsdagen, der er retserhvervelsestidspunktet, ejer af de danske aktier. Dette, på trods af at pensionsplanen endnu ikke var registreret som ejer hos sin custodian og derfor ikke kunne deltage i selve generalforsamlingen.

Da det kun er registrerede ejere af aktier, der kan deltage i generalforsamlingen, fører det civilretlige dobbelte ejerskab til en aktie, der består mellem købet af en aktie fra en short seller og afviklingen af aktiekøbet, heller ikke til, at der kan afgives flere stemmer ved en generalforsamling, end der er udstedt aktier.

**4 JURIDISKE FORHOLD VEDRØRENDE UDBYTTESKAT**

I det følgende vil vi redegøre for hjemmelen til udbetaling af den i sagen omtvistede refusion af udbytteskatter.

I nærværende sag findes hjemmelen til refusion i kildeskatteloven og den dertilhørende kildeskattebekendtgørelse, samt den relevante dobbeltbeskatningsoverenskomst mellem Danmark og USA.

**4.1 Udbytteskat indeholdes i henhold til kildeskattelovens regler.**

I henhold til kildeskattelovens § 65, stk. 1, skal der som udgangspunkt ved enhver beslutning om udlodning af udbytter fra selskaber hjemmehørende i Danmark indeholdes udbytteskat med en sats på 27 pct.

Ifølge kildeskattelovens § 65, stk. 6, har udbytteskatten med virkning fra indkomståret 2014 været nedsat til 22 pct. ved udbytteudlodninger til selskaber og fonde, der er skattepligtige til Danmark efter selskabsskattelovens § 1 eller fondsbeskatningsloven. Forinden var udbytteskattesatsen for disse selskaber og fonde nedsat til 25 pct. svarende til den dagældende selskabsskattesats efter selskabsskattelovens § 17, stk. 1.

Det fremgår af kildeskattelovens § 66, stk. 1, at de selskaber, der er underlagt pligt til indeholdelse af udbytteskatter, i måneden efter vedtagelsen af udbytteudlodningen skal indbetale det indeholdte beløb til SKAT senest samtidig med udløbet af betalingsfristen for selskabets indbetaling af indeholdt A-skat og arbejdsmarkedsbidrag.

Kildeskattelovens § 65, stk. 4 (indtil den 1. januar 2013 § 65, stk. 5), bestemmer, at der ikke skal indeholdes kildeskat af udbytter, hvis udbyttemodtageren er hjemmehørende i udlandet og ikke er omfattet af begrænset skattepligt efter bestemmelsen i selskabsskattelovens § 2, stk. 1, litra c.

Udgangspunktet i selskabsskattelovens § 2, stk. 1, litra c, er, at udenlandske modtagere af udbytte fra Danmark omfattes af begrænset skattepligt. Dette gælder dog navnlig ikke for modtagere af udbytter på datterselskabsaktier (dvs. ejerskab af mindst 10 pct. af det udloddende selskab) eller koncernselskabsaktier (dvs. hvor den udenlandske ejer er sambeskattet med det danske udbyttebetalende selskab eller kan sambeskattes med dette efter selskabsskattelovens § 31 A), forudsat at den udenlandske modtager kan påberåbe sig en dobbeltbeskatningsoverenskomst eller EU's moder/datterselskabsdirektiv (Direktiv 2011/96/EU).

**4.2 Kildeskattebekendtgørelsens regler om fritagelse for indeholdelsespligt**

Skatteministeren har i medfør af kildeskattelovens § 65, stk. 3 (indtil den 1. januar 2013 § 65, stk. 4), adgang til at fastsætte regler om fritagelse for pligten til indeholdelse af udbytteskatter ved udlodninger, der ikke er skattepligtige for modtageren. Denne adgang er udnyttet i kildeskattebekendtgørelsens kapitel 9, der handler om udbytteskatter og royaltyskatter.

Kildeskattebekendtgørelsens § 31 bestemmer, at der bl.a. ikke skal indeholdes udbytteskatter, når modtageren kan modtage udbyttet skattefrit efter reglerne om skattefrihed for datterselskabs/koncernselskabsaktier i aktieavancebeskatningslovens § 4 A eller 4 B, selskabsskattelovens § 2, stk. 1, litra c, selskabsskattelovens § 13, stk. 1, nr. 2, eller fondsbeskatningslovens § 10, stk. 1, medmindre det udloddende selskab er et investeringsselskab fritaget for dansk skattepligt efter selskabsskattelovens § 13, stk. 1, nr. 19.

**4.3 Begrænset skattepligt af udbytte**

I henhold til selskabsskattelovens § 2, stk. 1, litra c, er udenlandske modtagere af udbytte fra Danmark som udgangspunkt begrænset skattepligtige til Danmark af udbyttet. Skattesatsen for den begrænsede skattepligt udgør 27 pct. svarende til den udbytteskat, der ifølge kildeskattelovens § 65, stk. 1, er indeholdt ved udbetaling af udbyttet til den udenlandske aktionær.

**4.4    Bestemmelse af den rigtige procentsats**

Der skal således ikke indeholdes den samme skatteprocent i udbytteskat for samtlige aktionærer. Er aktionærens skattestatus ikke kendt, indeholdes den højeste skatteprocent (27 pct.). Dette betyder dog ikke absolut, at Skattestyrelsen er på den sikre side mht. at indtage lige så meget udbytteskat, som der senere hen er retskrav på refusion for. Handler foretaget på udbyttedatoen, der stadig ikke er afviklet på record day, vil medføre en risiko for refusionskrav fra aktiekøbere, der ikke kan vide, hvor me-

get udbytteskat der blev indbetalt. Deres refusionskrav vil derfor altid rette sig mod de 27 pct. udbyt-teskat, selv hvis den ultimative sælger ikke var trukket for udbytteskat.

### 4.5    Kompensationsbetalinger

Det må lægges til grund, at der er indeholdt udbytteskat, på det udbytte der blev udloddet af de danske selskaber.

En bestemmelse om indeholdelse af udbytteskat på kompensationsbetalingerne, der betales ind i custody-kæden af short sellere og ikke på nogen måde i kæden kan skelnes, fra udbyttet der stammer fra de danske selskaber, findes ikke. Den i Tyskland i 2006 indførte regel til beskatning af udbyttekompensationsbetalingen fra short selleren mangler til dato i Danmark.

### 4.6    Refusion af udbytteskat

Det fremgår bl.a. af kildeskattelovens § 69 B, stk. 1, at *har nogen*, der er skattepligtige efter kildeskattelovens § 2, eller selskabsskattelovens § 2, *modtaget udbytte*, royalty eller renter, hvori der efter §§ 65-65 D *er indeholdt kildeskat*, som overstiger den endelige skat efter en dobbeltbeskatningsoverenskomst, *tilbagebetales beløbet* inden seks måneder fra told- og skatteforvaltningens modtagelse af anmodning om tilbagebetaling.

Af dobbeltbeskatningsoverenskomsten mellem USA og Danmark fremgår af artikel 10, stk. 3, litra c, at udbytte fra et selskab hjemmehørende i Danmark ikke beskattes i Danmark, såfremt den *retmæssige ejer er en pensionskasse*, som om- talt i artikel 22, stk. 2, litra e, der er hjemmehørende i USA. Det er en forudsætning, at sådant udbytte ikke hidrører fra udøvelse af virksomhed af pensionskassen eller gennem et forbundet foretagende.

Af dobbeltbeskatningsoverenskomstens artikel 22, stk. 2, litra e, fremgår, at en person, der er hjemmehørende i en kontraherende stat, alene skal være berettiget til alle fordele efter denne overenskomst, hvis denne person er en juridisk person, hvad enten fritaget for beskatning eller ikke, der er organiseret efter lovgivningen i en kontraherende stat med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændigt erhvervsdrivende. Det er en forudsætning, at mere end 50 pct. af denne persons begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i en af de kontraherende stater.

Hverken Skattestyrelsen eller Skatteankestyrelsen dementerer, at ansøgeren om refusion var en amerikansk 401K-pensionsplan organiseret efter lovgivningen i USA med det formål at yde pension efter en fastsat ordning til arbejdstager, herunder selvstændige erhvervsdrivende.

Idet det om anført ovenfor må lægges til grund, at den omhandlede pensionsplan har været såvel civilretlige som skatteretlige ejer af de omhandlede aktier og udbytter, må det derfor lægge til grund, at pensionsplanen opfylder betingelserne for refusion efter kildeskatteloven og den dertilhørende bekendtgørelse. Og der er som anført ikke grundlag for at nægte refusionen med henvisning til utilstrækkelig indeholdelse af udbytteskatten.

### 5 DOKUMENTATION FOR SKATTEMÆSSIGT RETSMÆSSIGT EJERSKAB

Der findes ingen entydig dokumentation for skattemæssig retmæssig ejerskab. Dette er også bekræftet af den tværministerielle arbejdsgruppe (jf. notatet af den 27. juni 2016, side 2, bilag 5a):

> *"Ved kortlægning af gældende civilretlige regler er det bl.a. konstateret, at der ikke findes regler, der sikrer, at det er muligt at identificere de konkrete ejere af værdipapirer."*

Dette hænger sammen med, at skattemæssigt ejerskab ikke registreres nogen steder. Det eneste, der registreres, er civilretligt ejerskab – og det sker ved hver enkelt investor-custodian i henhold til EU's CSD-direktiv og Finality-direktivet.

I det følgende vil den for civilretligt ejerskab foreliggende dokumentation derfor blive gennemgået.

**5.1 Den i praksis foreliggende dokumentation for et skattemæssigt retsmæssigt ejerskab**

**5.1.1 Broker confirmations (handelsnotaer)**

Den endelige og bindende aftale mellem køberen og sælgeren af en aktie, der medfører, at køberen umiddelbart bliver ejer af aktien, bliver for dematialiserede aktier indgået elektronisk gennem en fondsmægler (broker).

Børsnoterede aktier kan i henhold til kapitalmarkedsloven og den underliggende EU-lovgivning ikke handles uden deltagelse af (autoriserede og kontrollerede) fondsmæglerfirmaer. I brokere føres købs- og slagsordre sammen ved en elektronisk transaktion kaldet "matching". Ved ejermatching-handler agerer brokeren som sælger af aktien til sin egen kunde. Brokeren køber aktien fra en anden kunde eller en anden broker.

Da selve indgåelsen af aftalen, der overdrager ejerskabet til aktien til køberen, er en rent elektronisk proces, kan dokumentation heraf kun ske ved (1) undersøgelse af computeren, hvor købs- og slags-ordre blev ført sammen, eller ved (2) in- direkte beviser som handelsnotaen (= broker confirmations), der efterfølgende udstedes som fysisk dokumentation for, at en elektronisk kontrakt er indgået.

Det skal hertil bemærkes, at handelsnotaen i sig selv *ikke* er selve kontrakten, der overdrager ejerska-bet til aktierne. Eventuelle menneskelige fejl (såsom brug af den forkerte skabelon, der henviser til køb ("BUY") i stedet for salg ("SALE"), eller forkerte datoer, beløb eller lignende trykfejl i en broker confir-mation er uden nogen relevans for gyldigheden af selve købekontrakten, der blev indgået ved den elektroniske matching. Officielle statistikker fra USA viser da også, at ca. 10 pct. af alle broker confirma-tions er fejlbehæftede, jf. præsentation fra konference i USA, jf. præsentation fra ACA's Spring 2015 Compliance Conference, der fremlægges som <u>bilag 84</u>.

Selve kontrakten vedrørende køb af de dematialiserede aktier er en ren elektronisk sammenføring af købs- og salgsordre. En sådan elektronisk kontrakt har i henhold til EU-lovgivningen (forordning 910/2015) samme retsvirkning og bevisværdi som en fysisk kontrakt udarbejdet i papirform.

MIFID II, der i Danmark er gennemført ved kapitalmarkedsloven, har indført regler for en markeds-struktur, der sikrer, at handel finder sted på regulerede markedspladser. For at opnå en bedre beskyt-telse af investorer har MIFID II pålagt alle aktier og andre finansielle instrumenter en handelsforplig-telse på "regulerede handelsfaciliteter" ("trade obligation", artikel 23 i MIFID). Det betyder, at enhver ordre til køb af aktier, der afgives af en kunde til en fondsmægler – der skal have adgang til en regule-ret handelsfacilitet – obligatorisk skal føre til en matching, dvs. indgåelsen af en endelig og bindende aftale om køb af aktier. Fondsmæglere er undergivet in ikke-diskretionær pligt til at gennemføre han-delsordrer via en tilfældig, <u>elektronisk computerstyret "matching-procedure"</u>.

Idet såvel aktierne selv som også kontrakten, ved hvilken ejerskabet til aktierne overdrages, udelukkende eksisterer i elektronisk form, forefindes dokumentationen for begge dele kun i elektronisk form. Fysiske beviser for at aktierne findes, og at ejerskabet hertil er overdraget, er ikke mere end dokumenter, der efterfølgende udstedes til bevisbrug.

Handelsnotaen er således et stykke papir, der repræsenterer det faktum, at der er indgået en elektronisk købsaftale.

Handelsnotaen må ikke – som Skattestyrelsen gør det i styrelsens sammenfattende indlæg af den 9. august 2019 – forveksles med den elektroniske instruktion fra handelsplatformen – hvor matching er sket – til clearing-agenten og custodian om at afvikle handlen.

Handelsnotaen udstedes først, når der fra brokeren er givet instruktioner til clearing-agenten om afvikling af den endelige og bindende købekontrakt. Disse instruktioner sætter en afvikling i gang, som ikke kan stoppes igen. Af netop denne grund hæfter clearing-agenten for betalingen og leveringen af aktierne.

De enkelte trin, der gennemføres ved købet af en aktie, kan skitseres, som følger:



### 5.1.2 Custody statements og DCA

På trods af at clearing og afvikling (settlement) af en aktiehandel, der fører til at aktien registreres i køberens depot hos dennes custodian, ikke er nødvendig for at blive ejer af en dansk aktie, blev pensionsplanens aktiehandler clearet og afviklet, og aktierne registreret i dens depot hos custodian.

Dette dokumenteres ved de fremlagte custody statements. Udskriften fra værdipapirdepotet (custody statement) dokumenterer, at en aktiehandel er blevet clearet, og aktieoverdragelsen afviklet (settlement er sket), og at den dematerialiserede aktie befinder sig på køberens depotkonto.

Der findes ingen pligt til at opbevare danske værdipapirer i et depot ved VP Securities eller i en dansk bank. Manglen på en depotudskrift fra et sådant institut er derfor intet indicium for, at investoren ikke ejer en dansk aktie.

Ingen aktionær har krav på at få oplyst af sin custodian, hvor denne har sine underdepotkonti. Sanjay Shah oplyser ikke engang til High Court i London (jf. hans processkrift, der fremlægges som bilag 85, punkt 56.1.4 og 56.1.5) i hvilke banker Solo-gruppen havde sine depotkonti. Manglen på præsentation af en kæde af subcustodians fra aktionærens egen depotkonto til et depot hos VP Securities kan derfor ligeledes ikke være et indicium for, at aktionæren ikke er ejer af en dansk aktie.

Ud over et custody statement modtager ejeren af en aktie også den af SKAT oprindeligt forlangte Dividend Credit Advice (DCA). Denne udstedes af custodian, når aktiehandlen er afviklet, og udbyttet er modtaget.

De fremlagte custody statements og DCA dokumenterer således at pensionsplanen ikke blot indgik en endelig og bindende aftale om køb af aktier, men at disse aftaler også blev "gennemført" – som Skattestyrelsen gerne lægmandsagtigt ønsker at formulere sig. Korrekt ville Skattestyrelsen tale om, at handlerne var blevet afviklet eller afregnet.

Om handlerne med aktierne blev afviklet (clearing og settlement) ved en "fysisk" levering af aktierne ved en "de-registrering" hos sælger og en "registrering" hos køber og en dertilhørende transfer af aktier mellem sælgers og købers custodian, eller om handlen blev afviklet ved brug af netting (med den konsekvens, at der eventuelt slet ikke sendtes en nettorapport til VP Securities – hvis nettoresultatet er 0), er i denne forbindelse irrelevant.

**5.2 Dokumentation for pensionsplanens skattemæssigt retmæssige ejerskab**

Dokumentation for hvert eneste skridt i gennemførelsen af en komplet udbyttearbitrage transaktion er blevet fremlagt, i det omfang den stadig er til stede. De 12 enkelte skridt kan opsummeres, som følger:

1    Ordre til køb af aktier afgives pr. e-mail til brokeren, som her fremlægges som bilag 86. Samtidig informeres clearing-agenten om, at denne ordre er afgivet, og pensionsplanen beder om tilsagn om at afvikle købet, hvis det matches.
2    Clearing-agenten giver tilsagn til aktiekøbet (hvilket indirekte betyder en garanti for afviklingen og betalingen af aktierne i clearing-agentens egen- skab af prime broker) – dette tilsagn gives i sig selv elektronisk og kan derfor ikke fremlægges i form af et papirdokument, men det bekræftes også via e-mail, jf. bilag 80.
3    Den elektroniske matching af købsordren og derved indgåelsen af en bindende aftale om køb af aktierne bliver bekræftet af mægleren (broker) pr. e-mail. Selve matchingen er en elektronisk proces, som man ikke kan dokumentere i sig selv, dog bekræfter mægleren handlen pr. e-mail, som er fremlagt som bilag 86. Senere sender brokeren handelsnotaen, som er fremlagt som bilag 11.
4    Faktura fra fondsmægleren (broker) bliver modtaget pr. e-mail. Er frem- lagt som bilag 11.
5    En broker confirmation (handelsnota) bliver modtaget pr. e-mail, jf. bilag 11.
6    Ordre til at sælge aktier gennem en forwardkontrakt bliver afgivet pr. e- mail, jf. bilag 86.
7    Bekræftelse vedrørende forwardkontrakten bliver modtaget pr. e-mail, jf. bilag 80.
8    Ordre vedrørende aktieudlån bliver afgivet pr. e-mail, jf. bilag 86.
9    Bekræftelse af aktieudlån bliver modtaget pr. e-mail, eksempel fremlægges som jf. bilag 80.

10   De enkelte skridt til at sælge aktierne igen svarer til de, der er beskrevet under punkt 1-5 i forbindelse med købet af aktierne.

11   Den åbne forwardkontrakt bliver lukket ved at placere en ordre til at købe en forwardkontrakt (jf. punkt 6 og 7).

12   Aktieudlånet bliver kaldt tilbage pr. e-mail, hvilket også blev bekræftet pr. e-mail (jf. punkt 8 og 9).

Idet selve aftalen om overdragelsen af ejerskab til en aktie indgås rent elektronisk (ved matching af købs- og salgsordre i computersystemerne), er handelsnotaen (broker confirmation), der udstedes, efter handlen er indgået, blot en bekræftelse af, hvad der elektronisk er sket. Skrivefejl i en broker-confirmation har derfor ingen indflydelse på, om der foreligger en endelig og bindende aftale.

Clearing- og afvikling af aktiehandlen sker ligeledes elektronisk på computersystemer, som kunderne (pensionsplanen) ikke har adgang til. Pensionsplanen har kun adgang til de e-mails, de selv har sendt og modtaget, samt den dokumentation, der efter handlen udstedes som dokumentation: en broker confirmation (handels- nota), et DCA (Dividend Credit Advice) og et custody statement (kontoudtog over depotkonto). Andre dokumenter kan pensionsplanen ikke have i sin besiddelse som dokumentation for ejerskabet.

Pensionsplanen har fremlagt følgende dokumentation for at eftervise købet og ejerskabet af aktierne, finansieringen af aktiekøbene og modtagelse af udbyttet:

1   Ordre til køb og salg af aktier (e-mails). Når sådanne e-mails matches, sluttes kontrakten til køb eller salg af aktier

2   Broker confirmations = handelsnotaer, der viser, at der er indgået en elektronisk kontrakt om køb eller salg af aktier

3   Dividend Credit Advice: Viser ikke kun ejerskab af aktier, men også modtagelse af et nettoudbytte

4   Custody statements, der viser aktieposterne, aktieudlån og forward hedgen.

5   E-mails vedrørende clearing og afvikling af transaktionerne

6   GMSLA-rammeaftaler samt e-mails, der i hvert enkelt tilfælde konkretiserer betingelserne for det enkelte aktieudlån. Pensionsplanen har hermed fremlagt "al korrespondance om aktielån". Skattestyrelsens påstand på side 17 er forkert. Skattestyrelsens opfordring i styrelsens 3. indlæg om at fremlægge al korrespondance er blevet besvaret.

Herudover har pensionsplanen fremlagt dokumentationen i forbindelse med kontoåbningsproceduren hos de forskellige finansielle virksomheder, der var involveret i aktietransaktionerne.

Det er således ikke korrekt, når Skattestyrelsen påstår, at ingen af pensionsplanerne har fremlagt

> "nogen form for fysisk eller elektronisk dokumentation for de- res tidligere aktie-besiddelser (som udgjorde grundlaget for deres refusionsanmodninger)" (indlæg af den 9. maj 2019, pkt. 1)

Skattestyrelsen forlanger på den ene side, at Landsskatteretten skal se bort fra de selvsamme dokumenter, som styrelsen på den anden side samtidig påstår, ikke eksisterer. Dokumenterne, som pensionsplanen havde i sin besiddelse, og yderligere dokumentation, som den har fremskaffet, eftersom Skattestyrelsen tilsyneladende ikke var tilfreds med den allerede fremlagte dokumentation, er indleveret til Skatteankestyrelsen.

I et forsøg på at bringe den fremlagte dokumentation i miskredit påberåber Skattestyrelsen sig, at de virksomheder, der udstedte dokumentationen, var uærlige og udstedte falsk dokumentation. Herved ignorerer Skattestyrelsen komplet, at hverken nogen af de involverede uafhængige virksomheder, re-

visorer, finanstilsyn eller andre offentlige myndigheder til dato har påstået eller dokumenteret at, nogen af de påberåbte dokumenter i sagen skulle være falske.

Taget i betragtning at elektroniske dokumenter har almindelig bevisværdi, og købekontrakterne, der umiddelbart førte til, at pensionsplanerne blev ejere af de danske aktier, blev indgået *elektronisk* gennem fondsmæglerne, er det denne elektroniske matching, der skal dokumenteres i denne sag. Denne elektroniske matching er pensionsplanen ikke i besiddelse af, da den sker hos fondsmæglerne, dvs. på den handelsplatform hvor mæglerne agerer.

Efter den elektroniske matching, der udgør selve købekontrakten, udstedes diverse dokumenter i fysisk form. Disse kan have skrive- og trykfejl, som dog er uden betydning for gyldigheden af kontrakten, der allerede var sluttet elektronisk.

Umiddelbart efter den elektroniske matching af købs- og salgsordre gives instruktioner videre til clearing og afvikling. Clearing og afvikling af handlen er et yderligere bevis for, at der tidligere var indgået en købskontrakt. Dette yderligere bevis kan pensionsplanen dog ikke levere, da Solo-gruppens computere er blevet beslaglagt.

**KONKLUSION PÅ FØRSTE DEL**

Pensionsplanen blev den skattemæssigt retmæssige ejer af aktierne og modtog udbytte fra de danske selskaber, idet også kompensationsbetalingen fra en short seller må betragtes som udbytte i henhold til den dansk-amerikanske dobbeltbeskatningsoverenskomsts artikel 10, eftersom ingen ejer af en aktie kan skelne mellem aktier købt af short sellere og aktier købt af long ownere.

Ligestilles kompensationsbetalingen ikke med et ægte udbytte fra selskabet selv, vil dette – ud over de rent faktuelle problemer, der opstår, når ingen kan skelne mellem kompensationsbetalingen og udnyttet i kæden af custodians – også medføre, at modtageren af kompensationsbetalingen ikke vil være skattepligtig heraf, idet den så heller ikke vil være omfattet af statsskattelovens § 4. Enhver dansk skattepligtig modtager af et udbytte ville i det tilfælde påberåbe sig at have modtaget en kompensationsbetaling og ikke et ægte udbytte.

Pensionsplanens ejerskab af aktierne er også dokumenteret ved alle de af EU-lovgivningen forlangte dokumenter for ejerskab. Yderligere dokumentation kan ingen fremlægge som bevis for skattemæssigt retmæssigt ejerskab.

**DEL 2: SKATTESTYRELSENS SYNSPUNKTER BEROR PÅ ET UDO- KUMENTERET OG FORKERT GRUNDLAG – IKKE GRUNDLAG FOR TILBAGEKALDELSE**

**6 SKATTESTYRELSENS MANGLENDE SAGSOPLYSNING**

Det skal i særlig grad fremhæves, at Skattestyrelsen – på linje med alle andre myndigheder – har haft ansvaret for at oplyse sagen tilstrækkeligt, inden Skattestyrelsen traf afgørelse i sagen.

Dette er et helt grundlæggende princip i dansk forvaltningsret. Princippet – benævnt officialprincippet eller officialmaksimen – er ikke lovfæstet, men udtryk for noget så grundlæggende, at det i teorien antages, at det er udtryk for en almindelig retsgrundsætning.

Formålet med officialprincippet er at understøtte, at der træffes materielt lovlige og rigtige afgørelser.

Officialprincippet hører til de såkaldte garantiforskrifter, og hvis en sag er utilstrækkeligt oplyst, kan det betyde, at afgørelsen må tilsidesættes som ugyldig. Det kan også betyde, at sagen må genoptages, så de manglende undersøgelser kan blive foretaget.

I nærværende sag har Skattestyrelsen i vidt omfang forsømt at overholde officialprincippet. Dette er særligt kritisabelt, når henses til den ekstraordinært store sagsgenstand og de meget alvorlige beskyldninger, og den heraf afledte store betydning for pensionsplanerne og disses ejere.

I den forbindelse skal særligt fremhæves den manglende rapport fra den 19. juni 2018 fra Deloitte, der var udarbejdet på anmodning fra Kammeradvokaten v/Boris Frederiksen. I Deloitte-rapporten er fulgt den komplette pengestrøm til Solo Capital-gruppens kapitalkonto hos Barclays Bank, men Skattestyrelsen har imidlertid ikke fremlagt denne rapport i sagen.

Dertil kommer, at Skattestyrelsen ikke har fået kopi fra SØIK af de oplysninger, der er relevante for sagerne, herunder særligt de oplysninger, som er relevante for dokumentation af de omtvistede aktietransaktioner og modtagelsen af udbytte mv.

Skattestyrelsen har endvidere forsømt at indhente relevante oplysninger hos de mange professionelle udenlandske aktører og udenlandske kontrol- og tilsynsmyndigheder.

Skattestyrelsen har tilsyneladende end ikke orienteret sig hos VP Securities om, hvordan værdipapirafviklingen foregår i praksis, herunder hvad der sker med udbyttet, når et aktiekøb ikke er afviklet endnu på record day. Dette er særligt kritisabelt når henses til den helt centrale betydning, som afviklingen af market claim processen har i nærværende sag.

Forsømmelsen af at indhente relevante oplysninger skal ses i lyset af, at SKAT via sine kontrolbeføjelser har reel mulighed for at indhente de af SKAT efterspurgte oplysninger.

I nærværende sag har SKAT imidlertid baseret sin opfattelse på udokumenterede antagelser om pensionsplanernes manglende ejerskab og udlån af de omhandlede aktier. SKAT har således ikke ført noget egentligt bevis for påstanden om manglende ejerskab mv., og påstanden er således aldeles udokumenteret.

Ved afgørelsen af nærværende sag er det meget væsentligt at holde sig for øje, at manglende tilstrækkelig sagsoplysning ikke kan komme pensionsplanerne til skade. Dette gælder særligt, når Skattestyrelsen, der som anført har en række særlige værktøjer til oplysning af sagen, er den nærmeste til at oplyse en række af sagens forhold.

Den manglende sagsoplysning må således i enhver henseende komme Skattestyrelsen til skade.

**7 FREMLAGT OG MANGLENDE DOKUMENTATION**

**7.1 Skattestyrelsens udokumenterede påstand om falsk dokumentation**

Idet Skattestyrelsen meget vel erkender, at de fremlagte dokumenter (aftaler, e- mails, custody statements, DCN'er) tilsammen beviser, at pensionsplanen var ejer af aktierne, modtog nettoudbyttet og havde retskrav på refusion, forsøger Skatte- styrelsen at overbevise Landsskatteretten om at se bort fra denne dokumentation, under påstand om at denne angiveligt skulle være "falsk".

Skattestyrelsen tøver stadig med udtrykkeligt at påberåbe sig dokumentfalsk. Dette, sandsynligvis på baggrund af at ingen af de involverede uafhængige virksomheder, der har udstedt disse dokumenter,

er blevet sigtet for dokumentfalsk af hverken de ansvarlige revisorer, finanstilsyn eller anklagemyndig-heder. End ikke den omfangsrige dokumentation, der er blevet fremlagt af de hundredevis af stævnede personer for domstolene over hele verden, hvor Skattestyrelsen har startet en stormflod af civile søgs-mål, har frembragt nogen form for bevis at der skulle være tale om dokumentfalsk.

Skattestyrelsen forsøger at afkræfte bevisværdien af den fremlagte dokumentation og benægte realite-ten i transaktionerne ved at fremhæve trykfejl og andre mangler i de fremlagte papirer. Skattestyrelsen mener, at disse fejl skulle være mistillidsskabende.

Hertil skal indledningsvis bemærkes, at denne sag ikke er en sag om trykfejl i diverse dokumenter. Det er en sag om, hvordan man bliver ejer af en dansk aktie, og om hvorvidt pensionsplanerne har modta-get et nettoudbytte fra deres aktier.

Ved en gennemgang af de omtalte fejl og mangler ses, at der gennemgående er tale om menneskelige trykfejl. Disse fejl er netop udtryk for realiteten i transaktionen og dokumentationen heraf. Havde bro-kernes og Solo-gruppens eneste opgaver og formål været at fremstille falske dokumenter – og ikke, som det i virkeligheden var tilfældet, at matche købs- og salgsordrer (brokernes virkelige opgave) og cleare og afvikle reelle aktiehandler (Solo-gruppens virkelige opgave) – må det formodes, at så mange selskaber med så mange medarbejdere i det mindste ville have været i stand til at fremstille korrekte "falske" dokumenter uden trykfejl eller andre mangler. Da Solo-gruppen imidlertid koncentrerede sig om clearing, afvikling og opbevaring af aktier, traderne koncentrerede sig om at placere købs- og salgs-ordrer samt fremskaffe finansieringen ved at finde låntagere til deres aktieposter, og fondsmæglerne koncentrerede sig om at matche købs- og salgsordrer på den alternative markedsplads, var der ingen, der bemærkede de for selve transaktionerne ubetydelige menneskelige trykfejl i dokumentationen, der blot beviser, hvad aktørerne i virkelighedens verden har gennemført af transaktioner. Rigtige menne-sker, der foretager rigtige transaktioner og skal dokumentere dette, laver rigtige fejl. Det er de fejl, som Skattestyrelsen under et stort detektivarbejde har identificeret. En perfekt dokumentation uden de i al-mindelig aktiehandel normale fejl ville derimod indikere, at materialet var fremstillet til formålet og ikke kunne dokumentere reelle aktietransaktioner.

**7.1.1 Fejl i dokumentation fra brokere**

Skattestyrelsen lader til at forveksle menneskelige fejl – der sker helt uden eller nærmere sagt mod de handlende personers vilje – og svindel, der kræver forsæt. Hvis Skattestyrelsen for alvor er af den op-fattelse, at en skrivefejl i dokumentationen over en aktiehandel gør selve handlen ugyldig eller endog svigagtig, er 10 pct. af alle handler i hele verden ugyldige eller svigagtige. En position, som Skattestyrel-sen ikke med alvor kan indtage.

Dokumentationen er jo ikke selve handlen, men det lader Skattestyrelsen også i det sammenfattende indlæg i førersagerne af den 9. august 2019, afsnit 8.6, side 70, stadig ikke til at kunne eller ville forstå. Skrivefejl kan ske og sker de facto hver dag, også inden for aktiehandel. Aktiehandlerne i sig selv berø-res dog ikke af disse skrivefejl. Aktiehandlerne finder korrekt sted, og da de er bundet ind i et så strengt reguleret system, kan der ikke svindles med aktiehandel. Det har EU aller- senest med MIFID og MIFIR sikret.

Hvis Skattestyrelsen for alvor er af den opfattelse, at menneskelige skrivefejl medfører, at dokumentet, der indeholder en skrivefejl, er fiktivt, svigagtigt eller ikke-eksisterende, så må pensionsplanerne kon-statere, at Skattestyrelsen selv må se sig konfronteret med det faktum, at styrelsen i det tilfælde slet ikke har sagsøgt nogen i de civile retssager, da Skattestyrelsen i disse sager konstant fejlagtigt har be-tegnet sagsøger som "SKAT". En fejl, som Skattestyrelsens engelske advokat, Pinsent Masons, har in-drømmet over for High Court i London.

### 7.1.1.1 Forskellige handelsdatoer på broker confirmations og custody statements

Skattestyrelsen fremhæver i styrelsens sammenfattende indlæg, afsnit 5.4.3, side 36, at der skulle være

> *"flere tilfælde, hvor handelsnotaerne (bilag 11) ikke stemmer overens med oplys-ningerne i custody statements (bilag 10) og Credit Advices (bilag Q)".*

Heraf følger ganske rigtigt, at custody statements – der i realiteten dokumenterer settlement – ikke passer med handelsnotaerne i bilag 11. Custody statements stemmer dog overens med de clearing-til-sagn, der blev fremlagt som bilag 80.

Bilag 11 var en fejlagtig handelsnota vedlagt regningen fra brokeren Sunrise, som blev modtaget længe efter transaktionerne.

Skattestyrelsen fremhæver yderligere, at pensionsplanerne ikke har fremlagt nogen dokumentation for, hvordan settlement skulle være sket korrekt, til trods for at handelsnotaerne (angiveligt) var fejlbe-hæftede.

Hertil skal bemærkes, at settlement netop ikke foregår på grundlag af handelsnotaerne. Settlement sker på grundlag af de elektroniske **clearing- og settlementinstruktioner**, som går fra handelsplatfor-men, hvor købs- og slagsordre matches, til clearing-agenten og custodian. Sådanne elektroniske afvik-lingsinstruktioner, der går fra en computer til en anden, kan pensionsplanerne uden adgang til disse computere ikke fremlægge.

Kun SØIK kan fremlægge denne dokumentation, da de er i besiddelse af computersystemerne.

Handelsnotaen udstedes først af brokeren (flere uger), efter settlementinstruktionerne er afgivet.

Efter at have konstateret uoverensstemmelser mellem handelsnotaerne – derud- viser menneskelige skrivefejl – og custody statements, analyserer Skattestyrelsen da også i afsnit 5.4.3.1, side 37, datoerne, der er angivet som handelsdato og som settlement-dato i de forskellige bilag, og kommer selv til den helt rigtige konklusion, at

> *"Der er flere forhold, som kunne tyde på, at uoverensstemmelsen mellem custody statement og handelsnotaen skyldes en fejl begået af brokeren"*

Disse skrivefejl i en broker confirmation gør dog ikke selve aktiehandlen, der sker ved elektronisk mat-ching af købs- og salgsordre, ugyldig.

Betydningen, som pensionsplanerne henviser til, at handelsnotaerne har som dokumentation i sagen, er ikke en betydning, som pensionsplanerne har opfundet, sådan som Skattestyrelsen antyder. Lovgi-ver har i modsætning til Skattestyrelsen forstået, at når settlement af en handel – hvilket i dansk sprog-brug betegnes som "afvikling" eller "afregning" – ikke er nødvendigt for at blive ejer af en aktie, så må dokumentationen, man kan finde for handlen, findes et andet sted. Dokumentationen må findes for den købekontrakt, der indgås elektronisk ved matching af købs- og salgsordre.

En sådan dokumentation er handelsnotaen. Hvis en sådan handelsnota indeholder fejl, betyder dette dog ikke, at handlen ikke har fundet sted. Handelsnotaen er blot udtryk for det, der er sket elektronisk.

Når uafhængige, autoriserede og kontrollerede fondsmæglere har udstedt disse handelsnotaer, er det udtryk for, at de under deres professionelle ansvar har gennemført en handel.

Det bemærkes hertil, at en handel er gennemført, allerede når købs- og salgsordre er matchet. Skattestyrelsen tager fejl i styrelsens påstand om, at pensionsplanerne ikke har dokumenteret, at en aftale om køb af aktier er blevet gennemført. Da ejerskabet skifter til køberen, når kontrakten indgås, er kontraktens indgåelse i sig selv også gennemførelsen.

En broker confirmation er blot dokumentation for, at en elektronisk aftale er indgået. Det er ikke selve aftalen. Der, hvor selve indholdet af aftalen manifesterer sig, er registreringen af det købte antal aktier på depotkontoen hos custodian. Dette vises i custody statements.

Custody statements indeholder de korrekte datoer, og disse bekræftes og understøttes af de handelse-mails, der er fremlagt i sagerne. Handlen blev indgået ved at matche de ordrer, der fremgår af e-mails.

Handelsdatoen i de fremlagte e-mails passer til handelsdatoen i custody statements og i DCA. Det er udelukkende mægleren, der har begået en fejl i udarbejdelsen af dokumentationen, der var vedlagt hans regninger.

### 7.1.1.2   Handelsnotaer forveksler køb og salg

Den af Skattestyrelsen konstaterede henvisning til et køb af aktier, mens custody statements viser et salg, er ligeledes udtryk for en menneskelig fejltagelse. Pensionsplanen, der tydeligvis koncentrerede sig om at gennemføre aktiehandlerne og verificere, at de bestilte henholdsvis solgte aktier blev ordentligt registret på pensionsplanens depotkonto, har ikke bemærket denne skrivefejl i handelsnotaerne modtaget fra pensionsplanens mægler. Pensionsplanens ordre var overensstemmende med registreringen på pensionsplanens depotkonto. Ofte modtog pensionsplanen også først handelsnotaerne, flere uger efter en aktietransaktion var gennemført.

Pensionsplanen har som følge af Skattestyrelsens skrivelse været i kontakt med brokeren og kan herefter oplyse, at det helt åbenbart var en menneskelig fejl foretaget at den ansatte medarbejder, der skulle udstede handelsnotaen. Medarbejderen brugte den forkerte skabelon, hvor der standardmæssigt var anført "BUY", og ikke skabelonen med "SALE".

### 7.1.1.3   Handelsnota angiver pris som "#####"

Også eksemplet på en handelsnota fra brokeren Bastion Capital London Ltd., hvor prisen på salget af 7.884 Mærsk-aktier er angivet som *"#########"* (bilag AA, side 57) er tydeligvis en computerfejl.

Pensionsplanen har som ovenfor anført heller ikke tidligere bemærket denne trykfejl, idet en broker confirmation først modtages, længe efter selve aktietransaktionen er gennemført.

Fejlen er som dokumenteret ved e-mails af den 7 januar og 16. maj 2019 fra Bastion Capital London Ltd., der fremlægges som <u>bilag 88 og 89</u>, også blevet bekræftet af brokeren Bastion Capital London Ltd, idet det anføres, at feltet ikke indeholdt et antal, men kun *"####"*, da feltets størrelse var indstillet med for få tegn til at kunne gengive det korrekte beløb. Bastion Capital London Ltd. har herefter udstedt en korrigeret broker confirmation. Dette er der intet "mystisk" i, selvom Skattestyrelsen gerne vil se en mystik, i alt hvad der foregår i denne sag. Sagens faktum er blot redegjort for og dokumenteret, således som Skattestyrelsen har opfordret til.

Naturligvis har pensionsplanernes repræsentanter anmodet brokeren om at ud- stede en korrekt bro-ker confirmation, nu efter fejlen er opdaget ved Skattestyrelsens detektivarbejde.

At Adrian Mildne udstedte den nye broker confirmation, selvom han i dag ikke længere arbejder for sin brors virksomhed, Bastion Capital London Ltd., har den enkle forklaring, at han stadig har formularen på sin computer, og at det var hans fejl, at formularen var indstillet med for få tegn. Adrian Mildne kunne derfor også så længe efter transaktionerne bekræfte, at feltet simpelthen var forkert indstillet, for han havde jo stadig originalen på sin computer. De reelle, originale transaktioner var registreret i hans computer. Om det nu er Adrian Mildne eller hans bror, Patrick Mildne, der underskriver en formu-lar, der oprindeligt – i original – stammer fra en computer, som Adrian Mildne i det mindste har en kopi af, er for så vidt underordnet. Det svækker på ingen måde troværdigheden af den fremlagte dokumen-tation.

### 7.1.1.4 Handelsnotaer tager ikke højde for helligdage

Skattestyrelsen mener, at handelsnotaerne fejlagtigt ikke skulle have taget højde for helligdage og an-fører hertil, at hverdage skal fastlægges, ud fra markedet i det land hvor aktien handles. Om dette nu er rigtigt eller ej – hvorfor skulle en OTC- handel, der gennemføres af udlændinge ved udenlandske brokere, og som afvikles af udenlandske clearing-agenter og custodians, holde sig til danske hverdage? – er herved ikke af afgørende betydning.

Faktum er, som Skattestyrelsen selv angiver det, at handlen i realiteten blev afviklet T+3 i henhold til den danske helligdagskalender. Handelsnotaen fra Sunrise Brokers var endnu en gang som så ofte fejl-agtig, da den viste T+6. Denne trykfejl betyder dog ikke, at det aftalte ikke blev overholdt. Det aftalte var indholdet i computeren, som SØIK har beslaglagt.

### 7.1.1.5 Fejl i andre handelsnotaer

De af Skattestyrelsen fremhævede fejl i handelsnotaer fra andre sager, der ikke er førersager, bekræf-ter kun pensionsplanernes udsagn om, hvor mange trykfejl der var i de for selve forretningen "udbytte-arbitrage" uvæsentlige bekræftelser af, hvad der var sket i realitetens verden. Den endelige og bin-dende aftale er en elektronisk transaktion, og den var der ingen fejl ved. Dette dokumenteres af de fremlagte custody statements.

Pensionsplanerne var klar over, at de var engagerede sig i udbyttearbitrage, og at de pga. den margi-nale profit, de kan realisere, på hver en aktie de ejer, er nødt til at erhverve enorme aktiemængder. Dette kan naturligvis kun lade sig gøre ved at anvende service providere, der tilbyder de nødvendige tjenesteydelser som en "fabriksvare". Som i enhver anden fabrik betyder stigende produktion også en stigende mængde fejl.

Taget i betragtning, hvor mange transaktioner der er gennemført af pensionsplanerne, og hvor mange enkelte skridt der er nødvendige, for at dette alt sammen falder på plads, er det virkelig bemærkelses-værdige ikke, at der er fejl i den efterfølgende dokumentation, men hvor få der i virkeligheden er.

### 7.1.2 Fejl i dokumentation fra custodian – custody statement og kontoudtog

Skattestyrelsen lader til at misforstå, hvad det er for dokumentation, der er fremlagt ved kontormøder-ne med Skatteankestyrelsen.

Skattestyrelsen skriver således i styrelsens 3. indlæg af den 9. maj 2019, pkt. 3.4, at,

> "De fremlagte oversigter over bogføringer (bilag 45-49 samt PowerPoint-præsen-
> tation, s. 134) er ikke kontoudtog, men alene udklip fra udaterede Excel-ark, som
> ikke har noget auto- ritativt præg, og hvis oprindelse ikke er dokumenteret."

Hertil bemærkes, at oversigten er udarbejdet af Schaffelhuber Müller & Kollegen S.à r.l. til brug for kontormøderne til at forklare transaktionerne. Dette blev også oplyst til Skatteankestyrelsen ved kontormøderne.

De fremlagte oversigterne er blot et resumé af begivenhederne, som er udarbejdet at Schaffelhuber Müller & Kollegen S.à r.l. på basis af de optegnelser over handlerne, som pensionsplanerne havde til rådighed. Som Skattestyrelsen burde have bemærket, er der intet sted er angivet, at dette er et kontoudskrift fra custodians computersystemer. I det tilfælde ville oversigterne jo havde angivet den enkelte custodians navn og være udarbejdet på custodians brevpapir.

Oversigterne er udarbejdet som et hjælpeinstrument for Skattestyrelsen og Landsskatteretten/Skatteankestyrelsen til at forstå de enkelte trin af en komplet aktietransaktion, der består i så mange enkelte delaspekter. Således giver de mening.

Skattestyrelsen bemærker videre til disse oversigter:

> " Oversigterne over bogføringer (bilag 45-49 og PowerPoint- præsentation, s.
> 134, fra kontormøderne) rummer ikke alle transaktioner for den givne pensions-
> plan for en given periode, men kun uddrag."

Det er ganske rigtigt. Som Skattestyrelsen rigtig bemærker, er der netop tale om et uddrag af bogføringer af transaktioner. Uddrag betyder, at ikke alt er taget med. For at lette forståelsen har vi kun medtaget transaktioner vedrørende en enkelt aktie. Ellers ville oversigten blive uoverskuelig og kompliceret. Oversigten var kun udarbejdet som en forklaring af et enkelt eksempel. Oversigten er og skulle ikke være et formelt kontoudtog fra et kontoførende institut.

Skattestyrelsen forstår ikke, hvorfor modtagelsen af refusionen fremgår af oversigterne udarbejdet til Skatteankestyrelsen, men ikke af de fremlagte custody statements. Grunden hertil er relativt enkel: Som forklaret ved kontormøderne viser nogle sider af custody statements aktiekøb og -salg. Andre viser lånetransaktionerne, og andre igen viser forwardtransaktionerne. Custody statements viser således alle transaktioner vedrørende aktiepositionerne. Udbytterefusionen blev naturligvis ikke bogført på aktiekontiene, men derimod på en "cash account". Denne cash account kunne pensionsplanerne løbende se online. Eftersom Skattestyrelsen lægger så stor vægt på ligeledes at se bevægelserne på kontantkontoen, har pensionsplanerne under stor anstrengelse kunnet fremskaffe de her som <u>bilag 90</u> fremlagte kontoudtog over bevægelserne på deres kontantkonto som ført ved deres respektive custodian.

Pensionsplanerne har til dato ikke betragtet dokumentation for modtagelse af udbytterefusionen for væsentlig for sagen, idet Skattestyrelsen jo godt ved, hvor meget udbytterefusion SKAT har udbetalt til pensionsplanernes agent på vegne af pensionsplanerne. Det fremgår jo også tydeligt af Skattestyrelsens egne bilag. Der er heller ingen af pensionsplanerne, der bestrider modtagelsen af udbytterefusionen.

Hvis Skattestyrelsen mener, at udbytterefusionen ikke skulle være tilgået pensionsplanerne, så rejses det alvorlige spørgsmål om, hvorfor Skattestyrelsen har stævnet alle pensionsplanerne i USA for tilbagebetaling og derved forårsaget så enorme omkostninger for de danske skatteborgere.

Den af Skattestyrelsen efterlyste dokumentation for betaling af brokeren, tax agent og custody fee fremgår af de her fremlagte cash account statements.

Den af Skattestyrelsen efterspurgte stock lending fee, der fremgår af oversigten, dækker de samlede omkostninger og renter i forbindelse med aktieudlånet. Der er altså tale om totalsummen af begge posteringer, der af custody agreement frem- står som "stock lending fee" og "interest". At oversigten benytter andre betegnelser end custody statement, er simpelthen fordi disse to ikke er udarbejdet af de samme personer. Oversigten er som sagt et resumé og trækker derfor forskellige poster sammen.

Der er følgelig ikke tale om fejl i de fremlagte custody statements. De uoverensstemmelser, der er konstateret, er opstået ved de forenklinger, som er foretaget i oversigterne, der er udarbejdet af Schaffel-huber Müller & Kollegen S.à r.l., for at forklare transaktionerne på en simpel måde for Skatteankestyrelsen.

Desuden forholder det sig således, at fejlkvotienten i custody statements i henhold til officielle amerikanske statistikker er 9:1, hvilket betyder at 10 pct. af alle dokumenter vedrørende aktietransaktioner er fejlbehæftede. Fejl er således intet udtryk for, at der ikke blev handlet danske aktier, tværtimod.

**7.1.3 Overholdelse af GMSLA**

Skattestyrelsen anfører i det sammenfattende indlæg af den 9. august 2019 i afsnit 3.2.4, side 18, at GMSLA'er ikke skulle være overholdt.

Det anføres i denne forbindelse, at GMSLA'erne skulle forudse en såkaldt "Marking to market" ("MTM") re-evaluering af værdien af aktierne, og denne svarede til den kontante sikkerhedsstillelse, for at sikre at der hverken forelå en over- eller en undersikring.

Spørgsmålet om en over- eller undersikring har absolut intet at gøre med spørgs- målet om, hvorvidt pensionsplanerne var ejere af de danske aktier og modtog ud- bytte. GMSLA'erne forudser derfor både i afsnit 5.4.b og i afsnit 5.5.b, at aktielån- tager og aktielångiver kun efter anmodning vil modtage en yderligere betaling af sikkerhed eller en tilbagebetaling af den allerede stillede sikkerhed. Det er derfor ikke relevant, om 5.4 eller 5.5finder anvendelse.

Skattestyrelsen kan dog ud fra de fremlagte custody statements, der er udarbejdet for at vise samtlige årets transaktioner, ikke se hver enkelt bogføring af den daglige MTM. Det årlige kontoudtog viser et sammenfattende beløb i slutningen af året.

Da vi ikke har adgang til computersystemet "TAS", der befinder sig på Solo-gruppens computere, og som foretog disse daglige MTM-beregninger – jf. punkt 56.8.3, side 23, i Sanjay Shahs processkrift – og ikke har daglige udskrifter fra dette system, har vi ved udarbejdelsen af vores støttedokument til forklaring af transaktionerne heller ikke kunnet optage disse enkelte daglige bogføringer. De ville i øvrigt have gjort oversigten totalt uoverskuelig og dermed tilintetgøre hele formålet med et forklarende støttedokument.

Idet disse daglige MTM-reguleringer er uden betydning for ejerskabet, er der ikke foretager nærmere undersøgelser af forholdet omkring MTM.

### 7.1.4 Stock lending rate

Skattestyrelsen anfører i det sammenfattende indlæg af den 9. august 2019 i afsnit 3.2.5, at stock lending rate fastsættes arbitrært, og at den aftale rate ikke anvendes.

Skattestyrelsen tvivler på, at betingelserne for aktielånene forhandles mellem partnerne, blot fordi (1) man i de fremlagte e-mails kan se de samme betingelser, og (2) den aftale rente ikke skulle være overholdt.

Havde Skattestyrelsen set bedre efter, ville man havde set, at der ikke var fastsat nogen låneperiode (Term: open). Dette medfører, at pensionsplanen og den professionelle mellemmand i aktielån på ethvert tidspunkt kunne opsige lånet, hvis modparten ikke gik med til ændrede, nye markedsbetingelser. At rentesatsen konstant blev ændret mellem parterne, ses, derved at man ikke kan regne baglæns, sådan om Skattestyrelsen forsøger i afsnit 4.5, side 28. Det er forkert kun at anvende en enkelt rentesats for hele låneperioden. Da dette er en regelmæssig øvelse, sker det ofte telefonisk. Vi har som bilag 79 fremlagt enkelte eksempler på e-mails sendt i forbindelse med aftalen om en "re-rating".

Den til ethvert tidspunkt aftalte rentesats blev overholdt. Der gjaldt bare ikke konstant den samme rentesats.

Hvad angår det faktum, at der på en givent tidspunkt er aftalt samme rentesats i alle aktieudlånene, er dette en naturlig konsekvens af, at (1) alle pensionsplanerne arbejdede med de samme fem mellemmænd i aktielån (stock loan intermediaries), og disse derfor naturligvis ved indgåelsen af aftalerne anvendte den på det tids- punkt gældende markedsrente, og (2) at der efterfølgende formfrit blev aftalt andre rentesatser ved en såkaldt "re-rating".

Hvorvidt pensionsplanerne i deres løbende forhandlinger med mellemmændene i aktielån var i stand til at forhandle sig til andre rentesatser, afhang som sagt af det aktuelle marked og pensionsplanernes forhandlingsevne.

### 7.2 Manglende dokumentation

Vi vil i det følgende redegøre for den dokumentation, som Skattestyrelsen hævder mangler i nærværende sag.

### 7.2.1 Købekontrakten over aktierne

Pensionsplanerne kan ikke umiddelbart dokumentere selve kontrakten, med hvilken aktierne blev købt, da denne kontrakt er elektronisk. Den sluttes, når købs- og slagsordre matches.

### 7.2.2 Pengestrøm og kontoudtog

#### 7.2.2.1 Pengestrøm

Skattestyrelsen forlanger af få dokumenteret en pengestrøm til pensionsplanerne. En sådan pengestrøm er ikke nødvendig for at blive ejer af en aktie. Ejerskabet erhverves allerede inden betalingen af aktien.

Da afviklingen af køb (og salg) af aktier foregår efter princippet "delivery versus payment", må betalingsstrømmen for aktierne dog nødvendigvis ske fra en kontantkonto hos custodian. Ellers kan custodian jo ikke sikre, at betalingen sker, samtidig med at aktierne leveres til køberens konto.

Da betalingen skal ske fra en kontant konto hos custodian, indbetales den kontante sikkerhedsstillelse under aktieudlånet ligeledes til denne konto hos custodian. Dette sikrer også, at aktielåntager modtager aktierne, på samme tidspunkt som han betaler den kontante sikkerhedsstillelse.

Også modtagelsen af nettoudbyttet kan kun være sket på pensionsplanens konto hos dens custodian, idet pengestrømmen fra selskabet ned igennem sub-custodykæden kun kan nå frem til custodian, ikke til nogen som helst anden bank eller finansiel virksomhed.

Da pensionsplanerne brugte et onlinesystem til at se pengestrømmene til deres egne konti, kan de uden computeren fra deres custodian ikke dokumentere alle disse pengestrømme. Det eneste, pensionspla-nerne kan vise, er de cash account statements fra deres egne custodians, som de stadig har opbevaret i papirform, jf. bilag 90.

Alle pensionsplanernes pengemidler befandt sig under en TTC-klausul på Solo Capitals konto ved en eller flere forretningsbanker.

Da ingen af de fire custodians i Solo-gruppen havde en banklicens, der tillod dem at opbevare kontante midler, blev alle kontante pengemidler opbevaret på Solo Capitals konto i en almindelig forretningsbank. Ifølge pensionsplanernes seneste efterforskninger agerede Solo Capital herved subcustodian for sine tre datterselskaber (de tre andre custodians) og opbevarede således ikke kun egne kunders pengemidler, men også pengemidler tilhørende de tre datterselskaber og deres respektive kunder. Alle pengetransak-tioner mellem kunder inden for Solo-gruppen kunne udføres, uden at det førte til bevægelser på Solo Ca-pitals konto i dennes bank. Dette var helt i overensstemmelse med det europæiske CSD direktiv 909/2014 kapitel IV Artikel 9 om internaliseret afvikling.

Hvilken forretningsbank Solo Capital brugte, ved pensionsplanerne ikke med sikkerhed. Ud fra Sanjay Shah's processkrift til High Court i London lader det dog til, at Solo Capital opbevarede pensionsplanernes kontante pengemidler på en konto i Barclays.

Pensionsplanerne oprettede alle en konto i USA i forbindelse med deres stiftelse – jf. eksempelvis de som bilag 91 i førersagerne fremlagte kontoudtog – dog blev disse konti ikke brugt til gennemførelse af aktie-transaktionerne og pengestrøm- mene i forbindelse hermed. Kontoudskrifter fra andre banker, der viser udbetalinger fra Solo til pensionsplanerne, kan ikke fremlægges, da de ikke havde fået udbetalt deres ge-vinst fra deres custodian til en anden bank endnu, da Solo Capital i sommeren 2015 blev lukket ned og sat under administration af PwC.

Pensionsplanerne havde ingen grund til at lade gevinsten fra udbyttearbitrage- transaktionerne udbetale til en anden konto i USA, da en udbetaling til de begunstigede ikke umiddelbart stod for døren. Gevin-sterne var i førersagerne dog under alle omstændigheder under et beløb, der ville føre til en rapporte-ringspligt til IRS.

Grunden til, at gevinsten, der blev hængende hos pensionsplanerne, var under USD 250.000, er de høje transaktionsomkostninger, som er beskrevet i afsnit 2. Ikke mindst Solo-gruppen fakturerede betydelige beløb til pensionsplanerne (jf. afsnit 2.3.4.) for deres tjenesteydelser, og for at Solo-gruppen i sidste ene måtte indestå som garant for, at aktierne ville blive betalt, hvis en aktielåntager ikke blev fundet i tide.

**7.2.2.2 Strøm af aktier**

Dokumentation af en strøm af aktier (eller udbytte) gennem kæden af custodians kan pensionsplanerne ikke fremlægge, da ingen custodian oplyste pensionsplanerne om, hvem deres respektive subcustodian er. Men når afviklingen af en aktiehandel ikke er nødvendigt for at være ejer af en dansk aktie, og det

først er ved afviklingen af en handel, at der eventuelt foretages en "strøm af aktier" gennem kæden af custodians (nemlig hvis der ikke sker en internaliseret afvikling), er en sådan strøm af aktier gennem custody-kæden tilmed uden bevisværdi.

Endelig skal bemærkes, at netting-procedurerne, der anvendes af alle clearing- og afviklingsagenter, fører til, at det er umuligt at følge nogen som helst aktie gennem kæden af subcustodians.

**7.2.3 TTC-klausulen**

Skattestyrelsen påstår, at pensionsplanerne ikke har dokumenteret TTC-klausulen. Som forklaret på kontormøderne, var TTC-klausulen oprindelig en bestanddel af custody agreements. I 2014 blev denne klausul taget ud af custody agreements og sat ind i de almene forretningsbetingelser, der skulle accepteres online.

For Pegasus Fox 23 LLC Solo 401K Plan er der i førersagerne fremlagt en custtody agreement, der indeholder TTC-klausulen. I øvrigt er der fremlagt et eksempel på en udskrift fra forretningsbetingelserne, der skulle godkendes online. Denne godkendelse kan pensionsplanerne ikke dokumentere, da SØIK har beslaglagt computerne fra Solo-gruppen. Pensionsplanerne har dog fremlagt dokumentation for, at pensionsplanerne har besluttet at godkende de almene forretningsbetingelser.

**7.2.4     Enkelte kontoåbningsdokumenter og transaktionsdokumenter**

For nogle af pensionsplanerne mangler den ovennævnte dokumentation vedrørende transaktionerne og kontoåbningsproceduren. Det er hovedsageligt, fordi de respektive pensionsplaners trustees ikke længere har adgang til den e-mailkonto, som alle transaktionerne blev afviklet over. Det kan dog formodes, at alle transaktionerne for samtlige af de pensionsplaner, som TVC Advokatfirma/Schaffelhuber Müller & Kollegen S.à r.l. repræsenterer, og som var kunder i Solo-gruppen, blev gennemført på samme vis. Den fremlagte dokumentation fra de øvrige pensionsplaner kan derfor anvendes analogt.

**7.2.5     Dokumentation i 2014 og 2015**

For handler gennemført i 2014 foreligger der flere dokumenter end for handler gennemført i 2015. Det har den simple årsag, at handlen blev automatiseret i 2015 med indførelsen af softwaresystemerne Octave, og BrokerMesh til at varetage opgaverne omkring ordrer (algo trading), handel, clearing og settlement. Det er kun beklageligt, at Skattestyrelsen nægter eksistensen af algo trading. Pensionsplanerne henviser Skattestyrelsen til kapitalmarkedslovens § 3, nr. 18 og nr. 20, der regulerer algo trading.

Faktum er, at algo traderen foretog valget af aktier, der skulle købes (idet algoritmen kendte udbyttedatoen og det udbytte, der blev forventedes udloddet), samt antallet, som hver pensionsplan ville købe. Dette skete ud fra programmerede aspekter om finansieringsmuligheder for den enkelte pensionsplan, risikoprofil og risiko- spredning etc.

Skattestyrelsens påstand med hensyn til algo trading (jf. det sammenfattende ind- læg af den 9. august 2019, side 44), ifølge hvilken

> *"Hvis der findes en algoritme, som pensionsplanerne anvender, så må den alene være blevet anvendt til at sløre de påståede aktiehandlers manglende realitet"*

er fuldkommen absurd. Det er ikke slet ikke formålet med algo trading at sløre aktiehandler og deres realitet.

Alle aktiehandler, også de, der blev cleared af Solo-gruppen, blev indrapporteret til myndighederne i London (FCA og børsen) på behørig vis (daglig trade- og transaction reports), som de allerede fremlagte statistikker fra Finanstilsynet dokumenterer. Disse indrapporteringer ville Skattesstyrelsen få bekræftet at SØIK, hvis styrelsen blot ville anmode SØIK herom. En sådan bekræftelse kan på ingen måde være til skade for eventuelle strafferetlige undersøgelser, der efter 3½ år angiveligt stadig er i gang.

Det reelle formål med algo trading er at forøge handelsvolumnet med mindre risiko for fejl, idet menneskelig indblanding elimineres mest muligt.

Algo trading kan heller ikke sløre aktiehandlerne, idet de som allerede nævnt indberettes til finanstilsynet (FCA) og børsen (LSE) i London.

Som resultat af disse indberetninger har den tværministerielle arbejdsgruppe i sit statusnotat af den 27. juni 2016 således også kunnet konstatere:

> *"I forbindelse med arbejdet i den tværministerielle arbejdsgruppe har udvalget modtaget oplysninger om handelsstatistik fra Finanstilsynet for årene 2012-2015, der viser aktiehandler for udvalgte børsnoterede danske selskaber. Det fremgår heraf, at der blandt andet er bemærkelsesværdigt store aktiehandler omkring tidspunktet for udlodning af udbytte. Arbejdsgruppen har på nuværende tidspunkt ikke afdækket årsagen hertil, herunder om handlerne kan være skattemotiverede. SKAT vil undersøge dette nærmere."*

**7.3 Ansvaret for manglende dokumentation**

Skattesstyrelsen påstår, at

> *"Pensionsplanerne gemmer sig i den sammenhæng i vidt omfang bag, at danske og engelske myndigheder har beslaglagt materiale fra deres custodians"*

Hertil bemærkes indledningsvis, at der ikke er tale om at "gemme sig", bag det simple faktum at materialet virkelig er beslaglagt. Det er desværre et faktum i sagen, at myndighederne har beslaglagt de computersystemer, der afviklede aktiehandlerne. Pensionsplanerne har derfor ikke mulighed for at ertervise alle de elektroniske transaktioner, der foregik efter afgivelsen af ordrer til køb af aktierne.
Matching af købs- og salgsordre skete elektronisk, clearing og settlement skete elektronisk, og selve opbevaringen og eksistensen af aktierne var elektronisk. Dematerialiserede aktier eksisterer nu engang kun i elektronisk form.

Al dokumentation, der er udstedt, er derfor ikke mere end en fysisk genspejling af, hvad der foregik rent elektronisk. Uden adgang til de elektroniske transaktioner er pensionsplanerne begrænset til at fremlægge dokumentationsmateriale i papirform, der ikke udgør selve retsakterne, men blot er udtryk for, at retsakter er blevet udført. Når disse udtryk for, at retsakter har fundet sted, udstedes af mennesker, indeholder disse naturligvis også de ganske almindelige menneskelige fejl såsom skrivefejl i datoer eller ISIN-numre, anvendelser af forkerte skabeloner (der viser køb i stedet for salg) og for små felter, der ikke kan udvise de mange tal og derfor kun giver et udprint med *"####"*.

Computersystemerne er de vigtigste bevisgenstande i sagen, da de elektroniske retsakter blev udført her. Disse computersystemer har SØIK haft i sin besiddelse i årevis, uden at dette har ført til nogen positiv bekræftelse af, at pensionsplanerne ikke ejede de danske aktier. Det må være udtryk for, at SØIK virkelig har fundet elektronisk dokumentation for afviklingen af aktiehandlerne. Da afviklingen først skete, <u>efter</u> at der var indgået en endelig aftale om køb af aktierne, der overdrog ejerskabet til aktierne til køberen, er

afviklingen dokumentation for, at ejerskabet inden da var overdraget ved matching af købs- og salgsor-
dre.

**8 FOR MEGET UDBETALT UDBYTTESKAT**

**8.1 Summen af alle refusioner**

Skattestyrelsen præsenterer i flere af styrelsens indlæg forskellige statistikker, af hvilke det angiveligt
skulle fremgå, at SKAT skulle have udbetalt mere i refusion end modtaget i udbytteskat.

Disse af SKAT selv fremstillede statistikker står i modstrid med de offentligt tilgængelige statistikker.

I henhold til SIR-rapporten af den 24 september 2015 (Skatteudvalget 2014-15 –2. samling) SAU Alm del),
side 16, har SKAT ikke udbetalt mere i refusion end modtaget:

Af side 16 fremgår således:

Graf 7.2, der fremgår nedenfor, omfatter indtægter, refusioner samt antal ansøgninger
om refusioner for årene 2005 til juni måned 2015.



**Graf 7.2.**