# Exhibit 3



12 Endeavour Square
London
E20 1JN

Tel:  +44 (0)20 7066 1000
Fax:  +44 (0)20 7066 1099
www.fca.org.uk

---

**FINAL NOTICE**

---

To:                                  SAPIEN CAPITAL LIMITED

Firm Reference Number:               479120

Date                                 6 May 2021

## 1.    ACTION

1.1    For the reasons given in this Notice, pursuant to section 206 of the Financial Services and Markets Act 2000 ("the Act"), the Financial Conduct Authority ("the Authority") has decided to impose on Sapien Capital Limited ("Sapien" or "the Firm") a financial penalty of £178,000.

1.2    The Authority would have imposed a penalty of £236,740 representing £178,000 disgorgement and £58,740 as the punitive element. As Sapien agreed to resolve all issues of fact and liability, under the Authority's executive settlement procedures, it qualified for a 30% discount to be applied to the non-disgorgement element of the penalty, reducing the penalty to £219,100. As the firm provided verifiable evidence that the imposition of this penalty figure would cause it serious financial hardship, the Authority decided to reduce the total penalty to £178,000, this being the disgorgement figure.

## 2.    SUMMARY OF REASONS

2.1    Fighting financial crime is an issue of international importance, and forms part of the Authority's operational objective of protecting and enhancing the integrity of

1

the UK financial system. Authorised firms are at risk of being abused by those seeking to conduct financial crime, such as fraudulent trading and money laundering. Therefore, it is imperative that firms have in place effective systems and controls to identify and mitigate the risk of their businesses being used for such purposes, and that firms will act with due skill, care and diligence to adhere to the systems and controls that they have put in place, and properly assess, monitor and manage the risk of financial crime.

2.2    Between 10 February 2015 and 10 November 2015 (the "Relevant Period"), Sapien:

a)    had inadequate systems and controls to identify and mitigate the risk of being used to facilitate fraudulent trading and money laundering in relation to business introduced by four authorised entities known as the Solo Group, thereby breaching Principle 3, and

b)    breached Principle 2 as it did not exercise due skill, care and diligence in applying its AML policies and procedures, and in failing properly to assess, monitor and mitigate the risk of financial crime in relation to the Solo Clients and the purported trading.

2.3    The Solo Clients were off-shore companies including BVI and Cayman Islands incorporated entities and a number of individual US 401(k) Pension Plans previously unknown to Sapien. They were introduced by the Solo Group, which purported to provide clearing and settlement services as custodians to clients within a closed network, via a custom over the counter ("OTC") trading and settlement platform known as Brokermesh. They were controlled by a small number of individuals, some of whom had worked for the Solo Group, without apparent access to funds to settle the transactions.

2.4    On behalf of the BVI and Cayman Islands Solo Clients, Sapien executed purported OTC equity trades to the value of approximately £2.5 billion in Danish equities and £3.8 billion in Belgian equities, and received gross commission of £297,044.

2.5    The Solo Trading was characterised by a purported circular pattern of extremely high value OTC equity trading, back-to-back securities lending arrangements and forward transactions, involving EU equities on or around the last day of cum-dividend. Following the purported Cum-Dividend Trading that took place on designated days, the same trades were subsequently purportedly reversed over several days or weeks to neutralise the apparent shareholding positions (the "Unwind Trading").

2

2.6     The purported OTC trades that were executed on Brokermesh did not have access to liquidity from public exchanges, yet the purported trades were filled within a matter of minutes, almost invariably, and represented up to 20% of the shares outstanding in the companies listed on the Danish stock exchange, and up to 10% of the equivalent Belgian stocks. The volumes also equated to an average of 20 times the total number of all shares traded in the Danish stocks on European exchanges, and 25 times the Belgian stocks traded on European exchanges on the relevant last cum-dividend trading date.

2.7     The Authority's investigation and conclusions in respect of the purported trading are based on a range of information including, in part, analysis of transaction reporting data, material received from Sapien, the Solo Group, and five other Broker Firms that participated in the Solo Trading. The combined volume of the Cum-Dividend Trading across the six Broker Firms was between 15-61% of the shares outstanding in the Danish stocks traded, and between 7-30% of the shares outstanding in the Belgian stocks traded. These volumes are considered implausible, especially in circumstances where there is an obligation to publicise holders of over 5% of Danish and Belgian listed stocks.

2.8     As a broker for the equity trades, Sapien executed the purported Cum-Dividend Trading and the purported Unwind Trading. However, the FCA believes it unlikely that Sapien would have executed both the purported cum-dividend trades and purported unwind trades for the same client in the same stock in the same size trades and therefore it is likely Sapien only saw one side of the purported trading. Additionally, the FCA considers that purported stock loans and forwards linked to the Solo Trading are likely to have been used to obfuscate and/or give apparent legitimacy to the overall scheme. Although there is evidence that Sapien was aware of the purported stock loans and forwards, these trades were not executed by Sapien.

2.9     The purpose of the purported trading was so the Solo Group could arrange for Dividend Credit Advice Slips ("DCAS") to be created, which purported to show that the Solo Clients held the relevant shares on the record date for dividend. The DCAS were in some cases then used to make withholding tax ("WHT") reclaims from the tax agencies in Denmark and Belgium, pursuant to Double Taxation Treaties. In 2014 and 2015, the value of Danish and Belgian WHT reclaims made, which are attributable to the Solo Group, were approximately £899.27 million and £188.00 million respectively. In 2014 and 2015, of the reclaims made, the Danish and Belgian tax authorities paid approximately £845.90 million and £42.33 million

respectively.

2.10    The Authority refers to the trading as 'purported' as it has found no evidence of ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades by the Solo Group. This, coupled with the high volumes of shares purported to have been traded, is highly suggestive of sophisticated financial crime.

2.11    Sapien staff had in place inadequate systems and controls to identify and mitigate the risk of being used to facilitate fraudulent trading and money laundering in relation to business introduced by four authorised entities known as the Solo Group. In addition, Sapien staff did not exercise due skill, care and diligence in applying AML policies and procedures and in failing properly to assess, monitor and mitigate the risk of financial crime in relation to the Solo Clients and the purported trading.

2.12    Sapien did not have policies and procedures in place to assess properly the risks of the Solo business, and lacked an appreciation of the risks involved in the purported equity trading that the Solo Clients were engaged in, which resulted in inadequate CDD being conducted and a failure to monitor transactions adequately and to identify unusual transactions. This heightened the risk that the Firm could be used for the purposes of facilitating financial crime in relation to the purported equity trading (the "Solo Trading") executed by Sapien between 4 May 2015 and 29 September 2015.

2.13    The way these purported trades were conducted in combination with their scale and volume are highly suggestive of financial crime. The Authority's findings are made in the context of this finding, and in consideration that these matters have given rise to additional investigation by other Tax Agencies and/or law enforcement agencies as has been publicly reported.

2.14    The Authority considers that Sapien failed to take reasonable care to organise and control its affairs responsibly and effectively with adequate risk management systems, as required by Principle 3, in relation to the purported Solo Trading and Solo Clients. Its policies and procedures were inadequate for identifying, assessing and mitigating the risk of financial crime posed by the Solo business as they failed to:

    a)  Give adequate guidance on how to conduct risk assessments and what factors to consider;

    b)  Set out adequate processes and procedures for EDD;

4

    c) Set out adequate processes and procedures for transaction monitoring including how transactions are monitored, and with what frequency; and

    d) Set out adequate processes and procedures for how to identify suspicious transactions.

2.15 The Authority considers that Sapien failed to act with due skill, care and diligence as required by Principle 2 in that it failed to properly assess, monitor and manage the risk of financial crime associated with the Solo Clients and the purported trading, in that the Firm:

    a) Failed to properly conduct customer due diligence, by failing to follow CDD procedures set out in the Firm's policies, and by amending customer due diligence forms in response to complaints from Solo Clients, to reduce the information required in respect of Solo Clients;

    b) Failed to gather information to enable it to understand the business that the customers were going to undertake, the likely size or frequency of the trading intended by 126 of the Solo Clients or the source of funds for 126 of the Solo Clients out of 166 clients introduced by Solo;

    c) Failed to undertake and document a risk assessment for each of the Solo Clients;

    d) Failed to complete EDD for any of the Solo Clients despite the fact that none of the Solo Clients were physically present for identification purposes and a number of other risk factors were present, including that each of the 40 of the entities disclosed that they had a net worth of less than €2 million but were purportedly going to execute 25 trades of €100 million;

    e) Failed to assess each of the Solo Clients against the categorisation criteria set out in COBS 3.5.2R and failed to record the results of such assessments, including sufficient information to support the categorisation, contrary to COBS 3.8.2R(2)(a);

    f) Failed to conduct transaction monitoring of the Solo Clients' purported trades;

    g) Failed to recognise numerous red flags with the purported trading

5

including failing to consider whether it was plausible and/or realistic that sufficient liquidity was sourced within a closed network of entities for the size and volumes of trading conducted by the Solo Clients. Likewise, failing to consider or recognise that the profiles of the Solo Clients meant that they were highly unlikely to meet the scale and volume of the trading purportedly being carried out, and/or failing to at least obtain sufficient evidence of the Solo Clients' source of funds to satisfy itself to the contrary; and

h) Received the payment from Elysium Global and failed to report the payment to the Authority after several employees questioned a number of red flags regarding the payment, and after the Authority had conducted an unannounced visit alerting Sapien to possible issues with the Solo Group.

2.16    Sapien's failings merit the imposition of a significant financial penalty. The Authority considers the failings to be particularly serious because they left the Firm exposed to the risk that it could be used to further financial crime;

1.    Sapien onboarded 166 Solo Clients over a three month period, some of which emanated from jurisdictions which did not have AML requirements equivalent to those in the UK;

2.    Sapien demonstrated a willingness to cut corners in an effort to obtain this business by bypassing its standard KYC forms and its compliance manual, which required information regarding the source of funds and the nature and purpose of the trading, in circumstances where it perceived a risk that a delay in onboarding the clients would possibly cause the loss of the business;

3.    Sapien's AML policies and procedures were not proportionate to the risks in the Solo business that it was undertaking;

4.    Sapien failed to properly review and analyse the KYC materials that were provided by the Solo Group or ask appropriate follow up questions to red flags in the KYC materials;

5.    Even after a number of red flags appeared, Sapien failed to conduct any ongoing monitoring, allowing these same clients to purportedly trade equities totalling more than £6 billion;

6.    Because Sapien failed to both have and apply appropriate AML systems and

6

controls in relation to the Solo business, there was an unacceptable risk that Sapien could be used by clients to launder the proceeds of crime;

7.  Sapien accepted a payment from Elysium Global after being alerted to the Authority's concerns regarding the Solo trading and after employees raised concerns regarding the payment; and

8.  Finally, these failings were not identified by Sapien.

2.17    Accordingly, to further the Authority's operational objective of protecting and enhancing the integrity of the UK financial system, the Authority has decided to impose on Sapien a financial penalty of £178,000 (representing the disgorgement figure) having been reduced from £236,740 due to the settlement discount and because the full penalty figure would cause the firm serious financial hardship.

## 3   DEFINITION

3.1    The following definitions are used in this Notice:

"**401(k) Pension Plan**" means an employer-sponsored retirement plan in the United States. Eligible employees may make pre-tax contributions to the plan but are taxed on withdrawals from the account. A Roth 401(k) plan is similar in nature; however, contributions are made post-tax although, withdrawals are tax-free. For the 2014 tax year, the annual contribution limit was $17,500 for an employee, plus an additional $5,500 catch-up contribution for those aged 50 and over. For the tax year 2015, the contribution limits were $18,000 for an employee and the catch-up contribution was $6,000. For a more detailed analysis, please see Annex C;

"**2007 Regulations**" or "**Regulation**" means the Money Laundering Regulations 2007;

"**the Act**" means the Financial Services and Markets Act 2000;

"**AML**" means Anti-Money Laundering;

"**AML certificate**" means an AML introduction form which is supplied by one authorised firm to another. The form confirms that a regulated firm has carried out CDD obligations in relation to a client and authorises another regulated firm to place reliance on it in accordance with Regulation 17;

"**the Authority**" means the Financial Conduct Authority, known prior to 1 April 2013 as the Financial Services Authority;

"**Broker Firms**" means the other broker firms who agreed with the Solo Group to carry out the Solo Trading;

"**Brokermesh**" means the bespoke electronic platform set up by the Solo Group for the Solo Clients to submit orders to buy or sell cash equities, and for the Broker Firms to provide or seek liquidity and execute the purported trading;

"**CDD**" means customer due diligence measures, the measures a firm must take to identify each customer and verify their identity and to obtain information on the purpose and intended nature of the business relationship, as required by Regulation 5;

"**Clearing broker**" means an intermediary with responsibility to reconcile trade orders between transacting parties. Typically, the clearing broker validates the availability of the appropriate funds, ensures the delivery of the securities in exchange for cash as agreed at the point the trade was executed, and records the transfer;

"**COBS**" means the Authority's Conduct of Business Sourcebook Rules;

"**Compliance Manual**" means Sapien's "Customer FCA Compliance Procedures Manual 2014", which was applicable during the Relevant Period;

"**Cum-dividend**" means when a buyer of a security is entitled to receive the next dividend scheduled for distribution, which has been declared but not paid. A stock trades cum-dividend up until the ex-dividend date, after which the stock trades without its dividend rights;

"**Cum-Dividend Trading**" means the purported trading that the Solo Clients conducted where the shares are cum-dividend in order to demonstrate apparent shareholding positions that would be entitled to receive dividends, for the purposes of submitting WHT reclaims;

"**Custodian**" means a financial institution that holds customers' securities for safekeeping. They also offer other services such as account administration, transaction settlements, the collection of dividends and interest payments, tax support and foreign exchange;

"**DCAS**" means Dividend Credit Advice Slips. These are completed and submitted

to overseas tax authorities in order to reclaim the tax paid on dividends received;

"**DEPP**" means the Authority's Decision Procedure and Penalties Manual;

"**Dividend Arbitrage**" means the practice of placing shares in an alternative tax jurisdiction around dividend dates with the aim of minimising withholding taxes ("WHT"), or generating WHT reclaims. Dividend Arbitrage may include several different activities including trading and lending equities and trading derivatives, including futures and total return swaps, designed to hedge movements in the price of the securities over the dividend dates;

"**Double Taxation Treaty**" means a treaty entered into between the country where the income is paid and the country of residence of the recipient. Double Taxation Treaties may allow for a reduction or rebate of the applicable WHT;

"**EDD**" means enhanced due diligence, the measures a firm must take in certain situations, as outlined in Regulation 14;

"**Elysium Global**" means Elysium Global (Dubai) Limited;

"**Executing broker**" means a broker that merely buys and sells shares on behalf of clients.  The broker does not give advice to clients on when to buy or sell shares;

"**European exchanges**" means registered execution venues, including regulated markets, multilateral trading facilities, organised trading facilities and alternative trading systems encapsulated in Bloomberg's European Composite;

"**FATCA**" means the Foreign Account Tax Compliance Act;

"**Financial Crime Guide**" means the Authority's consolidated guidance on financial crime, which is published under the name "Financial crime: a guide for firms". In this Notice, the applicable versions for the Relevant Period were published in January 2015 (incorporating updates which came into effect on 1 June 2014) and April 2015. The Financial Crime Guide contains "general guidance" as defined in section 139B FSMA. The guidance is not binding and the Authority will not presume that a firm's departure from the guidance indicates that it has breached the Authority's rules. But as stated in FCG 1.1.8, the Authority expect firms to be aware of the Financial Crime Guide where it applies to them, and to consider applicable guidance when establishing, implementing and maintaining their anti-financial crime systems and controls;

9

"**Financial Crime Manual**" means Sapien's "Financial Crime FCA Compliance Procedures Manual 2014", which was applicable during the Relevant Period;

"**Handbook**" means the collection of regulatory rules, manuals and guidance issued by the Authority;

"**JMLSG**" means the Joint Money Laundering Steering Group, which is comprised of leading UK trade associations in the financial services sector;

"**JMLSG Guidance**" means the 'Prevention of money laundering/combating terrorist finance guidance for the UK financial sector' issued by the JMLSG, which has been approved by a Treasury Minister in compliance with the legal requirements in the 2007 Regulations. The JMLSG Guidance sets out good practice for the UK financial services sector on the prevention of money laundering and combating terrorist financing. In this Notice, applicable provisions from the version dated on 19 November 2014 have been referred to.

The Authority has regard to whether firms have followed the relevant provisions of the JMLSG Guidance when deciding whether a breach of its rules on systems and controls against money laundering has occurred, and in considering whether to take action for a financial penalty or censure in respect of a breach of those rules (SYSC 3.2.6E and DEPP 6.2.3G);

"**KYC**" means Know Your Customer, which refers to CDD and EDD obligations;

"**KYC pack**" means the bundle of client identity information received, which usually included incorporation documents, certified copies of identity documents, utility bills and CVs;

"**Matched principal trading**" means a transaction where the facilitator interposes itself between the buyer and the seller to the transaction in such a way that it is never exposed to market risk throughout the execution of the transaction, with both sides executed simultaneously, and where the transaction is concluded at a price where the facilitator makes no profit or loss, other than a previously disclosed commission, fee or charge for the transaction;

"**MLRO**" means Money Laundering Reporting Officer;

"**OTC**" means over the counter trading which does not take place on a regulated

exchange;

"**Principles**" means the Authority's Principles for Businesses as set out in the Handbook;

"**the RDC**" means the Regulatory Decisions Committee of the Authority (see further under Procedural Matters below);

"**Relevant Period**" means the period from 10 February 2015 to 10 November 2015;

"**Sapien**" means Sapien Capital Limited;

"**SCP**" means Solo Capital Partners LLP;

"**Solo Clients**" means the entities introduced by the Solo Group to Sapien and the other brokers on whose behalf Sapien executed purported equity trades for some of the clients during the Relevant Period;

"**Solo Group**" or "**Solo**" means the four authorised firms owned by Sanjay Shah, a British national residing in Dubai, details of which are set out in paragraph 4.3;

"**Solo Trading**" means purported Cum-Dividend Trading and the purported Unwind Trading executed for Solo Clients during the Relevant Period;

"**UBO**" means ultimate beneficial owner with "beneficial owner" being defined in Regulation 6;

"**Unwind Trading**" means purported trading that took place over several days or week to reverse the Cum-Dividend Trading to neutralise the apparent shareholding positions;

"**Withholding Tax**" **or** "**WHT**" means a levy deducted at source from income and passed to the government by the entity paying it. Many securities pay periodic income in the form of dividends or interest, and local tax regulations often impose a WHT on such income; and

"**Withholding Tax Reclaims**" means in certain cases where WHT is levied on payments to a foreign entity, the WHT may be reclaimed if there is a Double Taxation Treaty between the country in which the income is paid and the country

of residence of the recipient. Double Taxation Treaties may allow for a reduction or rebate of the applicable WHT.

## 4  FACTS AND MATTERS

### Background

*Sapien*

4.1    Sapien is a UK-based corporate finance advisory and brokerage firm that offered diverse capital services to its clients. During the Relevant Period, Sapien's brokerage services included broking on a 'matched principal basis' in (i) fixed income securities, (ii) convertible bonds, (iii) floating rate notes and (iv) depository receipts.  During the Relevant Period, Sapien was permitted to execute trades for Professional Clients and Eligible Counterparties only. Before it onboarded 166 Solo Clients, Sapien only had up to approximately 30 to 40 active on-boarded clients.

### Sapien's Negligence

4.2    Sapien staff had in place inadequate systems and controls to identify and mitigate the risk of being used to facilitate fraudulent trading and money laundering in relation to business introduced by four authorised entities known as the Solo Group. In addition, Sapien staff did not exercise due skill, care and diligence in applying AML policies and procedures, and in failing to properly assess, monitor and mitigate the risk of financial crime in relation to the Solo Clients and the purported trading.

### The Solo Group

4.3    The four authorised firms referred to by the Authority as the Solo Group were owned by Sanjay Shah, a British national currently based in Dubai:

- Solo Capital Partners LLP ("SCP") was first authorised in March 2012 and was a broker.

- West Point Derivatives Ltd was first authorised in July 2005 and was a broker in the derivatives market.

- Old Park Lane Capital Ltd was first authorised in April 2008 and was an agency stockbroker and corporate broker.

12

- Telesto Markets LLP was first authorised on 27 August 2014 and was a wholesale custody bank and fund administrator.

4.4    During the Relevant Period, SCP and others in the Solo Group at various stages, held regulatory permissions to provide custody and clearing services. The Solo Group has not been permitted to carry out any activities regulated by the Authority since December 2015 and Solo Capital Partners formally entered Special Administration insolvency proceedings in September 2016.  The other three entities are in administration proceedings.

**Statutory and Regulatory Provisions**

4.5    The statutory and regulatory provisions relevant to this Notice are set out in Annex B.

4.6    Principle 3 requires firms take reasonable care to organise and control their affairs responsibly and effectively, with adequate risk management systems. The 2007 Regulations and rules in the Authority's Handbook further require firms to create and implement policies and procedures to prevent and detect money laundering, and to counter the risk of being used to facilitate financial crime. These include systems and controls to identify, assess and monitor money laundering risk, as well as conducting CDD and ongoing monitoring of business relationships and transactions.

4.7    Principle 2 requires firms to conduct their businesses with due skill, care and diligence. A firm merely having systems and controls as required by Principle 3 is not sufficient to avoid the ever-present financial crime risk. A firm must also carefully apply those systems and controls with due skill, care and diligence as required by Principle 2 to protect itself, and to properly assess, monitor and manage the risk of financial crime.

4.8    Money laundering is not a victimless crime. It is used to fund terrorists, drug dealers and people traffickers as well as numerous other crimes. If firms fail to apply money laundering systems and controls thoughtfully and diligently, they risk facilitating these crimes.

4.9    As a result, money laundering risk should be taken into account by firms as part of their day-to-day operations, including those in relation to the development of new products, the taking on of new clients and changes in their business profile. In doing so, firms should take account of their customer, product and activity profiles and the complexity and volume of their transactions.

4.10   The JMLSG has published detailed guidance with the aim of promoting good

practice, and giving practical assistance in interpreting the 2007 Regulations and evolving practice within the financial services industry. When considering whether a breach of its rules on systems and controls against money laundering has occurred, the Authority will have regard to whether a firm has followed the relevant provisions in the JMLSG guidance.

4.11   Substantial guidance for firms has also been published by the Authority regarding the importance of AML controls, in the form of its Financial Crime Guide, which cites examples of good and bad practice, publications of AML thematic reviews and regulatory notices.

**Background of Dividend Arbitrage and the Purported Solo Trading**

*Dividend Arbitrage Trading*

4.12   The aim of dividend arbitrage is to place shares in certain tax jurisdictions around dividend dates, with the aim of minimising withholding taxes or to generate WHT reclaims. WHT is a levy deducted at source from dividend payments made to shareholders.

4.13   If the beneficial owner is based outside of the country of issue of the shares, they may be entitled to reclaim that tax if the country of issue has a relevant treaty (a "Double Taxation Treaty") with the country of residence of the beneficial owner. Accordingly, dividend arbitrage aims at transferring the beneficial ownership of shares temporarily overseas, in sync with the dates upon which dividends become payable, in order that the criteria for making a withholding tax reclaim are fulfilled.

4.14   As the strategy is one of temporary transfer only, it is often executed using 'stock lending' transactions. While such transactions are structured economically as loans, the entitlement to a tax rebate depends on actual transfer of title. The legal structure of the 'loan' is therefore a sale of the shares, on condition that the seller is obliged to sell back equivalent shares to the buyer at a specified future date.

4.15   Dividend arbitrage may give rise to significant market risk for either party as the shares may rise or fall in value during the life cycle of the loan. In order to mitigate this, the strategy will often include a series of derivative transactions, which hedge this market exposure.

4.16   A key role of the share custodian in connection with dividend arbitrage strategies, is to issue a voucher to the beneficial owner which certifies such ownership on the date on which the entitlement to a dividend arose. The voucher will also specify the amount of the dividend and the sum withheld at source. This is sometimes known

as 'Dividend Credit Advice Slip' or 'Credit Advice Note'. The purpose of the voucher is for the beneficial owner to produce it (assuming the existence of a relevant Double Taxation Treaty), to the relevant tax authority to reclaim the withholding tax. The voucher generally certifies that, 1) the shareholder was the beneficial owner of the share at the relevant time, 2) the shareholder had received the dividend, 3) the amount of the dividend and, 4) the amount of tax withheld from the dividend.

4.17    Given the nature of dividend arbitrage trading, the costs of executing the strategy will usually be commercially justifiable only if large quantities of shares are traded.

*The Purported Solo Trading*

4.18    The Authority's investigation and understanding of the purported trading in this case is based, in part, on analysis of transaction reporting data and material received from Sapien, the Solo Group, and five other Broker Firms that participated in the Solo Trading. The Solo Trading was characterised by a circular pattern of purported extremely large-scale OTC equity trading, back-to-back securities lending arrangements and forward transactions.

4.19    The Solo Trading can be broken into two phases:

(i) purported trading conducted when shares were cum-dividend, in order to demonstrate apparent shareholding positions that would be entitled to receive dividends, for the purposes of submitting WHT reclaims ("Cum-Dividend Trading"), and

(ii) the purported trading conducted when shares were ex dividend, in relation to the scheduled dividend distribution event which followed the Cum-Dividend Trading, in order to reverse the apparent shareholding positions taken by the Solo Clients during Cum-Dividend Trading ("Unwind Trading").

4.20    The combined volume of the purported Cum-Dividend Trading across the six Broker Firms were between 15 and 61% of the shares outstanding in the Danish stocks traded, and between 7 and 30% of the shares outstanding in the Belgian stocks traded.

4.21    As a broker for the equity trades, Sapien executed the purported Cum-Dividend Trading and the purported Unwind Trading. However, the FCA believes it unlikely that Sapien would have executed both the purported cum-dividend trades and purported unwind trades for the same client in the same stock in the same size

trades and therefore it is likely Sapien only saw one side of the purported trading. Additionally, the FCA considers that purported stock loans and forwards linked to the Solo Trading are likely to have been used to obfuscate and/or give apparent legitimacy to the overall scheme. Although there is evidence that Sapien was aware of the purported stock loans and forwards, these trades were not executed by Sapien.

4.22    The purpose of the purported trading was to enable the Solo Group to arrange for DCAS to be created, which purported to show that the Solo Clients held the relevant shares on the record date for dividend. The DCAS were in some cases then used to make WHT reclaims from the tax agencies in Denmark and Belgium, pursuant to Double Taxation Treaties. In 2014 and 2015, the value of Danish and Belgian WHT reclaims made, which are attributable to the Solo Group, was approximately £899.27 million and £188.00 million respectively. In 2014 and 2015, of the reclaims made, the Danish and Belgian tax authorities paid approximately £845.90 million and £42.33 million respectively.

4.23    The Authority refers to the trading as 'purported' as it has found no evidence of ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades by the Solo Group.

**Sapien's Introduction to the Solo Group business**

4.24    In 2014, Sapien took on a new trading desk. The individuals working on the desk reported directly to Sapien management. The new trading desk was taken on to conduct futures derivatives trades for Sapien. While at prior firms, these individuals had acted as brokers for the Solo Group. Upon joining Sapien, they were keen to continue their prior relationship with the Solo Group.

4.25    On 23 October 2014, Sapien had its first meeting with representatives from the Solo Group. During the meeting, representatives from the Solo Group asked Sapien if it wanted to act as a nominated broker to trade equities. At the meeting, Sapien was not informed of the nature or location of the clients, the volume of trading, or the trading strategy that they would employ.

4.26    Despite the lack of information, after the meeting, a representative of Sapien sent an email confirming that it would like to be added to Solo's broker list.

4.27    On 24 November 2014, the Solo Group sent Sapien a custody agreement, pursuant to which the Solo Group would act as a custodian for Sapien. Sapien did not

16

understand the purpose of the custodian agreement and did not sign it.

4.28    Sapien arranged to have a second meeting with the Solo Group to try to gain clarity as to what type of business Solo wanted Sapien to perform and the purpose of the custody agreement. Sapien proposed that it would assist the Solo Group with futures derivatives. Again, Sapien left the meeting without clarity about what type of trading the Solo Group wanted Sapien to perform or who Solo would be settlement agent or custodian for.

4.29    Sapien arranged a third meeting with the Solo Group in December 2014 to, again, try to understand what type of business it would be performing for the Solo Group. For a third time, Sapien left the meeting without clarity about what the relationship would be.

4.30    It was not until the end of January 2015, that Sapien understood that there would be approximately 160 clients who would be introduced through the Solo Group. They were going to be trading equities, not futures derivatives, as had been proposed by Sapien. The firm understood that the clients would then have a custody arrangement with Solo. Sapien understood that the clients wanted Sapien to enter transactions for them on a matched-principal basis. Sapien further understood the clients would be located across various countries.

4.31    The Solo Group informed Sapien that the clients would be entering trades in excess of €100 million. The Solo Group told Sapien that it should expect to earn approximately €600,000 to €700,000 per annum in brokerage fees.

4.32    During this time period, Sapien saw the financial statements of the Solo Group and were aware that Solo had limited financial resources to cover the size of trades that they had referred.

4.33    The Solo Group made clear that Sapien would have to onboard its clients and trade using an electronic trading system. The Solo Group would act as the custodian for the trades.

**Onboarding of the Solo Clients**

*Introduction to Onboarding requirements*

4.34    The 2007 Regulations required authorised firms to use their onboarding process to obtain and review information about a potential customer to satisfy their KYC obligations.

17

4.35    As set out in Regulation 7 of the 2007 Regulations, a firm must conduct Customer Due Diligence ("CDD") when it establishes a business relationship or carries out an occasional transaction.

4.36    As part of the CDD process, first, a firm must identify the customer and verify their identity. Second, a firm must identify the beneficial owner, if relevant, and verify their identity. Finally, a firm must obtain information on the purpose and intended nature of the business relationship.

4.37    To confirm the appropriate level of CDD that a firm must apply, a firm must perform a risk assessment, taking into account the type of customer, business relationship, product or transaction. The firm must also document its risk assessments and keep its risk assessments up to date.

4.38    If the firm determines through its risk assessment that the customer poses a higher risk of money laundering or terrorist financing, then it must apply Enhanced Due Diligence ("EDD"). This may mean that the firm should obtain additional information regarding the customer, the beneficial owner to the extent there is one, and the purpose and intended nature of the business relationship. Additional information gained during EDD should then be used to inform its risk assessment process, in order to manage its money laundering/terrorist financing risks effectively. The information firms are required to obtain about the circumstances and business of their customers is necessary to provide a basis for monitoring customer activity and transactions, so firms can effectively detect the use of its products for money laundering and/or terrorist financing.

*Chronology of the onboarding*

4.39    In early February 2015, the onboarding process commenced for the Solo Clients, none of which had any prior relationship with Sapien.

4.40    To start the process, Sapien received an identical email from each of the Solo Clients stating, "I would like to be onboarded for brokerage services. I authorise [Name of Solo Group entity] to release any KYC you required". The only difference in the emails from the Solo Clients was which one of the four Solo entities was authorised to release the information to Sapien.

4.41    Sapien did not question why 166 purported separate entities drafted identical emails requesting to be a client. In fact, in some cases, the emails included the wrong Solo entity as custodian that was authorised to release KYC information, and

Sapien was then sent amended instructions. Even in these cases, Sapien did not appear to question why the client did not know which Solo entity it had a relationship with.

4.42   As Sapien had not obtained any information about the Solo Clients prior to onboarding, it was only after it received the initial request to be onboarded that the Firm started to receive information about the names and jurisdictions of the Solo Clients.

4.43   By the end of February 2015, Sapien learned that the Solo business was seasonal, and it would only occur between February to August or September. Sapien realised that its onboarding was taking too long, and it was going to miss the season if they delayed any further. Because of this, Sapien wanted the KYC checks done as quickly as possible.

4.44   When it started the Solo onboarding process, Sapien only had approximately 30 active clients. The number of clients it typically onboarded varied. Some months it might onboard three or four clients, other months it might onboard one client. In some months, it did not onboard anyone. With the introduction of the Solo business, Sapien onboarded 166 Solo Clients in three months.

4.45   On 3 March 2015, Sapien had received KYC material from one of the Solo Clients. After reviewing the material, Sapien determined that the signature on the client's passport did not match the signatures of the Power of Attorney, the Foreign Account Tax Compliance Act ("FATCA") form and the Customer Declaration Form. Sapien informed the Solo Group about the mismatched signatures, and Sapien merely asked the Solo Client to re-sign the forms. Sapien failed to ask for an explanation as to why the signatures were inconsistent. In internal communications, there was reference to the mismatched signatures being a "touchy subject." Despite this obvious red flag which meant that Sapien could not be satisfied that it had established the identity of the customer, it continued to onboard this client and the other Solo Clients.

4.46   Throughout the onboarding process, Sapien maintained a list of potential clients. By March 2015, Sapien had received a list of 167 potential Solo Clients.  Of the 167 clients, 10 were based in the Cayman Islands, 12 were based in the British Virgin Islands, 24 in Malaysia, and 117 in the United States. Over half of the entities were trusts.

4.47   By 8 April 2015, Sapien had concluded its review of 111 of the Solo Clients and

19

decided to onboard them. By this date, it was clear that over 100 of the clients were managed by three single individuals, and in total there were only 15 individuals controlling all 166 Solo Clients. Sapien did not meet a single Solo Client.

4.48    Additionally, Sapien was aware that some of the Solo Client representatives were former Solo employees. In fact, the KYC materials provided to Sapien showed that an ex-Solo employee was the ultimate beneficial owner of four of the Malaysian companies. His CV was included in the KYC materials showing that he was an ex-employee of Solo. Further, the KYC materials provided to Sapien showed that Sanjay Shah was a former director of at least one entity that Sapien onboarded.

4.49    Sapien completed the onboarding of 166 Solo Clients on 30 April 2015.

*CDD*

4.50    CDD is an essential part of the onboarding process, which must be conducted when onboarding a new client. Firms must obtain and hold sufficient information about their clients to inform the risk assessment process and manage the money laundering risks effectively.

4.51    As part of the CDD process first, under Regulation 5 of the 2007 Regulations, a firm must identify the customer and verify their identity. Second, a firm must identify the beneficial owner, if relevant, and verify their identity. Finally, a firm must obtain information on the purpose and intended nature of the business relationship.

   A.    *Customer Identification and Verification*

4.52    Regulation 20 of the 2007 Regulations requires that firms establish and maintain appropriate and risk-sensitive policies and procedures related to customer due diligence, and SYSC 6.3.1 requires that the policies must be comprehensive and proportionate to the nature, scale and complexity of its activities.

4.53    Sapien's Compliance Manual during the Relevant Period contained a CDD policy. This required that Sapien complete a "Customer Due Diligence Know Your Client File Note", which provides information on why the client is setting up an account and where the funds will be coming from" for each new client.

4.54    Sapien's Financial Crime Manual also noted that "Prior ... to entering into any business relationship with a customer, the firm will ensure that it has sufficient information on the customer, i.e. there is evidence on file to confirm that, firstly, the customer has been identified".

4.55    As part of its standard CDD process, Sapien provided new clients with a checklist, a standard form and a categorisation letter. Of the Solo Clients, 40 returned Sapien's Customer Information Disclosure Form. All 40 of these clients responded identically to a number of questions. First, the form asked what products were to be traded. All of the Clients ticked the box "Securities (DVP Equity/Cash Bonds)". Then, the form asked for the "Anticipated volume of transactions per product", all of the 40 Solo Clients responded with "25".  Most importantly, the Solo Clients were asked the "Anticipated size of transactions per product", and all 40 of these clients replied "€100,000,000".

4.56    Several pages later in the form, it asked, "Are the Company/Trust/Fund's total Balance Sheet assets of Euro 20,000,000 'or more.'" All 40 of the clients replied "no". Then, they were asked, "Is the Company/Trust/Fund's Net Turnover Euro 40,000,000 'or more.'" Again, all 40 of the clients replied "no". Then, the form asked, "Is the Company/Trust/Fund's Net Worth of Euro 2,000,000 'or more.'"  All 40 of the clients replied "no". Finally, the form asked, "Does the Company/Trust/Fund have a financial instrument portfolio (as defined below) which can currently be valued in excess of Euro 500,000?" All 40 of the clients replied "yes".

4.57    No one at Sapien questioned any of the Solo Clients as to why all 40 of these clients gave an identical response or how it was possible that the Solo Clients would be executing 25 trades of €100,000,000 each if they did not have a net worth of €2,000,000 or more. Despite the obvious disparity between intended trading versus financial position, Sapien continued to onboard these Solo Clients.

4.58    The 'Customer Information Disclosure Form' also asked each of the clients to specify the source of the investment funds. All 40 clients had an identical answer. They stated, "Any Contributions from sponsoring employer will be from revenue generated by such employer during the current taxable year. Contributions from the beneficiary including any rollover contributions from beneficiary, may be from income earned from sponsoring employer and from income earned from employment in prior years at other employers." Again, Sapien did not question why 40 purported separate entities gave an identical response.

4.59    Although 40 of the Solo Clients completed the Customer Information Disclosure Form, during the onboarding process, some of the Solo Clients complained that the forms were too lengthy. As a result, Sapien shortened its 12 to 13-page form to require a one-page form from the Solo Clients.

21

4.60    This cut out key KYC information including all the questions above: 1) "Are the Company/Trust/Fund's total Balance Sheet assets of Euro 20,000,000 'or more'"; 2) "Is the Company/Trust/Fund's Net Turnover Euro 40,000,000 'or more'"; 3) "Is the Company/Trust/Fund's Net Worth of Euro 2,000,000 'or more'"; 4) "Does the Company/Trust/Fund have a financial instrument portfolio (as defined below+) which can currently be valued in excess of Euro 500,000"; 5) "please specify the source of investment funds"; 6) what are "[a]nticipated volume of transactions per product", and 7) please specify the "[a]nticipated size of transactions per product."

4.61    Sapien's Compliance Manual contained a 'Know Your Customer File Note' that required the following questions be answered:  1) "What is the purpose and reason for opening the account and establishing the relationship?"; 2) "What is the anticipated level and nature of the activity that is to be undertaken?"; and 3) "What is the expected origin of the funds to be used within the relationship?" Despite its policy, these questions were noticeably absent from shorter form sent to the majority of the Solo Clients. As to 126 of the Solo Clients, Sapien failed to ask the anticipated level of activity that was to be undertaken. Moreover, despite the requirement in its compliance manual, Sapien failed to complete the Know Your Customer File Note for any of the Solo Clients.

4.62    Furthermore, Sapien never questioned why the Solo Clients were complaining about the forms.  Instead, Sapien showed a willingness to cut corners in its financial crime controls in order to appease the Solo Clients and ensure it got the Solo Clients onboarded quickly.

4.63    Because the question regarding origin of funds was removed from the information gathered, Sapien did not gather any information from the remaining clients regarding the source of funds, nor did it perform any checks on the sources of client funds that were being used to execute the trades. Contrary to what was required by its policy, Sapien had the misconception that because Sapien was not holding the clients' funds, it was not required to conduct such checks. It failed to appreciate the risks that the Firm could be used to facilitate financial crime regardless of whether the funds passed through the Firm or not. Sapien accepts that it should have been checking the source of funds and that failure to do so was a serious shortcoming in the onboarding process.

    B.    *Purpose and Intended Nature of a Business Relationship*

4.64    As part of CDD, Regulation 5(c) of the 2007 Regulations requires firms to obtain

information on the purpose and intended nature of the business relationship. The firm should use this information to assess whether a customer's financial behaviour over time is in line with its expectations, whether or not the client is likely to be engaged in criminal activity, and to provide it with a meaningful basis for ongoing monitoring of the relationship.

4.65    Regulation 20 of the 2007 Regulations requires that firms establish and maintain appropriate and risk-sensitive policies and procedures related to customer due diligence, and SYSC 6.3.1R requires that the policies must be comprehensive and proportionate to the nature, scale and complexity of its activities.

4.66    Sapien's Financial Crime Manual required that "[p]rior therefore to entering into any business relationship with a customer, the firm will ensure that it has sufficient information on the customer, i.e. there is evidence on file to confirm that, firstly, the customer has been identified and, secondly, that the nature of the business the customer is expected to undertake, including the expected or predictable pattern of transactions".

4.67    Sapien's Compliance Manual contained a Know Your Customer File Note that required the following question be answered: "What is the purpose and reason for opening the account and establishing the relationship?"

4.68    There is no evidence that Sapien sought to comply with its policies by taking steps to understand the business that the customers were expected to undertake. Sapien did have one conversation with Solo Group where they told Sapien to expect some trades exceeding €100 million. Additionally, as discussed above in paragraph 4.55, 40 of the 166 Solo Clients completed Sapien's Customer Information Disclosure Form. All 40 of the clients responded identically to a number of questions. First, the form asked what products were to be traded. All of the Clients ticked the box "Securities (DVP Equity/Cash Bonds)". Then the form asked for the "Anticipated volume of transactions per product", all of the 40 Solo Clients responded 25. The Solo Clients were asked the "Anticipated size of transactions per product", and all 40 clients replied €100,000,000.

4.69    Aside from that one conversation and the 40 completed Customer Information Disclosure Forms, Sapien had no other information regarding the expected pattern of transactions for 126 of the Solo Clients.

4.70    Even with the information that was completed with respect to 40 of the Solo Clients, Sapien did not request or receive sufficient information from the Solo Clients about

the purpose and intended nature of their proposed trading relationship or what kind of business they were trying to undertake. Sapien confirmed that its review of the KYC documents was for identification purposes only, and it did not conduct sufficient analysis of the information that had been obtained. This meant that Sapien had insufficient information on which to adequately evaluate whether the purported trading was in line with expectations and to identify unusually large transactions.

4.71    The JMLSG states: "if a firm cannot satisfy itself as to the identity of the customer; verify that identity; or obtain sufficient information on the nature and intended purpose of the business relationship, it must not enter into a new relationship and must terminate an existing one". Despite the obvious issues with the lack of information available to Sapien about the nature and intended purpose of the business relationship, Sapien onboarded every Solo Client.

*Risk assessment*

4.72    As part of the onboarding and due diligence process, firms need to undertake and document risk assessments for every client. Such assessments should be based on information contained in the clients' KYC documents.

4.73    Conducting a thorough risk assessment for each client assists firms in determining the correct level of CDD to be applied, including whether EDD is warranted. If a customer is not properly assessed, firms are unlikely to be fully apprised of the risks posed by each client, which increases the risk of financial crime.

4.74    Under Regulation 20 of the 2007 Regulations, firms are required to maintain appropriate and risk-sensitive policies and procedures related to risk assessments and management.

4.75    Sapien's Compliance Manual stated, "Completed Identification Verification Form(s) which will include a risk assessment of the client and the business to be undertaken. Additional verification will be required where the risk assessment indicates that there is a higher than standard risk for that client and/or business." The "ID and Verification Checklists" then each had three separate questions, which formed the basis of the risk assessment. These questions were "8.1 Does the client present a higher than standard money laundering risk? 8.2 Does the business to be undertaken with the client present a higher than standard money laundering risk? 8.3 Do geographic risks associated with the customer and/or connected individuals

and/or other impersonal entities present a higher than standard money laundering risk?"

4.76    Sapien's policies and procedures failed to set out any factors, aside from geography, or any guidance that would help anyone at Sapien conclude why a client would present a higher money laundering risk or why the particular business undertaken with the client would pose a higher money laundering risk. Even as to geography, the policies and procedures failed to identify any geographic regions that would pose a heightened risk of money laundering. Without such guidance, Sapien was not in a position to properly assess the risks either at the onboarding stage when the Solo Clients presented themselves or the risks once the Solo Clients began the purported trading.

4.77    In fact, despite having policies which required risk assessments, Sapien did not carry out risk assessments on the Solo Clients and instead relied on the introduction certificates provided by Solo. Sapien confirmed its review of the KYC documents was for identification purposes only. No consideration was given as to how the KYC documents affected each client's risk assessment, even where companies had been incorporated in places without regulatory equivalence such as the BVI or the Cayman Islands.

4.78    Sapien did not conduct sufficient analysis to determine whether the Solo Clients posed a higher risk of financial crime. Even a brief analysis shows the following risk factors:

- Sapien management had no former relationship with the Solo Clients, and Sapien failed to have the Solo Clients complete information regarding the nature of the business the Solo Client was to undertake. Therefore, Sapien did not have a profile against which to base an assessment of their purported trading for the purposes of ongoing monitoring.

- The Solo Clients' KYC material showed that almost all of the Solo Clients had just a single director, shareholder and/or beneficiary.

- The Solo Clients were introduced by the Solo Group, where there was a possibility of a conflict of interest as some UBOs were former employees of SCP, as set out in paragraph 4.48. Sapien relied on the AML certificates that were given by Solo for their ex-employees. Because of Solo's relationship with their former employees, they were not in a position to provide an unbiased view.

25

- Over half of the Solo Clients were US 401(k) Pension Plans, linked to trusts. The JMSLG has noted that "some trusts established in jurisdictions with favourable tax regimes have in the past been associated with tax evasion and money laundering".

- Additionally, Sapien had no awareness of how 401(k) Pension Plans operated, the rules for their establishment or the limits for investment. It had not previously encountered 401(k) Pension Plans, but still made no enquiries at all concerning them.

- None of the Solo Clients were physically present for identification purposes as the onboarding process was conducted via email. This is identified in the 2007 Regulations as being indicative of higher risk, and therefore firms are required to take measures to compensate for the higher risk associated with these clients.

- As described above, all the Solo Clients, despite purportedly being separate entities controlled by different beneficial owners, presented themselves with identical emails.

- The Solo Clients purportedly sought to do OTC equity trading which under JMLSG guidance needs a more considered risk based approach and assessment.

- 40 of the Solo Clients stated that they wanted to execute trades totalling €100,000,000; however, they admitted that they did not have net worth of €2,000,000.

4.79    In failing to conduct risk assessments, Sapien did not identify any risk factors for the Solo Clients; therefore, it was not able to determine whether or not the Solo Clients required EDD.

*EDD*

4.80    Firms must conduct EDD on customers which present a higher risk of money laundering, so they are able to judge whether or not the higher risk is likely to materialise.

4.81    Regulation 14(1)(b) states that firms "must apply on a risk-sensitive basis enhanced customer due diligence and enhanced ongoing monitoring in any … situation which by its nature can present a higher risk of money laundering or terrorist financing". The 2007 Regulations further require firms to implement EDD

26

measures for any client that was not physically present for identification purposes.

4.82    Regulation 20 of the 2007 Regulations requires firms to maintain appropriate and risk-sensitive policies and procedures related to customer due diligence measures, which includes enhanced due diligence. SYSC 6.3.1R further requires that the policies must be comprehensive and proportionate to the nature, scale and complexity of its activities.

4.83    Sapien's Compliance Manual stated: "Additional verification evidence will be required where the risk assessment indicates that there is a higher than standard risk for that client and/or business". If the firm concluded after conducting a risk assessment that the client posed a higher than standard money laundering risk, the business undertaken by the client presented a higher than standard money laundering risk, or there was a geographic risk associated with the customer, then the Customer Verification forms required Sapien to 1) "verify [the] identity of all directors/persons operating the account and others as required", 2) "verify the beneficial owners as required" and 3) "any further evidence required".

4.84    Other than the brief references, Sapien's policies failed to set out processes or procedures for EDD of a client or any examples of what further evidence would be required per point three above.

4.85    Sapien's policies were deficient in that they did not provide sufficient guidance to staff on the types of information required to satisfy the EDD process. The policies were also deficient as they did not require, in accordance with the 2007 Regulations, that if a client was not present for identification purposes then the firm was required to implement EDD. As a result, the policies and procedures on EDD were not comprehensive enough to deal with the risks they were supposed to minimise.

4.86    Because Sapien did not meet a single Solo Client, Sapien was required to implement EDD. However, even if a client had been present, for the reasons set out in paragraph 4.78, a number of risk factors indicated that the Solo Clients may have presented a higher risk of money laundering, and therefore Sapien ought to have applied EDD by obtaining additional information about the Solo Clients and the proposed trading. In view of the connections between some of the Solo Clients and the Solo Group, this should have included independent enquiries on the sources of funds for the Solo Clients to ensure that they were not still financially connected to the Solo Group as employees, and had sufficient funds to conduct the anticipated trading.

27

4.87    Sapien failed to apply any scrutiny as to the plausibility of the Solo Clients being able to conduct professional trading, particularly in relation to the level of funds that they would need to hold. For example, as to 40 of the 401(k) Pension Plans, Sapien knew or should have known that those 40 clients had disclosed that they did not have a net worth of Euro 2,000,000 or more, yet they had disclosed that they intended to execute trades totalling Euro 2.5 billion. It is implausible that an entity would be able to execute trades of that size with such a small net worth.

4.88    Additionally, one example of a client that was onboarded by Sapien was a 401(k) Pension Plan where an identity document showed that the sole beneficiary was a 19-year-old college student. The individual was also the sole beneficiary for four other pension plans onboarded by Sapien.

4.89    Instead of making enquiries as to how the beneficiary had sufficient funds given the contribution limits for 401(k) Pension Plans and experience to conduct purported trading as a per se professional client, the purpose of such trading, or his reason for having five 401(k) Pension Plans, no one at Sapien acknowledged seeing the documents or giving any consideration to the client's age.

*4.90*    Sapien believed at the time that because it was not holding client funds and it was relying on the introduction certificates from the Solo Group that it did not need to question the source of funds for any of the Solo Clients. Because of what it describes as a 'misconception', it accepts that there was no verification as to source of funds*.*

4.91    Furthermore, many of the Solo Clients' KYC documents contained a number of red flags. For example, one trustee was responsible for fifteen separate clients. Upon reviewing KYC packs for these 15 clients, it is clear that all of the 401(k) Pension Plans had been set up in September, November and December of 2014 shortly before the onboarding process. For five of the 401(k) Pension Plans related to this single trustee, the UBO was a UK citizen, who only provided a UK ID containing a UK address for the purposes of identification. Although there was one piece of mail indicating a US address for that individual, the piece of mail was for her as a trustee for a trust in someone else's name. No one questioned why this UK citizen needed five 401(k) Pension Plans, which are used solely for US income tax purposes, to be established in September, November and December 2014. Sapien failed to ask any basic questions including whether she continued to live at her UK address.

4.92    For these same entities, the documents contained additional red flags. For example, for all the LLC agreements provided in the KYC packs, which was the employer for

28

the 401(k) Pension Plan, the documents had blank spaces where the amount of the capital contributions for the LLC should have been completed. Similarly, the percentage interests of the members were also left blank. Again, Sapien did not ask any questions why these pieces of information had been omitted.

4.93    Sapien failed to conduct any EDD on the Solo Clients that presented a higher risk of money laundering, and therefore was unable to judge whether the higher risk was likely to materialise.

*Client Categorisation*

4.94    Part of the onboarding process also includes categorising clients according to the COBS rules, which is a requirement additional and separate to carrying out risk assessments. Pursuant to COBS 3.3.1R, firms must notify customers of their categorisation as a retail client, professional client or eligible counterparty. Authorised firms must assess and categorise clients based on their level of trading experience, risk knowledge and access to funds, in order to ensure suitable products are offered. Proper application of the rules also ensures that firms only act for clients within the scope of their permissions. Firms are required to notify clients as to the categorisation made by the Firm. Pursuant to COBS 3.8.2R, firms must also keep records in relation to each client's categorisation, including sufficient information to support that categorisation.

4.95    Sapien is authorised to deal as an agent for professional clients and eligible counterparties, which are types of clients that are considered to have experience, knowledge and expertise to make their own investment decisions. Sapien was aware that it could not accept clients unless they were in one of these categories. There are two types of professional clients: per se professionals and elective professionals. Each of these categories has prescriptive criteria, as listed in the COBS rules.

4.96    Sapien's Compliance Manual contained its policy regarding client categorisation. The policy required Sapien to assess, document its assessment and maintain evidence supporting its classification of prospective and current clients.

4.97    For the type of business conducted by Sapien, per se professional clients would include authorised firms, government bodies, institutional investors or large undertakings meeting two of: a balance sheet total of EUR 20,000,000; and/or a net turnover of EUR 40,000,000; and/or own funds of EUR 2,000,000.

4.98    With respect to the Solo business, Sapien sent out a letter to the Solo Clients requesting that they affirm they were professional clients. The Solo Clients merely signed and returned the letter stating that they were professional clients. There was no attempt by Sapien to determine if the Solo Clients actually met the rules set out in COBS or to comply with the assessment process in its policy.

4.99    Sapien accepted that when it went back to assess if the client categorisation had been done properly, it held insufficient details about the clients to confirm whether the Solo Clients were properly categorised.

**Ongoing monitoring**

4.100    Regulation 8(1) requires firms to conduct ongoing monitoring of the business relationship with their customers. Ongoing monitoring of a business relationship includes scrutiny of transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the firm's knowledge of the customer, his business and risk profile.

4.101    Monitoring customer activity helps identify unusual activity. If unusual activities cannot be rationally explained, they may involve money laundering or terrorist financing. Monitoring customer activity and transactions that take place throughout a relationship helps firms know their customers, assist them to assess risk and provides greater assurance that the firm is not being used for the purpose of financial crime.

*Transaction monitoring*

4.102    As part of a firm's ongoing monitoring of a client relationship, Regulation 8 requires that firms must scrutinise transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the relevant person's knowledge of the customer, his business and risk profile.

4.103    Furthermore, Regulation 14(1) states that enhanced ongoing monitoring must be applied in situations, which can present a higher risk of money laundering or terrorist financing.

4.104    Regulation 20 requires firms to have appropriate risk-sensitive policies and procedures relating to ongoing monitoring.  These policies must include procedures to identify and scrutinise: 1) complex or unusually large transactions; 2) unusual

patterns of activities which have no apparent economic or visible lawful purpose; and 3) any other activity which the relevant person regards as likely by its nature to be related to money laundering or terrorist financing.

4.105    Sapien's Compliance Manual required that the Firm scrutinise "transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure the transactions are consistent with the firm's knowledge of the customer and the customer's business and risk profile and the Suitability and Appropriateness assessments carried out by the Firm".

4.106    However, Sapien's policy regarding transaction monitoring failed to set out any procedures regarding how, or the frequency with which, client activity should have been monitored, even for higher risk clients, which created a risk that transaction monitoring would not be conducted consistently or at all.

4.107    The policies also failed to require that Sapien compare the size of the trades to the client profiles. The policies also did not give guidance on how to identify a suspicious transaction or any risk factors to consider.

4.108    Sapien did not conduct transaction monitoring for AML purposes. Sapien did not perform any scrutiny of the transactions undertaken throughout its relationship with the Solo Clients (including of the source of funds).

*The Purported Solo Trading*

4.109    During the Relevant Period, Sapien purportedly executed high volume Cum-Dividend Trades for the Solo Clients worth £6.39 billion, £2.55 billion in Danish equities and £3.84 billion in Belgian equities and received commissions of £297,044, which made up 13% of Sapien's total revenue for the period.

4.110    Sapien purportedly started executing trades with respect to the Solo Clients on 4 May 2015. From May 2015 forward, Sapien purportedly executed trades in 3 Danish securities and 11 Belgian securities on the last day of Cum-Dividend Trading. In addition, Sapien purportedly executed unwind trades in 15 Danish and 15 Belgian securities over the course of 2015.

4.111    Although Sapien had a brief conversation with the Solo Group prior to onboarding any Solo Clients that the level of purported trading would exceed €100 million, Sapien did not question the individual clients either before or after the trading started regarding their level of trading or their financial capacity and characteristics.

31

4.112   For example, one of the Cayman entities purportedly traded between 1 July 2015 and 3 July 2015 totalling approximately £1,312,659,119.79, and Sapien failed to ask any questions about the trading or the source of funds.

4.113   Although Sapien stated that it monitored the purported trades from a commercial perspective, "it conducted no ongoing monitoring for AML purposes".

4.114   All the purported trading that Sapien executed for the Solo Clients was done on the Solo Group's Brokermesh system. Brokermesh was an electronic platform, developed by an entity associated with the Solo Group, which generated trade orders from clients which were transmitted to brokers, including to Sapien. The purported trading on the platform was conducted via an automated process whereby once an order appeared on the system, a broker would seek liquidity from the Solo Clients available on the system. Then, once the liquidity was established, the order would be matched subject to trade authorisation from the relevant custodian.

4.115   Sapien has confirmed that liquidity was typically sourced within five to fifteen minutes despite having orders over £230 million. In one case, an order for £237 million was filled in three minutes only among the other Solo Clients. Sapien did not question how the liquidity could be met so quickly, especially given that all of the orders were only matched between Solo Clients and none of the trades ever went to public exchanges.

4.116   In another example, on 22 June 2015, Sapien was attempting to sell 3.9 million shares of a particular stock worth approximately £310 million on behalf of a Solo Client. Within two minutes, it received an email from another Solo Client trading on the Brokermesh platform that they could fill the entire order. Sapien confirmed that it had no concerns about the size of the trade, and it gave no consideration to how that amount of stock was available.

   A.   *Trade sizes*

4.117   Between May and August 2015, Sapien used Brokermesh to purportedly execute Cum-Dividend Trading to the value of £2.55 billion in Danish equities and £3.84 billion in Belgian equities.

4.118   Analysis of the Cum Dividend Trading reveals the following:

   • Between May and August 2015, Sapien purportedly executed only 'buy' orders on behalf of Solo Clients in 3 Danish stocks over 3 cum-dividend dates. An

average of 17.55% of the available shares in each stock was traded, which were cumulatively worth a total of £2.55 billion. The volumes also equated to an average of 20 times the total number of all shares traded in those stocks on European exchanges.

- Between May and June 2015, Sapien purportedly executed 'buy' orders on behalf of Solo Clients in 11 Belgian stocks over 7 cum-dividend dates. An average of 6.25% of the available shares in each stock was traded, which were cumulatively worth total of £3.84 billion. The volumes also equated to an average of 25 times the total number of all shares traded on European exchanges.

4.119   Sapien did not evaluate any of the trades cumulatively by the Solo Clients generally, or by each individual stock. As a result, it did not appreciate a number of key facts including but not limited to the total sizes that were being traded, the amount of shares outstanding and any applicable disclosable thresholds.

4.120   The Authority considers that it is significant for market surveillance and visibility that individual trades were below the applicable disclosable thresholds. For example, section 29 of the Danish Securities Trading Act required shareholders holding over 5% of Danish-listed stock to be publicised. Similarly, Belgian law requires pursuant to Article 6 of the 'Law of 2 May 2007 on disclosure of major holdings in issues whose shares are admitted to trading on a regulated market and laying down miscellaneous provisions' holders of more than 5% of the existing voting rights to notify the issuer and the Belgian Financial Services Markets Authority of the number and proportion of voting rights that he/she holds.

4.121   Furthermore, the Firm failed to recognise the implausibility that liquidity for such volumes could be found within a closed network of approximately 166 entities, most of which only had a single shareholder. The closed network did not have access to liquidity from public exchanges, yet the trades were filled within a matter of minutes and represented up to 20% of the shares outstanding in the companies listed on the Danish exchanges, and up to 10% of the equivalent Belgian stocks.

4.122   Sapien was not concerned regarding the size of the trades and never raised any concerns with the Solo Group. Sapien was told by the Solo Group that if any of the Solo Clients had insufficient funds or didn't have the stock to deliver, then the trades would be cancelled. Because none of the trades had been cancelled once the purported trading commenced, Sapien did not have concerns, nor did it ever question if it was a normal practice for trades to be cancelled between parties if

33

one party was short on funds.

4.123   Sapien also took comfort that the four Solo entities and the five brokers engaging in the purported trading were all FCA registered.

4.124   Sapien took the view that because it was the executing broker, and the trades were subject to custodian approval, the size of trades was not something that it needed to consider or have responsibility for. As Sapien perceived that it bore no risk of loss, it failed to recognise more general risks, including financial crime risk, which applies to all regulated firms. Consequently, it failed to appreciate the potential risk that it might be used to 'further money laundering'.

4.125   Although execution-only broking may reduce counterparty risk, all regulated firms must consider and mitigate the risk that they could be used to facilitate financial crime, even if client monies do not flow through the firm. The Authority has published considerable guidance on managing the risk of financial crime, particularly in its Financial Crime Guide, which was first published in December 2011 and of which Sapien ought to have been aware.

4.126   Sapien should have considered whether the size and volume of the transactions were in line with expectations for the Solo Clients and whether the Solo Clients had sufficient funds.

4.127   An additional consideration ought to have been whether it was realistic that the Solo Group had been able to source a network of clients who were of sufficiently high net worth to be able to trade sizes in the way that they purported to do.

   B.   *Trading Red Flags*

4.128   Once the purported Solo Trading commenced, a number of red flags in relation to the trading ought to have alerted Sapien to the possibility that it could be used for the purposes of financial crime and should have prompted it either to obtain explanations from the Solo Group or the Solo Clients on a number of matters, decline to execute particular trades, or cease its trading relationship with the Solo Clients:

- The Solo Clients placed extremely high value trades, yet most of them had only been recently incorporated, were based in non-EU/EEA countries (making them higher risk clients) and in a number of instances, were managed or owned by former employees of SCP.

- For the recently incorporated 401(k) Pension Plans, the value of the

purported trades far exceeded the investment amounts which could reasonably have accrued given the annual contribution limits and limited number of ultimate beneficial owners, which should have alerted Sapien as to the unrealistic nature of the trades.

- Sapien purportedly traded an average of 17.55% of the shares outstanding in the market on major listed Danish stocks, in circumstances where share ownership over 5% required publication. This was an average of 20 times higher than were reported on European exchanges for the same Danish stocks.

4.129  Solo Group purported to have sourced a custom automatic trade matching and settlement platform from an entity owned by Sanjay Shah.  Brokermesh was always able to locate liquidity for OTC trades worth over £6.3 billion that were executed by Sapien, even though access to the platform was closed, being limited to clients introduced to the brokers by the Solo Group.

**Elysium Global Payment**

4.130  On 23 September 2015, a Sapien employee telephoned one of the Solo Clients about outstanding second quarter invoices for commissions. After being asked about the status of the second quarter invoices, the beneficial owner stated, "I spoke to somebody and they said that those were invoices that were owed by Solo. I wasn't sure, and they were dealing with it, but I have spoken to somebody about it within, within Solo".

4.131  The Sapien employee failed to question why the commissions were owed by the Solo Group and not the individual clients.

4.132  The beneficial owner went on to state, "I was under the impression that all these things were just being paid . . . directly from the account. I don't have bank accounts for my entities, so you know, this, this was just going to be paid directly from my trading account".

4.133  The Sapien employee also failed to question how it was possible that the Solo Clients' entities were able to fund trading accounts and execute trades between 1 July 2015 and 3 July 2015 totalling approximately £1,312,659,119.79, if he did not have a bank account for his entity.

4.134  On 29 October 2015, two employees of Sapien spoke with each other on the telephone regarding the outstanding Solo Client commission invoices. On the call,

the first employee said that they had just had a conversation with a Solo Group employee who stated that:

Employee 1:  ". . . Elysium Global, is taking on the debts of the four custodians to settle the invoices."

…

Employee 1:  "So, um we're just waiting to hear from Elysium Global but we've just been, as part of the AML we need to find out, you know, a bit about this company cause obviously we don't know where the monies… but we've just, I've literally just gone on, we've just come off the phone from her, I've just done a search on Elysium Global and Sanjay [Shah] is a director of the company."

Employee 2: "Crikey.  I mean what is all this about?"

Employee 1: "I have no idea, but er, I think the best thing is just get out money and just leave it."

Employee 2:  "Yeah, well I think so too.     I can't help feeling this was  all premeditated."

Employee 1: "I don't know, this is, as [another Sapien employee] said, nothing is every straight forward with them is it."

Employee 2: "No, why would it… I, I just can't understand why they would do this.  Why would they take on the debts of all those different companies?"

Employee 1: "I don't know, I have no idea."

…

Employee 2:  "Absolutely right, yeah, I think we've got to grab the money while we can."

Employee 1:  "Definitely."

4.135   In addition to this call, there was a further call ten minutes later in which the same two employees considered this payment, initially questioning its nature. On the call, they determined the payment was not suspicious and did not report it

4.136   Despite these red flags and Sapien's awareness of the need to do AML checks on the receipt of the monies, on 30 October 2015, arrangements were made to receive £112,840 commission for its purported trading for the Solo Clients from Elysium Global.

4.137   On 3 November 2015, the Authority conducted an unannounced visit to the offices of Sapien regarding its dealings with the Solo Clients. On 10 November 2015, Elysium Global, a corporate vehicle connected to  Mr Shah  paid Sapien the £112,840.

4.138  Between the Authority's visit on 3 November 2015 and the payment on 10 November 2015, no one at the Firm considered whether it was appropriate to continue to receive the payment. Sapien also failed to notify the Authority of its intention to receive the money.

4.139  Sapien's Compliance Manual directed staff to report suspicions to the Firm's MLRO; however, the policy did not provide adequate detail on the types of behaviour that could be indicative of suspicious activity.

4.140  It was not until 14 February 2017 that Sapien notified the Authority of the details and nature of the payment.

4.141  The firm admitted that "having been made aware of the concerns surrounding Mr Shah by the Authority at the regulatory visit on 3 November 2015 the Firm should have notified the Authority of its intention to receive the monies (representing the brokerage fees as per the factoring arrangement made on 30 October 2015) before the transaction actually proceeded".

**End of the Purported Solo Trading**

4.142  Sapien executed its last trade for a Solo Client on 29 September 2015. The Solo Clients ceased the purported trading with all the brokers after an unannounced visit by the Authority to the offices of the Solo Group entities and the Broker Firms on 3 - 4 November 2015.

**Sapien failed to Identify Any of the Above Issues**

4.143  Sapien failed to identify any of the above issues. With respect to AML, in both the 2014 to 2015 and 2015 to 2016 fiscal years, Sapien did not identify any transactions raising any suspicions and no breaches were reported or observed.

## 5   FAILINGS

5.1  The statutory and regulatory provisions relevant to this Notice are referred to in Annex B.

5.2  The JMLSG Guidance has also been included in Annex B, because in determining whether breaches of its rules on systems and controls against money laundering have occurred, and in determining whether to take action for a financial penalty or censure in respect of a breach of those rules, the Authority has also had regard to whether Sapien followed the JMLSG Guidance.

**Principle 3**

5.3    Principle 3 requires a firm to take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems.

5.4    Sapien breached this requirement during the Relevant Period, in relation to the purported Solo Trading and Solo Clients, as its policies and procedures were inadequate for identifying, assessing and mitigating the risk of financial crime as they failed to:

       a)    Give adequate guidance on how to conduct risk assessments and what factors to consider;

       b)    Set out adequate processes and procedures for EDD;

       c)    Set out adequate processes and procedures for transaction monitoring including how transactions are monitored, and with what frequency; and

       d)    Set out adequate processes and procedures for how to identify suspicious transactions.

**Principle 2**

5.5    The Authority considers that Sapien failed to act with due skill, care and diligence as required by Principle 2 to properly assess, monitor and manage the risk of financial crime associated with the Solo Clients and the purported trading, in that the Firm:

       a)    Failed to properly conduct customer due diligence, by failing to follow CDD procedures set out in the Firm's policies and by amending customer due diligence forms, in response to complaints from Solo Clients, to reduce the information required in respect of Solo Clients;

       b)    Failed to gather information to enable it to understand the business that the Solo Clients were going to undertake, the likely size or frequency of the purported trading intended by 126 of the Solo Clients or the source of funds for 126 of the Solo Clients out of 166 clients introduced by Solo;

       c)    Failed to undertake and document a risk assessment for each of the Solo Clients;

       d)    Failed to complete EDD for any of the Solo Clients despite the fact that none of the Solo Clients were physically present for identification purposes and a

number of other risk factors were present including that each of the 40 entities disclosed that they had a net worth less than €2 million but were purportedly going to execute 25 trades of €100 million;

e)  Failed to assess each of the Solo Clients against the categorisation criteria set out in COBS 3.5.2R and failed to record the results of such assessments, including sufficient information to support the categorisation, contrary to COBS 3.8.2R(2)(a);

f)  Failed to conduct transaction monitoring of the Solo Clients purported trades;

g)  Failed to recognise numerous red flags with the purported trading including failing to consider whether it was plausible and/or realistic that sufficient liquidity was sourced within a closed network of entities for the size and volumes of trading conducted by the Solo Clients. Likewise, failing to consider or recognise that the profiles of the Solo Clients meant that they were highly unlikely to meet the scale and volume of the trading purportedly being carried out, and/or failing to at least obtain sufficient evidence of the clients' source of funds to satisfy itself to the contrary; and

h)  Received the payment from Elysium Global and failed to report the payment to the Authority. Several employees discussed the payment internally and initially questioned a number of red flags regarding the payment and then did not determine it to be suspicious and did not report it. This determination was made after the Authority had conducted an unannounced visit alerting Sapien to possible issues with the Solo Group.

## 6  SANCTION

**Financial Penalty**

6.1  The Authority has considered the disciplinary and other options available to it and has concluded that a financial penalty is the appropriate sanction in the circumstances of this particular case. The principal purpose of a financial penalty is to promote high standards of regulatory conduct by deterring persons who have breached regulatory requirements from committing further breaches, helping to deter other persons from committing similar breaches, and demonstrating generally the benefits of compliant behaviour.

6.2  The Authority's policy on the imposition of financial penalties is set out in Chapter

39

6 of DEPP. In determining the proposed financial penalty, the Authority has had regard to this guidance.

6.3    DEPP 6.5A sets out a five-step framework to determine the appropriate level of financial penalty.

**Step 1: disgorgement**

6.4    Pursuant to DEPP 6.5A.1G, at Step 1 the Authority seeks to deprive a firm of the financial benefit derived directly from the breach where it is practicable to quantify.

6.5    The financial benefit derived directly by Sapien from its breaches is quantifiable by reference to the revenue figure derived from the Solo Clients' purported trading as described in paragraph 4.109 of this Notice, minus custody and consultant fees, totalling £178,000.

6.6    The figure after Step 1 is therefore **£178,000.**

**Step 2: the seriousness of the breach**

6.7    Pursuant to DEPP 6.5A.2G, at Step 2 the Authority determines a figure that reflects the seriousness of the breach. Where the amount of revenue generated by a firm from a particular product line or business area is indicative of the harm or potential harm that its breach may cause, that figure will be based on a percentage of the Firm's revenue from the relevant products or business area.

6.8    The Authority considers that the revenue generated by Sapien is indicative of the harm or potential harm caused by its breach. The Authority has therefore determined a figure based on a percentage of Sapien's relevant revenue during the period of the breach.

6.9    Sapien's relevant revenue is the revenue derived from the purported Solo Trading. The period of Sapien's breach was from 10 February 2015 to 10 November 2015. The Authority considers Sapien's revenue for this period to be £178,000.

6.10   In deciding on the percentage of the revenue that forms the basis of the Step 2 figure, the Authority considers the seriousness of the breach and chooses a percentage between 0% and 20%.  This range is divided into five fixed levels which represent, on a sliding scale, the seriousness of the breach; the more serious the

40

breach, the higher the level.  For penalties imposed on firms there are the following five levels:

Level 1 – 0%

Level 2 – 5%

Level 3 – 10%

Level 4 – 15%

Level 5 – 20%

6.11    In assessing the seriousness level, pursuant to DEPP 6.5A.2 the Authority takes into account various factors which reflect the impact and nature of the breach, and whether it was committed deliberately or recklessly.  The factors that the Authority considers to be relevant to the Firm's breaches are set out below.

*Impact of the breach*

6.12    There is no evidence of direct consumer harm arising from the breaches.

*Nature of the breach*

6.13    During the Relevant Period, the Firm had inadequate systems (Principle 3) and did not exercise due skill, care and diligence (Principle 2).

6.14    The Firm failed to identify any AML issues during the Relevant Period (a 9-month period).

6.15    The breaches identified demonstrate systemic weaknesses in the Firm's policies, procedures and management systems for tackling fraudulent trading and money laundering.

6.16    The purported share trading attributed to the Solo Group was highly suggestive of sophisticated financial crime.

*Reckless or deliberate breach*

*6.17*    The Authority does not consider that the breaches were either deliberate or reckless.

*Level of Seriousness*

6.18    DEPP 6.5A.2G(11) lists factors likely to be considered 'level 4 or 5 factors'. Of these, the Authority considers the following factors to be relevant:

(1) The breaches revealed serious or systemic weaknesses in the Firm's procedures and the management systems or internal controls relating to the Firm's governance of financial crime risk.

(2) The breach created a significant risk that financial crime would be facilitated, occasioned or otherwise occur.

6.19    DEPP 6.5A.2G(12) lists factors likely to be considered 'level 1 factors,' 'level 2 factors' or 'level 3 factors' of which the Authority considers the following to be relevant:

(c) There was no, or limited, actual or potential effect on the orderliness of, or confidence in, markets as a result of the breach.

6.20    Taking all of these factors into account, the Authority considers the seriousness of the breach to be level 4 and so the Step 2 figure is 15% of £178,000.

6.21    Step 2 is therefore **£26,700.**

**Step 3: Mitigating and aggravating factors**

6.22    Pursuant to DEPP 6.5A.3G, at Step 3, the Authority may increase or decrease the amount of the financial penalty arrived at after Step 2, but not including any amount to be disgorged as set out in Step 1, to take into account factors which aggravate or mitigate the breach.

6.23    The Authority considers that the following factor aggravates the breach:

a) Given the number and detailed nature of the Authority and the JMLSG's publications on financial crime risks and the standards expected of firms, and past enforcement action taken by the Authority in respect of similar failings by other firms, Sapien should have been aware of the importance of appropriately assessing, managing and monitoring the risk that the Firm could be used for the purposes of financial crime.

6.24    The Authority does not consider there to be any mitigating factors.

6.25    Having taken into account the aggravating factor, the Authority considers that, onbalance, the Step 2 figure should be increased by 10%.

6.26    Step 3 is therefore **£29,370.**

**Step 4: adjustment for deterrence**

6.27    Pursuant to DEPP 6.5A.4G, if the Authority considers the figure arrived at after Step

3 is insufficient to deter the firm who committed the breach, or others, from committing further or similar breaches, then the Authority may increase the penalty.

6.28    The Authority considers that DEPP 6.5A.4G(1)(a) is relevant in this instance and has therefore determined that this is an appropriate case where an adjustment for deterrence is necessary. Without an adjustment for deterrence, the financial penalty would be £29,370. In the circumstances of this case, the Authority considers that a penalty of this size would not serve as a credible deterrent to Sapien and others. A penalty of such small size would not meet the Authority's objective of credible deterrence. As a result, it is necessary for the Authority to increase the penalty to achieve credible deterrence. The Authority considers that a multiplier of two should be applied at Step 4.

6.29    Step 4 is therefore **£58,740.**

**Step 5: settlement discount**

6.30    Pursuant to DEPP 6.5A.5G, if the Authority and the firm on whom a penalty is to be imposed agree the amount of the financial penalty and other terms, DEPP 6.7 provides that the amount of the financial penalty which might otherwise have been payable will be reduced to reflect the stage at which the Authority and the firm reached agreement. The settlement discount does not apply to the disgorgement of any benefit calculated at Step 1.

6.31    The Authority and Sapien did reach agreement to settle so a 30% discount applies to the Step 4 figure.

6.32    The Authority has rounded down the final penalty to the nearest £100. Step 5 is therefore **£219,100** (including disgorgement of £178,000).

**Serious Financial Hardship**

6.33    Pursuant to DEPP 6.5D.4(1), the Authority will consider reducing the amount of a penalty if a firm will suffer serious financial hardship as a result of having to pay the entire penalty. The Authority accepts from the verifiable evidence provided by

43

Sapien that the payment of a penalty of £219,100 including disgorgement of £178,000 would cause it serious financial hardship. Whilst the Authority considers it appropriate to reduce the penalty for serious financial hardship, the Authority does not consider it appropriate to allow Sapien to retain the financial benefit derived directly from its breaches. The Authority therefore considers that a financial penalty of £178,000, this being the disgorgement element, is the appropriate penalty figure. The Authority will allow the financial penalty of £178,000 to be paid over a three-year period.

**Penalty**

6.34   The Authority has therefore decided to impose a total financial penalty of £178,000 on Sapien for breaching Principle 3 and Principle 2.

## 7   REPRESENTATIONS

7.1   Annex D contains a brief summary of the key representations made by Sapien and how they have been dealt with. In making the decision which gave rise to the obligation to give this Notice, the Authority has taken into account all of the representations made by Sapien, whether or not set out in Annex D.

## 8   PROCEDURAL MATTERS

8.1   This Notice is given under section 208 of the Act and in accordance with section 388 of the Act. The following paragraphs are important.

**Decision maker**

8.2   The decision which gave rise to the obligation to give this Notice was made by the RDC. The RDC is a committee of the Authority which takes certain decisions on behalf of the Authority. The members of the RDC are separate to the Authority staff involved in conducting investigations and recommending action against firms and individuals. Further information about the RDC can be found on the Authority's website:

https://www.fca.org.uk/about/committees/regulatory-decisions-committee-rdc

**Manner and time for payment**

8.3   The Authority will allow the financial penalty to be paid over a three-year period in scheduled payments with the final payment due to be paid by Sapien Capital

44

Limited no later than 31 March 2024.

**If the financial penalty is not paid**

8.4    If any or all of the scheduled instalments of the financial penalty is outstanding after its due date for payment, the full amount outstanding of the financial penalty shall then become immediately due and payable including all future instalments, and the Authority may recover the outstanding amount as a debt owed by Sapien Capital Limited to the Authority, including interest thereon.

**Publicity**

8.5    Sections 391(4), 391(6) and 391(7) of the Act apply to the publication of information about the matter to which this notice relates. Under those provisions, the Authority must publish such information about the matter to which this notice relates as the Authority considers appropriate. The information may be published in such manner as the Authority considers appropriate. However, the Authority may not publish information if such publication would, in the opinion of the Authority, be unfair to you or prejudicial to the interests of consumers or detrimental to the stability of the UK financial system.

**Contacts**

8.5    For more information concerning this matter generally, contact Evan Benge (direct line: 02070661660 / evan.benge@fca.org.uk ) or Natalie Birtle (direct line: 020 7066 6856/ natalie.birtle@fca.org.uk) of the Enforcement and Market Oversight Division of the Authority.

Elizabeth France
Deputy Chair, Regulatory Decisions Committee

**ANNEX A:  CHRONOLOGY**

| | |
|---|---|
| **2008** | Sapien was incorporated and authorised by the Authority. |
| **September 2014** | A new trading desk joined Sapien. |
| **23 October 2014** | Sapien held its first meeting with the Solo representatives. |
| **24 November 2014** | Solo provided the custody agreement to Sapien for signature. |
| **4 December 2014** | Sapien held its second meeting with Solo to discuss the business. |
| **20 January 2015** | Solo advised Sapien that there was potential for it to execute trades as a broker for clients of Solo. |
| **27 January 2015** | Solo informed Sapien that there will be 160 clients to onboard. |
| **29 January 2015** | Solo informed Sapien of fee structure. Sapien commission was 1/64 of Solo Clients' orders. Order would be large, potentially over Euro 100 million and above. Solo estimated Sapien would make Euro 600/700k net. |
| **10 February 2015** | Sapien began onboarding the Solo Clients. |
| **12 March 2015** | Sapien indicated to Solo that Sapien had completed onboarding of approximately 69 clients. |
| **30 April 2015** | Sapien completed the onboarding of 166 Solo Clients. |
| **4 May 2015** | Purported trading of Belgian stocks commenced. |
| **6 May 2015** | Purported trading of Danish stocks commenced. |
| **16 July 2015** | First invoice from Solo to Sapien. |
| **23 September 2015** | Sapien employee telephoned a Solo Client regarding an outstanding invoice.  The Solo Client stated he did not have bank accounts for his entities. |
| **29 October 2015** | The two Sapien employees spoke on the telephone regarding Elysium Global taking on the debts of the Solo Clients. |
| **30 October 2015** | Sapien made arrangements to receive £112,840 Elysium Global payment. |
| **3 November 2015** | Unannounced visit by FCA Enforcement |

| 10 November 2015 | Elysium Global sent £112,840 payment to Sapien. |
|---|---|
| 14 February 2017 | FCA first notified of the detail, nature and context of payment from Elysium Global. |

### ANNEX B:  RELEVANT STATUTORY AND REGULATORY PROVISIONS

**1.    RELEVANT STATUTORY PROVISIONS**

**The Financial Services and Markets Act 2000**

1.1    Pursuant to sections 1B and 1D of the Act, one of the Authority's operational objectives is protecting and enhancing the integrity of the UK financial system.

1.2    Pursuant to section 206 of the Act, if the Authority considers that an authorised person has contravened a requirement imposed on it by or under the Act, it may impose on that person a penalty in respect of the contravention of such amount as it considers appropriate.

**The Money Laundering Regulations 2007**

1.3    Regulation 5 provides:

**Meaning of customer due diligence measures**

*"Customer due diligence measures" means—*

*(a) identifying the customer and verifying the customer's identity on the basis of documents, data or information obtained from a reliable and independent source;*

*(b) identifying, where there is a beneficial owner who is not the customer, the beneficial owner and taking adequate measures, on a risk-sensitive basis, to verify his identity so that the relevant person is satisfied that he knows who the beneficial owner is, including, in the case of a legal person, trust or similar legal arrangement, measures to understand the ownership and control structure of the person, trust or arrangement; and*

*(c) obtaining information on the purpose and intended nature of the business relationship."*

1.4    Regulation 7 provides:

**Application of customer due diligence measures**

*(1) …, a relevant person must apply customer due diligence measures when he—*

*(a) establishes a business relationship;*

*(b) carries out an occasional transaction;*

*(c) suspects money laundering or terrorist financing;*

*(d) doubts the veracity or adequacy of documents, data or information previously obtained for the purposes of identification or verification.*

*(2) Subject to regulation 16(4), a relevant person must also apply customer due diligence measures at other appropriate times to existing customers on a risk-sensitive basis.*

1.5    Regulation 8 provides:

**Ongoing monitoring**

"*(1) A relevant person must conduct ongoing monitoring of a business relationship.*

*(2) "Ongoing monitoring" of a business relationship means—*

> *(e) scrutiny of transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the relevant person's knowledge of the customer, his business and risk profile; and*

> *(f) keeping the documents, data or information obtained for the purpose of applying customer due diligence measures up-to-date.*

*(3) Regulation 7(3) applies to the duty to conduct ongoing monitoring under paragraph (1) as it applies to customer due diligence measures.* "

1.6    Regulation 14 provides:

**Enhanced customer due diligence and ongoing monitoring**

"*(1) A relevant person must apply on a risk-sensitive basis enhanced customer due diligence measures and enhanced ongoing monitoring—*

> *(a) in accordance with paragraphs (2) to (4);*

> *(b) in any other situation which by its nature can present a higher risk of money laundering or terrorist financing.*

*(2) Where the customer has not been physically present for identification purposes, a relevant person must take specific and adequate measures to compensate for the higher risk, for example, by applying one or more of the following measures—*

> *(a) ensuring that the customer's identity is established by additional documents, data or information;*

> *(b) supplementary measures to verify or certify the documents supplied, or*

*requiring confirmatory certification by a credit or financial institution which is subject to the money laundering directive;*

(c) *ensuring that the first payment is carried out through an account opened in the customer's name with a credit institution."*

1.7    Regulation 17 provides:

**Reliance**

"*(1) A relevant person may rely on a person who falls within paragraph (2) (or who the relevant person has reasonable grounds to believe falls within paragraph (2)) to apply any customer due diligence measures provided that—*

(a) *the other person consents to being relied on; and*

(b) *notwithstanding the relevant person's reliance on the other person, the relevant person remains liable for any failure to apply such measures.*

*(2) The persons are—*

(a) *a credit or financial institution which is an authorised person;*
*…*

*(4) Nothing in this regulation prevents a relevant person applying customer due diligence measures by means of an outsourcing service provider or agent provided that the relevant person remains liable for any failure to apply such measures."*

1.8    Regulation 20 provides:

**Policies and Procedures**

"*(1) A relevant person must establish and maintain appropriate and risk-sensitive policies and procedures relating to—*

(a) *customer due diligence measures and ongoing monitoring;*

(b)          *reporting;*

(c) *record-keeping;*

(d) *internal control;*

(e) *risk assessment and management;*

(f) *the monitoring and management of compliance with, and the internal communication of, such policies and procedures,*

*in order to prevent activities related to money laundering and terrorist financing.*

*(2) The policies and procedures referred to in paragraph (1) include policies and procedures—*

*(a) which provide for the identification and scrutiny of—*

*(i) complex or unusually large transactions;*

*(ii) unusual patterns of transactions which have no apparent economic or visible lawful purpose; and*

*(iii) any other activity which the relevant person regards as particularly likely by its nature to be related to money laundering or terrorist financing;"*

## 2.    RELEVANT REGULATORY PROVISIONS

2.1    In exercising its powers to impose a financial penalty, the Authority has had regard to the relevant regulatory provisions published in the Authority's Handbook. The main provisions that the Authority considers relevant are set out below.

### Principles for Business ("Principles")

2.2    The Principles are a general statement of the fundamental obligations of firms under the regulatory system and are set out in the Authority's Handbook.

2.3    Principle 2 provides:

*"A firm must conduct its business with due skill, care and diligence."*

2.4    Principle 3 provides:

*"A firm must take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems."*

### Senior Management Arrangements, Systems and Controls ("SYSC")

2.5    SYSC 3.2.6E provides:

*"The FCA, when considering whether a breach of its rules on systems and controls against money laundering has occurred, will have regard to whether a firm has followed relevant provisions in the guidance for the UK financial sector issued by the Joint Money Laundering Steering Group."*

2.6    SYSC 3.2.6R provides:

 *"A firm must take reasonable care to establish and maintain effective systems*

51

*and controls for compliance with applicable requirements and standards under the regulatory system and for countering the risk that the firm might be used to further financial crime."*

2.7    SYSC 6.1.1R provides:

*"A firm must establish, implement and maintain adequate policies and procedures sufficient to ensure compliance of the firm including its managers, employees and appointed representatives (or where applicable, tied agents) with its obligations under the regulatory system and for countering the risk that the firm might be used to further financial crime."*

2.8    SYSC 6.3.1R provides:

*"A firm must ensure the policies and procedures established under SYSC 6.1.1 R include systems and controls that:*

*(1) enable it to identify, assess, monitor and manage money laundering risk; and*

*(2) are comprehensive and proportionate to the nature, scale and complexity of its activities."*

2.9    SYSC 6.3.6 provides:

*"In identifying its money laundering risk and in establishing the nature of these systems and controls, a firm should consider a range of factors, including:*

*(1) its customer, product and activity profiles;*

*(2) its distribution channels;*

*(3) the complexity and volume of its transactions;*

*(4) its processes and systems; and*

*(5) its operating environment."*

2.10    SYSC 6.3.7 provides:

*"A firm should ensure that the systems and controls include:*

*(3) appropriate documentation of its risk management policies and risk profile in relation to money laundering, including documentation of its application of those policies;*

*(4) appropriate measures to ensure that money laundering risk is taken into account in its day-to-day operation, including in relation to:*

*(a) the development of new products;*
*(b) the taking-on of new customers; and*

*(c) changes in its business profile."*

2.11    SYSC 9.1.1 R provides:

*"A firm must arrange for orderly records to be kept of its business and internal organisation, including all services and transactions undertaken by it, which must be sufficient to enable the appropriate regulator or any other relevant competent authority under MiFID or the UCITS Directive to monitor the firm's compliance with the requirements under the regulatory system, and in particular to ascertain that the firm has complied with all obligations with respect to clients."*

**Conduct of Business Sourcebook (COBS)**

2.12    COBS 3.5.2 provides:

**Per Se Professional Clients**

*"Each of the following is a per se professional client unless and to the extent it is an eligible counterparty or is given a different categorisation under this chapter:*

*(1) an entity required to be authorised or regulated to operate in the financial markets. The following list includes all authorised entities carrying out the characteristic activities of the entities mentioned, whether authorised by an EEA State or a third country and whether or not authorised by reference to a directive:*

> *(a) a credit institution;*
>
> *(b) an investment firm;*
>
> *(c) any other authorised or regulated financial institution;*
>
> *(d) an insurance company;*
>
> *(e) a collective investment scheme or the management company of such a scheme;*
>
> *(f) a pension fund or the management company of a pension fund;*
>
> *(g) a commodity or commodity derivatives dealer;*
>
> *(h) a local;*
>
> *(i) any other institutional investor;*

*(2) in relation to MiFID or equivalent third country business a large undertaking meeting two of the following size requirements on a company basis:*

> *(a) balance sheet total of EUR 20,000,000;*
>
> *(b) net turnover of EUR 40,000,000;*

53

*(c) own funds of EUR 2,000,000;*

*(3) in relation to business that is not MiFID or equivalent third country business a large undertaking meeting any 1 of the following conditions:*

*(a) a body corporate (including a limited liability partnership) which has (or any of whose holding companies or subsidiaries has) (or has had at any time during the previous two years) 1 called up share capital or net assets of at least £51 million (or its equivalent in any other currency at the relevant time);*

*(b) an undertaking that meets (or any of whose holding companies or subsidiaries meets) two of the following tests:*

> *(i)     a balance sheet total of EUR 12,500,000;*
>
> *(ii)    a net turnover of EUR 25,000,000;*
>
> *(iii)   an average number of employees during the year of 250;*

*(c) a partnership or unincorporated association which has (or has had at any time during the previous two years) net assets of at least £5 million (or its equivalent in any other currency at the relevant time) and calculated in the case of a limited partnership without deducting loans owing to any of the partners;*

*(d) a trustee of a trust (other than an occupational pension scheme, SSAS, personal pension scheme or stakeholder pension scheme) which has (or has had at any time during the previous two years) assets of at least £10 million (or its equivalent in any other currency at the relevant time) calculated by aggregating the value of the cash and designated investments forming part of the trust's assets, but before deducting its liabilities;*

*(e) a trustee of an occupational pension scheme or SSAS, or a trustee or operator of a personal pension scheme or stakeholder pension scheme where the scheme has (or has had at any time during the previous two years):*

> *(i) at least 50 members; and*
>
> *(ii) assets under management of at least £10 million (or its equivalent in any other currency at the relevant time);*

*(f)  a local authority or public authority.*

*(4) a national or regional government, a public body that manages public debt, a central bank, an international or supranational institution (such as the World Bank, the IMF, the ECP, the EIB) or another similar international organisation;*

*(5) another institutional investor whose main activity is to invest in financial*

54

*instruments (in relation to the firm's MiFID or equivalent third country business) or designated investments (in relation to the firm's other business). This includes entities dedicated to the securitisation of assets or other financing transactions."*

2.13    COBS 3.8.2R provides:

*"(2) A firm must make a record in relation to each client of:*

*the categorisation established for the client under this chapter, including sufficient information to support that categorisation;*

**Decision Procedure and Penalties Manual ("DEPP")**

2.14    Chapter 6 of DEPP, which forms part of the Authority's Handbook, sets out the Authority's statement of policy with respect to the imposition and amount of financial penalties under the Act. In particular, DEPP 6.5A sets out the five steps for penalties imposed on firms.

2.15    DEPP 6.2.3G provides:

*"The FCA's rules on systems and controls against money laundering are set out in SYSC 3.2 and SYSC 6.3. The FCA, when considering whether to take action for a financial penalty or censure in respect of a breach of those rules, will have regard to whether a firm has followed relevant provisions in the Guidance for the UK financial sector issued by the Joint Money Laundering Steering Group."*

**Enforcement Guide**

2.16 The Enforcement Guide sets out the Authority's approach to taking disciplinary action. The Authority's approach to financial penalties and suspensions (including restrictions) is set out in Chapter 7 of the Enforcement Guide.

**JMLSG GUIDANCE– PART I (dated 19 November 2014)**

**A risk-based approach – governance, procedures and internal controls**

2.16    JMLSG Paragraph 4.5 provides:

*"A risk-based approach requires the full commitment and support of senior management, and the active co-operation of business units. The risk-based approach needs to be part of the firm's philosophy, and as such reflected in the procedures and controls.  There needs to be a clear communication of policies and procedures across the firm, along with the robust mechanisms to ensure that they are carried out effectively, weaknesses are identified, and improvements are made wherever necessary."*

2.17    JMLSG Paragraph 4.6 provides:

*"Although the ML/TF risks facing the firm fundamentally arise through its important that the firm considers its customer risks in the context of the wider ML/TF environment inherent in the jurisdictions in which the firm and its customers operate. Firms should bear in mind that some jurisdictions have close links with other, perhaps higher risk jurisdictions, and where appropriate and relevant regard should be had to this."*

2.18    JMLSG Paragraph 4.9 provides:

"The procedures, systems and controls designed to mitigate assessed ML/TF risks should be appropriate and proportionate to these risks, and should be designed to provide an effective level of mitigation."

2.19    JMLSG Paragraph 4.12 provides:

*"A risk-based approach takes a number of discrete steps in assessing the most cost effective and proportionate way to manage and mitigate the money laundering and terrorist financing risks based by the firm.  These steps are to:*

> *identify the money laundering and terrorist financing risks that are relevant to the firm;*

> *assess the risks presented by the firm's particular*

> *customers and any underlying beneficial owners\*;*

> *products;*

> *delivery channels;*

> *geographical areas of operation;*

> *design and implement controls to manage and mitigate these assessed risks, in the context of the firm's risk appetite;*

> *monitor and improve the effective operation of these controls; and*

> *record appropriately what has been done, and why.*

*\* In this Chapter, references to 'customer' should be taken to include beneficial owner, where appropriate."*

2.20    JMLSG Paragraph 4.13 provides:

*"Whatever approach is considered the most appropriate to the firm's money laundering/terrorist financing risk, the broad objective is that the firm should know at the outset of the relationship who their customers are, where they operate, what they do, their expected level of activity with the firm and whether or not they are likely to be engaged in criminal activity. The firm then should consider how the profile of the customer's financial behaviour builds up over time, thus allowing the firm to identify transactions that may be suspicious."*

56

2.21    JMLSG Paragraph 4.20 provides:

"*In reaching an appropriate level of satisfaction as to whether the customer is acceptable, requesting more and more identification is not always the right answer – it is sometimes better to reach a full and documented understanding of what the customer does, and the transactions it is likely to undertake. Some business lines carry an inherently higher risk of being used for ML/TF purposes than others.*"

2.22    JMLSG Paragraph 4.21 provides:

"*However, as stated in paragraph 5.2.6, if a firm cannot satisfy itself as to the identity of the customer; verify that identity; or obtain sufficient information on the nature and intended purpose of the business relationship, it must not enter into a new relationship and must terminate an existing one.*"

2.23    JMLSG Paragraph 4.22 provides:

"*While a risk assessment should always be performed at the inception of a customer relationship (although see paragraph 4.16 below), for some customers a comprehensive risk profile may only become evident once the customer has begun transacting through an account, making the monitoring of transactions and on-going reviews a fundamental component of a reasonably designed RBA.  A firm may also have to adjust its risk assessment of a particular customer based on information received from a competent authority.*"

2.24    JMLSG Paragraph 4.25 provides:

"*For firms which operate internationally, or which have customers based or operating abroad, there are additional jurisdictional risk considerations relating to the position of the jurisdictions involved, and their reputation and standing as regards the inherent ML/TF risk, and the effectiveness of their AML/CTF enforcement regime.*"

2.25    JMLSG Paragraph 4.50 provides:

"*Where a customer is assessed as carrying a higher risk, then depending on the product sought, it will be necessary to seek additional information in respect of the customer, to be better able to judge whether or not the higher risk that the customer is perceived to present is likely to materialise. Such additional information may include an understanding of where the customer's funds and wealth have come from. Guidance on the types of additional information that may be sought is set out in section 5.5.*"

2.26    JMLSG Paragraph 4.51 provides:

"*Where the risks of ML/TF are higher, firms must conduct enhanced due diligence measures consistent with the risks identified. In particular, they should increase*

57

*the degree and nature of monitoring of the business relationship, in order to determine whether these transactions or activities appear unusual or suspicious. Examples of EDD measures that could be applied for higher risk business relationships include:*

> ➢ *Obtaining, and where appropriate verifying, additional information on the customer and updating more regularly the identification of the customer and any beneficial owner*

> ➢ *Obtaining additional information on the intended nature of the business relationship*

> ➢ *Obtaining information on the source of funds or source of wealth of the customer*

> ➢ *Obtaining information on the reasons for intended or performed transactions*

> ➢ *Obtaining the approval of senior management to commence or continue the business relationship*

> ➢ *Conducting enhanced monitoring of the business relationship, by increasing the number and timing of controls applied, and selecting patterns of transactions that need further examination*

> ➢ *Requiring the first payment to be carried out through an account in the customer's name with a bank subject to similar CDD standards"*

2.27    JMLSG Paragraph 4.61 provides:

"*Firms must document their risk assessments in order to be able to demonstrate their basis, keep these assessments up to date, and have appropriate mechanisms to provide appropriate risk assessment information to competent authorities.*"

**Enhanced due diligence**

2.28    JMLSG Paragraph 5.5.1 provides:

"*A firm must apply EDD measures on a risk-sensitive basis in any situation which by its nature can present a higher risk of money laundering or terrorist financing. As part of this, a firm may conclude, under its risk-based approach, that the information it has collected as part of the customer due diligence process (see section 5.3) is insufficient in relation to the money laundering or terrorist financing risk, and that it must obtain additional information about a particular customer, the customer's beneficial owner, where applicable, and the purpose and intended nature of the business relationship.*"

2.29    JMLSG Paragraph 5.5.4 provides:

58

*"In practice, under a risk-based approach, it will not be appropriate for every product or service provider to know their customers equally well, regardless of the purpose, use, value, etc. of the product or service provided. Firms' information demands need to be proportionate, appropriate and discriminating, and to be able to be justified to customers."*

2.30    JMLSG Paragraph 5.5.5 provides:

*"A firm should hold a fuller set of information in respect of those business relationships it assessed as carrying a higher money laundering or terrorist financing risk, or where the customer is seeking a product or service that carries a higher risk of being used for money laundering or terrorist financing purposes."*

2.31    JMLSG Paragraph 5.5.6 provides:

*"When someone becomes a new customer, or applies for a new product or service, or where there are indications that the risk associated with an existing business relationship might have increased, the firm should, depending upon the nature of the product or service for which they are applying, request information as to the customer's residential status, employment and salary details, and other sources of income or wealth (e.g., inheritance, divorce settlement, property sale), in order to decide whether to accept the application or continue with the relationship. The firm should consider whether or not there is a need to enhance its activity monitoring in respect of the relationship. A firm should have a clear policy regarding the escalation of decisions to senior management concerning the acceptance or continuation of high-risk business relationships."*

2.32    JMLSG Paragraph 5.5.9 provides:

*"The ML Regulations prescribe three specific types of relationship in respect of which EDD must be applied.  They are:*

> ➢ *where the customer has not been physically present for identification purposes (see paragraphs 5.5.10ff);*

> ➢ *in respect of a correspondent banking relationship (see Part II, sector 16:  Correspondent banking);*

> ➢ *in respect of a business relationship or occasional transaction with a PEP (see paragraph 5.5.18ff)."*

**Reliance on third parties**

2.33    JMLSG Paragraph 5.6.4 provides:

*"The ML Regulations expressly permit a firm to rely on another person to apply any or all of the CDD measures, provided that the other person is listed in Regulation 17(2), and that consent to be relied on has been given (see paragraph 5.6.8). The relying firm, however, retains responsibility for any failure to comply with a requirement of the Regulations, as this responsibility cannot be delegated."*

2.34    JMLSG Paragraph 5.6.14 provides:

*"Whether a firm wishes to place reliance on a third party will be part of the firm's risk-based assessment, which, in addition to confirming the third party's regulated status, may include consideration of matters such as:*

> *its public disciplinary record, to the extent that this is available; the nature of the customer, the product/service sought and the sums involved; any adverse experience of the other firm's general efficiency in business dealings; any other knowledge, whether obtained at the outset of the relationship or subsequently, that the firm has regarding the standing of the firm to be relied upon."*

2.35    JMLSG Paragraph 5.6.16 provides:

*"In practice, the firm relying on the confirmation of a third party needs to know:*

> *the identity of the customer or beneficial owner whose identity is being verified; the level of CDD that has been carried out; and confirmation of the third party's understanding of his obligation to make available, on request, copies of the verification data, documents or other information.*

*In order to standardise the process of firms confirming to one another that appropriate CDD measures have been carried out on customers, guidance is given in paragraphs 5.6.30 to 5.6.33 below on the use of pro-forma confirmations containing the above information."*

2.36    JMLSG Paragraph 5.6.24 provides:

*"A firm must also document the steps taken to confirm that the firm relied upon satisfies the requirements in Regulation 17(2). This is particularly important where the firm relied upon is situated outside the EEA."*

2.37    JMLSG Paragraph 5.6.25 provides:

*"Part of the firm's AML/CTF policy statement should address the circumstances where reliance may be placed on other firms and how the firm will assess whether the other firm satisfies the definition of third party in Regulation 17(2) (see paragraph 5.6.6)."*

**Ongoing Monitoring**

2.38    JMLSG Paragraph 5.7.1 provides:

*"Firms must conduct ongoing monitoring of the business relationship with their customers. Ongoing monitoring of a business relationship includes:*

60

> ➢ *Scrutiny of transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the firm's knowledge of the customer, his business and risk profile; Ensuring that the documents, data or information held by the firm are kept up to date."*

2.39    JMLSG Paragraph 5.7.2 provides:

*"Monitoring customer activity helps identify unusual activity. If unusual activities cannot be rationally explained, they may involve money laundering or terrorist financing. Monitoring customer activity and transactions that take place throughout a relationship helps firms know their customers, assist them to assess risk and provides greater assurance that the firm is not being used for the purposes of financial crime."*

2.40    JMLSG Paragraph 5.7.3 provides:

*"The essentials of any system of monitoring are that:*

> ➢ *it flags up transactions and/or activities for further examination;*

> ➢ *these reports are reviewed promptly by the right person(s); and*

> ➢ *appropriate action is taken on the findings of any further examination.*

2.41    JMLSG Paragraph 5.7.4 provides:

*"Monitoring can be either:*
> ➢ *in real time, in that transactions and/or activities can be reviewed as they take place or are about to take place, or*

> ➢ *after the event, through some independent review of the transactions and/or activities that a customer has undertaken*

*and in either case, unusual transactions or activities will be flagged for further examination."*

2.42    JMLSG Paragraph 5.7.7 provides:

*"In designing monitoring arrangements, it is important that appropriate account be taken of the frequency, volume and size of transactions with customers, in the context of the assessed customer and product risk."*

2.43    JMLSG Paragraph 5.7.8 provides:

*"Monitoring is not a mechanical process and does not necessarily require sophisticated electronic systems. The scope and complexity of the process will be influenced by the firm's business activities, and whether the firm is large or small. The key elements of any system are having up-to-date customer information, on*

*the basis of which it will be possible to spot the unusual, and asking pertinent questions to elicit the reasons for unusual transactions or activities in order to judge whether they may represent something suspicious."*

**JMLSG Part II – Wholesale Markets**

**Types of Risk**

2.44    JMLSG Part 2 Paragraph 18.14 provides:

*"OTC and exchange-based trading can also present very different money laundering risk profiles. Exchanges that are regulated in equivalent jurisdictions, are transparent and have a central counterparty to clear trades, can largely be seen as carrying a lower generic money laundering risk. OTC business may, generally, be less well regulated and it is not possible to make the same generalisations concerning the money laundering risk as with exchange-traded products. For example, trades that are executed as OTC but then are centrally cleared, have a different risk profile to trades that are executed and settled OTC. Hence, when dealing in the OTC markets firms will need to take a more considered risk-based approach and undertake more detailed risk-based assessment."*

2.45    JMLSG Part 2 Paragraph 18.21 provides:

*"Firms may also wish to carry out due diligence in respect of any introducing brokers who introduce new customers or other intermediaries and consider whether there are any red flags in relation to corruption risks."*

## ANNEX C:  401(k) Funds

Employer Created 401(k) Plans

A 401(k) is a qualified profit sharing plan that allows employees to contribute a portion of their wages to individual retirement accounts. Employers can also contribute to employees' accounts. Any money that is contributed to a 401(k) below the annual contribution limit is not subject to income tax in the year the money is earned, but then is taxable at retirement. For example, if John Doe earns $100,000 in 2018, he is allowed to contribute $18,500, which is the 2018 limit, to his 401(k) plan. If he contributes the full amount that he is allowed, then although he earned $100,000, his taxable income for income tax purposes would be $81,500. Then, he would pay income tax upon any money that he withdraws from his 401(k) at retirement. If he withdraws any money prior to age 59 1/2, he would be subject to various penalties and taxes.

Contribution to a 401(k) plan must not exceed certain limits described in the Internal Revenue Code. The limits apply to the total amount of employer contributions, employee elective deferrals and forfeitures credits to the participant's account during the year. The contribution limits apply to the aggregate of all retirement plans in which the employee participates. The contribution limits have been increased over time. Below is a chart of the contribution limits:

| Year | Employee Contribution Limit | Employer Contribution Limit | Total Contribution | Catch Up Contribution (only for individuals Age 50+) |
|------|------|------|------|------|
| 1999 | $10,000 | $20,000 | $30,000 | 0 |
| 2000 | $10,500 | $19,500 | $30,000 | 0 |
| 2001 | $10,500 | $24,500 | $35,000 | 0 |
| 2002 | $11,000 | $29,000 | $40,000 | $1,000 |
| 2003 | $12,000 | $28,000 | $40,000 | $2,000 |
| 2004 | $13,000 | $28,000 | $41,000 | $3,000 |
| 2005 | $14,000 | $28,000 | $42,000 | $4,000 |
| 2006 | $15,000 | $29,000 | $44,000 | $5,000 |
| 2007 | $15,500 | $29,500 | $45,000 | $5,000 |
| 2008 | $15,500 | $30,500 | $46,000 | $5,000 |
| 2009 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2010 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2011 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2012 | $17,000 | $33,500 | $50,000 | $5,500 |
| 2013 | $17,500 | $34,000 | $51,000 | $5,500 |
| 2014 | $17,500 | $34,500 | $52,000 | $5,500 |
| 2015 | $18,000 | $35,000 | $53,000 | $6,000 |

If an individual was aged 30 in 1999, the absolute maximum that he could have contributed including the maximum employer contributions would be $746,000.

Minimum Age Requirements

In the United States, the general minimum age limit for employment is 14. Because of this, an individual may make contributions into 401(k) plans from this age if the terms of the plan allow it. The federal government does not legally require employers to include employees in their 401(k) plans until they are at least 21 years of age. If you are at least 21 and have been working for your employer for at least one year, your employer must allow you to participate in the company's 401(k) plan.  As a result, some employers' plans will not allow individuals to invest until they are at least 18 or 21 depending upon the terms of the plan.

One-Participant 401(k) Plans

A one-participant 401(k) plan are sometimes called a solo 401(k).  This plan covers a self-employed business owner, and their spouse, who has no employees. These plans have the same rules and requirements as other 401(k) plans, but the self-employed individual wears two hats, the employer and the employee.

---

[1] Rounded to the nearest £100 in line with FCA policy.

## ANNEX D: REPRESENTATIONS

1.    A summary of Sapien's key representations (in italics) and the Authority's conclusions in respect of them, are set out below.

**Step 1 of the penalty calculation – disgorgement**

2.    *Sapien disagrees with the Authority's proposal that the penalty should include a figure for disgorgement of £297,044, being what it said were the financial benefits derived by Sapien directly from its breaches. In fact, the disgorgement figure ought to be zero because Sapien did not derive any such benefits. Sapien provided the Authority with accounting documents reviewed by independent accountants who confirmed that the figures had been properly extracted from Sapien's books and that the profit and loss account and balance sheet had been reviewed for reasonableness. These demonstrated that, while £297,000 of revenue technically came into Sapien from the Solo business by way of commissions, most was instantly paid out, under pre-agreed contractual terms, in fees of £94,000 to the team of individuals working on the trading desk, and custodian and consultant fees of €40,000 to Solo. In addition, Sapien held part of the revenue (£84,000) on account of further custodian and consultant fees due to Solo. While it did not pay these, it applied this sum towards the payment of legal costs incurred in relation to the Solo business. After deduction of these sums, Sapien received a net revenue of £94,000 from the Solo business, plus the £84,000 held on account. Its accounting policy was to recognise only net revenue as income.*

3.    *In addition, in arriving at a revenue figure for disgorgement purposes, there should be deducted the remainder of the legal fees paid in connection with the Solo business, namely £297,000. Once these are deducted, it can be seen that, rather than receiving any actual benefit from the Solo business, Sapien received a direct loss of £119,000. The disgorgement amount should be zero.*

4.    *Sapien does not consider that the gross commission for facilitating the Solo Trading should be used as the figure for disgorgement. In the market abuse case of FCA v Da Vinci, the judge adopted a net revenue approach, stating that he did not accept that a person who had committed market abuse should be required to disgorge benefits that they had not received. In this case, it cannot be said that Sapien received a benefit from the funds that were paid out straight away.*

5.    The Authority has considered the information provided by Sapien to determine which is the appropriate figure to calculate as the financial benefit for disgorgement. The

Authority considers that while the gross commission from the Solo business is the starting point for the appropriate figure for disgorgement, in all the circumstances of this case, Sapien's financial benefit ought to be calculated as that amount minus the sums paid out in respect of fees to the brokers and the custodian and consultant fees to Solo. The Authority is satisfied that the net figure is appropriate in this case because of Sapien's particular business structure, notably its contracts with independent, self- employed brokers which were specifically introduced on this business model, which predated the Solo clients, under which they were entitled to recoup their commission share. The Authority accepts Sapien's argument that it did not receive a benefit from those funds, notwithstanding the fact they were technically received by Solo before being paid on. It considers a similar approach should be taken in this case to the custodian and consultant fees. The Authority considers that the £84,000 held by Sapien as provision towards further payments due to custodians and consultants also forms part of the relevant revenue, as these monies were a benefit received by Sapien. This gives a direct financial benefit of £178,000.

6.  The Authority does not agree that it is appropriate to deduct legal fees incurred in connection with the Solo business when calculating the revenue figure for the purposes of disgorgement.

**Step 2 of the penalty calculation – seriousness**

7.  *No risk was caused to consumers by Sapien's breaches. The Authority has acknowledged that the fraud was a sophisticated international financial crime, which has impacted other banks and brokers. Sapien was an innocent victim, and took responsibility because of the severity of the issue, and has since invested in corrective procedures.*

8.  *Sapien's pre-existing accounting policy was to only recognise net revenue as its income for its broking business. The net revenue figure (as explained and calculated above) should also be used for the purposes of ascertaining the relevant revenue for the purposes of the Step 2 calculation, and accordingly the appropriate figure is zero.*

9.  The Authority recognises that there was no evidence of direct consumer harm arising from the breaches, though considers that Sapien ought to have been aware of the potential for a firm of its nature to be used for illegitimate purposes, and the potential for loss to the public purse.

10. The Authority considers that Sapien's breaches revealed weaknesses throughout the firm's procedures and controls that were serious and systemic, and also created a

significant risk that a financial crime would be facilitated.

11. The Authority will ordinarily take the revenue figure for the purposes of DEPP 6.5A.2G as being the revenue figures prepared by the firm in accordance with the firm's accounting policies. The Authority recognises that Sapien received £94,000 of revenue from the Solo business. The Authority also considers it appropriate in the particular circumstances of this case to include in the revenue figure the £84,000 due to Solo that Sapien received, as that sum was retained "on provision" by Sapien and thus became part of its revenue. The Authority does not agree that it is appropriate to deduct legal fees paid by Sapien in connection with the business represented by that revenue, as they do not reduce the revenue actually received by Sapien. The Authority considers that £178,000 is the relevant revenue figure for the Step 2 calculation.

**Step 3 of the penalty calculation – Mitigating features**

12. *Sapien has accepted its mistakes, and its breaches were neither intentional nor malicious.*

13. *Additionally, Sapien has taken responsibility for its mistakes by instructing legal and compliance consultants at great expense to rectify its practices. Sapien engaged external consultants and incurred expenses of more than £500,000 on legal and compliance costs in order to improve the firm's systems and processes. Sapien also engaged consultants to review and suggest improvements to its CASS systems and processes, as well as its risk management system. Sapien undertook the compliance review voluntarily, which ought to be a mitigating factor, in the same way that the remedial action taken by RBS was identified as a mitigating factor in the RBS Final Notice dated November 2014.*

14. *Sapien takes responsibility for its failings in its systems and controls, and it is only with the benefit of hindsight that the shortcomings in relation to the Solo business have become apparent.*

15. *Sapien's shareholders are not seeking to avoid a penalty; they did not draw down the reserves as dividends, demonstrating the shareholders and directors' commitment to the firm's improvement.*

16. The Authority accepts Sapien's position that its breaches were not intentional or malicious. But it regards them as serious, for the reasons set out in this Notice.

17. Although Sapien has taken steps to improve its systems and processes, the Authority considers that these were steps to be expected of Sapien, and so do not merit any mitigation discount. The Authority noted that, as is apparent from the Final Notice in

the case referred to, RBS had taken significantly more steps to remedy their breaches than Sapien has done, such as introducing an IT Resilience programme, taking the initiative to launch a customer and non-customer redress and remuneration programme. The Authority considers that Sapien ought to have been aware from the JMLSG Guidance and the Financial Crime Guide, of how to implement good practices in managing and mitigating money laundering risks, monitoring customer activity and ensuring the firm is not being used to further financial crime.

18.  The Authority does not consider that there are any mitigating factors present. Taking the aggravating factor set out at para 6.22 of this Decision Notice, the Authority considers that an increase of 10% to the step 2 figure is appropriate. The step 3 figure is therefore £29,370.

**Serious Financial Hardship**

19.  *Any financial penalty imposed would cause Sapien to become insolvent. A financial penalty would be a disproportionate outcome and would not assist the Authority in advancing its statutory objectives, especially as Sapien has taken significant steps to improve its systems and controls.*

20.  *Sapien's financial position deteriorated significantly due to certain market events which occurred between 5th and 9th February 2018. Despite attempts to safeguard the firm's capital by holding 2-3 times the margins to cover client positions, the firm tried to liquidate positions to minimise their clients' exposure, but faced difficulties with lack of liquidity and extreme price movements. Sapien's clients were exposed to material losses, and Sapien could not meet its legal obligations to fund shortfalls. Sapien lost a significant amount of capital and had to raise emergency capital to bridge the client money shortfall. The firm had used $6.2million of its capital and borrowed unsecured emergency financing of $7.5million to fund client money shortfalls, which resulted in money being returned to clients in full. Despite a period of 18 months without financial activity, the Firm had to continue to meet its contracted expenses and liabilities whilst the two directors took minimal income from the firm.*

21.  *Sapien is not in a position to seek loans in order to fund the payment of any financial penalty. It has outstanding liabilities for office lease payments. It entered into compromises with its creditors pursuant to which it is contractually obliged to pay a profit share of 80% to the creditors. Any penalty imposed by the Authority would be categorised as an expense to be deducted before arriving at the profit and loss for the financial year (which is currently sufficient to allow it to meet its capital adequacy requirements and rebuild the business), rendering it insolvent.*

22. *The payment of the entire proposed penalty would cause serious financial hardship and the insolvency of the firm.*

23. *Sapien has learnt a salutary lesson, and does not require any additional deterrence, especially as the firm has incurred significant expense and management time towards remedial action. There has been no criminal element to this matter on Sapien's behalf. The seriousness of the breaches does not outweigh the serious financial hardship caused to Sapien. Sapien has been fully co-operative with the Authority, providing thorough and frank disclosure of any documents requested.*

24. DEPP 6.5D.1(2) states that the Authority will only consider whether to reduce a proposed penalty if it would cause serious financial hardship to a firm, if the firm provides verifiable evidence that payment of the penalty will cause them serious financial hardship, and the firm provides full, frank and timely disclosure of the verifiable evidence, and cooperates fully in answering any questions asked by the Authority about its financial position. DEPP 6.5D.4(1) states that the Authority will "*…consider reducing the amount of a penalty if a firm will suffer serious financial hardship as a result of having to pay the entire penalty.*" As set out in DEPP 6.5D.1(3), the onus is on Sapien to satisfy the Authority that payment of the penalty will cause it serious financial hardship.

25. The Authority considers that Sapien has been fully co-operative with the Authority in answering questions about its financial position, and that it has provided full, frank and timely disclosure of evidence of serious financial hardship. The Authority has considered those documents, and is satisfied of Sapien's ongoing liabilities to its creditors, its capital adequacy requirements, and its limited funds available.

26. The Authority considers that a penalty of £219,100 (including the disgorgement element) is the appropriate and correct penalty to impose, given the behaviour of the firm, to mark the Firm's breaches, and for the purposes of deterrence. However, the Authority has taken into account DEPP 6.5D.4(1) and is satisfied from the financial documents updated as of November 2020, that imposing the full penalty figure of £219,100 would render the firm insolvent.

27. However, whilst the Authority accepts Sapien's representations that the full penalty figure would cause it serious financial hardship, the Authority does not consider it appropriate to permit Sapien to retain the financial benefit derived directly from its failings. The Authority therefore considers it appropriate to reduce the penalty figure to the disgorgement element of £178,000 only. The Authority has taken into account Sapien's financial position, and considers that Sapien should be allowed to pay the final

69

penalty figure of £178,000 over a three-year period, with an initial lower payment in the first year.